## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

MAXXAM PARTNERS, LLC, a Delaware
limited liability company, and GLENWOOD
ACADEMY, an Illinois not-for-profit
corporation,

               Plaintiffs,

   v.

COUNTY OF KANE, KANE COUNTY
ZONING BOARD OF APPEALS, and KANE
COUNTY BOARD,

               Defendants.

Case No. 17 C 5707

Hon. Jorge L. Alonso

JURY TRIAL DEMANDED

### ORDER APPROVING AND ENTERING CONSENT DECREE

Before the Court is the parties' Joint Motion to Approve and Enter the Consent Decree [78 and 86]. The parties' motion requests that upon approval and entry of the Consent Decree, except as necessary to enforce the terms of the Settlement Agreement and the Consent Decree, this matter be dismissed with prejudice, with each party to bear its own attorneys' fees and costs. For the reasons stated in open Court, the earlier filed Joint Motion [78] is denied as moot and the later filed Joint Motion [86] is approved and granted. The Court enters and adopts the Consent Decree [86], and incorporates the parties' proposed text, verbatim, below.

### CONSENT DECREE

This Consent Decree ("Decree") is entered by the Court upon the agreement of Plaintiffs Maxxam Partners LLC, its successors and assigns ("Maxxam"), Glenwood Academy, its successors and assigns ("Glenwood" and, together with Maxxam, "Plaintiffs") and Defendants County of Kane, Kane County Zoning Board of Appeals, and Kane County Board (collectively "Defendants" or "Kane County").

### I.    BACKGROUND

On August 4, 2017, Plaintiffs filed a five-count complaint against Defendants alleging that Defendants denied Maxxam's application for a special use to operate an alcoholism and substance abuse treatment facility on the property of the former Glenwood Academy School for Boys' West Campus, located at 41W400 Silver Glen Road in unincorporated Kane County, Illinois, in violation of the Fair Housing Act, 42 U.S.C. § 3601, ("FHA"), Americans with Disabilities Act,

1

42 U.S.C. § 12102, ("ADA"), Rehabilitation Act, 29 U.S.C. § 791, the Fifth and Fourteenth Amendments to the United States Constitution, and state zoning law. Plaintiffs seek declaratory and injunctive relief, compensatory and punitive damages, and attorneys' fees. Plaintiffs' complaint is referred to herein as "the Lawsuit."

Defendants dispute that they wrongfully denied Plaintiffs' application for special use and specifically deny that they discriminated against Plaintiffs' proposed patients on the basis of disability in violation of the FHA, ADA, Rehabilitation Act, the Fifth and Fourteenth Amendments to the United States Constitution, and state zoning law. On October 13, 2017, Defendants filed an Answer to Counts I, II, and III of the Lawsuit, denying the claims and allegations and filed a motion to dismiss Counts IV and V of the complaint. In their response to Defendants' motion to dismiss, Plaintiffs disputed the legal bases for Defendants' motion and withdrew their claim for damages under Count V. On June 19, 2018, the Court denied Defendants' motion to dismiss without prejudice and with leave to refile should the parties not reach a settlement.

The Plaintiffs and Kane County resolved all matters related to this action by entering into a "Settlement Agreement" on August 14, 2018, subject to the entry of this Decree. The Settlement Agreement requires that the Plaintiffs and Defendants jointly submit a request that the Court enter this Decree, and thereby enforce approval of Maxxam's application for the special use, subject to the terms and conditions set forth in Section III, below.

To avoid the uncertainty, delay and expense of complicated litigation, the parties agree that this dispute between them should be resolved upon the terms and conditions set forth in the Settlement Agreement and this Decree. The parties recognize and acknowledge that Defendants do not admit liability in this matter and dispute that they are liable to Plaintiffs for any of the claims and allegations in the Lawsuit. The parties further recognize and acknowledge that this Decree has been negotiated at arms' length and in good faith, that all required notices and procedural and substantive procedures have been provided and followed, and that this Decree is fair, reasonable, in the public interest, and lawful.

The parties agree that, with the entry of this Decree, this case has been settled and all issues and controversies have been resolved to their mutual satisfaction. The parties request this Court to retain jurisdiction to enforce the terms of their Settlement Agreement and this Decree under the authority of *Kokkonen v. Guardian Life Insurance Company of America*, 511 U.S. 375, 381-82 (1994).

**NOW THEREFORE,** pursuant to the authority granted to this Court and to the Defendants by the Illinois Counties Code and Kane County Ordinance §§ 4.8-2, et seq., and upon agreement and consent of the parties, it is hereby **ORDERED**, **ADJUDGED**, and **DECREED** as follows:

## II.    PARTIES

This Decree applies to and is binding upon Maxxam, Glenwood Academy, County of Kane, Kane County Zoning Board of Appeals, Kane County Board, and the members, officials, employees, and agents of those so bound, and as provided in section IV below.

### III.    SPECIAL USE APPROVAL

#### A.    The Subject Property (the "Property")

The subject property has a street address of 41 W 400 Silver Glen Road, St. Charles, Illinois 60175 and is identified under parcel numbers 08-03-100-109; 05-34-300-032; 05-34-400-025. The legal description of the property is attached hereto as <u>Exhibit 1</u>, and is expressly incorporated herein.

#### B.    Special Use Approval

On August 28, 2015, Maxxam applied for a special use permit to operate an alcoholism and substance abuse treatment facility ("the Facility") (the "Application"). The Application, which includes a Rider and tabbed exhibits, is attached hereto as <u>Exhibit 2</u> and incorporated herein by this reference. Pursuant to the Parties' agreement, Maxxam has re-filed, and Kane County has again considered Maxxam's Application for a special use permit to operate the Facility as described in Maxxam's Application on the Property and incorporated therein the Application and all supporting materials previously filed as Petition 4364.

The County Zoning Officer designated the re-filed application submitted by Maxxam as Petition 4462 and properly scheduled a public hearing before the Kane County Zoning Board of Appeals ("ZBA"). The ZBA has properly conducted a public hearing pursuant to the Kane County Zoning Ordinance and Illinois law during which it incorporated the complete public record from Petition 4364 and heard additional testimony and comments; a record of which public hearing can be found on the County website or otherwise made available for public inspection. The County Board represents that it has considered the public record and the findings and recommendations of the Kane County ZBA concerning Petition 4462 and it has determined that Petition 4462 as modified by the terms and conditions set forth in Section III.C below: (i) satisfies all of the standards set forth in Sections 4.8-2(a) through 4.8-2(f) of the Kane County Zoning Ordinance for the approval of a special use permit to operate the Facility on the Property; and (ii) complies with all applicable provisions of the Zoning Ordinance. Accordingly, the County Board approved the terms of this Decree and Petition 4462 as described herein and subject to the conditions described herein pursuant to the Ordinance, attached as <u>Exhibit 3</u>. These approvals give Maxxam the right to operate an alcoholism and substance abuse treatment facility on the Property as described in the Application (Exhibit 2), subject to those conditions set forth in section III.C., below. Maxxam's Application for special use approval pursuant to the Kane County Zoning Ordinance is thereby deemed granted on such terms and conditions.

Based on the parties' representations, the Court finds that Defendants, in approving this Decree, the Settlement Agreement, and Petition 4462, have complied with Illinois law and the Kane County Zoning Ordinance.

In granting its approval for the special use in accordance with this Decree, Defendants do not admit that their previous actions were wrongful or that they discriminated against Plaintiffs' proposed patients on the basis of disability in violation of the FHA, ADA, Rehabilitation Act, the

3

Fifth and Fourteenth Amendments to the United States Constitution, and state zoning law. Further, by adopting Exhibit 3, the Special Use Permit Ordinance, Defendants seek to help aid the public by helping individuals and families who are impacted by addiction. Defendants reserve the right to ensure that the Property is in compliance with all applicable codes and ordinances; provided, however, that the Defendants shall not enforce any restriction that discriminates against Plaintiffs, any resident of the alcoholism and substance abuse treatment facility on the Property, or any person associated with any resident of the alcoholism and substance abuse treatment facility on the Property on the basis of disability or any protected class. This Decree does not waive or vary the application of any other section of Kane County's ordinances, State of Illinois law, or federal law.

## C.     Conditions of Approval

The conditions of approval are intended to ensure that the operation of the approved special use is beneficial to, and does not negatively impact, the health, safety and general welfare of Kane County's residents. To the extent any of the conditions conflict with, or are in contravention of, any Kane County ordinance in existence as of the date of this Decree, or any State of Illinois law, State of Illinois license and operation requirements of Department of Human Services Division of Alcoholism and Substance Abuse Treatment and Intervention Licenses ("DHS"), found at 77 Illinois Administrative Code, Subchapter d, Part 2060 ("Code"), or federal law, the condition is invalid and shall not be enforced.

The parties agree that all conditions contained in this Decree are fair and reasonable, will not cause undue hardship on a party, and are not discriminatory or contrary to law. The parties further agree that prior to the start of operation and thereafter on the annual anniversary date of the start of operation, Maxxam shall provide the Kane County Zoning Officer a non-confidential statement substantially in the form of Exhibit 4 confirming compliance with the conditions listed below. The parties acknowledge and agree that this statement is subject to public disclosure.

Subject to the above, the special use approval is subject to the following conditions:

1.      Maxxam and the Facility shall obtain all necessary licenses from the State of Illinois prior to start of operation, and shall maintain such licenses in good standing during any period of operation. In connection therewith, Maxxam shall comply with the legal and administrative requirements of the Code to the satisfaction of DHS. These requirements shall include, but are not limited to, all restrictions, obligations, undertakings, and requirements of Part 2060 (77 Ill. Admin. Code 2060) that govern any of the following:

   a.    Organization representative and ownership disclosure (*see* Section 2060.207, 209);

   b.    License application, period of licensure, renewal, change of ownership/management, and dissolution (*see* Sections 2060.211, 213, 215, 217, 219, 221, 223, 225, 227);

    c. Facility requirements (*see* Section 2060.305), including those requiring proof of compliance with all local and State health, safety, sanitation, building and zoning codes (*see* Section 2060.305(a)(1)) and life safety codes (*see* Section 2060.305(a)(2)), and those pertaining to emergency and disaster planning and preparedness (*see* Section 2060.305(c));

    d. Records retention (*see* Section 2060.307);

    e. Staff qualifications, training, and personnel requirements and procedures (*see* Section 2060.309, 311, 313);

    f. Quality improvement (*see* Section 2060.315);

    g. Emergency patient care (*see* Section 2060.327);

    h. Incident reporting (*see* Section 2060.331);

    i. Inspections (*see* Section 2060.335);

    j. Medical services (*see* Section 2060.413);

    k. Infectious disease control (*see* Section 2060.415);

    l. Patient assessment, screening and treatment planning (*see* Section 2060.417, 419, 421, 423); and

    m. Continuing recovery planning and discharge (*see* Section 2060.427).

2. To the extent permitted by law, Maxxam shall provide Kane County or its designee with 150 doses of NARCAN (Naloxone) or similar mutually agreeable medication per year for a total of 1,500 doses for a 10-year period, starting on the date one month after the start of operation and thereafter on the annual anniversary of such date.

3. The Special Use Permit approved by the Ordinance specifically and solely applies to the use and operation of all existing buildings on the subject Property as depicted on the site plan labeled "Maxxam Partners, LLC – Site Plan" and as described in the Application and Rider (Exhibit 2). A copy of the "Maxxam Partners, LLC – Site Plan" is separately attached and incorporated hereto as Exhibit 5.

4. Should Maxxam or its successor or assigns desire to add new buildings the parties shall comply with all applicable review and approval procedures in the Kane County Zoning Ordinance, as well as all applicable Kane County Ordinances, Illinois law, and federal and state anti-discrimination laws.

5.      The Facility shall not provide outpatient treatment of methadone patients or any other outpatient program or service unless it is related to a patient's inpatient continuum of care.

6.      Maxxam agrees to provide a level of security that, in the opinion of Maxxam's retained security vendor, is sufficient to protect the facility's residents and the surrounding community.

7.      Maxxam shall comply with Change of Ownership/Management requirements in Section 2060.221 of the Code. Section 2060.221 provides, among other things, that each license issued by the Department of Human Services is not transferable and becomes null and void when there is a change of ownership involving more than 25% of the aggregate ownership interest within a one-year period or a significant change in management. Maxxam agrees to contemporaneously provide the County Zoning Officer with a copy of any notifications sent to the Department of Human Services under Section 2060.221(b). Maxxam agrees to provide to any successor owner(s) a copy of this Decree.

8.      Maxxam shall use reasonable efforts to pursue accreditation for the Facility by the Joint Commission on Accreditation of Health Care Organizations ("JCAHO") and the Commission on Accreditation of Rehabilitation Facilities ("CARF").

9.      Maxxam and the Facility shall comply, as applicable, with all requirements of the Illinois Controlled Substances Act, 720 ILCS 520, and any other applicable federal, state or local law, regulation or code pertaining to the storage, distribution, disposal, and dispensation of any controlled substance.

10.     Maxxam shall comply with the Professional Staff Qualifications requirement provided in Section 2060.309 of the Code. Such compliance includes, in any medically managed or monitored detoxification service that at least one staff member, 24 hours a day, shall be a registered nurse, or a licensed practical nurse or certified emergency medical technician who has completed at least 40 hours of formal training in the field of alcoholism or other substance abuse. Notwithstanding Section 2060.309's staffing requirements, Maxxam agrees to provide a Medical Director as referenced in Section 2060.413(a)(1) on premises at least 30 hours per week.

11.     Within one year of the start of operation, Maxxam shall establish a foundation through the Community Foundation for the Fox River Valley for outreach to the Kane County community in connection with issues pertaining to substance abuse and addiction. Maxxam will fund the foundation at a minimum level of $15,000 per year for a minimum of 10 years.

12.     Maxxam shall comply with all applicable federal, state and local laws, regulations and codes pertaining to wastewater at its facility, including but not

6

limited to the Wastewater Land Treatment Site Regulation Act, 415 ILCS 50/1, all related legal requirements of Kane County, and all related requirements of the Illinois and federal Environmental Protection Agency. Maxxam shall provide to the County any well monitoring/testing reports it receives from the Illinois or federal Environmental Protection Agency and/or any reports it receives from third-party vendors within 30 days of receipt.

13. Maxxam shall comply with Section 2060.305 (g) (1)-(24) of the Code's spacing requirements including that (a) a minimum of 80 square feet is provided in a single bedroom; (b) 60 square feet is provided per bed in a multi-bedroom with no more than four beds per room; and (c) no bunk beds will be used for any detoxification patient.

14. Maxxam shall install a fence substantially in compliance with Exhibit 6. The fence shall be located and installed around the Property 5-yards inside the survey line except for designated floodplain areas, as indicated in Exhibit 6, and across the private road/access drive. The fence shall be a minimum of 4 feet in height and shall be similar to the fence depicted in the photograph in Exhibit 7.

15. Exterior lighting fixtures upon replacement of existing fixtures or upon installation of new fixtures shall be full cut-off and have a color temperature of less than 3,000 Kelvin, provided that such fixtures do not compromise security as determined by the security system provider.

16. All signage related to the Facility shall be restricted to the Property. Further, such signage or advertising shall not be placed on the water tower located on the Property.

17. Maxxam shall pay the Fox River & Countryside Fire/Rescue District or any entity providing emergency medical services (EMS) to the Subject Property, including through any mutual aid agreements (hereinafter collectively the "EMS Entity"), directly for all emergency transport fees for transports to or from the Property, according to the EMS Entity's regular cost recovery and fee schedule in effect at the time of the transport. Maxxam agrees that the EMS Entity can bill Maxxam directly for all such transport fees and that Maxxam shall pay such fees on behalf of its patients and residents directly to the EMS Entity.

## IV. SUCCESSOR OWNERS AND RECORDATION

Plaintiffs and Defendants agree that this Decree, the Settlement Agreement and the Special Use granted herein each shall run with the land and inure to the benefit of and shall be binding upon Maxxam Partners, LLC together with any assigns and/or successors (including any assignee of Maxxam's rights to purchase the Property, under its purchase and sale agreement, or otherwise), and any other tenant or occupant of the Property and any successor owners of Maxxam Partners, LLC or managers of the business. This Decree and the Settlement Agreement shall be recorded

with the Kane County Recorder's Office by Maxxam at Maxxam's sole cost and expense within thirty days of entry of this Decree.

## V. PROCEDURES AND MISCELLANEOUS.

### A. Retention of Jurisdiction.

1. By consent of the parties, the Court shall retain jurisdiction for the purpose of enforcing the terms of this Decree and of the Settlement Agreement.

2. The parties shall comply with all terms of this Decree and the signed Settlement Agreement. The parties agree and acknowledge that this Decree, including its reference to the signed Settlement Agreement and/or any other document, meets all requirements of Federal Rule of Civil Procedure 65(d) to state its terms specifically and to describe in reasonable detail the acts restrained or required, and the parties further agree and acknowledge that they waive any and all challenges to this Decree under Rule 65(d) before this Court and/or on appeal.

3. The parties shall attempt to resolve informally any disputes that may occur under the Decree and/or the Settlement Agreement. If the parties are unable to reach agreement, the issue may be submitted by either party to the Court for resolution.

### B. Integration; Representations and Warranties.

The Settlement Agreement and Decree (together the "Consent Documents") constitute the final, complete and exclusive agreement and understanding between the Plaintiffs and the Defendants with respect to the settlement of this action. The Plaintiffs and the Defendants acknowledge that there are not, and that they are not relying upon, any representations, agreements or understandings relating to the settlement of the matters embodied in the Decree, other than those expressly contained therein. The Plaintiffs and the Defendants acknowledge and represent that they have carefully reviewed the Settlement Agreement and this Decree and the terms thereof, they understand their contents and that they have executed them as their own free and voluntary act after consultation with legal counsel, which have had an opportunity to review the Settlement Agreement and Decree and their terms.

### C. Disputed Liability.

It is understood and agreed that Kane County's consent to this Decree is made in the compromise of a doubtful and disputed claim and that this Decree is not to be construed as an admission of any liability of Kane County, such liability having been expressly denied.

### D. Effect on Parties and Property.

8

This Decree enforces the granting of a special use for the Property and approval of a special use on the foregoing terms and conditions pursuant to Kane County's approval of the application on such terms and conditions, and with the same force and effect as any other special use approved by Kane County in the ordinary course. Except as set forth herein, this Decree is not intended to constitute a waiver by any party of any rights or remedies at law or in equity. As such, the obligations and rights under this Decree run with the Property and belong to both Plaintiffs and any future owners or developers of the Property.

This Decree shall supersede any prior Kane County Board votes or resolutions as they relate to the parties, the Property, the special use application, and the development of an alcoholism and substance abuse treatment facility on the Property.

Upon sale of the property to Maxxam, its successors and assigns, any and all obligations of Glenwood under the Consent Decree are terminated and cease to exist. Maxxam, and Maxxam alone, is responsible for the operation of its facility, and Glenwood is not a necessary or indispensable party to any disputes arising between Kane County and Maxxam regarding the operation of the facility. This paragraph does not, however, affect or relieve Glenwood of its duties and obligations under the Settlement Agreement.

**E. Dismissal.**

Except as necessary to enforce the terms of the Settlement Agreement and Decree, this case is hereby dismissed with prejudice. Each party shall bear its own attorney's fees and costs. The Parties are barred from relitigating any claims raised in this matter or any claims released by the mutual general releases they executed concurrently herewith and/or set out in the Settlement Agreement.

**F. Final Order.**

Upon approval and entry of this Decree by the Court, this Decree shall constitute a final judgment of the Court. The Court finds that there is no just reason for delay and, therefore, enters this judgment as a final judgment.

ENTERED

11/30/18

_____
Jorge L. Alonso
United States District Judge

9

# Exhibit 1

**Exhibit 1**

**To Ordinance Approving the Consent Decree and Settlement Agreement with Maxxam Partners, LLC and Glenwood Academy and Granting a Special Use as Described in Petition No. ____**

THAT PART OF THE SOUTH HALF OF SECTION 34, TOWNSHIP 41 NORTH, RANGE 7 EAST OF THE 3rd PRINCIPAL MERIDIAN AND PART OF THE NORTH HALF OF FRACTIONAL SECTION 3, TOWNSHIP 40 NORTH, RANGE 7 EAST OF THE 3rd PRINCIPAL MERIDIAN ALL DESCRIBED AS FOLLOWS: COMMENCING AT THE NORTHWEST CORNER OF THE SOUTHWEST QUARTER OF SECTION 35, TOWNSHIP 41 NORTH, RANGE 7 EAST OF THE 3rd PRINCIPAL MERIDIAN, THENCE EASTERLY ALONG THE NORTH LINE OF SAID SOUTHWEST QUARTER 339.90 FEET; THENCE SOUTHERLY TO THE SOUTHWEST CORNER OF THE SOUTHWEST QUARTER; THENCE NORTHERLY ALONG THE LAST DESCRIBED COURSE 980.77 FEET TO THE CENTER LINE OF MCDONALD DRIVE; THENCE NORTHWESTERLY AND WESTERLY ALONG SAID CENTER LINE 2884.59 FEET TO A POINT THAT IS 62.70 FEET WESTERLY OF THE EAST LINE OF THE SOUTHWEST QUARTER OF SAID SECTION 34 (MEASURED ALONG SAID CENTER LINE) BEING THE NORTHEAST CORNER OF A TRACT OF LAND CONVEYED TO HENRY O. LARSON AND ELIZABETH V. LARSON BY DEED RECORDED AS DOCUMENT 648085; THENCE SOUTHERLY ALONG THE EASTERLY LINE OF SAID LARSON TRACT 776.0 FEET TO A POINT THAT IS 10.0 FEET NORTHERLY OF THE SOUTHEAST CORNER OF SAID LARSON TRACT; THENCE EASTERLY PARALLEL WITH THE SOUTH LINE OF SAID LARSON TRACT 24.85 FEET; THENCE SOUTHEASTERLY ALONG A LINE FORMING AN ANGLE OF 68°59'52" WITH THE PROLONGATION OF THE LAST DESCRIBED COURSE (MEASURED CLOCKWISE THEREFROM) 101.12 FEET; THENCE SOUTHERLY ALONG A CURVE TO THE RIGHT HAVING A RADIUS OF 210.0 FEET, TANGENT TO THE LAST DESCRIBED COURSE 104.64 FEET; THENCE SOUTHWESTERLY ALONG A CURVE TO THE RIGHT HAVING A RADIUS OF 390.0 FEET, TANGENT TO THE LAST DESCRIBED CURVE, 90.98 FEET; THENCE SOUTHWESTERLY TANGENT TO THE LAST DESCRIBED CURVE 104.0 FEET; THENCE SOUTHERLY ALONG A CURVE TO THE LEFT HAVING A RADIUS OF 360.0 FEET TANGENT TO THE LAST DESCRIBED COURSE 94.87 FEET TO A LINE DRAWN PARALLEL WITH AND 59.25 FEET NORTHERLY OF THE SOUTH LINE (MEASURED AT RIGHT ANGLES THERETO) OF THE SOUTHWEST QUARTER OF SAID SECTION 34 FOR A POINT OF BEGINNING; THENCE EASTERLY ALONG SAID PARALLEL LINE 336.05 FEET; THENCE SOUTHEASTERLY ALONG A LINE FORMING AN ANGLE OF 157°06'37" WITH THE LAST DESCRIBED COURSE (MEASURED COUNTERCLOCKWISE THEREFROM) 1418.0 FEET; THENCE SOUTHERLY ALONG A LINE FORMING AN ANGLE OF 122°50'43" WITH THE LAST DESCRIBED COURSE (MEASURED COUNTERCLOCKWISE THEREFROM) 892.0 FEET; THENCE SOUTHWESTERLY ALONG A LINE FORMING AN ANGLE OF 99°11'29" WITH THE LAST DESCRIBED COURSE (MEASURED COUNTERCLOCKWISE THEREFROM) 1863.0 FEET; THENCE NORTHWESTERLY ALONG A LINE FORMING AN ANGLE OF 142°54'33" WITH THE LAST

DESCRIBED COURSE (MEASURED COUNTERCLOCKWISE THEREFROM) 1448.0 FEET; THENCE NORTHERLY ALONG A LINE FORMING AN ANGLE OF 117°39'28" WITH THE LAST DESCRIBED COURSE (MEASURED COUNTERCLOCKWISE THEREFROM) 867.0 FEET; THENCE NORTHERLY ALONG A LINE FORMING AN ANGLE OF 172°26'59" WITH THE LAST DESCRIBED COURSE (MEASURED COUNTERCLOCKWISE THEREFROM) 741.0 FEET TO SAID PARALLEL LINE; THENCE EASTERLY ALONG SAID PARALLEL LINE 1514.95 FEET TO THE POINT OF BEGINNING, IN KANE COUNTY, ILLINOIS. The property is located at 41W400 Silver Glen Road.

# Exhibit 2

KANE COUNTY DEVELOPMENT DEPARTMENT
Zoning Division, Kane County Government Center
719 Batavia Avenue
Geneva, Illinois 60134
Office (630) 444-1236  Fax: (630) 232-3411

*Received Date*

# APPLICATION FOR ZONING MAP AMENDMENT AND/OR SPECIAL USE

*Instructions:*

*To request a map amendment (rezoning) for a property, complete this application and submit it with all required attachments to the Subdivision and Zoning Division.*

*When the application is complete, we will begin the review process.*

## The information you provide must be complete and accurate.  If you have a question please call the subdivision and zoning division, and we will be happy to assist you.

| 1. Property Information: | Parcel Number (s): 08-03-100-009; 05-34-300-032; 05-34-400-025 |
|---|---|
| | Street Address (or common location if no address is assigned): 41W400 Silver Glen Road, St. Charles, IL 60175 |

| 2. Applicant Information: | Name Maxxam Partners, LLC | Phone (630) 513-9800 |
|---|---|---|
| | Address c/o Andrew E. Kolb, Esq. & F. Keith Brown | Fax (630) 513-9802 |
| | Meyers & Flowers, LLC 3 N. Second Street, Suite 300 St. Charles, IL 60174 | Email akolb@vlklawfirm.com |

| 3. Owner of record information: | Name Glenwood Academy, an Illinois not-for-profit corporation | Phone (708) 754-0175 |
|---|---|---|
| | Address c/o Mary Hollie, President & CEO, Glenwood Academy | Fax (708) 754-0175 |
| | 500 West 187th Street, Glenwood, IL 60425 | Email mhollie@glenwoodschool.org |

## Zoning and Use Information:

2040 Plan Land Use Designation of the property:  Institutional / Private Open Space

Current zoning of the property:  F District-Farming

Current use of the property:  Vacant- Formerly Glenwood School

Proposed zoning of the property:  F District - Farming. No proposed change

Proposed use of the property:  Private-pay alcoholism and substance abuse treatment facility

If the proposed Map Amendment is approved, what improvements or construction is planned?  (An accurate site plan may be required)

## Attachment Checklist

- ☑ Plat of Survey prepared by an Illinois Registered Land Surveyor.
- ☑ Legal description
- ☑ Completed Land Use Opinion application (Available in pdf form at www.kanedupageswed.org/luo.pdf), as required by state law, mailed to:  The Kane Dupage Soil and Water Conservation District, 545 S. Randall Road, St. Charles, IL  60174.
- ☑ Endangered Species Consultation Agency Action Report (available in pdf form at www.dnr.state.il.us/orep/nrrc/aar.htm) to be filed with the Illinois Department of Natural Resources.
- ☑ List of record owners of all property adjacent & adjoining to subject property
- ☑ Trust Disclosure (If applicable)
- ☑ Findings of Fact Sheet
- ☑ Application fee (make check payable to Kane County Development Department)

I (we) certify that this application and the documents submitted with it are true and correct to the best of my (our) knowledge and belief.

_Mary H Hollis_        8/27/15
Record Owner            Date

_Andrew Tab Esq._        8/27/15
Applicant or Authorized Agent      Date

# Findings of Fact Sheet – Map Amendment and/or Special Use

- *The Kane County Zoning Board is required to make findings of fact when considering a rezoning. (map amendment)*
- *You should "make your case" by explaining specifically how your proposed rezoning relates to each of the following factors.*

Maxxam Partners, LLC _____  Date  8/28/15
*Name of Development/Applicant*  *Date*

1. How does your proposed use relate to the existing uses of property within the general area of the property in question?
   See attached Rider.

2. What are the zoning classifications of properties in the general area of the property in question?
   See attached Rider.

3. How does the suitability of the property in question relate to the uses permitted under the existing zoning classification?
   See attached Rider.

4. What is the trend of development, if any, in the general area of the property in question?
   See attached Rider.

5. How does the projected use of the property, relate to the Kane County 2040 Land Use Plan?
   See attached Rider.

# Findings of Fact Sheet – Special Use



**Special Use Request** _____     **Date** _____

- *The Kane County Zoning Board is required to make findings of fact when considering a special use.*

- *Special Uses shall be considered at a public hearing before the Zoning Board of Appeals. In its report of findings of facts, recommendations shall be made to the County Board following the public hearing. The Zoning Board __will not__ recommend a special use __unless__ the following items are addressed:*

6. Explain how the establishment, maintenance or operation of the special use will not be detrimental to or endanger the public health, safety, morals, comfort or general welfare.
   See attached Rider.

7. Explain how the special use will not be injurious to the use, enjoyment and value of other property in the immediate vicinity.
   See attached Rider.

8. Explain how the special use will not impede the normal, orderly development and improvement of the surrounding property.
   See attached Rider.

9. Will adequate utility, access roads, drainage and other necessary facilities be provided? Please explain:
   See attached Rider.

10. Will adequate measures be provided for ingress and egress so designed to minimize the traffic and congestion? Please explain:

See attached Rider.

11. Will the special use conform to the regulations of the district in which it is located? Please explain:

See attached Rider.

<u>**RIDER TO APPLICATION FOR SPECIAL USE**</u>

Applicant, Maxxam Partners, LLC, a Delaware limited liability company ("**Applicant**"), for its Application for a Special Use, states as follows:

<u>**Property Information:**</u>

      Parcel Number(s): 08-03-100-009; 05-34-300-032; 05-34-400-025
      Street Address: 41W400 Silver Glen Road, St. Charles, Illinois 60175

<u>**Applicant / Contract Purchaser Information:**</u>

      Name: Maxxam Partners, LLC
      Address: c/o Andrew E. Kolb, Esq. & F. Keith Brown, Esq., Meyers & Flowers, LLC, 3 Second Street, Suite 300, St. Charles, Illinois 60174
      Phone: Andrew E. Kolb: 630-513-9800
      Fax:  Andrew E. Kolb: 630-513-9802
      Email: Andrew E. Kolb: <u>akolb@vlklawfirm.com</u>

      Applicant's Team: Copies of the biographies and/or curriculum vitae of Applicant's team members are incorporated herein as **Exhibit A.**

<u>**Co-Applicant / Owner of Record Information:**</u>

      Name: Glenwood Academy, an Illinois not-for-profit corporation.
      Address: c/o Mary Hollie, President, Glenwood Academy, 500 West 187th Street, Glenwood Illinois, 60425.
      Phone: c/o Mary Hollie, President, Glenwood Academy; (708) 576-5054
      Fax: c/o Mary Hollie, President, Glenwood Academy; (708) 756-5676
      Email: c/o Mary Hollie, President, Glenwood Academy; mhollie@glenwoodschool.org.

## I.  General Background

1.1    <u>The Property</u> – The Subject Property is comprised of approximately 120.0574 acres and is located at 41W400 Silver Glen Road, St. Charles, in unincorporated Kane County, Illinois. The Subject Property is located south of McDonald Road, west of Corron Road and north of Silver Glen Road, in unincorporated Kane County.  The ("**Subject Property**") is legally described in **Exhibit B** attached hereto.

1.2    <u>Previous Use</u> – Kane County approved the existing special use for the Subject Property on May 9, 1989.  The approval granted the Glenwood School for Boys (subsequently renamed, Glenwood Academy) permission to operate a private boarding school for at-risk children on the Subject Property.  The special use has existed since 1989 without incident or revocation.  The special use remains in effect; however the Glenwood Academy permanently closed the school in June 2012 and the Subject Property is currently unoccupied.

1.3    <u>Applicable Code Provisions</u> - The Subject Property is located in the **"F" Farming Zoning District** of the Kane County Zoning Ordinance.

Pursuant to Section 25-8-1-2(dd) of the Kane County Zoning Ordinance, Special Uses within the "F" district also include:

"Other uses **similar** to those permitted herein as special uses."

In accordance with Section 25-8-1-2(a) of the Kane County Zoning Ordinance, the enumerated "special uses" in the "F" Farming Zoning Classification include by cross-reference, all "special uses allowed in the R1 District." Thus, all special uses permitted in the "F" district include all special uses permitted in the R1 District by reference.

Pursuant to Section 25-9-5-2(c), the following special use is expressly permitted within the R1 District (and by reference thereby within the "F" Farming District where the Subject Property is Located):

"**Hospitals**, general, for human beings. This may include power plants, residence for nurses and similar facilities."

Pursuant to Section 25-8-1-2(q), Special Uses within the "F" district also include:

"Monasteries, nunneries, religious retreats, **nursing and convalescent homes**, assisted living facilities, boarding schools and orphanages."

Furthermore, Section 5.3(b) of the Kane County Zoning Ordinance states that "no section, clause or provision of this Ordinance is intended nor shall be construed as contrary to the Federal Fair Housing Act," *and it* implicitly acknowledges the County's mandate to provide such accommodations to persons with disabilities.

Additionally, pursuant to Section 5.15 of the County Ordinance, "the Enforcing Officer may allow land-uses which, though not contained by name in a zoning district list of permitted or special uses, are deemed to be similar in nature and clearly compatible with the listed uses."

Applicant submits the legal opinions of Holland & Knight, LLP and Meyers & Flowers, LLC attached herein as **Tab #12** and **Tab #13**, respectively, in support of the zoning analysis outlined above.

1.4    Applicant's Proposed Use - Applicant proposes to use the existing buildings and infrastructure on the Subject Property for a 120-bed exclusively private-pay alcoholism and substance abuse treatment facility. The facility will offer patients a full continuum of care while they reside at Applicant's facility. The average duration of a patient's stay will be between 30 – 90 days. The duration of a patient's stay is determined by the patient's addiction and treatment plan. Applicant will treat all addictions with the exceptions of methamphetamine and sexual addictions. Applicant will also treat patients with eating disorders. Applicant will not accept Medicare or Medicaid. "Private-pay" patients will be pre-screened to ensure that they meet Applicant's patient standards, medically and financially.

2

Applicant's treatment programs are personalized using what evidence tells the staff will work for each particular patient. Applicant's professional staff assesses and diagnoses patients, collaborates with the patient and devises a treatment plan that will meet their individual needs. Among the resources Applicant's staff will use in alcoholism and substance abuse treatment are dialectical behavioral therapy, cognitive behavioral therapy, medication-assisted treatment, psychotherapy, art therapy, and a sobriety curriculum.

The Subject Property is ideally suited for the proposed use as an alcoholism and substance abuse treatment facility. The existing facility (with minor interior cosmetic updates and renovations) provides a private residential setting for patients. Applicant proposes to maintain the original footprint of the former Glenwood Academy and will limit renovation activities solely to the existing structures. No new buildings or structures will be constructed.

Per the submitted aerial overlay (**Tab #7**); there are eight existing residential dormitories that will be used as patient lodges. The eight patient lodges will house patients with separate buildings for men and women. Patient Lodge #1 will be used for "medically managed detoxification." Patient Lodges #2 - #8, will house patients according to their needs and the type of treatment they will be receiving.

The "Dining/Multi-Purpose Building" will be used as a central dining room and a multi-purpose room for movies, motivational speakers, and other group therapy activities. The "Therapy and Activity Building" contains twelve rooms that will be utilized for individual and group therapy sessions, art therapy, music therapy, yoga and meditation. The Applicant considers exercise to be an important component of treatment. As such, the existing Gymnasium will become a 25,000 square foot recreation center for exercise, yoga, basketball, volleyball, and other physical activities. Applicant plans to convert certain interior spaces within the recreation center into modern weight training and cardiovascular fitness rooms.

The facility will be licensed by the Division of Alcoholism and Substance Abuse of the Illinois Department of Human Services and will be accredited by the Joint Commission on Accreditation of Health Care Organizations (JCAHO). The level of care provided will be in accordance with that specified in the American Society of Addiction Medicine's (ASAM) Patient Placement Criteria and with the related administrative code.

## II. Development Requests – Application for a Special Use "similar" to a Hospital and a Nursing and Convalescent Home.

2.0    Development Requests – Applicant requests the following development approvals:

(a) Applicant requests a Special Use to operate the Subject Property as an alcoholism and substance abuse treatment facility in accordance with the ordinances and analysis outlined in Section 2.1, this Rider, and the materials incorporated in Section III hereof; and

(b) Applicant requests "reasonable accommodation" with respect to Applicant's proposed facility. Applicant's proposed alcoholism and substance abuse treatment facility will provide in-patient residential treatment to persons with disabilities who are protected under the terms of the Federal Fair Housing Act.

2.1     <u>Applicable Ordinances</u> – As referenced in Section 1.3 above, the Subject Property is located in the **"F" Farming Zoning District** of the Kane County Zoning Ordinance.

Pursuant to Section 25-8-1-2(dd) of the Kane County Zoning Ordinance, Special Uses within the "F" district also include:

      "Other uses **similar** to those permitted herein as special uses."

In accordance with Section 25-8-1-2(a) of the Kane County Zoning Ordinance, the enumerated "special uses" with the "F" Farming Zoning Classification include by cross-reference, all "special uses allowed in the R1 District." Thus, all special uses permitted in the "F" district include all special uses permitted in the R1 District by reference.

Pursuant to Section 25-9-5-2(c), the following special use is expressly permitted within the R1 District (and by reference thereby within the "F" Farming District where the Subject Property is Located):

**"<u>Hospitals</u>, general, for human beings. This may include power plants, residence for nurses and similar facilities."**

Pursuant to Section 25-8-1-2(q), Special Uses within the "F" district also include:

"Monasteries, nunneries, religious retreats, **<u>nursing and convalescent homes</u>**, assisted living facilities, boarding schools and orphanages."

Furthermore, Section 5.3(b) of the Kane County Zoning Ordinance states that "no section, clause or provision of this Ordinance is intended nor shall be construed as contrary to the Federal Fair Housing Act," *and it* implicitly acknowledges the County's mandate to provide such accommodations to persons with disabilities.

In further support of Applicant's development petition, Applicant requests that the Commission and Board note Section 5.15 of the Kane County Zoning Ordinance. Section 5.15 is evidence that the overall spirit and intent of the Kane County Zoning Ordinance is to permit existing land uses consistent and similar to existing permitted and special uses. More specifically, Section 5.15 vests the Zoning Enforcement Office of Kane County with the authority to examine existing uses in the County that are not enumerated as either permitted or special uses under the Code, and thereafter, to make a determination that the use being examined is allowed based solely upon the fact that it is "similar" to an existing use enumerated under the Zoning Ordinance. This section is consistent with Applicant's development petition.

4

Applicant submits the legal opinions of Holland & Knight, LLP and Meyers & Flowers, LLC attached herein as **Tab #12** and **Tab #13**, respectively, in support of its zoning analysis outlined above.

<u>Analysis of similarity pursuant to Section 25-8-1-2(a)</u> – Applicant's proposed use for the Subject Property as an alcoholism and substance abuse treatment facility is substantially similar to that of a hospital, in terms of both facility operations and Illinois licensure law. These similarities include:

> (a) Compliance with National Fire Protection Association's Life Safety Code,
> (b) Compliance with emergency care regulations,
> (c) Compliance with patient room and bath facility regulations,
> (d) Compliance with food preparation, nutrition, and dining facility regulations,
> (e) Compliance with housekeeping and laundry service regulations,
> (f) Compliance with patient rights standards,
> (g) Compliance with standards for maintenance of patient records,
> (h) Compliance with quality improvement and utilization review regulations,
> (i) Compliance with facility staffing and staff qualification standards,
> (j) Diagnostic services,
> (k) 24-hour observation, monitoring and treatment,
> (l) The administration of medicine,
> (m) Investigation of complaints in patient care,
> (n) Inspections before license renewals; and
> (o) Right to deny a license or impose a moratorium.

### *Murer Consultants, Inc. – Expert Opinion*

Applicant hereby submits the expert opinion of Murer Consultants, Inc. ("Murer Consultants"), in support of Applicant's position that the proposed use as an alcoholism and substance abuse treatment facility is "similar" to a hospital under the Kane County Zoning Ordinance.

Murer Consultants concluded that the proposed facility is similar to a hospital as the term is defined under the Kane County Zoning Ordinance. Murer Consultants based this finding on the fact that the proposed facility substantially meets the definition of a hospital as defined under the Kane County Zoning Ordinance. Murer Consultants concluded that under Illinois licensure law, the facility staffing and service requirements applicable to the proposed facility share similar characteristics as those applicable to hospitals and the services provided by the proposed facility are regularly and customarily provided by hospitals in Illinois. Applicant submits the expert opinion of Murer Consultants attached herein as **Tab #11.**

### *Illinois Legislation*

The Illinois statutes governing the licensure requirements of a hospital directly support the Applicant's position that the Applicant's proposed use as an alcoholism and substance abuse treatment facility is "similar" to a "Hospital" but exempts alcoholism and substance abuse

treatment facilities from being licensed as a hospital. It is clear that the legislature made the distinction to avoid unfairly burdening alcoholism and substance abuse treatment facilities with any unintended hardship.  Furthermore, Illinois law requires facilities providing these services to be licensed *either* as a hospital or as an alcoholism and substance abuse treatment facility.

### *Illinois Hospital Licensing Act*

Section 3(a) of the Hospital Licensing Act provides the legal definition of a "Hospital" in the State of Illinois:

> *"Hospital means any institution, place, building, buildings on a campus, or agency, public or private, whether organized for profit or not, devoted primarily to the maintenance and operation of facilities for the diagnosis and treatment or care of 2 or more unrelated persons admitted for overnight stay or longer in order to obtain medical, including obstetric, psychiatric and nursing, care of illness, disease, injury, infirmity, or deformity."*

Section 3(a)(5) also states  that:

> *"The term "Hospital" does not include:*
>
> *(5) any person or facility required to be licensed pursuant to the Alcoholism and Other Drug Abuse and Dependency Act."*

Applicant's proposed use requires licensure under the Alcoholism and Other Drug Abuse and Dependency Act.  Devoid of the exemption provided under Section 3(a)(5) as mentioned above, the Applicant would have to be licensed as a "Hospital."  Thus, the definitions are so similar that the distinction was made in Section 3(a)(5) of the Illinois Hospital Licensing Act, so that alcoholism and substance abuse treatment facilities would not be burdened with any unintended hardship.

### *Existing Hospital Facilities*

Another factor demonstrating the similarity between a "Hospital" and an "alcoholism and substance abuse treatment facility," is that many existing alcoholism and substance abuse treatment facilities in the State of Illinois are physically located in a hospital or on a campus and *are licensed as hospitals.*  In addition to medically managed detoxification, many licensed hospital facilities also provide inpatient residential alcoholism and substance abuse treatment.

Examples of hospitals that provide in-patient residential alcoholism and substance abuse treatment include:
(a) Captain James A Lovell Federal Heath Care Center, 3001 Green Bay Road, Building 11, North Chicago, 60064;
(b) Loretto Hospital Addiction Center, 645 South Central Avenue, Chicago, Illinois 60644;
(c) Edward J. Hines Veterans Administration Hospital, Substance Abuse Section, 100 5th Avenue, Hines, Illinois;

6

(d) Behavioral Health Services of Central DuPage Hospital, 27 West 350 High Lake Road, Winfield, Illinois 60190;

(e) Saint Bernard Hospital, 326 West 64th Street, Chicago, Illinois 60621;

(f) Holy Family Medical Center, *"Keys to Recovery Program,"* 100 North River Road, Des Plaines, Illinois, 60016,

Analysis of similarity pursuant to Section 25-8-1-2(q) – Applicant's proposed use for the Subject Property as an alcoholism and substance abuse treatment facility is substantially similar to that of a "Nursing and Convalescent Home." In support of the Applicant's proposed use to that of a "Nursing and Convalescent Home," Applicant hereby submits and incorporates herein the legal opinions of Holland & Knight, LLP and Meyers & Flowers, LLC attached herein as **Tab #12** and **Tab #13**, respectively. The Kane County Zoning Ordinance defines "Nursing and Convalescent Home" as "a building and premises for the care of sick, infirm, aged, or injured persons to be housed; or a place of rest for those who are bedfast or need considerable nursing care, but not including hospitals, assisted living facilities or group homes." The law firm, Holland & Knight, states in their legal opinion that "the defined 'Nursing and Convalescent Home' use best describes the residential dwelling arrangements for the residents of the facility." Furthermore, "the patients of the proposed residential alcoholism and substance abuse treatment facility are disabled and sick, and will be housed in seven separate resident lodges. Each lodge is a home or dwelling unit as it contains bedrooms with private bathrooms, a kitchen, and a dining/living room area." Also "the patients' medications will be administered to them in the lodges by the facility's professional staff, the same as in a Nursing Home."

Legal Opinions – In support of Applicant's entitlement to this Special Use and Applicant's request for "reasonable accommodation" under the Federal Fair Housing Act as set forth herein, Applicant hereby submits and incorporates herein the legal opinions of Holland & Knight, LLP and Meyers & Flowers, LLC attached herein as **Tab #12** and **Tab #13**, respectively.

7

III. <u>Submission Materials</u>

Along with the filing of its Application, and in support thereof and in support of all standards applicable to a Special Use and Applicant's development requests as set forth herein, the Applicant submits and incorporates herein the following required attachments and supplemental materials:

| Ex. A | **Principal Biographies** |
|---|---|
| Ex. B | **Legal Description** |
| Tab #1 | **ALTA Survey** |
| Tab #2 | **Kane / DuPage Soil and Water Conservation District Land Use Opinion** |
| Tab #3 | **Land Use Opinion Waiver(s)** |
| Tab #4 | **IDNR – Endangered Species Report** |
| Tab #5 | **Certification of Notice to Adjacent Property Owners / List of Adjacent Property Owners** |
| Tab #6 | **Aerial Photo – *Sidwell*** |
| Tab #7 | **Site Plan Aerial with Building Identifiers** |
| Tab #8 | **Concept Meeting Power Point Presentation** |
| Tab #9 | **Holland & Knight – Legal Opinion** |
| Tab #10 | **Meyers & Flowers, LLC – Legal Opinion** |
| Tab #11 | **Murer Consultants, Inc.- Expert Opinion - "Similarity"** |
| Tab #12 | **Market Impact Study – MaRous & Company** |
| Tab #13 | **Fiscal Impact Study – Poletti and Associates, Inc.** |
| Tab #14 | **Schaeffer & Roland, Inc. – Wastewater System Evaluation** |
| Tab #15 | **KLOA Summary Traffic Evaluation** |
| Tab #16 | **Photographs of Property and Improvements** |
| Tab #17 | **Digital Submission** |
| Tab#18 | **Opinion from John Curtiss of The Retreat** |
| Tab#19 | **Land Use Opinion – J. Christopher Lannert** |
| Tab #20 | **Application Fee / Kane County Application Forms** |

IV. <u>Criteria</u>

**Special Uses -** Section 4.8 of the Kane County Zoning Ordinance sets forth the procedures and criteria for granting a Special Use hereby addressed by the Applicant. Section 4.8-1 states that:

> "*Uses as hereinafter enumerated, which may be proposed for classification as "special uses," shall be considered at a public hearing before the Zoning Board, and its report of findings or fact and recommendations shall be made to the County Board following the public hearing; provided, that the County Zoning Board, in its report of findings or facts and recommendations to the County Board, shall not recommend a special use unless the Zoning Board shall find:*

8

**(a) That the establishment, maintenance or operation of the special use will not be unreasonably detrimental to or endanger the public health, safety, morals, comfort or general welfare;**

The establishment of the specific special use sought here, an upscale, alcoholism and substance abuse treatment facility, will serve to improve the public health, safety, morals, comfort, and general welfare of the community. The proposed facility will provide upscale in-patient residential treatment as well as many opportunities for healthful recreation and recuperation on-site. The facility will commit to participating in substantial community outreach programs with local schools, religious groups and other agencies in an effort to improve alcoholism and substance abuse awareness within the community. The treatment and amenities provided by the proposed facility will improve the health of its patients and aid in their recovery and its outreach programs will aim do the same for members of the community.

To address the safety and comfort of its patients and the community, Applicant will have strict written admittance and discharge policies for all patients. Prior to granting admission to the facility, a phone interview is conducted with the patient seeking treatment. During this initial phone interview, all prospective patients are thoroughly pre-screened by Applicant to ensure that all participants in the treatment programs meet (i) Applicant's financial admissions criteria; and (ii) Applicant's treatment criteria. Once patients are onsite they undergo further screening by staff members to ensure they are medically, socially, and emotionally stable enough to meet the requirements of Applicant's programs. Applicant has strict policies prohibiting guests from leaving the premises unaccompanied prior to completing the program.

In support of the position that the proposed use will not be detrimental to or endanger public health, safety, morals, comfort or general welfare, Applicant hereby submits the expert opinion letter of John H. Curtiss, President of The Retreat, a nonprofit residential alcoholism and substance abuse treatment facility located in Wayzata, Minnesota (**Tab #18**). Mr. Curtiss has 35-years of operational experience and his letter addresses possible concerns that may arise from the County Board and/or community. Mr. Curtiss, states that incomplete stays, voluntary discharges, and "walk-outs" are rare for high-end alcoholism and substance abuse treatment facilities. Mr. Curtiss, states that in his experience those who choose to invest in an expensive treatment program are highly motivated to complete the program successfully and are thus unlikely to leave prematurely. In the case of Applicant's facility, should a patient choose to leave the facility prior to completing the program, Applicant will provide a private car service to transport the patient from the facility to a pre-designated location selected by the patient prior to admission.

The proposed use will also serve to improve the safety and general welfare of the community by providing certainty with respect to the Subject Property. The Subject Property has been vacant since June 2012. The vacant nature of the property has led to numerous reported incidents on the property. These incidents include theft, trespass, loitering, yard waste dumping, and destruction of property. The most recent occurrence took place in April 2015, when criminal damage was reported to the authorities.

9

The Applicant will ensure the safety and security of its patients and the surrounding community by providing both onsite and third party monitoring systems with video cameras at the premises, security guards, and thermal cameras that will monitor the perimeter while maintaining the aesthetics of the surrounding Forest Preserve District.

**(b) That the special use will not be injurious to the use and enjoyment of other property in the immediate vicinity for the purposes already permitted, nor substantially diminish and impair property values within the neighborhood;**

The proposed alcoholism and substance abuse treatment facility will not be injurious to the use and enjoyment of other property in the immediate vicinity for the purposes already permitted. The Applicant proposes to use the Subject Property "as-is" on its existing footprint, and Applicant does not intend to construct any new buildings or perform other exterior improvements which might impede the use or enjoyment of other property in the surrounding area. The only improvements planned for the campus are cosmetic updates to the interiors of the structures.

The proposed special use will not diminish or impair property values within the surrounding area. Applicant has commissioned two separate market impact studies to determine the impact, if any, of the proposed special use on the surrounding property owners. The studies were performed by MaRous & Company, and Poletti and Associates, Inc. and are incorporated herein as **Tab #12** and **Tab #13**, respectively.

*MaRous & Company*

Michael S. MaRous, MAI, CRE has appraised more than $15 billion worth of primarily investment-grade real estate in more than 25 states. Mr. MaRous has provided highest and best use, marketability, and feasibility studies for a variety of properties. Many of the largest redevelopment areas and public projects, including Interstate 355, the O'Hare International Airport expansion, the Midway Airport expansion, and the McCormick Place expansion are part of Mr. MaRous' experience. Mr. MaRous is a former Mayor of Park Ridge, Illinois and a member of the Appraisal Institute, MAI and has published numerous books on the topic of real estate. The complete biography of Mr. MaRous and a list of his representative clients and projects are found within his expert opinion incorporated herein.

Highest and Best Use. The MaRous & Company ("MaRous") Market Impact Analysis study dated August 20, 2015 made a number of findings. Specifically, the study found that the approval of a special use permit for the proposed alcoholism and substance abuse treatment facility is the highest and best use of the property and is less intense than the prior use as a boarding school for at-risk children. According to the study, the facility will provide "on-going maintenance as opposed to a vacant and potentially neglected property, financial benefits to the taxing bodies, and a single access point into the facility. In addition, the client population will be tightly controlled. Therefore, the highest and best use of the existing facility is as a high-end alcoholism and substance abuse treatment facility." The study found that there are few viable options for the use of a property of

this size and character, and that demand for such a property is minimal given that few buyers would have the resources to purchase and operate a facility of this quality and size.

No Negative Effect Upon Surrounding Property Values. The MaRous study also found that the proposed use as an alcoholism and substance abuse treatment facility will not have a measurable negative impact on either, (i) the character; or (ii) the property values of adjoining uses. Specifically, Mr. MaRous conducted a comprehensive "matched pair analysis" of a similar facility in a similar geographic area and a "'Before' and 'After' Value Assessment" on nearby residential property to confirm and conclude that the Applicant's proposed facility will not result in a negative effect upon surrounding monetary property values due to the proximity of Applicant's in-patient residential treatment facility. Furthermore, the study found that the uncertainty created by a vacant facility, and the long-term potential maintenance problems on the current abandoned site appear to be a bigger threat to property values in the area than the proposed treatment facility. MaRous pointed out that there are few viable options for the use of a property of this size and character, and that demand for such a property is minimal given that few buyers would have the resources to purchase and operate a facility of this quality and size.

*Poletti and Associates*

Dr. Peter J. Poletti, Jr., MAI holds degrees from the University of Illinois, Southern Illinois University, and St. Louis University. Dr. Poletti served as an Assistant Professor of geography at the University of Missouri-St. Louis and has taught college courses in both real estate and economics. Poletti is a certified appraiser through the Appraisal Institute and has over 30 years of real estate experience. A list of representative clients and projects on which he has performed analysis can be found within Dr. Poletti's Resume affixed to his expert report incorporated herein.

The study performed by Poletti and Associates, Inc. ("Poletti"), dated June 21, 2015 provides an analysis and evaluation of the Subject Property and surrounding area. The study applied various elements from a variety of techniques to reach conclusions. The techniques used by Poletti include: Hedonic Price Modeling, Multiple Regression Modeling, a Comparison of Averages technique, and Paired Sales Analysis. In Poletti's study, Poletti first created a Target Area together with a nearby Control Area in the vicinity of a currently operating alcoholism and substance abuse treatment facility to determine if the facility had a measurable effect upon property values based upon recent arms-length real estate transactions. In Poletti's study, analysis was made of the Rosecrance Center in Rockford, Illinois and the Timberline Knolls facility in LeMont, Illinois.

Timberline Knolls is a 164-bed alcoholism and substance abuse treatment facility similar to Applicant's proposed facility and is located on 43 wooded acres in LeMont, Illinois. The Timberline Knolls facility was converted into its current use in 2005. The campus is a combination of older and newer structures. Poletti created both a Target Area in close

11

proximity to the facility and a nearby Control Area for comparison. Applying his techniques, Poletti concluded that the presence of the facility had no statistically measurable effect upon property values within the Target Area as compared to the nearby Control Area. In sum, with respect to Timberline Knolls, the presence of the facility did not negatively affect property values.

The Rosecrance Center in Rockford, Illinois is a rehabilitation facility similar to Applicant's proposed facility and is located on a 50 acre site. The Rosecrance Center's facility houses 96 beds within 67,000 square feet and includes a gymnasium and workout facility. The Rosecrance Center's facility is surrounded by farmland and a residential subdivision. In viewing this facility, Poletti applied a comparison of overall average prices technique, a multiple regression analysis and a paired sales analysis. As was the case with Timberline Knolls, Poletti again found that the presence of the Rosecrance Center's facility did not negatively affect property values based upon arm's length transactions.

In addition to the forgoing comparison studies, Poletti also examined the physical characteristics of the Applicant's proposed site in Kane County. Dr. Poletti in his study, concluded that the proposed alcoholism and substance abuse treatment facility will be located to minimize the effect on the property values of the surrounding property. The study focuses in part on the geographic layout of the site and the fact that the site does not appear to be visible from nearby residential properties. Poletti observes that to the south of the Subject Property the closest residential properties are the homes located in the Silver Glen Meadows Subdivision on the north side of Silver Glenn Road. The homes in this subdivision are set back from views of the facility by a combination of distance and existing tree lines.

Importantly, Poletti points out that the facility essentially is screened and is set back from nearby properties with residential uses, a key factor in reaching the conclusion that the facility will have no negative effect upon property values. In this regard, Poletti notes specifically that the facility is located in an area with a high proportion of open space and agricultural land that serves as a setback for adjacent property owners. Poletti points out that the Kane County Forest Preserve adjoins the property on the east, south, west, and partially on the north sides of the property. The designated Forest Preserve property is used to restore and preserve native prairie habitat and will not be developed for more intensive use.

Poletti also notes that the nature of the single point of access to the facility will also help minimize the effect on surrounding property values. The use of only one access point means that traffic to and from the facility will essentially be limited to Silver Glen Road (which was the case with the Glenwood Academy). In further support of the proposition that the single point of access will mitigate diminution of property values in the surrounding area, Applicant submits and incorporates herein the traffic study of Kenig, Lindgren, O'Hara, Aboona, Inc. (as further outlined in detail below in Standards (e) and (d).

Finally, Poletti found that the proposed use provides certainty, specifically the ongoing quality maintenance of an occupied facility, as opposed to vacant property which becomes an attractive nuisance if not maintained.

*Positive Fiscal Impact*

The proposed facility will have a positive fiscal impact on Kane County. The Subject Property is currently owned by Glenwood Academy, an organization that is tax-exempt under IRC §501(c)(3). Due to its tax-exempt status, Glenwood Academy did not pay income taxes to the Internal Revenue Service (IRS) or to the Illinois Department of Revenue. More importantly, Glenwood Academy did not pay real estate taxes to Kane County or its taxing bodies. The Applicant's for-profit proposed use would not be tax-exempt and therefore the Subject Property would return to the real estate tax rolls of Kane County. The return of such a high value property to the tax rolls would provide for an increase in the real estate tax base and generate significant income for the school district, forest preserve district, library district, sanitary district, and other taxing bodies. Over $250,000 of real estate tax revenue generated from the Subject Property will be earmarked for Kane County School District 301 without increasing the number of students in the district. A complete breakdown of property tax revenue is included below:

| Campton Township Taxing District | | |
|---|---|---|
| Purchase Price | $9,750,000 | |
| Estimated Assessment | $3,250,000 | |
| 2014 Tax Rate | 10.365477% | |
| Estimated RE Taxes | $336,878 | |
| | | |
| Kane County | 0.46836% | $15,222 |
| Forest Preserve | 0.31263% | $10,160 |
| Campton Township | 0.555845% | $18,065 |
| Campton Roads | 0.26093% | $8,480 |
| Campton Cemetery | 0.00277% | $90 |
| **Central School District 301** | **7.882872%** | **$256,193** |
| Elgin College 509 | 0.607621% | $19,748 |
| Fox River Fire & Countryside Fire District | 0.274449% | $8,920 |
| Campton Solid Waste | 0.0000% | $0 |
| | 10.365477% | $336,878 |

In addition to the aforementioned taxation benefits, the proposed use of the facility will be a creator of jobs in the surrounding community. The facility will employ and/or contract with between 80-120 people in diverse job functions. The jobs that will be created by this project include medical directors, psychologists, therapists, counselors, registered nurses, receptionists, maintenance workers, as well as janitorial and kitchen

13

staff. The number of high-paying jobs created by the proposed facility will have a positive impact on the local economy. Furthermore, the number of professional jobs created by this facility may also have a positive effect on home values in the surrounding area by increasing the demand for such product due to the professional staff looking for homes close to the facility. Lastly, there will be immediate construction jobs created through the renovation of the existing structures on the campus, as Applicant will bid the renovation work to local contractors.

**(c) That the establishment of the special use will not impede the normal and orderly development and improvement of surrounding property for uses permitted in the district;**

The proposed facility will maintain the vast open space of the Subject Property and will not impede the development and improvement of the surrounding property. The Subject Property is predominately surrounded by property owned by the Kane County Forest Preserve District and thus Applicant's proposed use will not affect in any manner any permitted development in adjacent or nearby areas. The application contains a memorandum authored by land planning expert J. Christopher Lannert of The Lannert Group (attached herein as **Tab #18**). Mr. Lannert is an Illinois registered landscape architect with over 30-years' experience in all facets of land planning. This memorandum provides historical and present day context of the existing conditions that impact the property. Lannert concludes that the Applicant's proposed use will not and cannot affect the normal orderly development or improvement of the surrounding area. Lannert bases this conclusion on a number of factors including:

> (1) That the existing corporate limits of the surrounding communities will control future.

> (2) That the established uses in the area and permitted rights of the underlying zoning, dictate future development.

> (3) That the historical open space policies of the jurisdictions, the existing open space commitments on site, and the abutting Forest Preserve holdings, prevent any transitional impact on adjacent properties.

> (4) The self-contained, inward orientation of the existing facility will not affect future development.

Furthermore, as stated in Standard (b) above, the Market Impact Analyses performed by MaRous and Poletti indicate that the proposed treatment facility will have no measurable negative effect on the value of homes in the surrounding area.

14

**(d) That adequate utility, access roads, drainage and/or other necessary facilities have been or are being provided;**

Adequate utilities, access roads, drainage, and other necessary facilities exist on the Subject Property. The existing infrastructure and improvements were sufficient to serve the prior-existing use, the Glenwood Academy and have been demonstrated to be sufficient to serve the Applicant's proposed special use.

The Subject Property is presently served by a private water and wastewater system, which has been demonstrated to be capable of serving the proposed facility. Sheaffer & Roland, Inc. ("Sheaffer & Roland") conducted an evaluation on the Subject Property's private water and wastewater system. The study concluded that the water, fire, and wastewater systems currently in place are the correct size to accommodate the Applicant's proposed use as a treatment facility. The study found that the existing potable water storage can supply the target population for three days at its maximum demand level, and that the wastewater system is appropriately sized for the proposed facility. The study also concluded that all water systems in place have been well maintained and are in good operating condition. A copy of the report prepared by Sheaffer & Roland, dated May 9, 2015 titled "Glenwood School for Boys and Girls Water and Wastewater System Evaluation" is attached hereto as **Tab #14**.

The Applicant includes a copy of the Summary Traffic Evaluation prepared by Kenig, Lindgren, O'Hara, Aboona, Inc. ("KLOA"), which concludes that given the existing low volume of traffic along Silver Glen Road, additional traffic generated from Applicant's proposed facility will not have a detrimental effect on Silver Glen Road traffic. KLOA also concluded that the existing access drive and westbound right-turn lane on Silver Glen Road will adequately serve the traffic generated from Applicant's proposed facility and that a traffic signal is not warranted or necessary at the intersection of Silver Glen Road and the Access Drive. Given that the Applicant's facility will generate less traffic than the Glenwood Academy, the access road will meet the needs of Applicant. A copy of the traffic evaluation prepared by KLOA dated June 22, 2015 is attached as **Tab #15**.

**(e) That adequate measures have been or will be taken to provide ingress and egress so designed as to minimize traffic congestion in the public streets and roads;**

As stated above in Standard (d), the Subject Property contains adequate means of ingress and egress that were designed to minimize traffic and congestion created by the more-intensive previous use of the property, the Glenwood Academy. The site contains a ½-mile access road that separates the property from Silver Glen Road.

The Applicant includes a copy of the Summary Traffic Evaluation prepared by KLOA, which concludes that given the low volume of traffic along Silver Glen Road, additional traffic generated from Applicant's proposed facility will not have a detrimental impact on Silver Glen Road traffic. KLOA also concluded that the existing access road and westbound right-turn lane on Silver Glen Road will adequately serve the traffic generated from Applicant's proposed facility and that a traffic signal is not warranted or necessary

15

at the intersection of Silver Glen Road and the Access Drive. No additional intersection or roadway improvements will be necessary to accommodate traffic for the site.

A copy of the traffic evaluation prepared by KLOA dated June 22, 2015 is attached as **Tab #15**.

**(f)   That the special use shall in all other respects conform to the applicable regulations of the district in which it is located, except as such regulations may in each instance be modified by the County.**

The Applicant's proposed use conforms to the regulations of the "F" Farming Zoning District of the Kane County Zoning Ordinance. As referenced in Sections 1.3 and 2.1 above, the Subject Property is located in the "F" Farming Zoning District of the Kane County Zoning Ordinance.

Pursuant to Section 25-8-1-2(dd) of the Kane County Zoning Ordinance, Special Uses within the "F" district also include: "Other uses **similar** to those permitted herein as special uses." In accordance with Section 25-8-1-2(a) of the Kane County Zoning Ordinance, the enumerated "special uses" with the "F" Farming Zoning Classification include by cross-reference, all "special uses allowed in the R1 District." Thus, all special uses permitted in the "F" district include all special uses permitted in the R1 District by reference. Pursuant to Section 25-9-5-2(c), the following special use is expressly permitted within the R1 District (and by reference thereby within the "F" Farming District where the Subject Property is Located): **"Hospitals, general, for human beings. This may include power plants, residence for nurses and similar facilities."** Pursuant to Section 25-8-1-2(q), Special Uses within the "F" district also include: "Monasteries, nunneries, religious retreats, **nursing and convalescent homes**, assisted living facilities, boarding schools and orphanages."

Applicant has established that its proposed use of the Subject Property conforms to the regulations set forth under the Kane County Zoning Ordinance and is similar to a "Hospital" and "Nursing and Convalescent Home."

The Applicant's proposed use will provide consistency in ensuring that county regulations will continue in the future. Furthermore, Applicant's proposed use conforms to the Kane County 2040 Lane Plan as described in the **Supplemental Exhibit** incorporated herein. Additionally, the physical features of the site, including soils, drainage, access, utilities, and vegetation demonstrate the Applicant's commitment to land stewardship and the historical goals of Kane County and the objectives of the Forest Preserve District of Kane County are consistent with the philosophy and practicality of the Applicant's proposed use.

Lastly, Applicant has no immediate need or intent to construct additional buildings or make other improvements except those requested by the county and set forth in a special use ordinance, and the special use is an allowed special use in the "F" District. The proposed institutional use is consistent with the prior institutional use for the Glenwood School.

16

### V.  Miscellaneous.

Applicant requests that copies of all notices given to Applicant hereunder (or in connection with the actions requested to be taken herein) be sent to the following parties:

Andrew E. Kolb, Esq.
Meyers & Flowers, LLC
3 N. Second Street, Suite 300
St. Charles, Illinois 60174
Phone: 630-513-9800
Fax: 630-513-9802

**akolb@vlklawfirm.com**

## EXHIBIT A
## APPLICANT'S TEAM

### Maxxam Partners, LLC – Principals

**Mr. Elliott Messing** – Since 1980, Mr. Messing has been involved in the healthcare industry through the ownership of assisted living and alcoholism and substance abuse treatment facilities in Florida. The facilities provide high quality services through the facilities own professional and medical staffs.

The Recovery Village is a luxury alcoholism and substance abuse treatment facility located in Umatilla, Florida, a rural community 40 miles from Orlando. The facility is licensed by the State of Florida and provides a full continuum of care, which includes inpatient residential treatment, eating disorder stabilization, medical detoxification, and individual and group therapy. The facility only accepts private health insurance and self-pay patients.

Mr. Messing has had ownership interests in the following facilities:

**2012 The Recovery Village, Umatilla, Florida**
(80 bed Alcoholism and Substance Abuse and Detoxification Facility)

**2005 The Renaissance, Deerfield Beach, Florida**
(165 bed Assisted Living Facility with a 36 bed Alzheimer's Unit)

**1990 Cresthaven East, West Palm Beach, Florida**
(250 bed Assisted Living Facility with a 45 bed Alzheimer's Unit)

**1980 Carlyle on the Bay, Miami, Florida**
(117 unit Congregate Living Facility)

Prior to his career in healthcare, Mr. Messing served as Senior Vice President of Republic Mortgage Investors, a NYSE Real Estate Investment Trust, where he was responsible for the management, and redevelopment a distressed real estate portfolio. Mr. Messing graduated from the University of Miami School of Business with a Bachelor of Business Administration, *magna cum laude* and J.D. *cum laude* from the University of Miami School of Law Mr. Messing is a member of The Florida Bar and is a Certified Public Accountant (Retired Status).

**Mr. Steven Marco -** Mr. Steven Marco is a fourth generation real estate developer. He has worked on branded real estate development projects connected to the Ritz-Carlton Hotel Company and Six Senses Hotels Resorts Spas. Mr. Marco graduated from Washington University in St. Louis with a Bachelor of Science in Business Administration and an Honors Designation in Management. Mr. Marco is a member of the University of Chicago's Harris School of Public Policy's International Council.

**Maxxam Partners, LLC - Board of Advisors**

**Mr. Billy Zane** – Mr. Billy Zane a native of Chicago and a graduate of Francis W. Parker School is a highly acclaimed actor, producer, artist and entrepreneur.  Mr. Zane has been featured in more than 100 films.  Mr. Zane's role as Caledon Hockley in the 1997 film *Titanic* garnered him a Blockbuster Movie Award as Best Supporting Actor. Among his other best-known credits are *Back to the Future, Dead Calm, Tombstone, Sniper, Zoolander, Orlando, The Phantom,* and *Twin Peaks.* Among the critically acclaimed independent films he has made, he has produced and starred in the celebrated film noir classic *This World, Then the Fireworks* and the silent film *I Woke Up Early the Day I Died,* which he produced with Muse Productions.  Beyond acting, Mr. Zane is a highly reviewed and celebrated abstract expressionist who has recently had solo exhibitions in Los Angeles, London and Miami.  Mr. Zane was recently awarded the 2013 Chicago Man of the Year Award by Men's Journal.  In 2014, Mr. Zane starred as Captain von Trapp in the Lyric Opera of Chicago's, "The Sound of Music."

**Mr. Hill Harper** - Mr. Hill Harper is an award-winning actor, best-selling author, motivational speaker, and philanthropist. Mr. Harper starred on the CBS TV drama CSI: NY from 2004 to 2013. As of March 2013, he joined the USA spy drama Covert Affairs as a new series regular for season four. Mr. Harper is the author of four New York Times bestsellers and he has earned seven NAACP Image Awards for his writing and acting.  Mr. Harper travels frequently as a motivational speaker, addressing a wide range of audiences, including, adults, couples, and business leaders.  In July 2010, he was diagnosed with thyroid cancer. His best-selling book, The Wealth Cure, chronicles the cancer diagnosis and his journey to health. Mr. Harper graduated with his B.A., *magna cum laude* from Brown University and his J.D. *cum laude* from Harvard University Law School and Masters of Public Administration from the John F. Kennedy School of Government at Harvard University.

**Stephen Holtsford, M.D.** - Dr. Stephen Holtsford is the former Medical Staff President and attending physician in the emergency department of Delnor Community Hospital.  He is Medical Director for the Southern Fox Emergency Medical Services System and currently resides in St. Charles, Illinois.  Dr. Holtsford is the past Chair and a current member of Region IX's Emergency Medical Services Advisory Council, an Illinois council that serves as an advisory body to the Department of Public Health.  He currently serves on the Continuing Medical Education Committee for Delnor Community Hospital.  Dr. Holtsford is a past President of the Board of Directors of the Tri-City Health Partnership, a no-cost medical clinic serving the disadvantaged in Kane County.  Dr. Holtsford has continued to serve as member of the Board of Directors and volunteer physician of the Tri-City Health Partnership.  Dr. Holtsford graduated with his B.A., *with honors* from the University of Illinois (Urbana-Champaign) and received his M.D. from the University of Illinois (Chicago).  Dr. Holtsford completed a combined Emergency Medicine and Internal Medicine residency from the University of Illinois (Chicago).  Dr. Holtsford is certified by both the American Board of Emergency Medicine and the American Board of Internal Medicine.  Dr. Holtsford is a member of the American College of Emergency Physicians (Fellow), American Academy of Emergency Medicine (Fellow), and Physicians for Social Responsibility.

## EXHIBIT B
## LEGAL DESCRIPTION OF SUBJECT PROPERTY

THAT PART OF THE SOUTH HALF OF SECTION 34, TOWNSHIP 41 NORTH, RANGE 7 EAST OF THE THIRD PRINCIPAL MERIDIAN AND PART OF THE NORTH HALF OF FRACTIONAL SECTION 3, TOWNSHIP 40 NORTH, RANGE 7 EAST OF THE THIRD PRINCIPAL MERIDIAN ALL DESCRIBED AS FOLLOWS:

COMMENCING AT THE NORTHWEST CORNER OF THE SOUTHWEST QUARTER OF SECTION 35, TOWNSHIP 41 NORTH, RANGE 7 EAST OF THE THIRD PRINCIPAL MERIDIAN, THENCE EASTERLY ALONG THE NORTH LINE OF SAID SOUTHWEST QUARTER 339.90 FEET; THENCE SOUTHERLY TO THE SOUTHWEST CORNER OF THE SOUTHWEST QUARTER; THENCE NORTHERLY ALONG THE LAST DESCRIBED COURSE 980.77 FEET TO THE CENTER LINE OF MCDONALD DRIVE; THENCE NORTHWESTERLY AND WESTERLY ALONG SAID CENTER LINE 2884.59 FEET TO A POINT THAT IS 62.70 FEET WESTERLY OF THE EAST LINE OF THE SOUTHWEST QUARTER OF SAID SECTION 34 (MEASURED ALONG SAID CENTER LINE ) BEING THE NORTHEAST CORNER OF A TRACT OF LAND CONVEYED TO HENRY O. LARSON AND ELIZABETH V. LARSON BY DEED RECORDED AS DOCUMENT 648085; THENCE SOUTHERLY ALONG THE EASTERLY LINE OF SAID LARSON TRACK 776.0 FEET TO A POINT THAT IS 10.0 FEET NORTHERLY OF THE SOUTHEAST CORNER OF SAID LARSON TRACT; THENCE EASTERLY PARALLEL WITH THE SOUTH LINE OF SAID LARSON TRACT 24.85 FEET; THENCE SOUTHEASTERLY ALONG A LINE FORMING AN ANGLE OF 68 DEGREES 59 MINUTES 52 SECONDS WITH THE PROLONGATION OF THE LAST DESCRIBED COURSE (MEASURED CLOCKWISE THEREFROM) 101.12 FEET; THENCE SOUTHEASTERLY ALONG A CURVE TO THE RIGHT HAVING A RADIUS OF 210.0 FEET, TANGENT TO THE LAST DESCRIBED COURSE 104.64; THENCE SOUTHWESTERLY ALONG A CURVE TO THE RIGHT HAVING A RADIUS OF 390.0 FEET, TANGENT TO THE LAST DESCRIBED CURVE, 90.96 FEET; THENCE SOUTHWESTERLY TANGENT TO THE LAST DESCRIBED CURVE 104.0 FEET; THENCE SOUTHERLY ALONG A CURVE TO THE LEFT HAVING A RADIUS OF 360.0 FEET TANGENT TO THE LAST DESCRIBED COURSE 94.87 FEET T A LINE DRAW PARALLEL WITH THE 59.25 FEET NORTHERLY OF THE SOUTH LINE (MEASURED AT RIGHT ANGLES THERETO) OF THE SOUTHWEST QUARTER OF SAID SECTION 34 FOR A POINT OF BEGINNING; THENCE EASTERLY ALONG SAID PARALLEL LINE 336.05 FEET; THENCE SOUTHEASTERLY ALONG A LINE FORMING AN ANGLE OF 157 DEGREES 06 MINUTES 37 SECONDS WITH THE LAST DESCRIBED COURSE (MEASURED COUNTER CLOCKWISE THEREFROM) 1418.0 FEET: THENCE SOUTHERLY ALONG A LINE FORMING AN ANGLE OF 122 DEGREES 50 MINUTES 43 SECONDS WITH THE LAST DESCRIBED COURSE (MEASURED COUNTER CLOCKWISE THEREFROM) 892.0 FEET: THENCE SOUTHWESTERLY ALONG A LINE FORMING AN ANGLE OF 99 DEGREES 11 MINUTES 29 SECONDS WITH THE LAST DESCRIBED COURSE (MEASURED COUNTER CLOCKWISE THEREFROM) 1863.0 FEET; THENCE NORTHERLY ALONG A LINE FORMING AN ANGLE OF 142 DEGREES 54 MINUTES 33 SECONDS WITH LAST DESCRIBED COURSE (MEASURED COUNTERCLOCKWISE THEREFROM) 1448.0 FEET; THENCE NORTHERLY ALONG A LINE FORMING AN ANGLE 117 MINUTES 39 MINUTES 28 SECONDS WITH THE LAST DESCRIBED COURSE (MEASURED COUNTER CLOCKWISE THEREFROM) 867.0 FEET: THENCE NORTHERLY ALONG A LINE FORMING AN ANGLE OF 172 DEGREES 26 MINUTES 59 SECONDS WITH THE LAST DESCRIBED COURSE (MEASURED COUNTER CLOCKWISE THEREFROM) 741.0 FEET TO SAID PARALLEL LINE; THENCE EASTERLY ALONG SAID PARALLEL LINE 1514.95 FEET TO THE POINT OF THE BEGINNING, IN KANE COUNTY ILLINOIS.

Parcel Number(s): 08-03-100-009; 05-34-300-032; 05-34-400-025
Street Address: 41W400 Silver Glen Road, St. Charles, Illinois 60175

## Supplemental Exhibit - Kane County 2040 Land Use Plan

The proposed use of the Subject Property promotes the goals of the Kane County 2040 Land Use Plan ("The 2040 Plan,") in the ways described below:

    a.  The 2040 Plan's "Quality of Kane" model emphasizes healthy people, healthy living and healthy communities and the unique coverage of three principal planning processes: transportation, health, and land use.[1] The special use recognizes these concepts. In order to promote healthy communities, the special use will not only treat individuals who suffer from disease of alcoholism and drug addiction, but will also commit to participate in substantial community outreach to community schools, religious groups, and other agencies to improve alcoholism and substance abuse awareness within the community.

    b.  The 2040 Plan recognizes that the following factors contribute to Health: Physical Environment (10%); Clinical Care (20%); Health Behaviors (30%); and Socio-Economic (40%).[2] The proposed special use fits in with these factors. The physical environment of the site will not change and will therefore not impact surrounding neighbors and at the same time are a critical component for the health and well-being of the facility's patients. The high-end clinical care provided by the proposed facility will improve the health of its patients, and its outreach will do the same for others in the community. Part of the treatment regimen of the proposed facility includes helping patients understand and make healthy behavioral and physical (diet and exercise) choices.

    c.  The 2040 Plan recognizes the benefits of "Re-inhabitation," which is the adaptive re-use of existing structures for uses that provide for and contribute to society.[3] The proposed adaptive re-use of the former Glenwood School will address a societal need for the effective treatment of alcoholism and drug addiction with no substantial changes to the existing facility.

    d.  The 2040 Plan's focus on community health expressly recognizes that alcohol misuse is among the challenges that face the citizens of Kane County[4] and encourages environments that prevent excessive consumption of alcohol. The Facility's treatment of individuals who have a dependency on alcohol and other substances combined with its community outreach programs address these important considerations.[5] The Facility's treatment of individuals who are addicted to alcohol and/or other unlawful substances combined with community outreach programs organized by the facility address these

---

[1] Kane County 2040 Plan, "Quality of Kane Model," Page 11.
[2] Kane County 2040 Plan, "Contributing Factors to Health," Page 41.
[3] Kane County 2040 Plan, "Opportunities for Retrofitting Sprawling Land Use Patterns," Page 53.
[4] Kane County 2040 Plan "Community Health," Page 79.
[5] Kane County 2040 Plan "Community Health," Page 98.

important aspects of community health.

e. The 2040 Plan contains a list of "Ten Essential Services of Public Health." They include: (1) Monitor health status and understand health issues facing the community; (2) Protect people from health problems and health hazards; (3) Give people the information they need to make healthy choices; (4) Engage the community to identify and solve health problems; (5)Develop public health polices and plans; (6) Enforce public health laws and regulations; (7) Help people receive health services; (8) Maintain a competent public health workforce; (9) Evaluate and improve programs an interventions; and (10) Contribute to and apply the evidence base of public health.[6] The proposed special use contributes positively to these ten essential services outlined in The 2040 Plan.

f. The 2040 Plan expressly recognizes the need for a policy of cross-sector collaboration to achieve community-wise wellness through partnerships with school districts, colleges, social service agencies, the faith-based community, non-profit organizations, hospitals, physicians, employers, park districts, municipal staff, elected officials, and other organization. The proposed facility is committed to significant community outreach and will assist in achieving the goal of cross-collaboration.

g. The 2040 Plan expressly encourages the removal of barriers that unnecessarily discourage housing diversity.[7] The proposed special use would allow for a residential treatment facility for disabled adults suffering from alcoholism and substance addictions.

h. The 2040 Plan seeks to preserve and protect open space and green infrastructure as the cornerstone of natural resource protection and community well-being. A considerable portion of the 120 acre Subject Property is open space, and the Application is intended to commit permanently a portion of that open space by way of easement or other appropriate action.

---

[6] Kane County 2040 Plan, "Ten Essential Services of Public Health," Page 83.
[7] Kane County 2040 Plan, "Housing Objectives," Page 99.

22



ALTA/ACSM LAND TITLE SURVEY
OF
THE GLENWOOD SCHOOL FOR BOYS AND GIRLS
ST. CHARLES, ILLINOIS

# KANE-DUPAGE
## SOIL AND WATER CONSERVATION DISTRICT

## LAND USE OPINION
## 12-43



August 27, 2012

Prepared for:
Village of Campton Hills

Petitioner:
Kiva Real Estate Investments, LLC
3359 Main Street
Skokie, IL 60076

3315 Dean Street, Suite 100, St. Charles, IL 60175 | Phone: (630) 584-7961 | Fax: (630) 584-9534

# KANE-DUPAGE
# SOIL AND WATER CONSERVATION DISTRICT

## LAND USE OPINION
## 12-43



August 27, 2012

Prepared for:
Village of Campton Hills

Petitioner:
Kiva Real Estate Investments, LLC
3359 Main Street
Skokie, IL 60076

2315 Dean Street, Suite 100, St. Charles, IL 60175 | Phone: (630) 584-7961 | Fax: (630) 584-9534

**12-43**          **Executive Summary**          **August 27, 2012**

**Petitioner:**  Kiva Real Estate Investments, LLC, 3359 Main St., Skokie, IL 60076
**Contact Person:** Patrick Griffin 630-524-2566
**Unit of Government Responsible for Permits:**  Village of Campton Hills
**Acreage:** 120
**Location of Parcel:** Section 3 Campton/34 Plato, Township 40/41 N, Range 7 E
**Property Address/PIN#:** 41W400 Silver Glen Road
**Existing Land Use:** Vacant Former Glenwood
**Surrounding Land Use:** Forest Preserve
**Proposed Land Use:**  Residential Addiction Treatment Center
**Kane County Land Use Plan Map:** Institutional Private Open Space

# Natural Resource Concerns

**Soils Limitations:**  Soils at this site contain limitations for dwellings with basements, dwellings without basements, small commercial buildings.  See soils information pages, and attached soils tables.  All information is from the Soil Survey of Kane County, Illinois.



**Wetlands:**  The National Wetland Inventory map and the ADID wetland map do identify wetland areas on this site. **Therefore, a wetland delineation specialist who is recognized by the U.S. Army Corps of Engineers should determine the exact boundaries and value of any wetlands. (See page 5 for more wetland information.)**

**Floodplain:** There are floodplain areas identified on this site. In addition, there are hydric soils, which may be prone to ponding. (See page 10)



**Stormwater:** The District encourages the use of on-site detention for stormwater runoff, and recommends the use of a 0.10cfs/acre release rate for on-site detention ponds. (See page 13 for more information concerning stormwater planning on this site.)

**Sediment and Erosion Control:** Development on this site should include a sedimentation and erosion control plan. (See page 17)

**NPDES Permits:** An NPDES (National Pollution Discharge Elimination System) permit is required by the EPA for all construction sites over 1 acre. (See page 18)

**Aquifer Sensitivity:** According to Illinois State Geological Survey, Environmental Geology Report, published 1995, there are no aquifers that may be adversely impacted by this project. (See page 3 and Appendix A)

**Soil Data:** The soil data from SSURGO (or NASIS) is part of a national dataset. The hydric rating used in this report has been modified to reflect local interpretations with guidance from the Area Soil Scientist.

## LAND USE OPINION

**Land Use Opinion:** This site contains the following concerns: **Wetlands, Soil Limitations, Floodplain, Woodlands, Soil Erosion and Sediment Control, and Stormwater Management.** Based on the information in this report, it is the opinion of the Kane-DuPage Soil and Water Conservation District Board that this site **is not suited** for the proposed use **unless** the previously mentioned concerns are addressed.

**12-43**          TABLE OF CONTENTS

PURPOSE AND INTENT ................................................................. 1
SOILS INFORMATION ................................................................. 2
AQUIFER IMPACT .................................................................... 3
SEPTIC ABSORPTION SYSTEMS ....................................................... 3
WETLANDS ........................................................................... 5
FLOODPLAINS ...................................................................... 10
WETLAND AND FLOODPLAIN REGULATIONS ............................................ 13
STORMWATER ...................................................................... 13
TOPOGRAPHY AND DRAINAGE ....................................................... 14
EROSION .......................................................................... 17
WOODLANDS ....................................................................... 17
NATIONAL POLLUTANT DISCHARGE ELIMINATION ...................................... 18
SOILS INTERPRETATIONS ........................................................... 18
SOIL LIMITATION INTERPRETATIONS ................................................. 18
SOIL ANALYSIS .................................................................... 19
LAND USE CONSIDERATIONS ......................................................... 21
GIS MAPPING .............................................................. Appendix A
SOIL TABLES .............................................................. Appendix B
CONTACT LIST ............................................................. Appendix C

TABLE OF FIGURES

FIGURE 1: SOIL SURVEY MAP ........................................................ 4
FIGURE 2: NATIONAL WETLAND INVENTORY MAP ........................................ 6
FIGURE 3: ADID WETLAND MAP ....................................................... 7
FIGURE 4: WETLAND PHOTOGRAPH LOCATION MAP ....................................... 8
FIGURE 5-7: WETLAND PHOTOGRAPHS ............................................... 8-9
FIGURE 8: FLOODPLAIN MAP ........................................................ 11
FIGURE 9: HYDRIC SOILS .......................................................... 12
FIGURE 10-11: DRAINAGE AND TOPOGRAPHY ....................................... 15-16

## PURPOSE AND INTENT

This report presents natural resource information to officials of the local governing body and other decision makers. Decisions concerning variations, amendments or relief of local zoning ordinance may reference this report. Also, decisions concerning the future of a proposed subdivision of vacant or agricultural lands and the subsequent development of these lands because of these decisions may reference this report. This report is a requirement under the SWCD Act contained in ILCS 70, 405/1 ET seq.

This report intends to present the most current natural resource information available in an understandable format. It contains a description of the present conditions and resources available and their potential impact on each other. This information comes from standardized data, on-site investigations and other information furnished by the petitioner. Please read the entire report to coordinate and inter-relate all natural resource factors considered. This report, when used properly, will provide the basis for good

land use change decisions and proper development while protecting the natural resource base of the county.

The conclusion of this report in no way indicates the impossibility of a certain land use. However, it should alert the reader to possible problems that may occur if the capabilities of the land are ignored. Please direct technical questions about data supplied in this report to: Kane-DuPage

**Soil and Water Conservation District**
2315 Dean Street
Suite 100
St. Charles, IL 60175
Phone: (630) 584-7961

2

# SOILS INFORMATION

## IMPORTANCE OF SOILS INFORMATION

Soils information is taken from the Soil Survey of Kane County, Illinois, United States Department of Agriculture, Natural Resource Conservation Service. This information is important to all parties involved in determining the suitability of the proposed land use change. Each soil polygon has a number. That number is a symbol for a map unit that will be described in detail in the <u>Soils Interpretations</u> section of this report found on pages 18-22.

## SOIL MAP UNITS

The soil survey map of this area (Figure 1) indicates soil map units. Each soil map unit has limitations for a variety of land uses such as septic systems, and buildings site development, including dwellings with and without basements. Approximately 34% of the soils contain very limiting conditions for building site development. See <u>Soils Interpretations</u> section and attached <u>Soil Tables</u>.

The Soil Survey Geographic (SSURGO) data base was produced by the U.S. Department of Agriculture, Natural Resources Conservation Service and cooperating agencies for the Soil Survey of Kane County, Illinois. The soils were mapped at a scale of 1:12,000. The enlargement of these maps to scales greater than that at which they were originally mapped can cause misunderstanding of the detail of the mapping. If enlarged, maps do not show the small areas of contrasting soil that could have been shown at a larger scale. The depicted soil boundaries and interpretations derived from them do not eliminate the need of onsite sampling, testing, and detailed study of specific sites for intensive uses. Thus, this map and its interpretations are intended for planning purposes only.

## LIST OF SOIL MAP UNITS

| SOIL MAP UNIT | PERCENT OF PARCEL | ACRES |
|---|---|---|
| 103A - Houghton | 2% | 2.01 |
| 152A - Drummer | 11% | 13.42 |
| 193B - Mayville | 4% | 4.22 |
| 344C2 - Harvard | 9% | 10.61 |
| 348B - Wingate | 13% | 14.93 |
| 356A - Elpaso | 21% | 25.17 |
| 656B - Octagon | 27% | 31.35 |
| 656C2 - Octagon | 10% | 11.43 |
| 662B - Barony | 1% | 1.59 |
| W - Water | 2% | 2.51 |
| Table 1: Soil Map Units | Total | 117.24 |

All percentages and acreages are approximate.

We suggest that a geotechnical engineer conduct an on site investigation. This should determine, specifically, what soils type is present at a particular location, along with its associated limitations or potential for a particular use. It will also assist in determining which types of engineering procedures are necessary to account for the limitations of the soil on the site.

3

## SOILS INFORMATION

Figure 1: Soil Survey Map (Page 4)

United States Department of Agriculture (USDA), Natural Resources Conservation Service (NRCS), Kane County SSURGO soil layer certified in 2000 and DuPage County SSURGO soil layer certified in 1999. Areas shaded red represent VERY LIMITING limitations for building site development, and areas shaded yellow represent SOMEWHAT LIMITING limitations for building site development.

## AQUIFER IMPACT

According to the Potential for Agricultural Chemical Contamination of Aquifers in Illinois: 1995 Revision Environmental Geology 148 prepared by the Department of Energy and Natural Resources, Illinois State Geological Survey, this site lies completely within a zone rated as somewhat limted with respect to potential for contamination from spilled or applied substances to the soil surface. Please see Appendix A for mapping indicating the range of coverage.

## SEPTIC ABSORPTION SYSTEMS

There are no septic absorption systems proposed on this site. There is currently a water treatment system existing on the site.



5

## WETLANDS

**Figure 2: National Wetland Inventory Map (Page 6)**

United States Department of the Interior, Fish and
Wildlife Service, National Wetlands Inventory,
Photo Year 1983-1984, Digitized 1985-1986.

A review of the National Wetland Inventory map indicates that wetlands do appear to exist on this site. An on-site inspection of the site supported this conclusion. The types of wetlands identified on this site include: (PEMA – Palustrine, Emergent, Temporarily Flooded; **PEMC** – Palustrine, Emergent, Seasonally Flooded; **PFO1A** – Palustrine, Forested, Broad-Leaf Deciduous, Temporarily Flooded) **A wetland delineation specialist who is recognized by the U.S. Army Corps of Engineers should determine the exact boundaries and value of these wetlands.**

Wetlands function in many ways to benefit mankind. They control flooding by offering a slow release of excess water downstream or through the soil. They cleanse water by filtering out sediment and some pollutants. In addition, they may function as rechargers of our valuable groundwater. They are also essential breeding, rearing, and feeding grounds for many species of wildlife. This organization believes that such valuable resources should remain in a natural state.

Wetlands often need to receive some runoff in order to sustain vegetation and wetland conditions. In fact, low value wetlands may actually be enhanced by receiving more storm water and with selective plantings. Diversion of storm water away from wetlands may dry the wetland. However, there is a problem with using high value wetlands as a significant storm water control device. Urban storm water runoff can carry high volumes of sediment and pollutants, which do not benefit wetlands and water quality. Management of storm water and plant diversity

could greatly enhance the value of the wetlands on this property.

The U.S. Army Corps of Engineers has been given jurisdiction over the utilization of our wetland resources. The responsibilities and regulatory authorities of the Corps of Engineers are based on Section 404 of the Clean Water Act (33 U.S.C. 1344). Section 301 of the Act prohibits the discharge of dredged or fill material into waters or other wetland areas without a permit from the Corps.

### ADID WETLANDS

**Figure 3: ADID Wetlands (Page 7)**
Kane County's Wetlands and Streams Advanced Identification (ADID) Study completed in 2004.

Released in August of 2004, the Kane County Advanced Identification of Aquatic Resources (or ADID) study is a cooperative effort between federal, state, and local agencies to inventory, evaluate, and map high quality wetland and stream resources in the county. ADID studies are part of a U.S. Environmental Protection Agency program to provide improved awareness of the locations, functions, and values of wetlands and other waters of the United States. The primary purpose is to identify wetlands and streams unsuitable for dredging and filling because they are of particularly high quality. This information can be used by federal, state, and local governments to aid in zoning, permitting, and land acquisition decisions. In addition, the information can provide data to agencies, landowners, and private citizens interested in restoration, acquisition, or protection of aquatic sites and resources.

A review of the Kane County ADID map revealed that ADID wetlands were identified on this site. ADID wetland #1746, 1737, 1893, 1891, 1892, 1890, 1277, and 1272 were mapped on this site. For more detailed information regarding this/these wetland(s), please refer to the full Kane County ADID study at http://www.co.kane.il.us/kcstorm/index.htm.





8

Figure 4: Wetland Photograph Location Map



Figure 5: Photograph of Wetland
Photograph 1 taken facing southwest



**Figure 6: Photograph of Wetland**
Photograph 2 taken facing northeast



**Figure 7: Photograph of Prairie & Sandhill Cranes**
Photograph 3 taken facing north



10

---

## FLOODPLAINS

**Figure 8: Floodplain Map (Page 11)**

Federal Emergency Management Agency, National Flood Insurance Program, Q3 Flood Data, Disc 6, September 1998.

According to the Flood Insurance Rate Map, approximately 20% of this site is within the boundaries of a 100-year floodplain.

This development may impede the beneficial functions of the floodplain. These functions include the temporary storage and the slow release of floodwaters. This disturbance could adversely affect other properties in the watershed.

Another indication of flooding potential can be found in the soils information. Figure 9 indicates the hydric soils mapped for the site. Hydric soils by definition have potential ponding problems.

Development in floodplains/floodways is regulated by the Department of Natural Resources, Office of Water Resources. A copy of this report is being sent to the Division Office in Bartlett.

**Figure 9: Hydric Soils (Page 12)**

Hydric soils are shaded purple and soils with hydric inclusions are shaded yellow.





# WETLAND AND FLOODPLAIN REGULATIONS

The laws of the United States and the State of Illinois

> PLEASE READ THE FOLLOWING IF YOU ARE PLANNING TO DO ANY WORK NEAR A STREAM (THIS INCLUDES SMALL UNNAMED STREAMS, LAKES, WETLANDS, AND FLOODWAYS.

assign certain agencies specific and different regulatory roles to protect the waters within the State's boundaries. These roles, when considered together, include protection of navigation channels and harbors, protection against floodway encroachment, maintenance and enhancement of water quality, protection of fish and wildlife habitat As well as recreational resources. Unregulated use of waters within the State of Illinois could permanently destroy or alter the character of these valuable resources and adversely impact the public. Therefore, please contact the proper regulatory authorities when planning any work associated with Illinois waters so that proper consideration and approval can be obtained.

## Who Must Apply:

Anyone proposing to dredge, fill, riprap, or otherwise alter the banks or beds of, or construct, operate, or maintain any dock, pier, wharf, sluice, dam, piling, wall, fence, utility, floodplain or floodway subject to State or Federal regulatory jurisdiction should apply for agency approvals.

### REGULATORY AGENCIES:

- **Wetland/U.S. Waters:** U.S. Army Corps of Engineers, Chicago District, 111 North Canal Street, Chicago, IL 60606-7206. Phone: (312) 353-4117.
- **Floodplains: Illinois Department of Natural Resources\Office of Water Resources,** 2050 W. Sterns Road, Bartlett, IL 60103. Phone: (847) 608-3100

**Coordination:** We recommend early coordination with the regulatory agencies BEFORE finalizing work plans. This allows the agencies to recommend measures to mitigate/compensate for adverse impacts. Also, the agency can make possible environmental enhancement provisions early in the project planning stage. This could reduce time required to process necessary approvals.

> CAUTION: Contact with the United States Army Corps of Engineers is strongly advised before commencement of any work in or near a water of the United States. This could save considerable time and expense. Persons responsible for willful and direct violation of Section 10 of the River And Harbor Act of 1899 or Section 404 of the Federal Water Pollution Control Act are subject to fines ranging up to $25,000 per day of violation and imprisonment for up to one year or both.

# STORMWATER

The proposed removal of vegetation, compaction of soil, and addition of impervious surfaces (rooftops, roadways, etc.) will greatly increase the amount of storm water runoff generated on this site. We strongly recommend the use of on-site storm water management. All additional runoff should be retained in on-site detention ponds and released at a rate that approximates natural, undisturbed runoff conditions. The S.W.C.D. encourages the use of a .10 cfs/acre release rate. Insufficient storm water management on this site will threaten the storm water capacity of the floodplain. This has the potential to cause or aggravate flooding conditions on surrounding properties or elsewhere in the watershed.

If detention ponds are constructed, the S.W.C.D. strongly encourages incorporating as many of the natural attributes of the existing wetlands as possible. Natural waterway features provide many benefits that sterile detention ponds do not. These include: 1)

flood control by slow release of excess water through the soil, 2) water purification by vegetation, 3) groundwater recharge, and 4) habitat for wildlife. However, there are concerns associated with allowing urban storm water flow to enter natural wetland features. If the runoff generated by impervious surfaces, such as rooftops and roadways, is loaded into these natural features, their flood control capabilities could be overburdened and flooding damage could result. Therefore, care must be used to insure that the natural features are not damaged or destroyed when used as part of a storm water detention plan.

In addition, storm water release needs to be regulated to insure that the tributary/drainage ditch flowing through to the site is not adversely impacted, nor are downstream properties in the watershed.

## Topography and Drainage

**TOPOGRAPHY** refers to the general shape of the land surface, and the position of its natural and manmade features. It includes the presence or absence of hills, and the slopes or difference in elevation between hilltops and valleys of a given region. Topography influences natural drainage. The force of gravity causes water to move down slopes towards depressions or streams, and pulls free or standing water downward through the soil. Soils on hills tend to be dry and soils in depressions and valleys often are wet or saturated.

The amount of moisture in the soil while it is developing, affects the rate of weathering and the development of soil colors. Soil colors are a reflection of the saturation status of the soil during development. Well-drained soils have uniformly brownish or yellowish brown subsoils; poorly drained soils have grayish subsoils; somewhat poorly drained soils have mottled brownish yellowish and grayish subsoils. Differences in natural soil drainage are typically associated with topography.

USGS Topographic maps and other topographic surveys give information on elevations, which are important to determine slopes, natural drainage directions, and watershed information. Elevations determine the area of impact of flooding. Slope information determines steepness and erosion potential of the site. Slope has the greatest impact in determining the erosion potential of a site during construction activities. Drainage directions determine where water leaves the property in question, possibly impacting surrounding natural resources.

**This parcel of land is located on flat topography with 2% to 8% slopes. The high point of this property is located in the east portion of the site at an elevation of 904 feet above mean sea level. The property generally drains in all directions via overland, at the lowest elevation on the property at 872 feet above sea level.**

Figure 10 and 11: Municipalities 2 ft Contours (Page 15) and USGS Topographic Map (Page 16)





## EROSION

Development on this site should include the use of a soil erosion and sedimentation control plan. Due to the soil type and slope of the site, the S.W.C.D. believes that the potential for soil erosion during and after this proposed construction will be **moderate**. Furthermore, the erosion and sedimentation may become a primary non-point source of water pollution. Eroded soil during the construction phase can create unsafe conditions on roadways, degrade water quality, and destroy aquatic ecosystems lower in the watershed. Soil erosion also increases the risk of flooding due to choking culverts, ditches, and storm sewers, and by reducing the capacity of natural and man-made detention facilities.

Erosion and sedimentation control measures include: 1) staging the construction to minimize the amount of disturbed areas present at the same time, 2) maintaining or planting vegetative groundcover, and 3) keeping runoff velocities low. Wise placement and protection of soil stockpiles is also helpful. Siltation fences are useful controls only if they are properly installed and maintained. Soil erosion and sedimentation control plans, including maintenance responsibilities, should be clearly communicated to

all contractors working on the site. Debris basins and siltation ponds can also be used to prevent suspended sediment from leaving the property or damaging the wetland areas. On this property special care must be taken to protect any wetland features from sedimentation damage.

Detailed information on the most appropriate methods of controlling erosion and sedimentation in urbanizing areas can be found in the publication "Procedures and Standards for Urban Soil Erosion and Sedimentation Control in Illinois" (The Green Book) and the "Illinois Urban Manual". These manuals and additional technical assistance may be obtained by contacting this office. A copy of the Illinois Environmental Protection Agency "Standards and Specifications for Soil Erosion and Sediment Control" can be obtained by contacting the National Technical Information Service, 5285 Port Royal Rd, Spring, VA, 22161, (703) 487-4650. Additionally, the Northeastern Illinois Planning Commission (NIPC) has published "Suggested Soil Erosion and Sedimentation Control Ordinance: A Guide for Local Officials". This can be ordered by calling (312) 454-0400.

## WOODLANDS

The S.W.C.D. encourages preserving as much of the wooded character of this site as possible. Long-term preservation of the trees will require taking certain precautions during and after construction. The ground around each tree to be saved should be flagged or fenced off. Also, it should be protected from heavy machinery. This area should be at least as wide as the area covered by the spread of the tree branches. Soil compaction around the roots of the trees can permanently interfere with the uptake of oxygen, nutrients, and water. This may cause the premature death of the trees. The placement of fill material around the trunks of trees can have the same

adverse effects. Other construction practices to avoid near the trees are: cutting and filling, raising the soil level, and removing neighboring trees. Contractors and construction crews should be informed of all tree preservation efforts.

Careful protection of this area around the trees may also preserve some of the natural woodland groundcover. In general, native plants are hardy, and islands of such vegetation around the bases of trees could prove to be an attractive, inexpensive, and low maintenance form of landscaping.

# NATIONAL POLLUTANT DISCHARGE ELIMINATION

Discharges of storm water from construction sites, which disturb 1 or more acres of land, must be covered by an NPDES permit. Under the NPDES General Permits for Storm Water Discharges from Construction Sites, the EPA requires the development and implementation of a pollution prevention plan. A pollution prevention plan for construction is designed to reduce pollution at the construction site before it can cause environmental problems. Many of the practices and measures required for the pollution prevention plan represent the standard operating procedure at many construction sites. Storm water management controls, erosion and sediment controls, inspection and maintenance have all been used at a number of construction projects. The General NPDES permit can be obtained through the Illinois Environmental Protection Agency, Division of Water Pollution Control, 2200 Churchill Road, P.O. Box 19276, Springfield, Illinois 62794-9276.

# SOILS INTERPRETATIONS

The soil interpretation information and a summary of the soil limitations for this site are derived from the SSURGO certified soil layers for Kane and DuPage Counties, IL.

The soil limitation ratings are used mainly for engineering designs of dwellings with or without basements, local streets and roads, small commercial buildings, septic tank absorption fields, and etc. The ratings of not limiting, somewhat limiting, and very limiting are based on national averages and are defined and used as follows:

<u>Not Limiting (Slight)</u> - This limitation rating indicates that the soil properties are generally favorable for the specified use and that any limitations are minor and easily overcome.

<u>Somewhat Limiting (Moderate)</u> - This rating indicates that the soil properties and site features are unfavorable for the specified use, but that the limitations can be overcome or minimized with special planning and design.

<u>Very Limiting (Severe)</u> - This indicates that one or more soil properties or site features are very unfavorable and difficult. A major increase in construction effort, special designs, or intensive maintenance is required. These costly measures may not be feasible for some soils that are rated as severe.

# SOIL LIMITATION INTERPRETATIONS

<u>Flooding</u> is the temporary covering of soil surface by flowing water from any source, such as streams overflowing their banks, runoff from adjacent or surrounding slopes, inflow from high tides, or any combination of sources.

<u>Ponding</u> is standing water in a closed depression. The water is removed only by percolation, transpiration, or evaporation.

<u>Frost heave</u> potential and <u>shrink-swell actions</u> are concerns when constructing paved surfaces, such as foundations and roadways.

<u>Frost heave</u> is the result of moisture freezing in the soil and forming ice lenses. The ice lenses cause the soil to expand, leading to the premature deterioration of paved surfaces.

<u>Shrink-swell action</u> is related to the type and percentage of clay present. Clays are capable of absorbing large quantities of soil moisture because of their greater surface area. Absorption of soil moisture results in the swelling of the clay horizons. Upon drying, the soil tends to shrink. The expansion and contraction exerts stress on foundations, footings, and paved surfaces due to the changes in soil moisture conditions.

Soils limited by <u>wetness</u> indicates the presence of a seasonally high water table. A seasonally <u>high water table</u> is a zone of saturation at the highest average depth during the wettest season. It is at least 6 inches thick, persists in the soil for more than a few weeks, and is within 6 feet of the soil surface.

# SOIL ANALYSIS

This site contains (9) soil-mapping units (103A – Houghton Muck; 152A - Drummer; 193B - Mayville; 344C2 - Harvard; 348B - Wingate; 356A - Elpaso; 656B - Octagon; 656C2 - Octagon; 662B - Barony)

## HOUGHTON MUCK -- 103A

Houghton muck, 0 to 2 percent slopes, (103A) is nearly level and very poorly drained. It is found in closed depressions and broad drainageways. This soil is comprised mostly of organic matter.

Included within this soil mapping unit are small areas of somewhat poorly drained Brenton soils and poorly drained Drummer soils. These soils are slight rises and drainageways, respectively.

Water and air move through this soil at a rapid rate, and surface runoff from disturbed areas is usually slow.

This soil has very poor potential for most urban uses.

## DRUMMER SILTY CLAY LOAM – 152A

The Drummer silty clay loam, 0 to 2 percent slopes, (152A) soil mapping unit is level to nearly level, poorly drained, and is found on upland flats, in drainageways, and in depressions on outwash plains and on end and ground moraines. The texture is predominantly silty clay loam.

Other soils associated with this unit include somewhat poorly drained Brenton, Flanagan, and Elburn soils. These soils are on upland ridges and knolls.

Water and air move through this soil at a moderate rate, and surface runoff from disturbed areas is usually slow to ponded.

Due to wetness and lack of stability, this soil is poorly suited for most urban uses.

## MAYVILLE SILT LOAM-193B

The Mayville silt loam, 2 to 5 percent slopes, (193B) soil mapping unit is gently sloping, well drained, and found on convex ridgetops, knolls and side slopes. The texture of the surface layer is silt loam. The subsoil is silty clay loam in the upper part, clay loam in the middle part, and loam in the lower part.

Included within this mapping unit are small areas of somewhat poorly drained Herbert soil and poorly drained Drummer soil. These soils are in shallow depressions and drainageways.

Water and air move through this unit at a moderate rate, and surface runoff from disturbed areas is medium or faster.

Mayville has fair to good potential for most urban uses.

## HARVARD SILT LOAM - 344C2

Harvard (344C2) is moderately sloping (5 to 10 %), moderately well to well drained, and is on short uneven side slopes, convex ridges, and knolls on outwash plains. The surface layer is silt loam in texture. The subsoil is silty clay loam and clay loam.

Also included in this unit are small areas of somewhat poorly drained Millbrook soils and poorly drained Drummer soils. These are in shallow depressions and drainageways.

Water and air move through this soil at a moderate rate, and runoff from disturbed areas is medium to rapid.

The potential for most urban uses is good to fair.

## WINGATE SILT LOAM- 348B

The Wingate silt loam, 2 to 5% percent slopes, (348B) soil mapping unit is gently sloping, moderately well to well drained, and found on convex ridges, knolls, and short uneven side slopes. The texture of the surface layer is silt loam. The subsoil grades from silt loam and silty clay loam to clay loam and loam.

Water and air move through this soil at a moderate rate, and runoff from disturbed areas is medium or faster.

Included within this soil mapping unit are small areas of somewhat poorly drained Lisbon soil and poorly drained Drummer soil.

This soil has fair to good potential for most urban uses.

## ELPASO SILTY CLAY LOAM - 356A

Elpaso silty clay loam, 0 to 2 percent slopes, (356A) soil mapping unit is level to nearly level, poorly drained, and is found on upland flats, in drainageways, and in depressions on outwash plains and on end and ground moraines. The texture is predominantly silty clay loam.

Other soils associated with this unit include somewhat poorly drained Brenton, Flanagan, and Elburn soils. These soils are on upland ridges and knolls.

Water and air move through this soil at a moderate rate, and surface runoff from disturbed areas is usually slow to ponded.

Due to wetness and lack of stability, this soil is poorly suited for most urban uses.

OCTAGON SILT LOAM - 656B

Octagon silt loam, 2 to 4 percent slopes, (656B) is gently sloping, well drained, and found on convex ridgetops and side slopes. The surface layer and upper part of the subsoil are silt loam. The remainder of the subsoil is clay loam. The underlying material may contain sandy loam.

Included within this soil mapping unit are small areas of somewhat poorly drained Herbert and Lisbon soils and poorly drained Drummer soil. These occupy shallow depressions and drainageways.

Water and air move through this soil at a moderate rate, and runoff from disturbed areas is usually slow to medium.

The potential for most urban uses is fair to good.

OCTAGON SILT LOAM - 656C2

The Octagon silt loam, 4 to 6 percent slopes eroded, (656C2) mapping unit is moderately sloping, well drained, and found on ridgetops and side slopes on end moraines. The surface layer is silt loam, and the subsoil is clay loam.

Included within this unit are small areas of somewhat poorly drained Herbert and Lisbon soils and poorly drained Drummer soils. These soils occupy shallow depressions and drainageways.

Water and air move through this soil at a moderate rate, and runoff from disturbed areas is medium or faster.

For most urban uses this unit has good to fair potential.

BARONY SILT LOAM - 662B

The Barony silt loam, 2 to 5 percent slopes, (662B) is gently sloping, moderately well to well drained, and located on short, uneven side slopes, convex ridge tops, and knolls on outwash plains. The surface layers are silt loam. The subsoil is silty clay loam in the upper part, clay loam in the middle part, and sandy loam in the lower part.

Included within this mapping unit are small areas of somewhat poorly drained Millbrook and Brenton soils and poorly drained Drummer soil. There are in shallow depressions and drainageways.

Water and air move through this soil at a moderate rate, and runoff from disturbed areas is medium or faster.

This soil unit has fair to good potential for most urban uses.

# LAND USE CONSIDERATIONS

## HOUGHTON MUCK – 103A

Houghton muck, 0 to 2 percent slopes, (103A) is very poorly suited for urban uses. The depth to the high water table is frequently less than one foot. This soil is subject to frequent ponding/ flooding. It also has low strength and stability because the organic matter content and frost heave potentials are high.

Alternative sites should be selected for urban development. This soil lacks the strength and stability to support foundations for dwellings, and frequent water saturation and flooding are difficult and expensive to overcome. This soil is poorly suited for streets and roads due to low strength and stability, wetness, and flooding.

There is a high potential for pollution of groundwater supplies if septic tank absorption fields are used in this soil. This soil should not be used for septic systems.

## DRUMMER SILTY CLAY LOAM – 152A

The Drummer (152A) unit is severely limiting due to the problems associated with wetness and surface flooding/ponding. This is due in part to the landscape position. Drummer is found in surface depressions that convey and store surface waters. This unit is capable of supporting a seasonal high water table at the surface.

Areas of this soil used for building would have to be artificially drained and protected from ponding. Dwellings with basements would be difficult or expensive to construct because of difficulty in lowering the water table. Dwellings without basements would require drainage, as well. Use of this soil for streets and roads is limited by wetness, flooding, and frost heave.

Use of this soil for septic tank absorption systems is not advised. This is due to wetness and flooding. Sanitary facilities should be connected to community sewers and treatment facilities.

## MAYVILLE SILT LOAM-193B

Mayville (193B) is well suited for dwellings with basements but is only moderately well suited for dwellings without basements. This is due to lack of stability caused by frost heave and shrink-swell potentials.

Frost heave is the result of moisture freezing in the soil and forming ice lenses. Ice formation in the soil causes expansion which leads to the premature deterioration of paved surfaces such as foundations and driveways, etc.

Shrink-swell is related to the type and percentage of clays present. Clays are capable of absorbing large quantities of soil moisture because of their greater relative surface area. Absorption of soil moisture results in the swelling of the clay horizons. Upon drying, the soil tends to shrink. This alternating expansion and contraction with changes in soil moisture conditions exerts stress on foundations and footings.

This soil is generally well suited for septic tank absorption systems. However, a moderately slow rate of water movement in the underlying material is a concern in some places.

## HARVARD SILT LOAM - 344C2

Harvard (344C2) is only moderately well suited for dwellings without basements due to lack of stability in the subsoil. This soil is well suited for dwellings with basements. Frost heave is a concern for the construction of paved surfaces.

Wetness and slow percolation limit the suitability for the use of septic absorption systems.

## WINGATE SILT LOAM – 348B

The Wingate silt loam (348B) soil is only moderately suited for dwellings without basements due to a lack of stability in the subsoil. It is well suited for dwellings with basements. Frost heave is a concern for roadways and other paved surfaces.

This soil is moderately well suited for the use of septic absorption systems. However, slow permeability in the subsoil and underlying material may be a problem.

## ELPASO SILTY CLAY LOAM-356A

The Elpaso silty clay loam, 0 to 2 percent slopes, (356A) unit is severely limiting due to the problems associated with wetness and surface flooding/ponding. This is due in part to the landscape position. Drummer is found in surface depressions that convey and store surface waters. This unit is capable of supporting a seasonal high water table at the surface.

Areas of this soil used for building would have to be artificially drained and protected from ponding. Dwellings with basements would be difficult or expensive to construct because of difficulty in lowering the water table. Dwellings without basements would require drainage, as well. Use of this soil for streets and roads is limited by wetness, flooding, and frost heave.

Use of this soil for septic tank absorption systems is not advised. This is due to wetness and flooding. Sanitary facilities should be connected to community sewers and treatment facilities.

OCTAGON SILT LOAM - 656B

Octagon silt loam, 2 to 4 percent slopes, (656B) is suited for dwellings with basements but only moderately suited for dwellings without basements. It lacks stability because it has moderate frost heave potential and the subsoil has a moderate shrink-swell potential. Frost heave is also a problem for roadways and paved surfaces.

This soil is generally well suited for the use of septic tank absorption systems. The rate of water

movement in the subsoil may be a problem in some locations.

OCTAGON SILT LOAM - 656C2

The Octagon silt loam, 4 to 6 percent slopes eroded, (656C2) unit is only moderately suited for dwellings without basements due to instability in the subsoil. It is well suited for dwellings with basements. Frost heave is a problem for roadways and other paved surfaces.

This unit is generally well suited for septic tank absorption systems. However, slow percolation in the subsoil may be a problem.

BARONY SILT LOAM - 662B

The Barony silt loam, 2 to 5 percent slopes, (662B) is well suited for dwellings with basements but only moderately suited for dwellings without basements. This is due to instability caused by high frost heave potential and moderate shrink-swell potential. Frost heave and low strength are concerns with the construction of roadways.

For the use of septic absorption systems, this soil has moderate wetness and slow percolation limitations.

**Our opinion is based on information from the following sources:**

United States Department of Agriculture (USDA), Natural Resources Conservation Service (NRCS), Kane County, IL SSURGO soil layer certified in 2000, and DuPage County, IL SSURGO soil layer certified in 1999 and accompanying interpretations.

Federal Emergency Management Agency, National Flood Insurance Program, Q3 Flood Data, Disc 6, September 1998.

United States Department of the Interior, Fish and Wildlife Service, National Wetlands Inventory, Photo Year 1983-1984, Digitized 1985-1986.

United States Department of Agriculture, Natural Resources Conservation Service. Wetland Inventory Map. Digitized from original base map in 1997.

U.S. Geological Survey, Illinois Digital Orthophoto Quadrangles, 1998/1999 photos, Published: Champaign, Illinois State Geological Survey, 2000.

An on-site investigation conducted by the SWCD Resource Analyst, Candice Jacobs/Ashley Jennings on August 21, 2012.

We respectfully submit this information in compliance with the Illinois Soil and Water Conservation Districts Act (ILCS 70, 405/1 et seq). The District Board reviews proposed developments. Candice Jacobs, Resource Conservationist, prepared this report.

cc:  Kiva Real Estate Investments LLC
     3359 Main Street
     Skokie, IL 60076

ecc:  Wayne Gorski, USEPA

24

# APPENDIX A

# GIS Mapping



# APPENDIX B

## Soil Tables

# SOIL REPORT
# LUO 12-43

## Dwellings With Basements

Aggregation Method: Dominant Condition
Tie-break Rule: Higher

Kane County, Illinois
Survey Area Version and Date: 6 - 01/20/2012

| Map symbol | Map unit name | Rating | Component name and % composition Rating reasons |
|---|---|---|---|
| 103A | Houghton muck, 0 to 2 percent slopes | Very limited | Houghton 90% Subsidence Depth to saturated zone Organic matter content |
| 152A | Drummer silty clay loam, 0 to 2 percent slopes | Very limited | Drummer 90% Depth to saturated zone Shrink-swell |
| 193B | Mayville silt loam, 2 to 5 percent slopes | Somewhat limited | Mayville 92% Depth to saturated zone |
| 344C2 | Harvard silt loam, 5 to 10 percent slopes, eroded | Somewhat limited | Harvard 92% Shrink-swell |
| 348B | Wingate silt loam, 2 to 5 percent slopes | Somewhat limited | Wingate 90% Shrink-swell Depth to saturated zone |
| 356A | Elpaso silty clay loam, 0 to 2 percent slopes | Very limited | Elpaso 90% Ponding Depth to saturated zone Shrink-swell |
| 656B | Octagon silt loam, 2 to 4 percent slopes | Somewhat limited | Octagon 92% Depth to saturated zone |
| 656C2 | Octagon silt loam, 4 to 6 percent slopes, eroded | Somewhat limited | Octagon 92% Depth to saturated zone |
| 662B | Barony silt loam, 2 to 5 percent slopes | Somewhat limited | Barony 92% Shrink-swell Depth to saturated zone |
| W | Water | Not rated | Water 100% |

Dwellings are single-family houses of three stories or less. For dwellings with basements, the foundation is assumed to consist of spread footings of reinforced concrete built on undisturbed soil at a depth of about 7 feet.

The ratings for dwellings are based on the soil properties that affect the capacity of the soil to support a load without movement and on the properties that affect excavation and construction costs. The properties that affect the load-supporting capacity include depth to a water table, ponding, flooding, subsidence, linear extensibility (shrink-swell potential), and compressibility. Compressibility is inferred from the Unified classification of the soil. The properties that affect the ease and amount of excavation include depth to a water table, ponding, flooding, slope, depth to bedrock or a cemented pan, hardness of bedrock or a cemented pan, and the amount and size of rock fragments.

The ratings are both verbal and numerical. Rating class terms indicate the extent to which the soils are limited by all of the soil features that affect the specified use. "Not limited" indicates that the soil has features that are very favorable for the specified use. Good performance and very low maintenance can be expected. "Somewhat limited" indicates that the soil has features that are moderately favorable for the specified use. The limitations can be overcome or minimized by special planning, design, or installation. Fair performance and moderate maintenance can be expected. "Very limited" indicates that the soil has one or more features that are unfavorable for the specified use. The limitations generally cannot be overcome without major soil reclamation, special design, or expensive installation procedures. Poor performance and high maintenance can be expected.

Numerical ratings indicate the severity of individual limitations. The ratings are shown as decimal fractions ranging from 0.01 to 1.00. They indicate gradations between the point at which a soil feature has the greatest negative impact on the use (1.00) and the point at which the soil feature is not a limitation (0.00).

The map unit components listed for each map unit in the accompanying Summary by Map Unit table in Web Soil Survey or the Aggregation Report in Soil Data Viewer are determined by the aggregation method chosen. An aggregated rating class is shown for each map unit. The components listed for each map unit are only those that have the same rating class as listed for the map unit. The percent composition of each component in a particular map unit is presented to help the user better understand the percentage of each map unit that has the rating presented.

Other components with different ratings may be present in each map unit. The ratings for all components, regardless of the map unit aggregated rating, can be viewed by generating the equivalent report from the Soil Reports tab in Web Soil Survey or from the Soil Data Mart site. Onsite investigation may be needed to validate these interpretations and to confirm the identity of the soil on a given site.

## Dwellings Without Basements

Aggregation Method: Dominant Condition
Tie-break Rule: Higher

Kane County, Illinois
Survey Area Version and Date: 6 - 01/20/2012

| Map symbol | Map unit name | Rating | Component name and % composition Rating reasons |
|---|---|---|---|
| 103A | Houghton muck, 0 to 2 percent slopes | Very limited | Houghton 90% Subsidence Depth to saturated zone Organic matter content |
| 152A | Drummer silty clay loam, 0 to 2 percent slopes | Very limited | Drummer 90% Depth to saturated zone Shrink-swell |
| 193B | Mayville silt loam, 2 to 5 percent slopes | Somewhat limited | Mayville 92% Shrink-swell |
| 344C2 | Harvard silt loam, 5 to 10 percent slopes, eroded | Somewhat limited | Harvard 92% Shrink-swell |
| 348B | Wingate silt loam, 2 to 5 percent slopes | Somewhat limited | Wingate 90% Shrink-swell |
| 356A | Elpaso silty clay loam, 0 to 2 percent slopes | Very limited | Elpaso 90% Ponding Depth to saturated zone Shrink-swell |
| 656B | Octagon silt loam, 2 to 4 percent slopes | Somewhat limited | Octagon 92% Shrink-swell |
| 656C2 | Octagon silt loam, 4 to 6 percent slopes, eroded | Somewhat limited | Octagon 92% Shrink-swell |
| 662B | Barony silt loam, 2 to 5 percent slopes | Somewhat limited | Barony 92% Shrink-swell |
| W | Water | Not rated | Water 100% |

Dwellings are single-family houses of three stories or less. For dwellings without basements, the foundation is assumed to consist of spread footings of reinforced concrete built on undisturbed soil at a depth of 2 feet or at the depth of maximum frost penetration, whichever is deeper.

The ratings for dwellings are based on the soil properties that affect the capacity of the soil to support a load without movement and on the properties that affect excavation and construction costs. The properties that affect the load-supporting capacity include depth to a water table, ponding, flooding, subsidence, linear extensibility (shrink-swell potential), and compressibility. Compressibility is inferred from the Unified classification of the soil. The properties that affect the ease and amount of excavation include depth to a water table, ponding, flooding, slope, depth to bedrock or a cemented pan, hardness of bedrock or a cemented pan, and the amount and size of rock fragments.

The ratings are both verbal and numerical. Rating class terms indicate the extent to which the soils are limited by all of the soil features that affect the specified use. "Not limited" indicates that the soil has features that are very favorable for the specified use. Good performance and very low maintenance can be expected. "Somewhat limited" indicates that the soil has features that are moderately favorable for the specified use. The limitations can be overcome or minimized by special planning, design, or installation. Fair performance and moderate maintenance can be expected. "Very limited" indicates that the soil has one or more features that are unfavorable for the specified use. The limitations generally cannot be overcome without major soil reclamation, special design, or expensive installation procedures. Poor performance and high maintenance can be expected.

Numerical ratings indicate the severity of individual limitations. The ratings are shown as decimal fractions ranging from 0.01 to 1.00. They indicate gradations between the point at which a soil feature has the greatest negative impact on the use (1.00) and the point at which the soil feature is not a limitation (0.00).

The map unit components listed for each map unit in the accompanying Summary by Map Unit table in Web Soil Survey or the Aggregation Report in Soil Data Viewer are determined by the aggregation method chosen. An aggregated rating class is shown for each map unit. The components listed for each map unit are only those that have the same rating class as listed for the map unit. The percent composition of each component in a particular map unit is presented to help the user better understand the percentage of each map unit that has the rating presented.

Other components with different ratings may be present in each map unit. The ratings for all components, regardless of the map unit aggregated rating, can be viewed by generating the equivalent report from the Soil Reports tab in Web Soil Survey or from the Soil Data Mart site. Onsite investigation may be needed to validate these interpretations and to confirm the identity of the soil on a given site.

## Small Commercial Buildings

Aggregation Method: Dominant Condition
Tie-break Rule: Higher

Kane County, Illinois
Survey Area Version and Date:  6 - 01/20/2012

| Map symbol | Map unit name | Rating | Component name and % composition Rating reasons |
|---|---|---|---|
| 103A | Houghton muck, 0 to 2 percent slopes | Very limited | Houghton 90% Subsidence Depth to saturated zone Organic matter content |
| 152A | Drummer silty clay loam, 0 to 2 percent slopes | Very limited | Drummer 90% Depth to saturated zone Shrink-swell |
| 193B | Mayville silt loam, 2 to 5 percent slopes | Somewhat limited | Mayville 92% Shrink-swell |
| 344C2 | Harvard silt loam, 5 to 10 percent slopes, eroded | Somewhat limited | Harvard 92% Slope Shrink-swell |
| 348B | Wingate silt loam, 2 to 5 percent slopes | Somewhat limited | Wingate 90% Shrink-swell |
| 356A | Elpaso silty clay loam, 0 to 2 percent slopes | Very limited | Elpaso 90% Ponding Depth to saturated zone Shrink-swell |
| 656B | Octagon silt loam, 2 to 4 percent slopes | Somewhat limited | Octagon 92% Shrink-swell |
| 656C2 | Octagon silt loam, 4 to 6 percent slopes, eroded | Somewhat limited | Octagon 92% Shrink-swell Slope |
| 662B | Barony silt loam, 2 to 5 percent slopes | Somewhat limited | Barony 92% Shrink-swell |
| W | Water | Not rated | Water 100% |

Small commercial buildings are structures that are less than three stories high and do not have basements. The foundation is assumed to consist of spread footings of reinforced concrete built on undisturbed soil at a depth of 2 feet or at the depth of maximum frost penetration, whichever is deeper. The ratings are based on the soil properties that affect the capacity of the soil to support a load without movement and on the properties that affect excavation and construction costs. The properties that affect the load-supporting capacity include depth to a water table, ponding, flooding, subsidence, linear extensibility (shrink-swell potential), and compressibility (which is inferred from the Unified classification of the soil). The properties that affect the ease and amount of excavation include flooding, depth to a water table, ponding, slope, depth to bedrock or a cemented pan, hardness of bedrock or a cemented pan, and the amount and size of rock fragments.

The ratings are both verbal and numerical. Rating class terms indicate the extent to which the soils are limited by all of the soil features that affect the specified use. "Not limited" indicates that the soil has features that are very favorable for the specified use. Good performance and very low maintenance can be expected. "Somewhat limited" indicates that the soil has features that are moderately favorable for the specified use. The limitations can be overcome or minimized by special planning, design, or installation. Fair performance and moderate maintenance can be expected. "Very limited" indicates that the soil has one or more features that are unfavorable for the specified use. The limitations generally cannot be overcome without major soil reclamation, special design, or expensive installation procedures. Poor performance and high maintenance can be expected.

Numerical ratings indicate the severity of individual limitations. The ratings are shown as decimal fractions ranging from 0.01 to 1.00. They indicate gradations between the point at which a soil feature has the greatest negative impact on the use (1.00) and the point at which the soil feature is not a limitation (0.00).

The map unit components listed for each map unit in the accompanying Summary by Map Unit table in Web Soil Survey or the Aggregation Report in Soil Data Viewer are determined by the aggregation method chosen.  An aggregated rating class is shown for each map unit. The components listed for each map unit are only those that have the same rating class as listed for the map unit.  The percent composition of each map component in a particular map unit is presented to help the user better understand the percentage of each map unit that has the rating presented.

Other components with different ratings may be present in each map unit.  The ratings for all components, regardless of the map unit aggregated rating, can be viewed by generating the equivalent report from the Soil Reports tab in Web Soil Survey or from the Soil Data Mart site. Onsite investigation may be needed to validate these interpretations and to confirm the identity of the soil on a given site.

30

# APPENDIX C

# Contact List

# CONTACT LIST

**Federal Agencies**

**U. S. Army Corps of Engineers**
Regulatory Branch
111 N. Canal Street, Suite 600
Chicago, Illinois 60606
(312) 846-5530
http://www.usace.army.mil/ncc/

**U. S. D. A. Natural Resources**
Conservation Service
2315 Dean St. Suite 100
St. Charles, Illinois 60175
(630)584-7961
http://www.il.nrcs.usda.gov/

**U. S. Fish & Wildlife Service**
Chicago Metro Wetlands Office
1000 Hart Road, Suite 180
Barrington, Illinois 60010
(847) 381-2253
http://www.fws.gov/

**U. S. Environmental Protection Agency**
Region 5
77 West Jackson Boulevard
Chicago, Illinois 60604
(312) 353-2000
http://www.epa.gov/region5/

**State Agencies**

**Illinois Department of Natural Resources**
Lincoln Tower Plaza
524 S. Second Street
Springfield, Illinois 62794
(217) 782-6302
http://dnr.state.il.us/

**Illinois Environmental Protection Agency**
1021 North Grand Avenue East
Springfield, Illinois 62702
(217) 782-3397
http://www.epa.state.il.us/

**Illinois Department of Transportation**
201 West Center Court
Schaumburg, Illinois 60196
http://www.dot.state.il.us/

**Illinois Natural History Survey**
607 East Peabody Drive
Champaign, Illinois 61820
(217) 333-688
http://www.inhs.uiuc.edu/

**County Offices**

**DuPage County**

**Administration Building**
421 N. County Farm Road
Wheaton, Illinois 60187
http://www.co.dupage.il.us/
630-407-6500

**Development Department**
(630) 407-6700

**Environmental Concerns Department**
Stormwater Management Division
(630) 407-6700

**Solid Waste Department**
(630) 407-6700

**Health Department**
111 North County Farm Road
Wheaton, Illinois 60187
(630) 682-7400

**Forest Preserve District**
3 S 580 Naperville Road,
Wheaton, Illinois 60187
(630) 933-7200

**Kane County**

**Government Center**
719 S. Batavia Ave.
Geneva, IL 60134
http://www.co.kane.il.us/
630-232-3400

**Development Department**
(630) 232-3492

**Department of Environmental Management**
630-208-5118

**Forest Preserve District**
(630) 232-5980

**Health Department**
1240 North Highland Ave
Aurora, IL 60506
(630) 897-1124



MEYERS & FLOWERS
TRIAL ATTORNEYS

**PARTNERS**
TED A. MEYERS
PETER J. FLOWERS
CRAIG D. BROWN
RYAN P. THERIAULT
BRIAN J. PERKINS

3 NORTH SECOND STREET, SUITE 300
ST. CHARLES, ILLINOIS 60174
PHONE (630) 232-6333
FACSIMILE (630) 845-8982
www.meyers-flowers.com

**CHICAGO OFFICE**
225 W. WACKER DRIVE
SUITE 1515
CHICAGO, ILLINOIS 60606
(312) 214-1017

July 17, 2015

Via Hand Delivery

Mark VanKerkhoff
Director
Kane County Development and Community Services Department
719 S. Batavia Avenue
Geneva, IL 60134

**RE: Maxxam Partners, LLC Application for Special Use Permit- Land Use Opinion**

Dear Mr. VanKerkhoff:

    As part of Maxxam Partners, LLC's Application for Special Use, we enclose herewith electronic communication from Michelle Loth, Resource Assistant for the Kane-DuPage Soil & Water Conservation District, stating that all Land Use Opinion Reports are valid for 5 years and that a re-submittal for a Land Use Opinion for property located at 41W400 Silver Glen Road in St. Charles Illinois will not be necessary at this time. Land Use Opinion 12-43, submitted by Kiva Real Estate Investments, LLC and completed on August 27, 2012, is still valid for the purposes of Maxxam Partners, LLC's Application for Special Use. Also enclosed is an email communication from Keith T. Berkhout, Zoning Planner for Kane County, confirming that Maxxam Partners, LLC will not be required to obtain a new Land Use Opinion for submittal with its Application for Special Use.

    Respectfully,

*Andrew E. Kolb, Esq.*

| From: | Berkhout, Keith |
|---|---|
| To: | Kelly Bartelson |
| Subject: | RE: Proposed Land Use Opinion |
| Date: | Wednesday, April 22, 2015 1:32:54 PM |
| Attachments: | image002.png |

This email to confirm that our office will accept the Land Use Opinion due to the Soil & Water Conservation District's position that their report is good for five years.

**Keith T. Berkhout**
**Zoning Planner**
**Kane County Development and Community Services Department**
**719 S. Batavia Avenue**
**Geneva, Illinois 60134**

**630-232-3495 (Direct)**
**630-232-3411 (Fax)**
**berkhoutkeith@co.kane.il.us**



**From:** Kelly Bartelson [mailto:kelly@vlklawfirm.com]
**Sent:** Wednesday, April 22, 2015 12:45 PM
**To:** Berkhout, Keith
**Subject:** FW: Proposed Land Use Opinion

Keith,

Here is the email that was sent to you 3/31 from the Kane-DuPage Soil & Water Conservation District. Did you not receive this from Michelle?

Kelly

Kelly Bartelson
Assistant to Andrew E. Kolb



Vanek, Larson & Kolb, LLC
200 W. Main Street
St. Charles, IL 60174
Ph. 630.513.9800 x 2129
Fax 630.513.9802

**From:** Michelle Loth [mailto:michelle.loth@kanedupageswcd.org]
**Sent:** Monday, April 13, 2015 3:31 PM
**To:** Kelly Bartelson
**Subject:** FW: Proposed Land Use Opinion

Kelly,

Let me know if there is anything else you need.

Thanks,

*Michelle Loth*, Resource Assistant
Kane-DuPage Soil & Water Conservation District
2315 Dean Street Suite 100
St. Charles, IL 60175
(630) 584-7961 Ext. 3
michelle.loth@kanedupageswcd.org

**From:** Michelle Loth [mailto:michelle.loth@kanedupageswcd.org]
**Sent:** Tuesday, March 31, 2015 4:33 PM
**To:** 'berkhoutkeith@co.kane.il.us'
**Subject:** Proposed Land Use Opinion

Keith,

As a heads up, I spoke with Kelly from VLK Law Firm yesterday who is representing Myers and Flowers, LLC as the petitioner for a proposed new land use opinion located at 41W400 Silver Glen Road in St. Charles. According to our records, Land Use Opinion 12-43 submitted by Kiva real Estate Investments LLC also located in Campton Township at 41W400 Silver Glen Road in St. Charles was completed 8/27/2012. I advised Kelly that all Land Use Opinion reports are valid for 5 years and therefore a re-submittal for the same location will not be necessary at this time. Attached is a copy of the original application for Land Use Opinion 12-43, if you would like a copy of the full report I can send that as well. Let me know if you have any questions.

Thanks,

*Michelle Loth*, Resource Assistant

Kane-DuPage Soil & Water Conservation District
2315 Dean Street Suite 100
St. Charles, IL 60175
(630) 584-7961 Ext. 3
michelle.loth@kanedupageswcd.org



# Illinois Department of
# Natural Resources

One Natural Resources Way    Springfield, Illinois 62702-1271
http://dnr.state.il.us

Bruce Rauner, Governor

Wayne Rosenthal, Director

April 06, 2015

Andrew E. Kolb
Maxxam Partners, LLC
c/o Meyers & Flowers, LLC
3 N. Second Street, Suite 300
St. Charles , IL 60174

**RE: Maxxam Partners, LLC**
 **Project Number(s): 1511112 [1300521]**
 **County: Kane**

Dear Applicant:

This letter is in reference to the project you recently submitted for consultation. The natural resource review provided by EcoCAT identified protected resources that may be in the vicinity of the proposed action. The Department has evaluated this information and concluded that adverse effects are unlikely. Therefore, consultation under 17 Ill. Adm. Code Part 1075 is terminated.

This consultation is valid for two years unless new information becomes available that was not previously considered; the proposed action is modified; or additional species, essential habitat, or Natural Areas are identified in the vicinity. If the project has not been implemented within two years of the date of this letter, or any of the above listed conditions develop, a new consultation is necessary.

The natural resource review reflects the information existing in the Illinois Natural Heritage Database at the time of the project submittal, and should not be regarded as a final statement on the site being considered, nor should it be a substitute for detailed site surveys or field surveys required for environmental assessments. If additional protected resources are encountered during the project's implementation, you must comply with the applicable statutes and regulations. Also, note that termination does not imply IDNR's authorization or endorsement of the proposed action.

Please contact me if you have questions regarding this review.

Natalia Jones
Division of Ecosystems and Environment
217-785-5500

## CERTIFICATION OF NOTIFICATION
## OF ADJACENT PROPERTY OWNERS

Date: 7/17/15     To:

KANE COUNTY ZONING BOARD OF APPEALS

From:    Maxxam Partners, LLC

c/o Andrew E. Kob, Esq.

200 W. Main Street, St. Charles, IL 60174

(Ph #)    630-513-9800

     The undersigned, being sworn upon this oath, deposes and says that the list below includes the    names and addresses of all owners of property adjacent to property referred to in petition for

(circle one)   Variance   Rezoning   (Special Use)

for the purpose of    Applicant requests a Special Use to operate the Subject Property as

an alcoholism and substance abuse treatment facility .

and, further, that all persons owning property which is adjacent to parcel referred to in petition have been notified of the intent of the petitioner(s).

Petitioner's property is located in Section  34 , Township  41N , County of Kane.    (Legal Description Attached)

List names of property owners below. (Property Owners do not have to sign this form)

| NAME | ADDRESS (street, city, state and zip code) |
|---|---|
| See Attached | |
| | |
| | |
| | |
| | |

By: _____

_____
(Property Owner or Agent)

Subscribed and sworn to before me

this ____ day of _____, 20____

_____
Notary

**List of Adjacent Property Owners**

| Tax Permanent Parcel No. | Name of Registered Owner | Mailing Address |
|---|---|---|
| 08-03-200-011 | Forest Preserve District of Kane County | 1996 S. Kirk Road Suite 320 Geneva, IL 60134 |
| 08-03-200-009 | Forest Preserve District of Kane County | 1996 S. Kirk Road Suite 320 Geneva, IL 60134 |
| 08-03-200-008 | Forest Preserve District of Kane County | 1996 S. Kirk Road Suite 320 Geneva, IL 60134 |
| 08-03-200-007 | Forest Preserve District of Kane County | 1996 S. Kirk Road Suite 320 Geneva, IL 60134 |
| 08-03-100-008 | Forest Preserve District of Kane County | 1996 S. Kirk Road Suite 320 Geneva, IL 60134 |
| 05-34-400-027 | Forest Preserve District of Kane County | 1996 S. Kirk Road Suite 320 Geneva, IL 60134 |
| 05-34-400-022 | Forest Preserve District of Kane County | 1996 S. Kirk Road Suite 320 Geneva, IL 60134 |
| 05-34-300-046 | Cathy R. Bourel-Cartee | 41W815 McDonald Road Elgin IL 60124 |
| 05-34-300-044 | Joline T. Andrzejewski as Trustee of the Joline T. Andrzejewski Trust #2004 | 41W547 McDonald Road, Elgin, IL 60123 |
| 05-34-300-040 | Forest Preserve District of Kane County | 1996 S. Kirk Road Suite 320 Geneva, IL 60134 |





The Sidwell Company
2570 Foxfield Road, Suite 300
St. Charles, Illinois 60174
[Tel] 630.549.1000 [Fax] 630.549.1111
www.sidwellco.com



PLOT DATE
4/7/2015

# CAMPTON TWP.
## SEC. 3 T.40N. R.7E.
### KANE COUNTY, ILLINOIS



Scale: 1"=400'

08-03



THIS MAP DOES NOT REPRESENT A SURVEY. NO LIABILITY IS ASSUMED FOR THE ACCURACY OF THE DATA DELINEATED HEREIN, EITHER EXPRESSED OR IMPLIED BY KANE COUNTY OR ITS EMPLOYEES.
THIS MAP IS COMPILED FROM OFFICIAL RECORDS, INCLUDING PLATS, SURVEYS, RECORDED DEEDS, AND CONTRACTS, AND ONLY CONTAINS INFORMATION REQUIRED FOR LOCAL GOVERNMENT PURPOSES. SEE THE RECORDED DOCUMENTS FOR MORE DETAILED LEGAL INFORMATION.



**LEGEND**

1 — Executive Residence
2 — Dining / Multipurpose Building
3 — Therapy / Activity Center
4 — Gymnasium
5 — Patient Lodge #1
6 — Patient Lodge #2
7 — Patient Lodge #3
8 — Patient Lodge #4
9 — Patient Lodge #5
10 — Patient Lodge #6
11 — Patient Lodge #7
12 — Patient Lodge #8
13 — Lake

MAXXAM PARTNERS, LLC - SITE PLAN

**The Glenwood School for Boy's Special Use Application**



Our proposal is to convert The Glenwood School for Boy's Campus into a luxury Alcoholism and Substance Abuse Treatment Facility. The existing layout of the school is perfectly designed to offer comprehensive treatment for adult men and women. The existing eight residence dormitories will house the patients, with separate buildings for men and women; two additional residence dormitories were planned. The patients will be grouped according to their needs and the type of treatment they will be receiving. A state of the art security system will be installed, and the facility will provide 24 hour security services. If a patient wants to leave the facility, they will be taken to Chicago by a private car service.

The facility will be licensed by the Division of Alcoholism and Substance Abuse of the Illinois Department of Human Services and will be accredited by the Joint Commission on Accreditation of Health Care Organizations (JCAHO). As a luxury treatment facility, our clientele demands a full continuum of care, which typically includes Inpatient Residential, Residential Extended Care, Eating Disorder Stabilization, Medically Managed Detoxification, and other related services. Treatment shall be offered in varying degrees of intensity based on the level of care in which the patient is placed and the subsequent treatment plan developed for that patient. The level of care provided shall be in accordance with that specified in the ASAM Patient Placement Criteria and with the related administrative code. Our professional staff will develop a customized care plan for each patient.



The average stay will be between 30 and 90 days. The facility will only accept self-pay patients and private health insurance.

All of the services will be provided by our experienced and trained team of professionals, who will be licensed by the State of Illinois. In addition to usual team of professionals, we will have a full time Medical Director licensed as an Addiction Psychiatrist and a Licensed Dietitian. All of our staff will undergo drug testing, and we will be a drug free workplace. Individual and group therapy will be given in each residence dormitory and will be tailored to the patients' needs.

In addition to the medical care and addiction treatment, the facility will provide wellness and spiritual programs that include meditation, yoga, massage, and other therapeutic services. There will be a state of the art gym with group fitness classes and personal trainers. Art and nutritional classes will be offered. The existing gymnasium features a full size basketball court and will house many group activities (etc. Zumba, dancing).

The environment of the facility will feel more like a luxury spa than a treatment facility and will be dedicated to healing one's whole self. The interiors of the common areas and residence dormitories will be renovated and include new furniture. We also will be upgrading the bathrooms with higher end finishes. Private and Semi-Private accommodations will be available. Out of town patients will be picked up at the airport by luxury SUV's. The facility will be marketed to business executives, lawyers, doctors, celebrities, professionals, government workers, and their family members who are in need of treatment.

















## SITE PLAN

### LEGEND

1   ERIKSON ADMINISTRATION RESIDENCE HALL

2   ARMOUR STUDENT CENTER - WITH FRED W. BEZENSON EXECUTIVE WING

3   ACADEMIC CENTER

4   FIELD HOUSE AND MASSEY MEDICAL CENTER

5   HILL RESIDENCE HALL

6   ALUMNI RESIDENCE HALL

7   DARNALL RESIDENCE HALL

8   HOWELL RESIDENCE HALL

9   RESIDENCE HALL #5

10   RESIDENCE HALL #6

11   RESIDENCE HALL #7

12   RESIDENCE HALL #8

13   FUTURE RESIDENCE HALL

14   FUTURE RESIDENCE HALL

15   LAKE WILLET

GLENWOOD SCHOOL FOR BOYS - SITE PLAN



Existing Campus Aerial

# Holland & Knight

131 South Dearborn Street, 30th Floor | Chicago, Illinois | T 312-263-3600 | F 312-578-6666
Holland & Knight LLP | www.hklaw.com

## Memorandum

Date:       August 19, 2015

To:         Steven Marco, Maxxam Partners, LLC

From:       Steven M. Elrod
            Hart M. Passman

Re:         Proposed Alcoholism and Substance Abuse Treatment Facility, Kane County, Illinois
            Zoning Analysis

---

We have reviewed the Zoning Ordinance of Kane County, Illinois, and have determined that the property known as the Glenwood School for Boys, located at 41W400 Silver Glen Road in unincorporated Kane County, may be used for an alcoholism and substance abuse treatment facility, provided that a special use permit is approved by the County Board. We have also concluded that this use likely satisfies the standards for granting a special use at the specified location. Our analysis and findings are summarized below.

## I.      Permitted and Special Uses of the Subject Property.

There is no individual use in the County Zoning ordinance that explicitly references residential alcoholism and substance abuse treatment facilities. However, this use is included within several listed uses. The closest defined uses that encompass various portions of the proposed residential alcoholism and substance abuse treatment facility are:

- "*Assisted Living Facility,*" defined as: "A building and premises where the proprietor furnishes lodging and varying degrees of custodial care to persons who are elderly or who require assistance in daily living, but are otherwise in good health."

- "*Convalescent or Nursing Home,*" which is defined as: "A private home for the care of the aged or infirm, or a place of rest for those suffering bodily disorders."

- "*Hospital or Sanitarium,*" defined as: "An institution open to the public in which patients or injured persons are given medical or surgical care; or for the care of contagious diseases."

- "*Nursing and Convalescent Home*" (a separate term in the Zoning Ordinance) is defined as: "A building and premises for the care of sick, infirm, aged, or injured

Mr. Steven Marco
August 19, 2015

persons to be housed; or a place of rest for those who are bedfast or need considerable nursing care, but not including hospitals, assisted living facilities or group homes."

It is our opinion that the defined "hospital" use best describes the medically managed detoxification component of the proposed facility, and the defined "Nursing and Convalescent Home" use best describes the residential dwelling arrangements for the residents of the facility.

The Ordinance defines "Hospital or Sanitarium" as "an institution open to the public in which patients or injured persons are given medical or surgical care; or for the care of contagious diseases." The reference to "medical care" in the "hospital" definition comes closest to the proposed facility's treatment programs. We note that the proposed facility will have a licensed medical physician as its medical director, and that a licensed medical physician may see each facility patient daily, as needed. Also, the facility must have 24-hour staffing by either a registered or licensed nurse, or a certified emergency medical technician. This level of care and professional staff indicates that the facility will share many of the same characteristics as a hospital.

The Ordinance defines "Nursing and Convalescent Home" as "a building and premises for the care of sick, infirm, aged, or injured persons to be housed; or a place of rest for those who are bedfast or need considerable nursing care, but not including hospitals, assisted living facilities or group homes." We understand that the patients of the proposed residential alcoholism and substance abuse treatment facility are disabled and sick, and will be housed in seven separate resident lodges. Each lodge is a home or dwelling unit as it contains bedrooms with private bathrooms, a kitchen, and a dining/living room area. We further understand that the patients' medications will be administered to them in the lodges by the facility's professional staff, the same as in a Nursing Home.

The subject property is located in the "F" Farming zoning district of the Kane County Zoning Ordinance. In the F District, "Hospitals" (by cross-reference to the special uses in the R-1 District) and "Nursing and Convalescent Homes" are designated as special uses. Further, pursuant to Section 5.15 of the County Ordinance, the zoning officer may allow additional, unlisted uses that he or she determines is similar to, or compatible with, a listed permitted or special use. Section 8.1-2(dd) of the County Ordinance expressly allows, as special uses in the F District, "other uses similar to those permitted herein as special uses."

As noted above, we believe that the proposed alcoholism and substance abuse treatment facility would fall into the defined use of "hospital" and "nursing and convalescent home." Thus, the County would indeed have the authority to approve the proposed facility as a special use. Even if the facility is not a "hospital" or a "nursing or convalescent home," Sections 5.15 and 8.1-2(dd) would support the review of the proposal as "similar" to the recognized use categories. For these reasons, it is appropriate for the County to designate and review the proposed alcoholism and substance abuse treatment facility as a special use in the F District.

2

Mr. Steven Marco
August 19, 2015

## II.     Special Uses under Illinois Law.

The Illinois Supreme Court has explained that, under Illinois zoning law, "a 'special use' is a type of property use that is expressly permitted within a zoning district by the controlling zoning ordinance so long as the use meets certain criteria or conditions." *City of Chicago Heights v. Living Word Outreach Full Gospel Church and Ministries, Inc.*, 196 Ill. 2d 1, 16 (2001). The identification of a use as a "special use" constitutes "a local legislative determination that the use, as such, is neither inconsistent with the public's health, safety, morals or general welfare, nor out of harmony with the town's general zoning plan." *Id.* at 17 (internal citation omitted).

This means that the County has *already* determined, in its legislative discretion, that uses like the proposed facility are allowed and contemplated in the F Farming District, so long as the specific proposal satisfies the designated standards for the special use permits. It may be that there are parcels within the F Farming District that, for reasons unique to those parcels, are *unsuitable* for uses like the proposed facility. However, in this case, given the historic use of the subject property and existing buildings as an isolated residential-like setting for at-risk individuals, as well as the extensive natural and landscaped buffers, and we are certain that the proposal meets the County standards for special uses, particularly if the proposal will not include new construction.

We understand that opponents to the proposed facility have argued that the proposal is inconsistent with the County's comprehensive land use plan. Even if this is true, it is not dispositive. Under Illinois law, comprehensive plans are advisory only: Section 5-14004 of the Illinois Counties Code, 55 ILCS 5/5-14004 expressly states as much, and numerous court opinions, analyzing parallel provisions of the Illinois Municipal Code, confirm it. *See, e.g., City of Chicago Heights*, 196 Ill. 2d at 22 ("the City's zoning ordinance is law; the comprehensive plan is not."). Notably, in *Chicago Heights*, as here, the applicable special use permit standards do *not* include "conformance with the comprehensive plan." *Id.* Thus, this attack on the proposed facility would not be persuasive under Illinois or County law.

## III.     *LaSalle* Factors and Zoning Ordinance Standards.

At public hearings held by the Village of Campton Hills in 2012, concerning a similar treatment facility for this same property, the Campton Hills Village Attorney stated his opinion that such prior proposal satisfied the *LaSalle* factors by which courts frequently review zoning disputes. At the hearing and afterward, some opponents to that proposal voiced their disagreement with the Village Attorney's analysis. We have conducted our own analysis of the evidence presented at the public hearings and of the *LaSalle* factors, and believe that the Village Attorney was correct: a court should find that the prior treatment facility proposal satisfies those factors.

The specific task of the County is to weigh the evidence against the six standards for special uses set forth in Section 4.8-2 of the Zoning Ordinance. We believe that those standards

Mr. Steven Marco
August 19, 2015

can be met for this new proposed use, and therefore we conclude that the new proposal can qualify for the required special use permit.

## IV.     County Review under the Fair Housing Act.

Alongside its review of the proposed facility under the Zoning Ordinance and State zoning law, the County must also consider its obligations under the Federal Fair Housing Act (*"FHA"*).

The FHA prohibits discrimination in housing, including discrimination against "persons with disabilities." This prohibition encompasses the enforcement of zoning or other local ordinances in a manner that treats disabled persons less favorably than non-disabled persons. Under the FHA, a "disability" generally means "a physical or mental impairment which substantially limits one or more of such person's major life activities." 42 U.S.C. § 3602(h)(1). Individuals recovering from alcoholism and substance abuse, such as those that would be residing at the proposed facility, are considered to be persons with disabilities within the coverage of the FHA.

As we have advised our local government clients throughout the region, the United States Attorney's Office for the Chicago metropolitan area has taken an aggressive posture when local governments deny zoning approvals for residential facilities for persons with disabilities. In a well-known case resolved by consent decree, *United States v. Village of South* Elgin (No. 05 C 5258, N.D. Ill., December 13, 2006), which, incidentally, is located in Kane County, monetary damages and a civil penalty were paid by the Village as part of the settlement agreement for the denial of a special zoning permit, based in part on improper comments made by residents appearing at the public hearings in opposition to the proposed use. The settlement agreement also required the Village Board and other relevant village employees to receive training on the Fair Housing Act and required the village to keep and maintain records for the next three years relating to other zoning and land use requests regarding persons with disabilities. The Village was also required to submit biannual Compliance Reports, which Reports included, among other things, "the identity of each zoning, land-use, or building application or request for reasonable accommodation related to housing for disabled persons (including those for building permits, special exceptions, variances, or other uses not provided for) for which the Village had made a determination, indicating: (1) the date of the application; (2) the applicant's name; (3) the applicant's current residential street address; (4) the street address of the proposed housing; (5) the disposition of the application, including any appeals, indicating reasons for that outcome; and (6) if a vote was taken, how each member of the responsible body voted and the date of the vote." The U.S. Attorney said at the time that "this settlement should send a message to other communities that no municipality, driven by neighborhood opposition, can prohibit persons recovering from addictions from enjoying the benefits of living in the safe and supportive environment" of these types of residential facilities. In another jurisdiction, a court went so far as to reject a claim of immunity for town officials, because of their "irrational prejudice" against

4

Mr. Steven Marco
August 19, 2015

persons with disabilities. *See Pathways Psychosocial v. Town of Leonardtown*, 133 F. Supp. 2d 772 (D. Md., 2001).

Accordingly, the County will be required to make a "reasonable accommodation" with respect to the facility, because the facility will provide residential services to persons with disabilities who are protected under the Act. Notably, Section 5.3(b) of the County's Zoning Ordinance expressly recognizes that the FHA is applicable in Kane County, and implicitly acknowledges the County's mandate to provide such accommodations to persons with disabilities. Particularly when, as here, the proposed facility satisfies all zoning criteria for approval, it would be difficult for the County to deny the requested zoning relief without violating the FHA.

#35582401_v7

5



**Memorandum**

Date: July 18, 2015

To      Maxxam Partners, LLC

From:   Andrew E. Kolb, Esq.

Re:     Legal Opinion - Maxxam Partners, LLC – Proposed Alcoholism and Substance Abuse
        Treatment Facility

---

We have reviewed the Zoning Ordinance of Kane County, Illinois, and have determined
that from a zoning standpoint, the property, formally known as the Glenwood School for Boys,
located at 41W400 Silver Glen Road, in unincorporated Kane County (the "Site"), may be used
for an alcoholism and substance abuse treatment facility under applicable zoning ordinances of
Kane County, provided that a special use permit is issued by the Kane County Board. We have
also concluded that the proposed use as an alcoholism and substance abuse treatment facility
satisfies the standards for granting a special use at the specified location. Lastly, it is our opinion
that any denial of your proposed application for a special use by Kane County raises violations of
the Federal Fair Housing Act, 42 U.S.C. Sec. 3604(f) as noted below. Our analysis and findings
are as follows:

*Analysis*

There is no individual use expressed within the Kane County zoning ordinance that
explicitly references residential alcoholism and substance abuse treatment facilities as an
enumerated permitted or special use. However, an alcoholism and substance abuse treatment
facility is included within several other enumerated uses set forth in the ordinance. The closest
defined enumerated uses in the Kane County Zoning Ordinance that are similar to the proposed
residential alcoholism and substance abuse treatment facility are as follows:

(a) "Assisted Living Facility", defined as: "A building and premises where the proprietor
    furnishes lodging and varying degrees of custodial care to persons who are elderly or who
    require assistance in daily living, but are otherwise in good health."

(b) "Convalescent or Nursing Home," which is defined as: "A private home for the care of the aged or infirm, or a place of rest for those suffering bodily disorders."

(c) "Hospital or Sanitarium," defined as: "An institution open to the public in which patients or injured persons are given medical or surgical care; or for the care of contagious diseases," and;

(d) "Nursing and Convalescent Home" (a separate term in the Zoning Ordinance) is defined as: "A building and premises for the care of sick, infirm, aged, or injured persons to be housed; or a place of rest for those who are bedfast or need considerable nursing care, but not including hospitals, assisted living facilities or group homes."

### *Similarity to a Hospital*

It is our opinion that the defined "hospital" use describes the medically managed detoxification proposed at your alcoholism and substance abuse treatment facility. The Kane County Zoning Ordinance defines "Hospital or Sanitarium" as "an institution open to the public in which patients or injured persons are given medical or surgical care; or for the care of contagious diseases." The reference to "medical care" in the "hospital" overlaps substantially and is compatible with the proposed facility's treatment programs. We note that the proposed facility will have a licensed medical physician as its medical director, and that a licensed medical physician may see each facility patient daily, as needed. Also, the facility must have 24-hour staffing by either a registered or licensed nurse, or a certified emergency medical technician. This level of care and professional staff indicates that the facility will share many of the same characteristics as a hospital with respect to the administration of care.

Additional evidence of the similarity to a Hospital is found within relevant provisions of the Illinois Hospital Licensing Act, 210 ILCS 85 et seq. Section 3(A) of the Hospital Licensing Act provides the legal definition of a "Hospital" in the State of Illinois:

> *"Hospital means any institution, place, building, buildings on a campus, or agency, public or private, whether organized for profit or not, devoted primarily to the maintenance and operation of facilities for the diagnosis and treatment or care of 2 or more unrelated persons admitted for overnight stay or longer in order to obtain medical, including obstetric, psychiatric and nursing, care of illness, disease, injury, infirmity, or deformity."*

Section 3(A)(5) also states that:

> *"The term "hospital" does not include:*
>
> *(5) any person or facility required to be licensed pursuant to the Alcoholism and Other Drug Abuse and Dependency Act."*

Applicant's proposed use requires licensure under the Alcoholism and Other Drug Abuse and Dependency Act (separate from the Illinois Hospital Licensing Act). Devoid of the exemption provided under Section 3(A)(5) of the Illinois Hospital Licensing Act as mentioned above, the

Applicant would have to be licensed as a "Hospital." Thus, the definitions between the treatment facility and a hospital are so similar that legislature actually had to carve out our proposed use from the Hospital Licensing Act within Section 3(A)(5) of the Illinois Hospital Licensing Act. Simply put, because the two uses are so similar, the carve-out was necessary so that alcoholism and substance abuse treatment facilities would not be burdened with any unintended hardship of being licensed as a hospital.

Additional strong and comprehensive evidence to clearly establish "similarity" between a Hospital and our proposed treatment facility is found within the expert opinion procured from Murer Consultants, Inc.

### Similarity to a
### Nursing and Convalescent Home

Additionally, the defined term "Nursing and Convalescent Home" use best describes the residential dwelling arrangements of the residents. Thus, both uses are substantially similar and appropriate to our proposed use. The Kane County Zoning Ordinance defines Nursing and Convalescent Home as "a building and premises for the care of sick, infirm, aged, or injured persons to be housed; or a place of rest for those who are bedfast or need considerable nursing care, but not including hospitals, assisted living facilities or group homes." The patients of a residential alcoholism and substance abuse treatment facility are included in the definition of disabled and sick as defined in the zoning ordinance and will be housed in seven separate resident lodges. Each lodge is a home or dwelling unit as it contains bedrooms with private bathrooms, a kitchen and a dining/living room area. The patients' medications are administered to them in the lodges by the facility's professional staff, as would be the case in a Nursing and Convalescent Home.

### Similarity Standard –
### Kane County Zoning Ordinance

The subject property is located in the "F" Farming zoning district of the Kane County Zoning Ordinance. In the F District, "Hospitals" (by cross-reference to the special uses in the R-1 District) and "Nursing and Convalescent Homes" are designated as special uses. Further, pursuant to Section 5.15 of the County Ordinance, the zoning officer may allow additional, unlisted uses that he or she determines is **similar to, or compatible with,** a listed permitted or special use. Section 8.1-2(dd) of the County Ordinance expressly allows, as special uses in the F District, "**other uses similar to those permitted herein as special uses.**"

As noted above, we believe that the proposed alcoholism and substance abuse treatment facility would fall into the defined use of "hospital" and "nursing and convalescent home." Thus, the County would indeed have the authority to approve the proposed facility as a special use. Even though the facility is not a "hospital" or a "nursing or convalescent home," Sections 5.15 and 8.1-2(dd) would support the review of the proposal as "similar" to the recognized use categories. For these reasons, it is appropriate for the County to designate and review the proposed alcoholism and substance abuse treatment facility as a special use in the F District.

### *Special Uses in the State of Illinois*

Under Illinois zoning law, a "special use" is a type of property use that is expressly permitted within a zoning district by the controlling zoning ordinance so long as the use meets certain criteria and conditions. *City of Chicago Heights .v Living Word Outreach Full Gospel Church and Ministries, Inc.*, 196 Ill 2d 1, 16 (2001). For example, in our case, this means that "Hospital" (or any use similar thereto) already has been determined to be allowed in the "F" Farming District, so long as the proposed use satisfies the statutory standards for the granting of a special use under the Kane County Zoning Ordinance. For the reasons set forth in the zoning petition (and accompanying Rider) and based upon the findings within the expert reports referenced in Section III of the application Rider, and given the physical characteristics of the site, the prior use and the fact that the Site is surrounded by natural areas, we believe that you satisfy the standards for a special use.

### *Fair Housing Act*

In making its determination of whether or not to grant a special use, the County must also consider its obligations under the Federal Fair Housing Act ("FHA"), 42 U.S.C. Sec. 3604(f). Section 5.3(b) of the Kane County Zoning Ordinance states that "no section, clause or provision of this Ordinance is intended nor shall be construed as contrary to the Federal Fair Housing Act". Courts have repeatedly acknowledged the role a group living arrangement plays in the recovery of substance abusers. *See Corp. of the Episcopal Church in Utah*, 199 F. Supp.3d 1215, 1217-1218 (D. Utah 2000); *Oxford House, Inc. v. Town of Babylon*, 819 F.Supp. 1179, 1183 (E.D. NY 1993). The need for handicapped people to live in group arrangements for support or to pool caretaker staff has been described by courts as essential. *Brandt*, 82 F.3d at 174; *see also Smith & Lee Assocs, Inc.*, 102 F.3d at 795-96. Courts have repeatedly held that those suffering from alcoholism and drug addiction fall within the definition of "handicapped" thus to invoke the FHA. *Oxford House v. City of Baton Rouge, Louisiana*, 932 F.Supp.2d 683 (2013). Courts have held that municipal zoning that limits the housing opportunities for those undergoing drug and alcohol abuse treatment limits the opportunities for recovering individuals to live in residential communities and therefore violates certain provisions of the FHA.

Importantly, in our case, Kane County will be required to make a "reasonable accommodation" with respect to the facility, because the facility will provide residential treatment to persons with disabilities who are protected under the Act.

Respectfully,

Meyers & Flowers

By: *[signature]*
Andrew E. Kolb, Esq.
Of-Counsel



## Cherilyn G. Murer, J.D., C.R.A.

*Biographical Sketch*

*Curriculum Vitae*



**The Platinum Card®**

Contact:    Marcos Rada
American Express
(212) 640-2566

Dina George
David Kratz & Company
(212) 979-2700

## American Express Recognizes Health-Care Pioneer
## Cherilyn G. Murer as Platinum Card® Leader

### *Consultant Provides Concrete Solutions*
### *To Health-Care Questions*

New York (May 9, 1994) -- American Express has announced that Joliet area resident Cherilyn G. Murer will be honored as part of the "Platinum Card Profiles." This new program recognizes Platinum Card members for their individual leadership qualities and outstanding accomplishments. Ms. Murer is featured in the May issue of "Preview," a newsletter distributed exclusively to Platinum Card members.

Ms. Murer is founder and president of Murer Consultants, a legal-based health-care management consulting firm which assists health-care facilities in finding cost-effective ways to provide health-care. Murer Consultants gives counsel and does strategic planning for a variety of health-care providers from hospitals to rehabilitation centers to nursing homes. Since its 1985 inception, Ms. Murer and her 30 employees have specialized in post-acute care and rehabilitation, creating many of our nation's certified outpatient rehabilitation facilities.

"Ms. Murer has been a leader in helping health-care providers find cost-effective procedures without reducing the quality of care," said Luana Burcul, vice president of Platinum Card marketing for American Express. "Platinum Card is proud to honor her leadership in this area and her personal accomplishments."

Ms. Murer entered the health-care industry in 1978 as one of the first legal professionals in the field. "I saw health-care as the place where I felt there would be a great concentration in the next several decades," she states. She also believes in combining her personal interests and business experience in helping her community. As a result, she co-founded the Joliet Ballet Society and sponsors an internship program in her business for high-school students.

# Biographical Sketch

## Cherilyn G. Murer, J.D., C.R.A.
## President/CEO

*Biographical Sketch*

**Cherilyn G. Murer, J.D., C.R.A.**, Founder, President and CEO of the Murer Group, has long been an active voice in the advancement of quality, cost-effective health care. Ms. Murer received a Juris Doctor degree with honors from Northern Illinois University and has coupled her background in law with her previous operational experience as the Director of Rehabilitation Medicine at Northwestern Memorial Hospital, Chicago, Illinois. Ms. Murer is a sought after lecturer and educator whose focus is on assisting her clients navigate through the complex regulatory, strategic and financial issues facing healthcare today. With a national client base, Murer Consultants represents large multi-hospital health care systems, academic medical centers and large physician group practices focusing on strategic positioning, consolidation and acquisition, regulatory compliance and financial management.

In keeping with her commitment to policy and health reform, Ms. Murer was appointed to the University of Chicago Harris School of Public Policy, Dean's International Council. This prestigious group serves as advisors to the Harris School regarding issues of international importance and new policy initiatives.

In May 2005 Ms. Murer received a gubernatorial appointment, with Senate confirmation, to a six-year term to the Northern Illinois University Board of Trustees. During this term, Ms. Murer has served as Chairman of the Board of this public University. In January of 2011, Illinois Governor Pat Quinn reappointed Ms. Murer to the NIU Board of Trustees for another six year term and in September 2011, Ms. Murer was once again elected as Chairman of the Board of Trustees. Ms. Murer and her husband, Michael, have provided a philanthropic gift to NIU to establish the **Murer Initiative** as a forum for scholarly discussion, policy analysis and cross disciplinary integration of medicine, law, technology and finance. In 2002, Ms. Murer was appointed to the Northern Illinois University Law School's prestigious Board of Visitors and was honored with its 2003 College of Law Distinguished Alumni Award. In 2014 Ms. Murer accepted an invitation to serve on the executive Board of Solve the Organ Shortage (SOS), an international effort to end the organ shortage through science, partnership and policy. Also, in 2014 Ms. Murer was appointed to the Advisory Council of the Buck Institute for Research on Aging, a research facility focused solely on understanding the connection between aging and chronic disease.

Since 2003, Ms. Murer has held an appointment to the faculty of the University of Illinois at Chicago College of Medicine as a Clinical Assistant Professor of Law in the Department of Family Medicine. She conducts Grand Round Lectures targeted to both the faculty practice and residents orienting them to health care trends and key issues impacting the practice of family practice in today's changing environment.

Coinciding with the firm's 25th anniversary, Ms. Murer was honored by both the University of Illinois at Chicago and Northern Illinois University. In February 2010, she was inducted into the prestigious Chicago Area Entrepreneurship Hall of Fame. In April she received the 2010 Northern Illinois University Distinguished Alumni of the Year Award, the highest award given by the NIU Alumni Association to one individual each year who has achieved national, regional or statewide prominence. In September 2011 Ms. Murer received the Lewis University Distinguished Alumni Award in recognition of her professional achievements. Ms. Murer subsequently accepted an invitation to serve on the Board of Trustees of this 8,000 student LaSallian private university. Today, with growing enrollment, outstanding programs, experienced faculty and motivated students, Lewis University is recognized as one of the finest, mid-sized, comprehensive Catholic universities in the country.

March 2015

Ms. Murer was pleased to accept an invitation from the Commission on Accreditation of Rehabilitation Facilities (CARF) to participate on an International Advisory Committee developing the first set of International Stroke Rehabilitation Standards. Ms. Murer has presented the keynote address at the *Annual Case Management Society of America Convention* in Anaheim, California. As a featured speaker, she highlighted the critical role of case management in a reformed health care environment. Ms. Murer has been appointed by CARF to its International Advisory Committee to promote globalization of accreditation standards in Rehabilitation Medicine.

Ms. Murer has co-authored with Lyndean Lenhoff Brick and Michael A. Murer four books published by McGraw-Hill. *The Case Management Sourcebook,* a 300-page text that serves as a guide to designing and implementing a centralized case management system. A second book, published by McGraw Hill and co-published by HFMA, entitled *Post Acute Care Reimbursement Manual-A Financial and Legal Guide*, addressed the financial impact to post acute venues pre and post BBA. A third book, *Compliance Audits and Plans for Healthcare,* was one of the first books to address complex heath care compliance issues. A fourth book, *Medical Records Management* is an 800 page complete guide to disclosure, retention and technology. A fifth book was published in April of 2003 by Commerce Clearing House, Inc. (CCH), entitled *Understanding Provider-Based Status*. A sixth book, *The Case Management Workbook: A Road Map to an Effective Integrated Health System*, published through new publisher, CRC Press (a Routledge-Taylor & Francis Group) was released March 22, 2011. A seventh book, *Clinical Co-Management: A Bridge to Clinical Integration and Pathway to Bundled Payments*, authored by Cherilyn G. Murer and foreward by Mark D. Birdwhistell, University of Kentucky. Is in press and scheduled for release July of 2015.

Ms. Murer served as the moderator for the Healthcare Forum "Driving Down Cost of Care While Increasing Access for our Citizens", as part of the National Democratic Governors Association Policy Conference, held in Chicago in June of 2012. This panel included four Governors representing North Carolina, Montana, Vermont, and Illinois, as well as corporate representatives from AETNA, Blue Cross Blue Shield of Illinois, Walgreens, and Wellcare Illinois.

As commencement speaker at her alma mater, Marymount University in Arlington, Virginia, Ms. Murer was awarded the Mother Gerard Phelan Gold Medal; previous recipients have included Nancy Reagan, the Honorable Clare Boothe Luce, Elinor Guggenheimer, and past U.S. Surgeon General, Dr. Antonia Novello. Ms. Murer was also honored by American Express; recognized for her leadership and outstanding accomplishments. American Express described Ms. Murer as "*a health care pioneer who has been a leader in helping health care providers find cost effective procedures without reducing the quality of care.*"

Ms. Murer has been featured on the cover of **Modern Healthcare**, a Crain Publication, with a lead story on the need for national standardization of medicare regulations. For twenty years Ms. Murer served as a columnist for **Rehab Management Magazine**. Her column "Issues and Trends" focuses on timely and often controversial subjects impacting the delivery of health care. In April of 2011, Ms. Murer was invited to present the 18th annual Francis X Riley Lecture on professionalism and ethics. She joined the ranks of such notable previous lecturers as Illinois Attorney General Lisa Madigan; Illinois Supreme Court Justice Thomas Kilbride and the Honorable Abner J. Mikva. Cherilyn and Michael Murer subsequently funded a multi-year lecture series to further integrate a practical approach to professionalism and ethics into the law school curriculum.

Her concern for the future direction of health care within our country had previously prompted her to accept an appointment by Vice President George Bush to serve as National Co-Chair, Disability Coalition. She was subsequently appointed as President Bush's National Co-Chair "*Access to Opportunity Committee".*

March 2015

# Curriculum Vitae

# CURRICULUM VITAE

**Cherilyn G. Murer, J.D., C.R.A.**
Founder, President/CEO
Murer Consultants, Inc.
19065 Hickory Creek Drive, Suite 115
Mokena, Illinois 60448
(708) 478-7030 Business
(708) 478-7094 Telefax
Web site: http//www.murer.com

## Education

- **Juris Doctorate with Honors - February 1978**
  Northern Illinois University College of Law
  DeKalb, Illinois        RANK: 12/125

- **Bachelor of Arts with Honors - June 1975**
  Lewis University
  Romeoville, Illinois

- **Associate of Arts with High Honors - June 1966**
  Marymount University
  Arlington, Virginia

## Continuing Education

- **Stanford University Graduate School of Business**
  Burlingame, California
  Concentration: Marketing
  Certificate of Completion, September 1981
  *Intensive 2 week executive in residence program*

- **Harvard University Graduate School of Business**
  Cambridge, Massachusetts
  Concentration: Finance
  Certificate of Completion, May 1980
  *Intensive 2 week executive in residence program*

March 2015

## Certification

- **Certified Rehabilitation Administrator** #8305, awarded by Certification Board Association of Medical Rehabilitation Director, 1983

- **National Women's Business Enterprise Certification**, awarded to Murer Consultants, Inc., by the Women's Business Enterprise National Council, 2012.

## Professional Awards and Distinctions

- **2015 Keynote Speaker, Women In Business**, hosted by Lewis University, Romeoville, Illinois, October 9, 2015

- **2015 Keynote Speaker, Murer Professionalism and Ethics Series**, Northern Illinois University College of Law, April 15, 2015

- **2014 World Congress – Patient Flow and Emergency Management Summit** – Keynote Speaker: Prepare for the Immediate Impact and Future Implications of Health Reform from a Daily Operations and Emergency Management Perspective, Chicago, Illinois, June 25, 2014

- **2014 Keynote Speaker, Murer Professionalism and Ethics Series**, Northern Illinois University College of Law, March 2014

- **2013 Association of Catholic Colleges and Universities (ACCU) Ninth Annual Rome Seminar** – Part of 22-person international delegation representing the United States, Australia, Canada, Ireland and Italy, Rome, Italy, June 2013.

- **National Democratic Governors Association Policy Conference** – Panelist for "Healthcare – Preparing States for Implementing the Affordable Care Act", Chicago, Illinois, June 2013.

- **National Democratic Governors Association Policy Conference** – Moderator Healthcare Forum including four governors (Illinois, Montana, North Carolina, Vermont) and Corporate Representatives from Blue Cross Blue Shield, Walgreens, Aetna and Wellcare – "Driving Down Cost of Care While Increasing Access for Our Citizens", Chicago, Illinois, June 2012.

- **Lewis University Distinguished Alumni Award** – This honor was bestowed at the Alumni Awards Dinner during the Homecoming and Family Day activities at the University in recognition of professional achievement, September 2011.

- **2011 Northern Illinois University College of Law Francis X. Riley Lecture Series on Professionalism** - "Recalibrating the Compass – Amorality and the Ethics of Nonfeasance", The lecture series brings distinguished speakers to the NIU College of Law to discuss current issues relating to the legal profession.  Other speakers have included Illinois Attorney General Lisa Madigan, Honorable Thomas L. Kilbride and Honorable Abner J. Mikva.

- **2010 Northern Illinois University Distinguished Alumni of Year Award** – The most prestigious award given by the NIU Alumni Association, is awarded to one individual each year who has achieved national, regional, or statewide prominence, April 2010.

- **UIC Institute for Entrepreneurial Studies** – inducted into 26th Annual Chicago Area Entrepreneurship Hall of Fame, February 2010, sponsored by Crain's Chicago Business, Allscripts, and Grant Thorton.

- **Resolution of Distinguished Service to Northern Illinois University Board of Trustees** – presented by Board of Trustees of NIU in appreciation of time, energy and service at end of term as Chair of NIU Board of Trustees, June 2009.

- **Outstanding Alumni Award** – presented by the College of Law, Northern Illinois University, DeKalb, Illinois,  April 2003

- **Distinguished Alumni-Feature Article, "***Graduate at the Forefront of Today's Healthcare Industry***," Northern Lawyer Magazine,** Volume 6, #1, Summer 2000 Northern Illinois University College of Law, DeKalb, Illinois

- **American Express Platinum Profile**, for outstanding national leadership, May 1994

- **Mother Gerard Phelan Gold Medal**, for outstanding leadership and contributions to society presented by Marymount University, May 1991 (previous winners include Nancy Reagan, Elinor Guggenheimer, and past U.S. Surgeon General Antonia Novella)

- **Commencement Address** - Marymount University, May 1991

- **Myrtle M. And Tom B. Medders Award**, presented annually by the National Easter Seal Society to the outstanding health-care administrator for excellence in management, 1981

- **Distinguished Service Award**, presented by the Commission on Accreditation of Rehabilitation Facilities (CARF) 1981

- **President**, National Association of Rehabilitation Administrators, 1987 to 1988

- **Who's Who in Physical Medicine and Rehabilitation**, 1984

- **National Co-Chair, Disability Coalition** appointed by Vice President George Bush, 1988

March 2015

- **Co-Chair, Access to Opportunity Committee** for the 1989 Inauguration, President-elect George Bush

# *Advisory/Governing Boards*

- **The Buck Institute for Research On Aging**, Novato, California, 2014 to Present
  - ♦ Buck Advisory Council

- **Solve the Organ Shortage (SOS)**, Austin, Texas, 2014 to present, an international effort to end the organ shortage through science, partnership and policy
  - ♦ SOS Executive Board Member

- **Advisory Board National Readmission Prevention Collaborative (NRPC)**, Anaheim, California, 2013 to Present
  - ♦ Executive Advisory Board Member

- **University of Chicago Harris School of Public Policy Dean's International Council,** Chicago, Illinois, 2012 to present
  - ♦ Board Member
  - ♦ Chair, Internship Program

- **Lewis University Board of Trustees**, Romeoville, Illinois, 2011 to Present
  - ♦ Finance Committee, 2011 to present
  - ♦ Academic Affairs Committee, 2011 to present
  - ♦ Chair, Academic Affairs Committee, 2013 to present
  - ♦ Legal and Corporate Committee, 2014 to present

- **Northern Illinois University Board of Trustees**, DeKalb, Illinois
  - • Gubernatorial Re-Appointment with Senate Confirmation, 2011 to January 2017
  - • Gubernatorial Appointment with Senate Confirmation, May 2005 to May 2011
    - ♦ Immediate Past Chairman Board of Trustees, 2013 to 2015
    - ♦ Chairman, Board of Trustees, 2011 to 2013
    - ♦ Chairman, Board of Trustees, 2007 to 2009
    - ♦ Vice Chairman, Board of Trustees, 2005 to 2007
    - ♦ Chair, Legislation, Audit, Compliance and External Affairs Committee, 2009 to 2011
    - ♦ Chair, Research and Technical Committee, 2013 to Present
    - ♦ Chair, Academic Affairs Committee, 2005 to 2007
    - ♦ Vice Chair, Academic Affairs Committee, 2009 to 2011
    - ♦ Member, Legislation, Audit, Compliance and External Affairs Committee, 2009 to Present
    - ♦ Member, Finance, Facilities and Operations Committee, 2005 to Present
    - ♦ Member, Academic Affairs Committee, 2005 to Present
    - ♦ Chair, Subcommittee to establish NIU Proton Therapy and Research Facility in conjunction with Fermilab and Argonne National Laboratory, 2006 to Present

- **Northern Illinois University Proton Treatment and Research Center (NIPTRC)**, Batavia, Illinois, Founding Member Board of Managers, 2008 to 2012
  - ♦ Chairman, 2009 to 2012
  - ♦ Vice Chair, 2008 to 2009

- **Northern Illinois University College of Law Board of Visitors**, DeKalb, Illinois, September 2002 to Present

- **Northern Illinois University Foundation Board of Directors**, DeKalb, Illinois, September 2001 to 2012
  - ♦ Audit Committee, 2004 to 2005
  - ♦ Member Executive Committee, 2002 to 2005
  - ♦ Chair, Development Committee, 2002 to 2004
  - ♦ Leadership Steering Committee for $150 Million Capital Campaign, 2007 to 2009

- **Marymount University Board of Directors**, Arlington, Virginia, 2005 to 2006
  - ♦ Academic Affairs Committee, 2005 to 2006

- **Provena St. Joseph Medical Center Board of Directors**, Joliet, Illinois, September 1997 to September 1999
  - ♦ Member Board of Directors

- **Board of Managers:**
  - ♦ **Oak Tree Hospital at Baptist Northeast**, LaGrange, Kentucky; President, June 2006 to September 2009
  - ♦ **Northeast Joint Venture, LLC**, LaGrange, Kentucky; Vice President, June 2006 to September 2009
  - ♦ **Oak Tree Hospital at Baptist Regional Medical Center**, Corbin, Kentucky; President, April 2004 to June 2008
  - ♦ **Corbin Long Term Acute Care Venture, LLC**, Corbin, Kentucky; Vice President, April 2004 to June 2008

- **Editorial Advisory Board – Case Review**, CurAnt Communications, March 1996 to September 1999

- **National Advisory Board - Case Management**, Oregon Health Sciences University, April 1996 to May 1997

- **Editorial Advisory Board - Aspen Publishers, Inc.**, A Wolters Kluwer Company, Gaithersburg, Maryland, October 1995 to December 2000

- **Editorial Advisory Board - Continuing Care Magazine**, Stevens Publications, Waco, Texas, January 1992 to December 1996

- **Nominated to MedPac** (Federal Advisory Board to CMS) by Senator Richard Durbin, Illinois, 2007

March 2015

## *Qualified Expert Testimony*

- **State Recognition of Expertise –**
  - ♦ West Virginia Healthcare Authority, May 4, 2006, accepted as an expert in:
    - **Long Term Acute Care Hospital Operations**
    - **Long Term Acute Care Hospital Planning**
    - **Long Term Acute Care Hospital Financing**
  - ♦ Florida Division of Administrative Hearings, October 29, 2001, accepted as expert in:
    - **Long Term Acute Care Hospital Finance**
    - **Long Term Acute Care Hospital Regulatory Compliance**
    - **Long Term Acute Care Hospital Planning and Administration**
  - ♦ State of Pennsylvania Deposition Hearing, March 20, 2015, qualified as expert in:
    - **Medicare Provider Based Structure, Regulation and Reimbursement**

## *Faculty Appointments*

- **Clinical Assistant Professor of Law –** University of Illinois at Chicago, College of Medicine, Department of Family Medicine, Chicago, Illinois, April 2003 to present

- **Associate Professor of Law –** University of Illinois, College of Medicine; Department of Family and Community Medicine, Rockford, Illinois, 1995 to 2003

- **Adjunct Faculty –** Northern Illinois University, DeKalb, Illinois; College of Business Program - Business Mastery Certificate for Physicians, Dentists and Chiropractors Class: Federal Compliance, September 2003

- **Founding Steering Committee, Health Law Institute –** NIU College of Law DeKalb, Illinois, July 2001 to 2004

- **Guest Lecturer –** Marymount University, Arlington, Virginia, Masters Health Care Administration, 2003 to 2005

- **Lecturer –** College of St. Francis, Joliet, Illinois - Masters of Science Health Services, Administration, 1984 to 1988

## *Professional Appointments*

- **University of Chicago Harris School of Public Policy Dean's International Council,** Chicago, Illinois, September 2012 to present

- **International Advisory Committee,** Commission on Accreditation of Rehabilitation Facilities (CARF), September 2001 to Present

March 2015

- **National Advisory Committee** to establish accreditation standards for Case Management for the Commission on Accreditation of Rehabilitation Facilities, February 1998

- **Columnist**, Rehabilitation Management Magazine, a division of CurAnt Communications, Inc., Marina del Rey, California, September, 1993 to Present

- **US Small Business Administration** - Office of International Trade, Office of Women's Business Owners, Speakers Bureau, Member 1992 to 2000

- **Guest Columnist** - Continuing Care Magazine, Stevens Publication, Waco, Texas, January, 1991 to 1998

- **Business Advisory Task Force** - U.S. International Cultural and Trade Center Commission, Department of Commerce Appointment, Washington, D.C., January 1991 to January 1993

- **National Task Force** to revise Accreditation Standards for Work Hardening Programs; Commission on Accreditation of Rehabilitation Facilities, 1988

- **National Co-Chairperson - Disability Coalition**, appointment by Vice President George Bush, 1988

- **National Task Force** to establish Accreditation Standards for Work Hardening Program; Commission on Accreditation of Rehabilitation Facilities, 1988

- **Medical Advisory Board**, HealthStar Corporation, Houston, Texas, 1985 to 1987 - Chairperson, Stroke Rehabilitation Task Force, 1985

- **Issues Advisory Committee on Health Care** - Mondale for President 1984 Campaign, Comparative Analysis of National Health Care Plans in Japan, England, Sweden, and Canada as it related to the development of a United States National Health Plan.

- **Founding Steering Committee**, National Rehabilitation Caucus, May 1984 to 1986

- **Medical Administrative Surveyor** for the Commission on Accreditation of Rehabilitation Facilities (CARF), 1977 to 1992

- **National Task Force** to establish Accreditation Standards for Infant and Early Childhood Development Programs for the Commission on Accreditation of Rehabilitation Facilities, 1982

- **National Task Force** to establish Standards for Utilization of Program Evaluation for the Commission on Accreditation of Rehabilitation Facilities, 1982

March 2015

- **National Task Force** to establish Accreditation Standards for design of Program Evaluation in Medical Facilities for the Commission on Accreditation of Rehabilitation Facilities, 1979

- **Chairman** to Regional RTA Paratransit Advisory Board, 1978-1980

- **Plan and Development Committee** to Region IX Health Systems Agency, 1979-1982

- **Illinois Employment and Training Council Task Force** on the Handicapped, appointed by the Illinois Department of Commerce and Community Affairs, 1980

- **Illinois Department of Public Health Task Force** to rewrite the Rehabilitation Section of the Illinois Health Code, 1981

- **Medical Advisory Board** to Motivator-Monitor, Inc., Chicago, Illinois (manufacturer of computerized physical therapy equipment providing visual feedback for lower extremity range of motion), 1982-1984

## *Publications*

### Books:

- **"Clinical Co-Management: A Bridge to Clinical Integration and Pathway to Bundled Payments"** Author: Cherilyn G. Murer, J.D., C.R.A., Foreword by Mark D. Birdwhistell, University of Kentucky, CRC Press, Taylor & Francis Group (IN PRESS) Scheduled for release July, 2015

- **"The Case Management Workbook; Defining the Role of Physicians, Nurses and Case Managers"** Authors: Cherilyn G. Murer, J.D., C.R.A. Michael A. Murer, and Lyndean Lenhoff Brick, J.D. Published by CRC Press, Routledge-Taylor & Francis Group, March 2011

- **"Understanding Provider Based Status"** Authors: Cherilyn G. Murer, J.D., C.R.A., Michael A. Murer, J.D., and Lyndean Lenhoff Brick, J.D.; Published by CCH (Commerce Clearing House), April 2003, 229 pp.

- **"Complete Legal Guide to Healthcare Records Management"** Authors: Cherilyn G. Murer, J.D., C.R.A., Michael A. Murer, J.D., and Lyndean Lenhoff Brick, J.D.; Published by McGraw Hill and Co-published by HFMA, January 2000, 796 pp.

- **"Compliance Audits and Plans for Healthcare"** Authors: Cherilyn G. Murer, J.D., C.R.A., Michael A. Murer, J.D., and Lyndean Lenhoff Brick, J.D.; Published by McGraw Hill and Co-published by HFMA; Summer 1998, 238 pp.

- **"Post Acute Care Reimbursement Manual – A Financial and Legal Guide"** Authors: Cherilyn G. Murer, J.D., C.R.A., Michael A. Murer, J.D., and Lyndean Lenhoff Brick, J.D; Published by McGraw Hill and Co-published by HFMA; September 1997, 366 pp.

March 2015

- **"The Case Management Sourcebook"** Authors: Cherilyn G. Murer, J.D., C.R.A. and Lyndean Lenhoff Brick, J.D.; Published by McGraw Hill; Forward by Mutual of Omaha; July, 1997, 273 pp.

**Book Chapters and Monographs:**

- **Perspective: "Using Post-Acute Care Venues to Reduce Readmissions"**, Author: Cherilyn G. Murer. J.D., C.R.A. within
  **Book: "Readmission Prevention: Solutions Across the Provider Continuum"**, Author: Josh D. Luke, Ph.D., Published by American College of Healthcare Executives, 2015

- **Chapter: "Economic Considerations of Industrial Therapy"**, Author: Cherilyn G. Murer, J.D., C.R.A. within
  **Book: "Industrial Therapy"**, Author: Glenda L. Key, Published by Mosby Press

- **Monograph: "A Productivity Systems Guide for Occupational Therapy"**, Author: Cherilyn G. Murer, J.D., C.R.A.; Published by A.O.T.A. Inc.

- **Monograph: "Productivity Analysis Within An Acute Rehab Setting"**, Author: Cherilyn G. Murer, J.D., C.R.A.; Published by American Hospital Association

- **Monograph: "Building Revenues in Post Acute Care"**, Authors: Cherilyn G. Murer, J.D., C.R.A. and Lyndean Lenhoff Brick, J.D.; Published by Irwin Professional Seminars

**Journal Articles:**

- **"Clinical Co-Management at the Epicenter of Health Reform"**, Murer, *Rehab Management*, published by Ascend Media, Overland Park, Kansas, March 2012

- **"OIG Work Plan 2012 – Changes for Providers and Other Interesting Developments"**, Murer, *Rehab Management*, published by Ascend Media, Overland Park, Kansas, November/December 2011

- **"Health Care Reform in the Air – How, Where, and When Will It Land?"**, Murer, *Rehab Management*, published by Ascend Media, Overland Park, Kansas, October 2011

- **"Federal Qualified Health Centers"**, Murer, *Rehab Management*, published by Ascend Media, Overland Park, Kansas, June 2011

- **"Clinical Co-Management: Changing the Balance of Power?"**, Murer, *Rehab Management*, published by Ascend Media, Overland Park, Kansas, March 2011 *(On-Line Only)*

- **"The Extreme Volatility of Health Reform"**, Murer, *Rehab Management*, published by Ascend Media, Overland Park, Kansas, January/February 2011 *(On-Line Only)*

- **"Status of Physician-Owned Hospitals"**, Murer, *Rehab Management*, published by Ascend Media, Overland Park, Kansas, November/December 2010 *(On-Line Only)*

- **"LTACH 2011 Proposed Rules and the Initial Impact of Health Care Reform"**, Murer, *Rehab Management*, published by Ascend Media, Overland Park, Kansas, August/September 2010

- **"The Status of Physician-Owned Hospitals in a Reformed Health Care Environment"**, Murer, *Rehab Management*, published by Ascend Media, Overland Park, Kansas, June 2010 *(On-Line Only)*

- **"Meaningful Use Rules Proposed for Electronic Health Record Incentives Under HITECH Act"**, Murer, *Rehab Management*, published by Ascend Media, Overland Park, Kansas, April 2010

- **"MedPAC Makes Recommendations for 2010"**, Murer, *Rehab Management*, published by Ascend Media, Overland Park, Kansas, March 2010

- **"2010 OIG Work Plan – Implications for Rehab, Skilled Nursing, and Psychiatric Providers"**, Murer, *Rehab Management*, published by Ascend Media, Overland Park, Kansas, January 2010

- **"Health Care Reform Redirected to Insurance Abuses and Reform"**, Murer, *Rehab Management – On Line*, published by Ascend Media, Overland Park, Kansas, November/December 2009

- **"Reimbursement Program for Fiscal Year 2010"**, Murer, *Rehab Management*, published by Ascend Media, Overland Park, Kansas, August/September 2009

- **"Post-Acute Care Bundling Plan"**, Murer, *Rehab Management*, published by Ascend Media, Overland Park, Kansas, July 2009

- **"HITECH Act Inequality"**, Murer, *Rehab Management*, published by Ascend Media, Overland Park, Kansas, June 2009

- **"Kids Get Their Hands On Health"**, Murer, *Rehab Management*, published by Ascend Media, Overland Park, Kansas, March 2009

- **"'RAC' Up for Providers:   More Audits, Are You Ready?"**, Murer, *Rehab Management*, published by Ascend Media, Overland Park, Kansas, January/February 2009

- **"Fundamental Differences"**, Murer, *Rehab Management*, published by Ascend Media, Overland Park, Kansas, November 2008

March 2015

- **"IRF Perspective Payment System"**, Murer, *Rehab Management*, published by Ascend Media, Overland Park, Kansas, October 2008

- **"Present on Admission Overview"**, Murer, *Rehab Management*, published by Ascend Media, Overland Park, Kansas, August/September 2008

- **"The Precarious State of Medicaid"**, Murer, *Rehab Management*, published by Ascend Media, Overland Park, Kansas, July 2008

- **"HIPAA Meets Celebrity"**, Murer, *Rehab Management*, published by Ascend Media, Overland Park, Kansas, June 2008

- **"In Abeyance: The Status of LTACH"**, Murer, *Rehab Management*, published by Ascend Media, Overland Park, Kansas, April 2008

- **"Inpatient Rehab Overiew"**, Murer, *Rehab Management*, published by Ascend Media, Overland Park, Kansas, March 2008

- **"CMS Implements Severity-Based DRG System for 2008"**, Murer, *Rehab Management*, published by Ascend Media, Overland Park, Kansas, January/February 2008

- **"Increasing Patient Awareness and Safety"**, Murer, *Rehab Management*, published by Ascend Media, Overland Park, Kansas, December 2007

- **"Significant Changes for ASC Payment Systems"**, Murer, *Rehab Management*, published by Ascend Media, Overland Park, Kansas, November 2007

- **"Psychiatric Partial Hospitalization: An Overview"**, Murer, *Rehab Management*, published by Ascend Media, Overland Park, Kansas, October 2007

- **"NPI Compliance and Practical Implications"**, Murer, *Rehab Management*, published by Ascend Media, Overland Park, Kansas, August/September 2007

- **"Proton Therapy: Cutting-Edge Treatment for Cancerous Tumors"**, Murer, *Rehab Management*, published by Ascend Media, Overland Park, Kansas, July 2007

- **"EHRs: Issues Preventing Widespread Adoption"**, Murer, *Rehab Management*, published by Ascend Media, Overland Park, Kansas, June 2007

- **"Surviving Another Round of Medicare Changes"**, Murer, *Rehab Management*, published by Ascend Media, Overland Park, Kansas, April 2007

- **"A Patient-Centered Vision for Post-Acute Care Reform"**, **"LTACH Certification Criteria Legislation"**, Murer, *Rehab Management*, published by Ascend Media, Overland Park, Kansas, January/February 2007

March 2015

- **"Definitive New Guidelines"**, Murer, *Rehab Management*, published by Ascend Media, Overland Park, Kansas, October 2006

- **"REITs: A Growing Health Care Financing Option"**, Murer, *Rehab Management*, published by Ascend Media, Overland Park, Kansas, August/September 2006

- **"LTCH 2007 PPS Final Rule: Softer than Proposed"**, Murer, *Rehab Management*, published by Ascend Media, Overland Park, Kansas, July 2006

- **"Caps Are Back: Are You Provider Based?"**, Murer, *Rehab Management*, published by Ascend Media, Overland Park, Kansas, June 2006

- **"CMS Proposed Payment"**, Murer, *Rehab Management*, published by Ascend Media, Overland Park, Kansas, March 2006

- **"Rehab's Resurgence"**, Murer, *Rehab Management*, published by Ascend Media, Overland Park, Kansas, January/ February 2006

- **"First You Say You Do, Then You Don't"**, Murer, *Rehab Management*, published by Ascend Media, Overland Park, Kansas, November 2005

- **"Quality is Indicated"**, Murer, *Rehab Management*, published by Ascend Media, Overland Park, Kansas, October 2005

- **"The Medical Day Hospital"**, Murer, *Rehab Management*, published by Ascend Media, Overland Park, Kansas, August/September 2005

- **"The GAO Tells CMS to Reboot"**, Murer, *Rehab Management*, Ascend Media, Overland Park, Kansas, July 2005

- **"The LTACH in Rehab Clothing"**, Murer, *Rehab Management*, published by Ascend Media, Overland Park, Kansas, June 2005

- **"Growing Confusion"**, Murer, *Rehab Management*, published by Ascend Media, Overland Park, Kansas, April 2005

- **"Declassifying Coverage"**, Cover Story by Paul Barr, *Modern Healthcare*, published by Crain Communications, Inc. Chicago, Illinois, March 21, 2005

- **"Saving the Hospital-within-the-Hospital"**, Murer, *Rehab Management*, published by Ascend Media, Overland Park, Kansas, March 2005

- **"Discharge or Episode of Care?"**, Murer, *Rehab Management*, published by CurAnt Communications, Inc. a Division of Medical World Communications, Los Angeles, California, January/February 2005

- **"Untangling the Red Tape"**, Murer, *Rehab Management*, published by CurAnt Communications, Inc. a Division of Medical World Communications, Los Angeles, California, December 2004

- **"Every Minute Counts"**, Murer, *Rehab Management*, published by CurAnt Communications, Inc. a Division of Medical World Communications, Los Angeles, California, November 2004

- **"The Value of Percentages"**, Murer, *Rehab Management*, published by CurAnt Communications, Inc. a Division of Medical World Communications, Los Angeles, California, October 2004

- **"Not Done Yet"**, Murer, *Rehab Management*, published by CurAnt Communications, Inc. a Division of Medical World Communications, Los Angeles, California, August/September 2004

- **"Of Two Minds"**, Murer, *Rehab Management*, published by CurAnt Communications, Inc. a Division of Medical World Communications, Los Angeles, California, July 2004

- **"Ortho Opportunities"**, Murer, *Rehab Management*, published by CurAnt Communications, Inc. a Division of Medical World Communications, Los Angeles, California, June 2004

- **"No Stopping the LTACH"**, Murer, *Rehab Management*, published by CurAnt Communications, Inc. a Division of Medical World Communications, Los Angeles, California, April 2004

- **"HIPAA Revisited"**, Murer, *Rehab Management*, published by CurAnt Communications, Inc. a Division of Medical World Communications, Los Angeles, California, March 2004

- **"Good News from the Hill"**, Murer, *Rehab Management*, published by CurAnt Communications, Inc. a Division of Medical World Communications, Los Angeles, California, January/February 2004

- **"The Co-location Equation"**, Murer, *Rehab Management*, published by CurAnt Communications, Inc. a Division of Medical World Communications, Los Angeles, California, December 2003

- **"The 65/75 Split"**, Murer, *Rehab Management*, published by CurAnt Communications, Inc. a Division of Medical World Communications, Los Angeles, California, November 2003

- **"Stark Revelation"**, Murer, *Rehab Management*, published by CurAnt Communications, Inc. a Division of Medical World Communications, Los Angeles, California, October 2003

March 2015

- **"Here's to Good News"**, Murer, *Rehab Management*, published by CurAnt Communications, Inc. a Division of Medical World Communications, Los Angeles, California, July 2003

- **"LTACHs: A Good Idea That Just Got Better"**, Murer, *Rehab Management*, published by CurAnt Communications, Inc. a Division of Medical World Communications, Los Angeles, California, June 2003

- **"Confusing CORF Concepts"**, Murer, *Rehab Management*, published by CurAnt Communications, Inc. a Division of Medical World Communications, Los Angeles, California, April 2003

- **"Out to Lunch on the $1,500 Cap"**, Murer, *Rehab Management*, published by CurAnt Communications, Inc. a Division of Medical World Communications, Los Angeles, California, March 2003

- **"Division in the Ranks"**, Ohlson, Kristin, *Nightingale's Healthcare News*, Beard Group, quotes Cherilyn G. Murer, February 2003

- **"Specialty Hospitals Grab Spotlight"**, Wolf, Murray, *Healthcare Real Estate Insights*, Wolf Marketing & Media LLC, quotes Cherilyn G. Murer, February 2003

- **"CORF Ideas"**, Murer, *Rehab Management*, published by CurAnt Communications, Inc. a Division of Medical World Communications, Los Angeles, California, January/February 2003

- **"Rehab Rules Revisited"**, Murer, *Rehab Management,* published by CurAnt Communications, Inc. a Division of Medical World Communications, Los Angeles, California, December 2002

- **"Light at the End of the Tunnel"**, Murer, *Rehab Management,* published by CurAnt Communications, Inc. a Division of Medical World Communications, Los Angeles, California, October 2002

- **"Are You Provider-Based?"**, Murer, *Rehab Management*, published by CurAnt Communications, Inc. a Division of Medical World Communications, Los Angeles, California, October 2002

- **"The ABCs of PPS and LTACHs"**, Murer, *Rehab Management*, published by CurAnt Communications, Inc. a Division of Medical World Communications, Los Angeles, California, August/September 2002

- **"Sitting On Capitol Hill"**, Murer, *Rehab Management,* published by CurAnt Communications, Inc. a Division of Medical World Communications, Los Angeles, California, June/July 2002

- **"Protecting Patient Privacy"**, Murer, *Rehab Management,* published by CurAnt Communications, Inc. a Division of Medical World Communications, Los Angeles, California, April 2002

- **"CORFs-The New Contender"**, Murer, *Rehab Management,* published by CurAnt Communications, Inc. a Division of Medical World Communications, Los Angeles, California, March 2002

- **"As the Focus Narrows"**, Murer, *Rehab Management*, published by CurAnt Communications, Inc. a Division of Medical World Communications, Los Angeles, California, February 2002

- **"Where has Subacute Rehab Gone?"**, Murer, *Rehab Management*, published by CurAnt Communications, Inc. a Division of Medical World Communications, Los Angeles, California, November 2001

- **"Globalizing Health Care Standards"**, Murer, *Rehab Management International,* published by CurAnt Communications, Inc. a Division of Medical World Communications, Los Angeles, California, Fall 2001

- **"The Long and Changing Road"**, Murer, *Rehab Management*, published by CurAnt Communications, Inc. a Division of Medical World Communications, Los Angeles, California, August/September 2001

- **"The Hidden Danger"**, Murer, *Rehab Management*, published by CurAnt Communications, Inc. a Division of Medical World Communications, Los Angeles, California, June/July 2001

- **"Compliance Guidance for Nursing Facility Caregivers"**, Cherilyn G. Murer, J.D., C.R.A., Michael A. Murer, J.D., and Lyndean Lenhoff Brick, J.D. *CCH Healthcare Compliance Letter*, May 2001

- **"Gifts to Physicians May Violate Antikickback/Stark Laws"**, Cherilyn G. Murer, J.D., C.R.A., Michael A. Murer, J.D., and Lyndean Lenhoff Brick, J.D. *CCH Healthcare Compliance Letter*, April 2001

- **"Privacy Packs a Punch"**, Murer, *Rehab Management*, published by CurAnt Communications, Inc. a Division of Medical World Communications, Los Angeles, California, April 2001

- **"Deciphering the Details"**, Murer, *Rehab Management*, published by CurAnt Communications, Inc. a Division of Medical World Communications, Los Angeles, California, March 2001

- **"Cornering Compliance Issues"**, Murer, *Rehab Management*, published by CurAnt Communications, Inc. a Division of Medical World Communications, Los Angeles, California, December/January 2001

- **"The Geriatric Explosion"**, Murer, *Rehab International*, published by CurAnt Communications, Inc., Los Angeles, California, Fall 2000

- **"An Uncertain Future"**, Murer, *Rehab Management*, published by CurAnt Communications, Inc., Los Angeles, California, October/November 2000

- **"Overview of the New Provider-Based Regulations"** Cherilyn G. Murer, J.D., C.R.A., Michael A. Murer, J.D. and Lyndean Lenhoff Brick, J.D. *CCH Healthcare Compliance* July 2000

- **"Beyond The Hospital Campus Part II"**, Murer, *Rehab Management*, published by CurAnt Communications, Inc., Los Angeles, California, June/July 2000

- **"HCFA Focuses on Rights"**, Murer, Stevens Publications, Dallas, Texas, May 2000

- **"Compliance Edge Training: Distinguishing Between Discharges and Transfers"** Cherilyn G. Murer, J.D., C.R.A., Michael A. Murer, J.D. and Lyndean Lenhoff Brick, J.D. *CCH Healthcare Compliance* April 2000

- **"Beyond The Hospital Campus"**, Murer, *Rehab Management*, published by CurAnt Communications, Inc., Los Angeles, California, April/May 2000

- **"Case Management - The Tie That Binds"**, Murer, *Rehab Management*, published by CurAnt Communications, Inc., Los Angeles, California, February/March 2000

- **"ComplianceEdge Training – Physician Recruitment and the Antikickback Statue"**, Cherilyn G. Murer, J.D. C.R.A., Michael A. Murer, J.D. and Lyndean Lenhoff Brick, J.D. *CCH Healthcare Compliance Letter* February 2000

- **"The Managed Care Competitor"**, Murer, *Rehab Management*, published by CurAnt Communications, Inc., Los Angeles, California, December/January 2000

- **"Protecting CVA Census- Managed Care Competition For Stroke Census"** Murer, *Rehab Management*, published by CurAnt Communications, Inc., Los Angeles, California December/January 2000

- **"Thriving in a Post Acute Era of Health Care Delivery"**, Murer, *Rehab Management*, published by CurAnt Communications, Inc., Los Angeles, California, October/ November 1999

- **"A European Influence in the Technological Advances in Rehabilitation"**, Murer, *Rehab Management*, published by CurAnt Communications, Inc., Los Angeles, California October/November 1999

- **"The Revitalization of Rehabilitation"**, Murer, *Rehab Management*, published by CurAnt Communications, Inc., Los Angeles, California, August/September 1999

- **"Opening the Doors Through Technology"** Murer, *Rehab International*, published by CurAnt Communications, Inc., Los Angeles, California, Fall 1999

- **"Home Health Compliance: Identifying Potential Fraud and Abuse Violations"** Murer, *Rehab Management*, published by CurAnt Communications, Inc., Los Angeles, California, June/July 1999

- **"Quality or Productivity?"** Murer, *Rehab Management*, published by CurAnt Communications, Inc., Los Angeles, California, April/May 1999

- **"Maximizing Payments for Post-Acute Care"** Murer, *Modern Healthcare*, published by Crain Communications, Inc. Chicago, Illinois, February 15, 1999

- **"Weathering the Reimbursement Crunch"** Murer, *Rehab Management,* published by CurAnt Communications, Inc., Los Angeles, California, December/January 1999

- **"New Hope for the Future – Mitigating the effects of disabilities in a technological age."** Murer, *Rehab Management,* published by CurAnt Communications, Inc., Los Angeles, California, October/November 1998

- **"Community Brings Change"** Murer, *Rehab International,* published by CurAnt Communications, Inc., Los Angeles, California, Fall 1998

- **"Cutting Through the Red Tape – The bureaucratic dilemma of home health care"** Murer, *Rehab Management*, published by CurAnt Communications, Inc., Los Angeles, California, August/September 1998

- **"Adapting Healthcare Systems to a Unified Europe"** Murer, *Rehab Management,* published by CurAnt Communications, Inc., Los Angeles, California, August/September 1998

- **"A Changing Future - Alternative Medicine and Reimbursement Trends"** Murer, *Rehab Management*, published by CurAnt Communications, Inc., Los Angeles, California, June/July 1998

- **"Case Management – Where Do We Go From Here"** Murer, *Case Review*, published by Allied Health Care Publications, Los Angeles, California, May/June 1998

- **"Assisted Living: The Next Link in the Continuum"** Murer, *Rehab Management,* published by CurAnt Communications, Inc., Los Angeles, California, April/May 1998

- **"A Structuring Medical Directors Contracts in the Day of Compliance"** Murer, *Rehab Management* published by CurAnt Communications, Inc., Los Angeles, California, March 1998

- **"Corporate Compliance – Establishing Leadership and Compliance Programs to Prevent Health Care Fraud"** Murer, *Rehab Management*, published by CurAnt Communications, Inc., Los Angeles, California, December/January 1998

March 2015

- **"Budgetary Breakdown – Changes Demand Better Postacute Management"** Murer, *Rehab Management*, published by CurAnt Communications, Inc., Los Angeles, California, October/November 1997

- **"CORFs Expand With the Emergence of Medical Day Hospitals"** Murer, *Continuing Care,* published by Stevens Publishing Corporation, Waco, Texas, September 1997

- **"Certification and Accreditation – Quality Indicators or Baseline Standards"** Murer, *Rehab Management*, published by CurAnt Communications, Inc., Los Angeles, California, August/September 1997

- **"Medicare Fraud and Abuse"** Murer, *Rehab Management*, published by CurAnt Communications, Inc., Los Angeles, California, June/July 1997

- **"A Guide to Designing and Implementing a Centralized Case Management System"** Murer / Brick, *Continuing Care Magazine*, published by Stevens Publishing Corporation, Waco, Texas, May 1997

- **"All About APGs"** Murer, *Rehab Management* published by CurAnt Communications, Inc., Los Angeles, California, April/May 1997

- **"The Professional Case Manager"** Murer, Guest Editorial Murer, *Case Review* published by Allied Health Care Publications, Los Angeles, California, Spring 1997

- **"Quality Assessment and Managed Care"** Murer, *Rehab Management* published by CurAnt Communications, Inc., Los Angeles, California, February/March 1997

- **"Physician Reimbursement"** Murer, *Rehab Management* published by CurAnt Communications, Inc., Los Angeles, California, December/January 1997

- **"Management Trends"** Murer, *Rehab Management* published by CurAnt Communications, Inc., Los Angeles, California, October/November 1996

- **"CORFs Provide Comprehensive Services, Focus for Patients"** Murer, *Continuing Care* published by Stevens Publishing Corporation, Waco, Texas, September 1996

- **"The Long-Term Care Hospital"** Murer, *Rehab Management* published by CurAnt Communications, Inc., Los Angeles, California, August/September 1996

- **"Creating Common Knowledge"** Murer, *Case Review* published by Allied Health Care Publications, Los Angeles, California, Spring 1996

- **"Medicare Risk Contracting"** Murer, *Rehab Management* published by CurAnt Communications, Inc., Los Angeles, California, April/May 1996

- **"Funding Catastrophic Care"** Murer, *Rehab Management* published by CurAnt Communications, Inc., Los Angeles, California, February/March 1996

- **"The Case for 1996"** Murer, *Case Review* published by CurAnt Communications, Inc., Los Angeles, California, Winter 1996

- **"Trends in Postacute Care"** Murer, *Rehab Management* published by CurAnt Communications, Inc., Los Angeles, California, December/January 1996

- **"Health Care in the Middle East"** Murer, *Rehab Management International* published by CurAnt Communications, Inc., Los Angeles, California Fall 1995

- **"Entering the European Market"** Murer, *Rehab Management* published by CurAnt Communications, Inc., Los Angeles, California, June/July 1995

- **"Long-term Hospitals Add Revenues"** Murer and Brick, *Continuing Care* published by Stevens Publishing Corporation, Waco, Texas, May 1995

- **"Adopting the Product Line Focus in Subacute"** Murer and Brick, *Nursing Homes* published by Medquest Communication, Cleveland, Ohio, May 1995

- **"Australia's Health Care Model"** Murer, *Rehab Management* published by CurAnt Communications, Inc., Los Angeles, California, April/May 1995

- **"Health Care Reform in New Zealand"** Murer, *Rehab Management* published by CurAnt Communications, Inc., Los Angeles, California, February/March 1995

- **"Through the Labyrinth"** Murer, *Decisions in Imaging Economics* published by CurAnt Communications, Inc., Los Angeles, California, January/February 1995

- **"Think Subacute"** Murer, *Home Health Care Dealer* published by Allied Health Care Publications, Los Angeles, California, January/February 1995

- **"Geriatric Care in Japan"** Murer, *Rehab Management* published by CurAnt Communications, Inc., Los Angeles, California, December/January 1995

- **"Economic Consideration of Industrial Therapy"** in Industrial Therapy, Chapter 24, (Chicago, Mosby Press, 1994)

- **"Sweeping Up the Rubble"** Murer, *Rehab Management International* published by CurAnt Communications, Inc., Los Angeles, California, Fall 1994

- **"Rehab in Latin America"** Murer, *Rehab Management* published by CurAnt Communications, Inc., Los Angeles, California, October/November 1994

- **"Rehabilitation and Psychiatry: A Basis for Strategic Interface"** Murer and Brick, *Hospital Rehab* published by American Health Consultants, Atlanta, Georgia, October 1994

- **"The Long-Term Care Hospital"** Murer, *Continuing Care* published by Stevens Publishing Corporation, Waco, Texas, October 1994

- **"The Graying of Europe"** Murer, *Rehab Management* published by CurAnt Communications, Inc., Los Angeles, California, August/September 1994

- **"Canadian Health Care: A Provocative Role Model"** Murer, *Rehab Management* published by CurAnt Communications, Inc., Los Angeles, California, June/July 1994

- **"Standardizing Quality Indicators"** Murer, *Continuing Care* published by Stevens Publishing Corporation, Waco, Texas, May 1994

- **"NAFTA Opens Doors"** Murer, *Rehab Management* published by CurAnt Communications, Inc., Los Angeles, California, April/May 1994

- **"Physician Bundling, PHO's are Targets for a Reformed Market"** Murer and Brick, *Hospital Rehab* published by American Health Consultants, Atlanta, Georgia, April 1994

- **"Technology At Home and Abroad"** Murer, *Rehab Management* published by CurAnt Communications, Inc., Los Angeles, California, February/March 1994

- **"International Issues in Brain Injury"** Murer, *Rehab Management* published by CurAnt Communications, Inc., Los Angeles, California, December/January 1994

- **"Mexican Health Care: Planning for the 21st Century"** Murer and Brick, *Spectrum* published by Arthur D. Little Decision Resources, Burlington, Massachusetts, December 1993

- **"Cost Accounting is Critical for Rehabilitation Providers"** Murer and Brick, *Hospital Rehab*, published by American Health Consultants, Atlanta, Georgia, December 1993

- **"Broadening the Scope of Reform"** Murer, *Continuing Care* published by Stevens Publishing Corporation, Waco, Texas, October 1993

- **"Lessons From Abroad"** Murer, *Rehab Management* published by CurAnt Communications, Inc., Los Angeles, California, October/November 1993

- **"Unlikely Leaders"** Murer, *Continuing Care* published by Stevens Publishing Corporation, Waco, Texas, September 1993

- **"The Global Rehab Village"** Murer, *Rehab Management* published by CurAnt Communications, Inc., Los Angeles, California, August/September 1993

March 2015

- **"Throw Out the Rule Book, Start Taking Steps to Initiate Change Now"** Murer and Brick, *Hospital Rehab* published by American Health Consultants, Atlanta, Georgia, August 1993

- **"Avoid Common Pitfalls in Physician Recruitment, Retention Practices"** Murer and Shoufer, *Hospital Rehab* published by American Health Care Consultants, Atlanta, Georgia, June 1993

- **"Hospitals Can Guarantee Security With Customized Physician Contracts"** Murer and Shoufer, *Hospital Rehab* published by American Health Consultants, Atlanta, Georgia, May 1993

- **"Filling the Gap: Subacute Care"** Murer, *Continuing Care* published by Stevens Publishing Corporation, Waco, Texas, May 1993

- **"Hospitals Should Be Aware of the Legal, Practical Aspects in Physician Contracts"** Murer and Shoufer, *Hospital Rehab* published by American Health Consultants, Atlanta, Georgia, April 1993

- **"Documentation: A Front-Line Defense for Risk Management"** Murer and Brick, *Hospital Rehab* published by American Health Consultants, Atlanta, Georgia, January 1993

- **"Subacute Care: Hospital Rehabs Emerging Opportunity"** Murer and Brick, *Hospital Rehab* published by American Health Consultants, Atlanta, Georgia, December 1992

- **"Germany's Health Care System"** Murer and Brick, International Responses to Changes in the Health Care Environment published as book Chapter IV by Arthur D. Little Decision Resources, Burlington, Massachusetts, December 1992

- **"TEFRA Rebasing"** Murer and Brick, *Hospital Rehab* published by American Health Consultants, Atlanta, Georgia, September 1992

- **"Why Not a CORF?"** Murer, *Continuing Care* published by Stevens Publishing Corporation, Waco, Texas, September 1992

- **"Two Roads"** Murer, *Continuing Care* published by Stevens Publishing Corporation, Waco, Texas, July/August 1992

- **"Germany's Health Care System: Status and Prognosis for Reform"** Murer and Brick, *Spectrum* published by Arthur D. Little Decision Resources, Burlington, Massachusetts, July 1992

- **"Barrier Free"** Murer, *Continuing Care* published by Stevens Publishing Corporation, Waco, Texas, April 1992

- **"SNF Alternatives"** Murer, *Continuing Care* published by Stevens Publishing Corporation, Waco, Texas, March 1992

- **"The Pain Factor"** Murer, *Continuing Care* published by Stevens Publishing Corporation, Waco, Texas, November 1991

- **"Rocky Shoals"** Murer, *Continuing Care* published by Stevens Publishing Corporation, Waco, Texas, October 1991

- **"Into The Workforce"** Murer, *Continuing Care* published by Stevens Publishing Corporation, Waco, Texas, August/September 1991

- **"The Globalization of Rehabilitation"** Murer, *Rehab Management International* published by CurAnt Communications, Inc., Los Angeles, California, July 1991

- **"Managing Organizational Change"** Murer, *Rehabilitation Today Magazine* published by Sportscape, Inc., Framingham, Massachusetts, July/August 1991

- **"Coma to Community"** Murer, *Continuing Care* published by Stevens Publishing Corporation, Waco, Texas, July 1991

- **"The Privatization of Health Care in Europe and the Pacific Rim"** Murer and Brick, *Spectrum* published by Arthur D. Little Decision Resources, Burlington, Massachusetts, May 1991

- **"The New Generation of Outpatient Rehabilitation"** Murer and Brick, *Futurescope, Life Sciences* published by Arthur D. Little Decision Resources, Burlington, Massachusetts, November 1990

- **"Antitrust in the U.S. Health Care Marketplace"** Murer and Brick, *Spectrum* published by Arthur D. Little Decision Resources, Burlington, Massachusetts, October 1990

- **"The Implications of Health Care Personnel Shortages for Providers and Suppliers"** Murer and Brick, *Spectrum* published by Arthur D. Little Decision Resources, Burlington, Massachusetts, July 1990

- **"Work Hardening: The New Generation of Outpatient Rehabilitation"** Murer and Brick, *Spectrum* published by Arthur D. Little Decision Resources, Burlington, Massachusetts, April 1990

- **"Work Injury Management"** Murer, Advances in Prevention, Evaluation and Treatment of Work Injuries. *Chapters - Safe Work Hardening, Medical Legal Considerations and Orientation to Program Evaluation* published by Center for Advancement of Industrial Rehabilitation and Evaluation, Denver, Colorado, November 1989

- **"Medical Legal Considerations and Orientation to Program Evaluation"** Murer, published by Center for Advancement of Industrial Rehabilitation and Evaluation, Denver, Colorado, November 1989

- **"The Future of Medical Rehabilitation Services"** Murer, *Spectrum* published by Arthur D. Little Decision Resources, Burlington, Massachusetts, August 1989

- **"CORF: An Essential Component Within a Complete System of Health Care Services"** - II Part Series *CORF Quarterly*, Spring - Summer, 1989 a publication of the National Association of Rehabilitation Facilities

- **"Kwaliteits Management als Stratgisch Instrument"** Co-Authors J.A.H. Vlierhuis, Cherilyn G. Murer, J.D., C.R.A., *Ziekenhuis Management Magazine* - The Netherlands, February 1989

- **"The Dementia Epidemic: Risk Factors, Differential Diagnosis, Management and Rehabilitation"** John Stirling Meyer, M.D. Professor of Neurology, Baylor College of Medicine and Cherilyn G. Murer, J.D., C.R.A., December 1987

- **"Stroke Rehabilitation - A Model Program"** Proprietary document published by HealthStar Corporation, Houston, Texas, September 1986

- **"Provider Education Guide to Alternative Delivery Systems"** Murer, *National Physician Education Counsel Training Manual*, May 1986

- **"A Productivity Systems Guide for Occupational Therapy"** contributing author published by AOTA, Inc., 1985

- **"Productivity Analysis within an Acute Rehabilitation Setting / A Six-Month Study"** Murer, published by the American Hospital Association as a Management Engineering Technical Paper, 1983, AHA#RS-47

- **"Productivity Program Increases Direct Billable Time"** Murer, *Hospitals*, American Hospitals Publishing Inc., June 1, 1983, Reprinted-American Occupational Therapy Association, August 1983

- **"Productivity Analysis as a Means of Cost Containment in Physical Medicine and Rehabilitation Centers,"** Murer, Rehabilitation Literature, Vol. 43, May/June 1982

- **"Utilization of Program Evaluation"** Murer, published by the Commission of Accreditation of Rehabilitation Facilities, 1981

- **"The Evolution of Change - Program Evaluation in a Birth - Three Developmental Stimulation Therapy Program,"** Murer, Journal of the Organization of Rehabilitation Evaluators, November 1981

March 2015

- **"Program Evaluation Design for Outpatient Medical Rehabilitation Facilities"** Murer, published by the Commission on Accreditation of Rehabilitation Facilities, 1980

## Professional Organizations

- National Readmission Prevention Collaborative (NRPC), National Executive Advisory Board Member, 2013 to present

- National Association of Rehabilitation Administrators (NARA) President, 1987-1988; By-Laws Committee Chairperson 1984-1988

- National Rehabilitation Caucus Founding Steering Committee Legislative Committee, Chairperson 1984

- Association of Governing Boards of Universities and Colleges

- American Hospital Association

- Healthcare Financial Management Association (HFMA)

- National Association of Women Business Owners

## List of National/International Presentations

- **"Form and Function in the Climate of Today's Higher Education"** – Distinguished Lecturer at Northwestern University School of Education & Social Policy, Evanston, Illinois, November 3, 2014

- **"Prepare for the Immediate Impact and Future Implications of Health Reform from a Daily Operations and Emergency Management Perspective"** – Keynote Address at 2014 World Congress - Patient Flow and Emergency Management Summit, Chicago, Illinois, June 25, 2014

- **"Creative Use of the Legal Toolbox"** – Keynote Address at Northern Illinois University College of Law, DeKalb, Illinois, March 26, 2014

- **"Morality Without Rules: Ethics in Business Transactions"** – Northern Illinois University College of Law, DeKalb, Illinois, November 9, 2011

- **"Clinical Co-Management: Role, Responsibilities, and Opportunities for Physicians and Physician Groups"** – Metropolitan Chicago Healthcare Council, Chicago, Illinois, July 14, 2011

March 2015

- **"The Chaos of Health Reform and Its Impact on You"** – Chicago Speaker Series, Northern Illinois University Alumni Association, Chicago, Illinois, May 26, 2011

- **"Recalibrating the Compass – Amorality and the Ethics of Nonfeasance"** – 18th Annual Francis X. Riley Lecture on Professionalism, Northern Illinois University College of Law, DeKalb, Illinois, April 1, 2011

- **"The Role of IT in the American Healthcare Delivery System"** – Visiting Lecture Series, Northern Illinois University College of Business, DeKalb, Illinois, October 20, 2010.

- **"Healthcare 2010 and Beyond"** – Nationally Web-Cast Health Care Symposium, University of St. Francis College of Business and Health Administration, Joliet, Illinois, August 10, 2010. A one-on-one discussion with Senator Richard Durbin, Senior Senator of Illinois.

- **"Beyond Ownership: Improving Your Bottom Line through Internal Enhancement"** – Physician Hospital of America Conference, Dallas, Texas, May 7, 2010.

- **"The Chaos of Health Reform: Where Are We Now and Where Are We Going?"** – *"Back on the Beat"* Live Radio Program with Dick Kay, WCPT-AM/FM, a CNN Affiliate, Chicago, Illinois, February 20, 2010

- **"Health Care Reform Complexity"** – Joliet Chamber of Commerce, Joliet, Illinois, December 15, 2009

- **"Healthcare, Data Governance and Information Integrity Legal Issues"** – Panel at the 2009 Annual Information Integrity Conference, Northern Illinois University – Naperville Campus, Naperville, Illinois, November 17, 2009

- **"Health Care Reform"** – *"Back on the Beat"* Live Radio Program with Dick Kay, WCPT-AM/FM, a CNN Affiliate, Chicago, Illinois, September 12, 2009

- **"The Political Environment and Its Impact on Proton Therapy"**, Symposium on Recent Advances in Proton Radiation Therapy Research (Keynote Speaker), Northern Illinois University and NIU Proton Treatment and Research Center, University of Texas M.D. Anderson Cancer Center, Rice University, NIU Naperville, Campus, Naperville, Illinois, June 23, 2009

- **"Overcoming the Struggle: HealthCare's Journey Through the EpiCenter of Change"**, University of St. Francis, College of Business and Health Administration, Joliet, Illinois, June 11, 2009

- **"American Health Care Delivery System 2009 – 2020"**, Scott & White Memorial Hospital, Government Affairs Committee, Temple, Texas, May 6, 2009

March 2015

- **"Overcoming the Struggle: Thriving in Tumultuous Times"**, CARF 2009 Medical Rehabilitation Conference, Tucson, Arizona, April 20, 2009

- **"Information Systems and Organizations"**, College of Business, Northern Illinois University, DeKalb, Illinois, February 4, 2009

- **"Leadership & Governance – Roles & Responsibilities in Times of Crisis"**, CARF, Glendale, Arizona, Glendale, Arizona, December 5, 2009

- **"EMR ROI: The Effects for Quality and Core Measure in the Pay for Performance Model"**, First Annual Medsphere Collaborative Healthcare Forum, New York, New York, October 2, 2008

- **"Medicare and Medicaid Key Changes and Topics for 2008"**, UIC Grand Rounds, Chicago, Illinois, February 27, 2008

- **"Conversation with a CEO"**, Executive Speaker Series, College of Engineering & Engineering Technology and the College of Business, Northern Illinois University, DeKalb, Illinois, September 25, 2007

- **"Common Errors in Documentation and Coding Affecting Reimbursement"**, UIC Grand Rounds, Chicago, Illinois, August 30, 2006

- **"How Will CMS Define Surgical Hospitals after the Administrative Moratorium?"**, American Surgical Hospital Association, October 28, 2005

- **"Mandated National Quality Indicators and Their Impact on Physicians"**, UIC Grand Rounds, Chicago, Illinois, August 17, 2005

- **"Risk Management & Corporate Compliance Defined"**, CARF, Las Vegas, Nevada, June 7, 2005

- **"Finance & Compliance Issues: Conflict & Compliment"**, Louisville Bar Association, Louisville, Kentucky, December 20, 2004

- **"Risk Management & Corporate Compliance"**, CARF, Phoenix, Arizona, December 7, 2004

- **"How to Renegotiate Better Private Payer Contracts & When to Break Them"**, Medi-Serve, Arlington Heights, Illinois, September 17, 2004

- **"Interface of Financial & Compliance Issues: Conflict & Compliment"**, Kentucky HFMA, Louisville, Kentucky, July 29, 2004

- **"Multi-Venue Opportunities for Orthopedic Programs"**, ACI's 4th Orthopedic Services Conference, Chicago, Illinois, April 30, 2004

March 2015

- **"Risk Management & Corporate Compliance for CARF"**, CARF, Las Vegas, Nevada, April 27, 2004

- **"Risk Management & Corporate Compliance for CARF"**, CARF, Phoenix, Arizona, December 9, 2003

- **Risk Management & Financial Management "Risk Management"**, CARF, Tucson, Arizona, June 18, 2003

- **HIPAA & Regulatory Compliance Issues "Medical Legal Ethics"**, UIC Grand Rounds, Chicago, Illinois, June 11, 2003

- **"HIPAA in the Rehab Setting: Critical Analysis for Successful Implementation"**, CARF, Chicago, Illinois, May 9, 2002

- "**How to Train Your Staff on HIPAA Privacy"**, Eli Research, Audio Teleconference, February 27, 2002

- **"Revenue Generation: An Alternative Care Site Strategy"**, South Carolina Chapter HFMA, Columbia, South Carolina, February 1, 2002

- **"How is Medical Necessity and Fraud Related?"**, American Academy of Pain, Arlington, Virginia, September 7, 2001

- **"Remaining Current with a Centralized Case Management System"**, Case Management Society of America, June 8, 2001

- **"A 20 Year Renaissance of Rehabilitation"**, Indiana Hospital and Health Association Rehabilitation Conference, Indianapolis, Indiana, April 20, 2001

- **"Revenue Generation, an Alternative Care Site Strategy"**, North Carolina Healthcare Financial Management Association, Pinehurst, North Carolina, March 1, 2001

- **"Physicians, The OIG and Compliance"**, Iroquois IPA, Watseka, Illinois, October 12, 2000

- **"Revenue Generation"**, Healthcare Financial Management Association, -2000 Annual National Institute, Orlando, Florida, June 28, 2000

- **"Compliance in the Health Care Setting"**, Kentucky Organization of Nurse Executives, Louisville, Kentucky, October 27, 1999

- **"Quashing Organizational Gridlock Though Vision, Leadership and Tenacity"**, American College of Healthcare Executives Conference, Philadelphia, Pennsylvania, July 29, 1999

- **"Post Acute – A Regulatory Review after the Balanced Budget Act (BBA)**, Healthcare Financial Management Association, Anaheim, California, June 23, 1999

March 2015

- **"Compliance Watch"** Kentucky Organization of Nurse Executive, Louisville, Kentucky, May 19, 1999

- **"Strategies for Servicing the Balanced Budget Act",** American College of Healthcare Executives, Chicago, Illinois, March 8, 1999

- **"Modifying Outsourcing Arrangements in an Altered Contract Therapy Market",** AIC Worldwide, Orlando, Florida, November 18, 1998

- **"Impact of the 1997 Balanced Budget Act and the Status of Managed Care in a Reformed Health Care Environment",** Kentucky Organization of Nursing Executives, Louisville, Kentucky, November 6, 1998

- **"Compliance in the Post Acute Setting",** Audio Conference, October 14, 1998

- **"The Financial Impact of the 1997 Balanced Budget Act",** American Association Healthcare Administration Management, Ottawa, Illinois, September 18, 1998

- **"Balanced Budget Act: Impact on Social Services and the Health Care Industry",** Society for Social Work Administrators in Healthcare, Monticello, Illinois, September 1, 1998

- **"Post Acute Care Reimbursement Issues",** Premier National Rehabilitation Network Meeting, Atlanta, Georgia, May 12, 1998

- **"Develop a Strategic Response to Change Affecting PPS-Exempt Providers and CORFs",** Healthcare Financial Management Association, Audio Teleconference, December 17, 1997

- **"The Hospital of the Future",** IV Congreso International, Mexico City, Mexico, November 14, 1997

- **"Defining a System of Centralized Case Management"**, McGraw-Hill Education Group, Chicago, Illinois, July 24, 1997

- **"Building Revenues in Post Acute Care"**, Healthcare Financial Management Association, Orlando, Florida, June 30, 1997

- **"Maximizing Reimbursement for Physicians / CPT Coding",** Alden Nursing Home, Naperville, Illinois, May 14, 1997

- **"Managing Managed Care: Ethical Considerations"** The Rehabilitation Institute, Kansas City, Missouri, May 2, 1997

- **"Reengineering II - The Revenue Enhancement Phase,"** American Rehabilitation Association, Chicago, Illinois, April 11, 1996; Washington, D.C., May 2, 1996; Dallas, Texas, October 3, 1996

March 2015

- **"Health Care Directions,"** Association of Worker's Compensation Board of Canada Congress Committee, Edmonton, Alberta, Canada, June 24 & 25, 1996

- **"Effective Return-To-Work Strategies,"** Center for Labour-Management Development, Inc., Chicago, Illinois, April 19, 1996

- **"The Role of Small Business Within the International Marketplace,"** *Keynote Address*, Notre Dame University, South Bend, Indiana, February 24, 1996

- **"Healthcare Without Representation: The New Boston Tea Party?"** *Keynote Address*, Case Management Society of America, Anaheim, California, February 16, 1996

- **"The Case Manager and Biotechnology: Balancing Duty, Cost and Expectation,"** Case Management Society of America, Anaheim, California, February 16, 1996

- **"Effective Integration of Subacute Care Within a Continuum of Care,"** Comprehensive Therapeutics, Ltd., Lisle, Illinois, November 13, 1995

- **"Developing Alternative Venues of Care - A Financial, Legal, and Regulatory Framework,"** Business Network, Inc., Nashville, Tennessee, October 24 - 26, 1995

- **"Subacute Care: A Viable Alternative,"** Michigan Hospital Association, Lansing, Michigan, September 28, 1995

- **"Operational Restructuring: Rehabilitation's Response to Reform,"** American Rehabilitation Association, Washington, D.C., September 21, 1995

- **"Reaching New Customers Through Effective Marketing Techniques,"** Ohio Council for Home Care, Columbus, Ohio, September 12, 1995

- **"Financial Management and Cost Analysis for Subacute Care,"** Rehab Management Expo, Fort Lauderdale, Florida, September 8, 1995

- **"Rehab's Positioning Within Emerging Networks and Alliances,"** Rehab Management Expo, Fort Lauderdale, Florida, September 8, 1995

- **"Outpatient Rehabilitation Programs: New Concepts and Trends,"** Marianjoy Rehabilitation Foundation, Inc., Wheaton, Illinois, August 18, 1995

- **"Operational Restructuring: Rehabilitation's Response to Reform,"** American Rehabilitation Association, San Francisco, California, August 15, 1995

- **"Operational Restructuring: Rehabilitation's Response to Reform,"** American Rehabilitation Association, Nashville, Tennessee, July 17, 1995

March 2015

- **"Managed Care Follow-up,"** Marianjoy Rehabilitation Hospital and Clinics, Wheaton, Illinois, June 20, 1995

- **"Health Care Reform,"** Curative Rehabilitation Center, Milwaukee, Wisconsin, June 16, 1995

- **"Reaching New Customers Through Effective Marketing Techniques,"** Home Health Care Dealers/Suppliers, Orlando, Florida, April 7, 1995

- **"Gaining Insight Into Subacute Care,"** Home Health Care Dealers/Suppliers, Orlando, Florida, April 7, 1995

- **"Operational Restructuring: Rehabilitation's Response to Reform,"** American Rehabilitation Association, Chicago, Illinois, March 16, 1995

- **"Operational Restructuring: Rehabilitation's Response to Reform,"** American Rehabilitation Association, Orlando, Florida, February 9, 1995

- **"Financial Restructuring Within a Reformed Health Care System,"** Rehab Today Magazine Convention, Chicago, Illinois, October 14, 1994

- **"Effective Integration of Subacute Care Within a Continuum of Care,"** Rehab Today Magazine Convention, Chicago, Illinois, October 13, 1994

- **"Evaluating the Evaluators: Choosing A Functional Outcome Management,"** Illinois Hospital Association Conference, Naperville, Illinois, October 6, 1994

- **"Subacute - A Viable Alternative,"** IAHA - State Conference, Peoria, Illinois, October 5, 1994

- **"Financial Analysis and Cost Accounting for Subacute Care,"** Rehab Management Magazine Expo, Fort Lauderdale, Florida, September 30, 1994

- **"Rehab's Positioning Within Emerging Networks and Alliances,"** Rehab Management Magazine Expo, Fort Lauderdale, Florida, September 30, 1994

- **"Establishing Functional Outcomes,"** Lutheran Social Services of Illinois, St. Charles, Illinois, August 19, 1994

- **"Rehabilitation Re-engineering,"** National Association of Rehabilitation Facilities Seminar, Los Angeles, California, June 16, 1994

- **"Effective Integration of Subacute Care Within a Continuum of Care,"** Rehabilitation Today Magazine Convention, New York City, New York, June 2, 1994

- **"Financial Restructuring Within a Reformed Health Care System,"** Rehabilitation Today Magazine, New York City, New York, June 3, 1994

March 2015

- **"Rehabilitation Re-engineering,"** National Association of Rehabilitation Facilities Seminar, New York City, New York, May 19, 1994

- **"Rehabilitation Re-engineering,"** National Association of Rehabilitation Facilities Seminar, Chicago, Illinois, April 21, 1994

- **"Rehabilitation Re-engineering,"** National Association of Rehabilitation Facilities Seminar, Houston, Texas, February 24, 1994

- **"Seizing the Opportunity of Health Care Reform - Effective Strategies in an Explosive Market,"** APTA, Atlanta, Georgia, December 2, 1993

- **"Getting Into Subacute Care,"** Rehab Today / Club Industry Conference, Chicago, Illinois, November 11, 1993

- **"Managing Organizational Change,"** Rehab Today / Club Industry Conference, Chicago, Illinois, November 10, 1993

- **"Legal Implications Related to Rehabilitation,"** Kansas Association Rehabilitation Facilities, Wichita, Kansas, November 4, 1993

- **"Seizing the Opportunity of Health Care Reform - Effective Strategies in an Explosive Market,"** APTA, Phoenix, Arizona, October 21, 1993

- **"Developing Program Evaluation Systems for the Full Rehab Continuum,"** The Rehabilitation Institute of Northeast Georgia Medical Center, Atlanta, Georgia, October 1, 1993

- **"Rehab in the 90's,"** The Rehabilitation Institute of Northeast Georgia Medical Center, Atlanta, Georgia, October 1, 1993

- **"Subacute Care - Rehabilitation's Emerging Opportunity or Future Nemesis,"** NARF Summer Conference, Seattle, Washington, June 15, 1993

- **"Getting Into Subacute Care,"** Rehabilitation Today '93 Conference, New York City, New York, June 3, 1993

- **"Managing Organizational Change: A Guide for the Future,"** Rehabilitation Today '93 Conference, New York City, New York, June 2, 1993

- **"The Role of Protocols in Quality Assurance in the Field of Rehabilitation,"** Rehabilitation and Quality Revaidatie Centrum Amsterdam, Amsterdam, The Netherlands, March 25, 1993

- **"Legal Implications of Rehabilitation,"** Kansas Association of Rehabilitation Facilities, Kansas City, Kansas, November 12, 1992

March 2015

- **"Organizational Structuring and Competitive Markets, Only the Strong Survive,"** Rehab Today Convention, Chicago, Illinois, November 5, 1992

- **"Accentuate the Positive with ADA,"** National Rehabilitation Center, Inc., Nashville, Tennessee, October 16, 1992

- **"Polish Your Product: Beyond Basic Program Development,"** National Rehabilitation Centers, Inc., Nashville, Tennessee, October 15, 1992

- **"Accountability Measurement Systems, The Key to Privatization of European Health Care,"** Ravalidatiecentrum Kastanjehof, Apeldoorn, The Netherlands, September 24 and 25, 1992

- **"Setting Up An Organizational Hierarchy,"** Rehab Today Convention, New York City, New York, June 5, 1992

- **"Managing Organizational Change: A Guide for the Future,"** Rehab Today Convention, New York City, New York, June 4, 1992

- **"Program Evaluation - Key to Outcome Management,"** Rehabilitation Center Amsterdam, Amsterdam, The Netherlands, March 9, 1992

- **"Market-Based Planning for Work Hardening,"** University of Arizona and Commission on Accreditation of Rehabilitation Facilities (CARF), 1991 Work Hardening Seminar, Tucson, Arizona, October 25, 1991

- **"Legal Considerations in Work Hardening Programs,"** University of Arizona and Commission on Accreditation of Rehabilitation Facilities (CARF), 1991 Work Hardening Seminar, October 24, 1991

- **"Trends and Application in the Development of CORFs,"** Midwest Coalition of Hospital Chief Executive Officers, Minneapolis, Minnesota, September 6, 1991

- **"Managing by Product Line,"** American Speech Language and Hearing Association, 1991 Directors Conference, Rockville, Maryland, June 28 - 30, 1991

- **"Integrated Management Systems Meeting the Challenges of a New Decade,"** World Trade Center, Amsterdam, The Netherlands, February 20, 1991

- **"Market-Based Planning: Medical Rehabilitation,"** Commission on Accreditation of Rehabilitation Facilities (CARF) Conference, Tucson, Arizona, February 3 - 6, 1991

- **"Patient Outcome Assessment Systems as a Key Management Tool for Hospital and Health Care Organizations,"** Republic of China, 1990 International Medical and Pharmaceutical Symposium, Taipei, Taiwan, November 16, 1990

- **"Internationalization of Health Care - An American Perspective,"** Rijksuniversiteite Utrecht, University of Utrecht, The Netherlands, October 22, 1990

March 2015

- **"Innovative Techniques in the Recruitment and Retention of Allied Health Professional,"** California Association of Rehabilitation Facilities (CALARF), Annual Conference, Oakland, California, September 25, 1990.

## *Employment History*

- **The Murer Group, Joliet, Illinois**

  *Position:*   Founder and President / CEO
  February 1985 to Present

  The Murer Group is a fully matrixed organization integrating resources and staff fully responsive to the health care industry and its' national as well as international client base.

- **Northwestern Memorial Hospital, Chicago, Illinois**

  *Position:*   Administrative Director, Department of Rehabilitation Medicine
  May 1982 to September 1984

  900-bed teaching hospital affiliated with Northwestern University

- **Rehabilitation Center, Joliet, Illinois**

  *Position:*   Executive Director –
  Responsible to 17-member Board of Directors
  May 1976 to April 1982

  Directly responsible for the day-to-day operation and management of a Comprehensive Outpatient Physical Medicine and Rehabilitation Center (CORF)

March 2015

# Murer Consultants, Inc.



*Celebrating 30 Years in the Healthcare Industry*

19065 Hickory Creek Drive
Suite 115
Mokena, IL 60448
708-478-7030 Telephone
708-478-7094 Telefax

## MEMORANDUM

**TO:**      **Maxxam Partners, LLC**

**FROM:**   **Murer Consultants, Inc.**

**RE:**      Similarities between Proposed Alcoholism and Substance Abuse Treatment Facility and a Hospital as Defined by the Kane County Zoning Ordinance

**DATE:**   June 17, 2015

---

### OVERVIEW

Maxxam Partners, LLC engaged Murer Consultants to analyze the proposed alcoholism and substance abuse treatment facility (the "Facility") located at the former Glenwood Academy, a boarding school for at-risk children, and to provide an opinion as to whether this Facility is similar to a hospital, as the term "hospital" is defined under the applicable Kane County Zoning Ordinance (the "Ordinance").

Founded in 1985, Murer Consultants is a national legal-based health care management consulting firm. The company is comprised of consultants with legal backgrounds as well as varied experience in medicine, clinical services, finance and management. With clients in 43 states and abroad, Murer Consultants represents a variety of health care providers, ranging from large multi-hospital health care systems and academic medical centers to midsized physician groups. Murer Consultants focuses on numerous facets of healthcare delivery, including the licensure, certification, development and management of hospitals and similar facilities.

It is the opinion of Murer Consultants that the proposed Facility is similar to a hospital, as the term is defined under the Kane County Zoning Ordinance. Specifically:

1. The proposed Facility substantially meets the definition of a hospital, as defined under the Ordinance;

2. Under Illinois licensure law, the facility, staffing and service requirements applicable to the proposed Facility share similar characteristics as those applicable to hospitals; and

3. The services to be provided by the proposed Facility are regularly and customarily provided by hospitals in Illinois.

*www.murer.com*

## ANALYSIS

1. **The Facility substantially meets the definition of a hospital, as defined under the Kane County Zoning Ordinance.**

The Kane County Zoning Ordinance defines the term "hospital" as an "institution open to the public in which patients or injured persons are given medical or surgical care; or for the care of contagious diseases."[1] Here, the proposed Facility will be an institution open to certain members of the public that provides medical care.

It is Murer's understanding that the Facility will seek licensure by the Illinois Department of Human Services, Division of Alcoholism and Substance Abuse, pursuant to the Illinois Alcoholism and Other Drug Abuse and Dependency Act.[2] There are two types of general services which may be provided by this type of facility: treatment and intervention.[3] The Act defines "treatment" as:

> A "continuum of care provided to persons addicted to or abusing alcohol or other drugs that is designed to identify and change patterns of behavior that are maladaptive, destructive and/or injurious to health; or to restore appropriate levels of physical, psychological, and/or social functioning."[4]

This is opposed to the definition of "intervention," which is defined as "activities or services that assist persons and their significant others in coping with the immediate problems of substance abuse or dependence" and which may "involve referring persons for treatment, as needed."[5] Therefore, while a license to provide intervention allows the Facility to refer persons for treatment, a license to provide treatment requires the Facility to provide a "continuum of care" to its patients.

Here, the Facility as proposed will seek state licensure as a treatment facility. As such, the Facility will provide a "continuum of care" to its patients. Specifically, the Facility will provide "Level IV Medically Managed Detoxification," which the Act defines as:

> "Inpatient subacute residential substance abuse treatment for patients whose acute bio/medical/emotional/ behavioral problems are severe enough to require primary medical and nursing care services. Such services are for adults or adolescents and require 24 hours medically directed evaluation, care and treatment and that a physician see the patient daily."[6]

Per the express conditions of Illinois licensure, the Facility as proposed will provide a "continuum of care" which includes "primary medical and nursing care services" supervised by a physician, with 24 hours of "medically directed evaluation, care and treatment."

As such, the Facility as proposed would substantially meet the definition of a "hospital" under the Kane County Zoning Ordinance, as it will be an institution open to certain members of the public in which patients will be provided medical care.

---

[1] *See* Kane County Zoning Ordinance, Sec. 3.1.
[2] 20 ILCS 201/1-1, *et. seq* (West 2015).
[3] *See* Ill. Admin. Code tit. 77, § 2060.201.
[4] § 2060.103.
[5] § 2060.103.
[6] § 2060.401.

2. **Under Illinois licensure law, the facility, staffing and service requirements applicable to the proposed Facility share similar characteristics as those applicable to hospitals.**

Alcoholism and substance abuse treatment facilities share many similarities with hospitals in terms of Illinois licensure law. In fact, a hospital is not required to obtain a separate license under the Illinois Alcoholism and Other Drug Abuse and Dependency Act in order to provide alcoholism and substance abuse treatment. Rather, Illinois law requires facilities providing these services to be licensed as *either* a hospital *or* an alcoholism and substance abuse treatment facility.[7]

This decision by the Illinois legislature is reflective of the substantial similarities with regard to the facility, staffing and service requirements applicable to both types of facilities when providing Level IV Medically Managed Detoxification.

The following list summarizes many of these similar requirements the proposed Facility must meet under Illinois law:[8]

<u>Facility</u>

- Compliance with the National Fire Protection Association's Life Safety Code;[9]

- Compliance with emergency care regulations;[10]

- Compliance with infectious disease control regulations;[11]

- Compliance with patient room and bath facility regulations;[12]

- Compliance with food preparation, nutrition, and dining facility regulations;[13]

- Compliance with housekeeping and laundry services regulations;[14]

- Compliance with patient rights standards;[15]

- Compliance with standards for the maintenance of patient records;[16]

---

[7] *See* 20 Ill. Comp. Stat. Ann. 301/15-5(b).
[8] For a complete list of hospital licensure requirements, *see* Ill. Admin. Code tit. 77, part 250.
[9] Ill. Admin. Code tit. 77, § 2060.305(a).
[10] § 2060.327.
[11] § 2060.415.
[12] § 2060.305(g)(1)-(17).
[13] § 2060.305(g)(17)-(22).
[14] § 2060.305(g)(23)-(24).
[15] § 2060.323.
[16] § 2060.325.

- Compliance with quality improvement and utilization review regulations.[17]

Staffing (as a Level IV designation)

- Facility is required to identify a Medical Director who is licensed and in good standing to practice medicine in the state of Illinois;[18]

- Nursing services must be planned, assigned, supervised and evaluated by a registered nurse;[19]

- All professional staff providing clinical services must meet applicable professional staff qualifications.[20]

Services (as a Level IV designation)

- A licensed physician must see each patient daily;[21]

- The Facility must provide 24 hour observation, monitoring and treatment (via a registered nurse, or licensed practical nurse/certified emergency medical technician with 40 clock hours of training in the field of alcoholism and substance abuse);[22]

- Medications must be dispensed in accordance with the Illinois Medical Practice Act, the Pharmacy Practice Act, the Illinois Controlled Substances Act, the Poison Prevention Packaging Act and rules and regulations of the US Drug Enforcement Administration;[23]

- All patients must undergo medical screening to assess acute intoxication and/or withdrawal potential, biomedical conditions or complications, and emotional/behavioral conditions and complications;[24]

- All patients must undergo physical examination within 7 days after admission.[25]

Of note, the proposed Facility must have a licensed physician as the Medical Director, and a licensed physician must see each facility patient daily. Also, all nursing services must be planned, assigned, supervised and evaluated by a registered nurse, and the Facility must have 24-hour staffing by either a registered nurse or licensed nurse/emergency medical technician.

---

[17] § 2060.315.
[18] § 2060.413(a).
[19] § 2060.413(e).
[20] § 2060.309.
[21] § 2060.405.
[22] § 2060.309(c).
[23] § 2060.413(f).
[24] § 2060.413(b).
[25] § 2060.413(c).

These requirements (as well as the other requirements listed above) indicate that the level of acuity and personnel required to provide Level IV Medically Managed Detoxification share a number of characteristics with Illinois-licensed hospitals. As such, the proposed Facility is similar to a hospital under Illinois licensure law.

### 3. The services to be provided by the proposed Facility are regularly and customarily provided by hospitals in Illinois.

As discussed above, Illinois-licensed hospitals are appropriate venues for alcoholism and substance abuse treatment services. Also as discussed above, given the high level of acuity, the service to be provided by the proposed Facility (Level IV Medically Managed Detoxification) requires staffing and services similar to that of a hospital.

As a result, numerous hospitals provide these services in Illinois. Per the "Substance Abuse Treatment Facility Locator," as operated by the US Department of Health and Human Services, Substance Abuse & Mental Health Services Administration, twenty-two (22) facilities provide "hospital inpatient" detoxification services in Illinois (see the results of the treatment facility locator search attached hereto as Exhibit A). In contrast, per the Illinois Department of Human Services website, only one existing non-hospital facility is licensed by the Division of Alcoholism and Substance Abuse in Illinois to provide Level IV detoxification services:

> Cornell Interventions Woodridge
> 2221 W. 64th Street, 1st and 2nd Floor, Woodridge, IL, 60517.[26]

Although a facility is not required to be a hospital to provide this medically managed detoxification treatment per the regulations discussed above, the fact that hospitals regularly and customarily provide such treatment is indicative of the similarities between a hospital and the proposed Facility.

### CONCLUSION

Given the above analysis, it is the opinion of Murer Consultants that the Facility as proposed is similar to a hospital, as the term is defined under the Kane County Zoning Ordinance. This is because the Facility substantially meets the definition of a "hospital" under the Ordinance, shares numerous similarities to hospitals under Illinois licensure law, and will provide detoxification services regularly and customarily provided by hospitals.

Should you have any additional questions or concerns, please contact Murer Consultants at (708) 478-7030.

---

[26] See DASA Licensed Sites Sorted by County/City/Township, *available at*
https://www.dhs.state.il.us/onenetlibrary/27896/documents/by_division/oasa/licensedirectorybycounty.pdf.

# EXHIBIT A

**US Department of Health and Human Services**

**Substance Abuse & Mental Health Services Administration**

**Substance Abuse Treatment Facility Locator Search Results:
"Hospital Inpatient" plus "Detoxification"**

6/16/2015                                    Print Locator Results

# Listed Facilities

| # | Miles | Facility Name | Address |
|---|-------|---------------|---------|
| 1 | 13.1 | IL Institute for Addiction Recovery at Proctor Hospital | 5409 North Knoxville Avenue<br>Peoria, IL 61614<br>**309-691-1055** |

| | |
|---|---|
| **Service Setting (e.g., Outpatient, Residential, etc.)→** | Outpatient; Partial hospitalization/day treatment; Hospital inpatient; Outpatient Detoxification; Outpatient methadone/Buprenorphine or Vivitrol®; Outpatient Day Treatment or Partial Hospitalization; Intensive Outpatient treatment; Regular Outpatient treatment; Hospital Inpatient Detoxification; Hospital Inpatient Treatment; Computerized treatment |
| **Type of Care→** | Substance treatment services; Detoxification; Methadone maintenance; Methadone detoxification; Buprenorphine used in treatment; Naltrexone (oral); Vivitrol® (injectable Naltrexone) |
| **Special Programs/Groups Offered→** | Persons with co-occurring mental and substance abuse disorders; Adolescents; Persons who have experienced trauma |
| **Payment/Insurance Accepted→** | Cash or self-payment; Medicare; Private health insurance; Military insurance (e.g., TRICARE or CHAMPVA) |
| **Language Services→** | Services for the hearing-impaired |
| **Age Groups Accepted→** | Children/adolescents; Young adults; Adults |

| # | Miles | Facility Name | Address |
|---|-------|---------------|---------|
| 2 | 23.4 | IL Institute for Addiction Recovery At Advocate BroMenn Medical Center | Virginia at Franklin Street<br>Normal, IL 61761<br>**309-888-0993** |

| | |
|---|---|
| **Service Setting (e.g., Outpatient, Residential, etc.)→** | Outpatient; Partial hospitalization/day treatment; Hospital inpatient; Outpatient Day Treatment or Partial Hospitalization; Intensive Outpatient treatment; Regular Outpatient treatment; Hospital Inpatient Detoxification; Hospital Inpatient Treatment |
| **Age Groups Accepted→** | Young adults; Adults |
| **Special Programs/Groups Offered→** | Persons with co-occurring mental and substance abuse disorders; Lesbian, gay, bisexual, or transgender (LGBT) clients; Veterans; Military families; Clients referred from the court/judicial system (other than DUI/DWI); Seniors or older adults; Pregnant/postpartum women; Adult women; Adult men; Persons with HIV or AIDS; Persons who have experienced trauma; Persons who have experienced sexual abuse; Persons who have experienced intimate |

partener violence, domestic Violence

| | |
|---|---|
| **Payment/Insurance Accepted→** | Cash or self-payment; Medicare; Private health insurance |
| **Language Services→** | Services for the hearing-impaired |
| **Type of Care→** | Substance treatment services; Detoxification; Buprenorphine used in treatment; Naltrexone (oral); Vivitrol® (injectable Naltrexone) |

| 3 | 60.9 | Saint Marys Treatment Center | 1800 East Lake Shore Drive<br>Decatur, IL 62521<br>**217-464-2500** |
|---|---|---|---|

| | |
|---|---|
| **Service Setting (e.g., Outpatient, Residential, etc.)→** | Outpatient; Partial hospitalization/day treatment; Hospital inpatient; Outpatient Day Treatment or Partial Hospitalization; Intensive Outpatient treatment; Regular Outpatient treatment; Hospital Inpatient Detoxification |
| **Special Programs/Groups Offered→** | Adolescents |
| **Payment/Insurance Accepted→** | Cash or self-payment; Medicare; Private health insurance; Military insurance (e.g., TRICARE or CHAMPVA) |
| **Type of Care→** | Substance treatment services; Detoxification; Buprenorphine used in treatment; Naltrexone (oral) |
| **Age Groups Accepted→** | Children/adolescents; Young adults; Adults |

| 4 | 101.2 | Linden Oaks Hospital at Edward | 852 South West Street<br>Naperville, IL 60540<br>**630-305-5500** |
|---|---|---|---|

| | |
|---|---|
| **Languages→** | Spanish |
| **Payment/Insurance Accepted→** | Cash or self-payment; Medicaid; Medicare; Private health insurance; Military insurance (e.g., TRICARE or CHAMPVA) |
| **Type of Care→** | Detoxification; Buprenorphine used in treatment; Naltrexone (oral); Vivitrol® (injectable Naltrexone) |
| **Age Groups Accepted→** | Children/adolescents; Young adults; Adults |
| **Special Programs/Groups Offered→** | Adolescents; Adult women; Adult men |
| **Service Setting (e.g., Outpatient, Residential, etc.)→** | Hospital inpatient; Hospital Inpatient Detoxification; Computerized treatment |
| **Language Services→** | Services for the hearing-impaired |

| 5 | 107.1 | Behavioral Health Services of Central DuPage Hospital | 27 West 350 High Lake Road<br>Winfield, IL 60190 |
|---|---|---|---|

| | |
|---|---|
| | **(630) 933-4000** |
| **Type of Care→** | Substance treatment services; Detoxification; Buprenorphine used in treatment; Naltrexone (oral); Vivitrol® (injectable Naltrexone) |
| **Payment/Insurance Accepted→** | Cash or self-payment; Medicaid; Medicare; Private health insurance |
| **Special Programs/Groups Offered→** | Persons with co-occurring mental and substance abuse disorders; Adult women; Adult men |
| **Age Groups Accepted→** | Young adults; Adults |
| **Service Setting (e.g., Outpatient, Residential, etc.)→** | Outpatient; Partial hospitalization/day treatment; Hospital inpatient; Residential; Short-term residential; Residential Detoxification; Outpatient Detoxification; Outpatient Day Treatment or Partial Hospitalization; Intensive Outpatient treatment; Regular Outpatient treatment; Hospital Inpatient Detoxification; Hospital Inpatient Treatment |
| **Language Services→** | Services for the hearing-impaired |

| 6 | 109.2 | Advocate Good Samaritan Hospital | 3815 Highland Avenue<br>Downers Grove, IL 60515<br>**630-275-1703** |
|---|---|---|---|

| | |
|---|---|
| **Service Setting (e.g., Outpatient, Residential, etc.)→** | Hospital inpatient; Hospital Inpatient Detoxification; Hospital Inpatient Treatment |
| **Type of Care→** | Substance treatment services; Detoxification; Buprenorphine used in treatment; Vivitrol® (injectable Naltrexone) |
| **Payment/Insurance Accepted→** | Cash or self-payment; Medicaid; Medicare; State financed health insurance plan other than Medicaid; Private health insurance; Military insurance (e.g., TRICARE or CHAMPVA) |
| **Special Programs/Groups Offered→** | Persons with co-occurring mental and substance abuse disorders |
| **Language Services→** | Services for the hearing-impaired |
| **Age Groups Accepted→** | Young adults; Adults |

| 7 | 109.3 | Palos Community Hospital | 12251 South 80th Avenue<br>Palos Heights, IL 60463<br>**708-923-4000** |
|---|---|---|---|

| | |
|---|---|
| **Service Setting (e.g., Outpatient, Residential, etc.)→** | Hospital inpatient; Hospital Inpatient Detoxification; Hospital Inpatient Treatment |
| **Age Groups Accepted→** | Children/adolescents; Young adults; Adults |
| **Payment/Insurance Accepted→** | Cash or self-payment; Medicare; Private health |

6/16/2015                                                    Print Locator Results

| | | | insurance; Military insurance (e.g., TRICARE or CHAMPVA) |
|---|---|---|---|
| | | Type of Care→ | Substance treatment services; Detoxification; Buprenorphine used in treatment; Naltrexone (oral) |
| 8 | 112.9 | IL Institute for Addiction Recovery At Ingalls Memorial Hospital | 1 Ingalls Drive Harvey, IL 60426 **708-915-4090** |
| | | Age Groups Accepted→ | Young adults; Adults |
| | | Language Services→ | Services for the hearing-impaired |
| | | Type of Care→ | Substance treatment services; Detoxification; Methadone detoxification; Buprenorphine used in treatment; Naltrexone (oral); Vivitrol® (injectable Naltrexone) |
| | | Service Setting (e.g., Outpatient, Residential, etc.)→ | Outpatient; Partial hospitalization/day treatment; Hospital inpatient; Outpatient Day Treatment or Partial Hospitalization; Intensive Outpatient treatment; Regular Outpatient treatment; Hospital Inpatient Detoxification; Hospital Inpatient Treatment |
| | | Payment/Insurance Accepted→ | Cash or self-payment; Medicare; Private health insurance |
| 9 | 116.4 | Little Company of Mary Hospital Behavioral Health | 2800 West 95th Street Evergreen Park, IL 60805 **(708) 422-0110** |
| | | Special Programs/Groups Offered→ | Persons with co-occurring mental and substance abuse disorders |
| | | Payment/Insurance Accepted→ | Cash or self-payment; Medicare; Private health insurance |
| | | Age Groups Accepted→ | Young adults; Adults |
| | | Type of Care→ | Substance treatment services; Detoxification; Buprenorphine used in treatment; Naltrexone (oral) |
| | | Service Setting (e.g., Outpatient, Residential, etc.)→ | Outpatient; Partial hospitalization/day treatment; Hospital inpatient; Outpatient Day Treatment or Partial Hospitalization; Intensive Outpatient treatment; Hospital Inpatient Detoxification |
| 10 | 117.6 | Vet Affairs/Edward Hines Jr Hospital Substance Abuse Section | Roosevelt Road and 5th Avenue Hines, IL 60141 **708-202-8387** |
| | | Payment/Insurance Accepted→ | Cash or self-payment; Medicaid; Medicare; Private health insurance; Military insurance (e.g., TRICARE or CHAMPVA) |
| | | Special Programs/Groups Offered→ | Veterans; Adult women; Adult men; Persons who have experienced trauma |

6/16/2015                                          Print Locator Results

| | | | |
|---|---|---|---|
| | **Payment Assistance Available**→ | Payment assistance (check with facility for details) | |
| | **Type of Care**→ | Substance treatment services; Detoxification; Methadone maintenance; Methadone detoxification; Buprenorphine used in treatment; Naltrexone (oral); Vivitrol® (injectable Naltrexone) | |
| | **Age Groups Accepted**→ | Young adults; Adults | |
| | **Facility Operation (e.g. Private, Public)**→ | U.S. Department of Veterans Affairs | |
| | **Service Setting (e.g., Outpatient, Residential, etc.)**→ | Outpatient; Hospital inpatient; Residential; Short-term residential; Residential Detoxification; Outpatient Detoxification; Outpatient methadone/Buprenorphine or Vivitrol®; Intensive Outpatient treatment; Regular Outpatient treatment; Hospital Inpatient Detoxification | |

| 11 | 117.7 | McNeal Hospital Behavioral Health Services | 3249 South Oak Park Avenue Berwyn, IL 60402 **708-783-3140** |
|---|---|---|---|
| | **Type of Care**→ | Substance treatment services; Detoxification; Buprenorphine used in treatment; Naltrexone (oral); Vivitrol® (injectable Naltrexone) | |
| | **Special Programs/Groups Offered**→ | Persons with co-occurring mental and substance abuse disorders; Lesbian, gay, bisexual, or transgender (LGBT) clients; Veterans; Military families; Seniors or older adults; Pregnant/postpartum women; Persons with HIV or AIDS; Persons who have experienced trauma; Persons who have experienced sexual abuse; Persons who have experienced intimate partener violence, domestic Violence | |
| | **Service Setting (e.g., Outpatient, Residential, etc.)**→ | Outpatient; Partial hospitalization/day treatment; Hospital inpatient; Outpatient Day Treatment or Partial Hospitalization; Intensive Outpatient treatment; Hospital Inpatient Detoxification | |
| | **Payment/Insurance Accepted**→ | Cash or self-payment; Medicaid; Medicare; State financed health insurance plan other than Medicaid; Private health insurance; Military insurance (e.g., TRICARE or CHAMPVA) | |
| | **Age Groups Accepted**→ | Young adults; Adults | |

| 12 | 118 | Alexian Brothers Behavioral Health Hospital | 1650 Moon Lake Boulevard Schaumburg, IL 60169 **847-882-1600** |
|---|---|---|---|
| | **Payment/Insurance Accepted**→ | Cash or self-payment; Medicaid; Medicare; State financed health insurance plan other than Medicaid; Private health insurance; Military insurance (e.g., | |

6/16/2015                                           Print Locator Results

| | | | TRICARE or CHAMPVA) |
|---|---|---|---|

**Type of Care→** Substance treatment services; Detoxification; Buprenorphine used in treatment; Naltrexone (oral); Vivitrol® (injectable Naltrexone)

**Special Programs/Groups Offered→** Persons with co-occurring mental and substance abuse disorders; Lesbian, gay, bisexual, or transgender (LGBT) clients; Veterans; Active duty military; Military families; Seniors or older adults; Adolescents; Pregnant/postpartum women; Adult women; Adult men; Persons who have experienced trauma; Persons who have experienced sexual abuse; Persons who have experienced intimate partener violence, domestic Violence

**Age Groups Accepted→** Children/adolescents; Young adults; Adults

**Service Setting (e.g., Outpatient, Residential, etc.)→** Outpatient; Partial hospitalization/day treatment; Hospital inpatient; Outpatient Detoxification; Outpatient Day Treatment or Partial Hospitalization; Intensive Outpatient treatment; Regular Outpatient treatment; Hospital Inpatient Detoxification; Hospital Inpatient Treatment

| 13 | 118 | Leyden Family Service Share Program | 1776 Moon Lake Boulevard Schaumburg, IL 60169 **(847) 882-4181** |
|---|---|---|---|

**Payment/Insurance Accepted→** Cash or self-payment; Medicaid; Private health insurance

**Age Groups Accepted→** Young adults; Adults

**Type of Care→** Substance treatment services; Detoxification; Buprenorphine used in treatment

**Service Setting (e.g., Outpatient, Residential, etc.)→** Outpatient; Partial hospitalization/day treatment; Hospital inpatient; Residential; Short-term residential; Residential Detoxification; Outpatient Day Treatment or Partial Hospitalization; Intensive Outpatient treatment; Regular Outpatient treatment; Hospital Inpatient Detoxification

**Special Programs/Groups Offered→** Adult women; Adult men

**Payment Assistance Available→** Sliding fee scale (fee is based on income and other factors)

| 14 | 118.6 | VHS Westlake Hospital | 1225 West Lake Street Melrose Park, IL 60160 **708-938-7163** |
|---|---|---|---|

**Payment/Insurance Accepted→** Cash or self-payment; Medicaid; Medicare; Private health insurance; Military insurance (e.g., TRICARE or CHAMPVA)

| | | | |
|---|---|---|---|
| **Age Groups Accepted→** | | Young adults; Adults | |
| **Language Services→** | | Services for the hearing-impaired | |
| **Service Setting (e.g., Outpatient, Residential, etc.)→** | | Hospital inpatient; Hospital Inpatient Detoxification | |
| **Type of Care→** | | Detoxification; Methadone detoxification; Buprenorphine used in treatment; Naltrexone (oral) | |

| **15** | **120.4** | ABRAXAS Youth and Family Services Southwood Interventions | 5701 South Wood Street Chicago, IL 60636 **(773) 737-4600** |
|---|---|---|---|

| | |
|---|---|
| **Languages→** | Spanish |
| **Service Setting (e.g., Outpatient, Residential, etc.)→** | Outpatient; Hospital inpatient; Residential; Short-term residential; Long-term residential; Intensive Outpatient treatment; Regular Outpatient treatment; Hospital Inpatient Detoxification |
| **Age Groups Accepted→** | Young adults; Adults |
| **Payment/Insurance Accepted→** | Cash or self-payment; Medicaid; State financed health insurance plan other than Medicaid; Private health insurance; Military insurance (e.g., TRICARE or CHAMPVA); Access to Recovery (ATR) voucher |
| **Special Programs/Groups Offered→** | Persons with co-occurring mental and substance abuse disorders; Lesbian, gay, bisexual, or transgender (LGBT) clients; Clients referred from the court/judicial system (other than DUI/DWI); Seniors or older adults; Pregnant/postpartum women; Adult women; Adult men; Persons with HIV or AIDS; Persons who have experienced trauma; Persons who have experienced sexual abuse; Persons who have experienced intimate partner violence, domestic Violence |
| **Type of Care→** | Substance treatment services; Detoxification; Methadone detoxification; Naltrexone (oral) |
| **Payment Assistance Available→** | Sliding fee scale (fee is based on income and other factors); Payment assistance (check with facility for details) |

| **16** | **120.7** | Loretto Hospital Addiction Center | 645 South Central Avenue Chicago, IL 60644 **773-854-5440** |
|---|---|---|---|

| | |
|---|---|
| **Languages→** | Spanish |
| **Age Groups Accepted→** | Young adults; Adults |
| **Service Setting (e.g., Outpatient, Residential, etc.)→** | Outpatient; Partial hospitalization/day treatment; Hospital inpatient; Residential; Short-term residential; Residential Detoxification; Outpatient Day Treatment |

6/16/2015            Print Locator Results

| | | |
|---|---|---|
| | | or Partial Hospitalization; Intensive Outpatient treatment; Regular Outpatient treatment; Hospital Inpatient Detoxification; Hospital Inpatient Treatment |
| | **Payment/Insurance Accepted→** | Cash or self-payment; Medicaid; Medicare; State financed health insurance plan other than Medicaid; Private health insurance; Military insurance (e.g., TRICARE or CHAMPVA) |
| | **Language Services→** | Services for the hearing-impaired |
| | **Special Programs/Groups Offered→** | Adult women; Adult men; Persons with HIV or AIDS |
| | **Type of Care→** | Substance treatment services; Detoxification; Buprenorphine used in treatment |

**17** | 121.3 | Saint Bernard Hospital | 326 West 64th Street
Chicago, IL 60621
**773-962-3968**

| | |
|---|---|
| **Payment/Insurance Accepted→** | Medicaid; Medicare; Private health insurance |
| **Type of Care→** | Substance treatment services; Detoxification |
| **Payment Assistance Available→** | Payment assistance (check with facility for details) |
| **Service Setting (e.g., Outpatient, Residential, etc.)→** | Outpatient; Hospital inpatient; Regular Outpatient treatment; Hospital Inpatient Detoxification |
| **Age Groups Accepted→** | Young adults; Adults |

**18** | 122.6 | South Shore Hospital Medical Detox Services | 8012 South Crandon Avenue
Chicago, IL 60617
**773-356-5098**

| | |
|---|---|
| **Payment/Insurance Accepted→** | Medicaid; Medicare |
| **Type of Care→** | Detoxification |
| **Service Setting (e.g., Outpatient, Residential, etc.)→** | Hospital inpatient; Hospital Inpatient Detoxification |
| **Age Groups Accepted→** | Young adults; Adults |

**19** | 122.6 | South Shore Hospital Chemical Dependency | 8012 South Crandon Avenue
Chicago, IL 60617
**773-356-5303**

| | |
|---|---|
| **Exclusive Services→** | Methadone clients only |
| **Language Services→** | Services for the hearing-impaired |
| **Age Groups Accepted→** | Young adults; Adults |
| **Type of Care→** | Substance treatment services; Detoxification; Methadone maintenance; Methadone detoxification; |

6/16/2015                                      Print Locator Results

|  |  |  |  |
|---|---|---|---|
|  |  | All Clients in Opioid Treatment Program | |
|  | **Service Setting (e.g., Outpatient, Residential, etc.)→** | Hospital inpatient; Hospital Inpatient Detoxification; Hospital Inpatient Treatment | |
|  | **Payment/Insurance Accepted→** | Cash or self-payment; Medicare; State financed health insurance plan other than Medicaid; Private health insurance; Military insurance (e.g., TRICARE or CHAMPVA); Access to Recovery (ATR) voucher | |

| 20 | 125.6 | Holy Family Medical Center<br>Keys to Recovery | 100 North River Road<br>Des Plaines, IL 60016<br>**847-298-9355-2375** |
|---|---|---|---|
|  | **Language Services→** | Services for the hearing-impaired | |
|  | **Type of Care→** | Substance treatment services; Detoxification; Buprenorphine used in treatment; Naltrexone (oral) | |
|  | **Special Programs/Groups Offered→** | Seniors or older adults; Adult women; Adult men; Persons with HIV or AIDS; Persons who have experienced trauma; Persons who have experienced sexual abuse; Persons who have experienced intimate partener violence, domestic Violence | |
|  | **Service Setting (e.g., Outpatient, Residential, etc.)→** | Outpatient; Partial hospitalization/day treatment; Hospital inpatient; Residential; Short-term residential; Residential Detoxification; Outpatient Detoxification; Outpatient Day Treatment or Partial Hospitalization; Intensive Outpatient treatment; Regular Outpatient treatment; Hospital Inpatient Detoxification; Hospital Inpatient Treatment | |
|  | **Payment/Insurance Accepted→** | Cash or self-payment; Medicaid; Medicare; Private health insurance | |
|  | **Age Groups Accepted→** | Young adults; Adults | |

| 21 | 129.6 | Chicago Lakeshore Hospital<br>Chemical Dependence Program | 4840 North Marine Drive<br>Chicago, IL 60640<br>**773-878-9700** |
|---|---|---|---|
|  | **Languages→** | Spanish | |
|  | **Payment/Insurance Accepted→** | Cash or self-payment; Medicaid; Medicare; State financed health insurance plan other than Medicaid; Private health insurance; Military insurance (e.g., TRICARE or CHAMPVA) | |
|  | **Age Groups Accepted→** | Young adults; Adults | |
|  | **Special Programs/Groups Offered→** | Persons with co-occurring mental and substance abuse disorders; Lesbian, gay, bisexual, or transgender (LGBT) clients | |
|  | **Service Setting (e.g., Outpatient, Residential, etc.)→** | Outpatient; Partial hospitalization/day treatment; Hospital inpatient; Outpatient Detoxification; | |

6/16/2015 Print Locator Results

|  |  | Outpatient Day Treatment or Partial Hospitalization; Intensive Outpatient treatment; Hospital Inpatient Detoxification; Hospital Inpatient Treatment |
|--|--|--|
| | **Language Services→** | Services for the hearing-impaired |
| | **Type of Care→** | Substance treatment services; Detoxification; Methadone detoxification; Buprenorphine used in treatment; Naltrexone (oral) |

| 22 | 140.5 | Captain James A Lovell Federal Health Care Center | 3001 Green Bay Road North Chicago, IL 60064 |
|----|-------|--------|------------|
| | | | **224-610-4012** |

| | **Service Setting (e.g., Outpatient, Residential, etc.)→** | Outpatient; Partial hospitalization/day treatment; Hospital inpatient; Residential; Short-term residential; Long-term residential; Residential Detoxification; Outpatient Detoxification; Outpatient methadone/Buprenorphine or Vivitrol®; Outpatient Day Treatment or Partial Hospitalization; Intensive Outpatient treatment; Regular Outpatient treatment; Hospital Inpatient Detoxification |
|--|--|--|
| | **Payment Assistance Available→** | Payment assistance (check with facility for details) |
| | **Payment/Insurance Accepted→** | Cash or self-payment; State financed health insurance plan other than Medicaid; Private health insurance; Military insurance (e.g., TRICARE or CHAMPVA) |
| | **Age Groups Accepted→** | Young adults; Adults |
| | **Type of Care→** | Substance treatment services; Detoxification; Methadone maintenance; Methadone detoxification; Buprenorphine used in treatment; Naltrexone (oral); Vivitrol® (injectable Naltrexone) |
| | **Facility Operation (e.g. Private, Public)→** | U.S. Department of Veterans Affairs |
| | **Special Programs/Groups Offered→** | Persons with co-occurring mental and substance abuse disorders; Veterans; Adult women; Adult men; Persons with HIV or AIDS; Persons who have experienced trauma; Persons who have experienced sexual abuse; Persons who have experienced intimate partener violence, domestic Violence |



## MaROUS & COMPANY

August 20, 2015

Maxxam Partners, LLC
6423 Collins Avenue, Suite 1605
Miami Beach, Florida 33141

Subject:   Market Impact Analysis
           Proposed Alcoholism and Substance Abuse Treatment Facility
           41W400 Silver Glen Road
           Unincorporated St. Charles, Illinois 60175

In accordance with your request, the request for a special use to allow an alcoholism and substance abuse treatment facility (proposed treatment facility) at 41W400 Silver Glen Road, unincorporated St. Charles, Illinois, has been analyzed and this market impact analysis has been prepared.

MaRous & Company has conducted similar market impact studies for a variety of clients and for a number of different proposed developments over the last 30 years. Clients include municipalities, counties, school districts, corporations, developers, and citizen's groups. The types of proposals analyzed include: commercial developments such as shopping centers and big-box retail facilities; religious facilities such as mosques and mega-churches; residential developments such as high-density multifamily and congregate-care buildings and large single-family subdivisions; recreational uses such as skate parks and lighted high school athletic fields; and industrial uses such as wind farms, waste transfer stations, land-fills, and quarries.

I previously have studied the market impact for a proposed treatment facility at this location, with a date of value of January 3, 2013.

### Purpose and Intended Use of the Study

The purpose of this appraisal assignment is to analyze the potential impact, if any, on the value of the surrounding residential properties of the approval of a special use for the development of an alcoholism and substance abuse treatment facility on the site of the former Glenwood School for Boys, a boarding school for at-risk children, property. Specifically, this study is designed to address Section 4.8-2 (b) and (c) of the Kane County Zoning Ordinance which states that a special use "... will not be injurious to the use and enjoyment of other property in the immediate vicinity for the purposes already permitted, nor substantially diminish and impair property values within the neighborhood." and "... the establishment of the special use will not impede the normal and orderly development and improvement of surrounding property for uses permitted in the district." The report is intended specifically for your use as part of an application for a special use in Kane County. Any other use or user of this report is considered to be unintended.

Maxxam Partners, LLC
Proposed Alcoholism and Substance Abuse Treatment Facility
August 20, 2015

**Executive Summary**

As a result of the market impact analysis undertaken, it is my opinion that the approval of a special use for the proposed treatment facility will not have measurable negative impact on either the character or the property values of the adjoining uses. Specifically:

- The proposed use provides certainty, including on-going quality maintenance as opposed to vacant property, which could be described as an attractive nuisance;
- There is likely to be limited demand for the existing facilities for an alternative use;
- There is no better use to which the existing facilities could be put that would enhance the value of the surrounding property;
- The existing facilities are separated by the forest preserve district from most adjoining property owners, and there are significant distances between the facilities and residential dwellings;
- There are financial benefits to the taxing bodies by use by a for-profit facility versus the current use by a not-for-profit facility;
- The proposed treatment facility will create high-paying jobs in the area which will benefit market demand;
- Controls are in place to limit the type of patients to be accepted, and the client population will be highly controlled and carefully monitored;
- There is limited and controlled access into the facility;
- An analysis of the impact of the Park Ridge Youth Campus on the value of single-family residences immediately adjacent using a matched pair analysis indicated that it did not have a measurable impact on surrounding property values;
- An analysis of the value of a single-family house in a subdivision south of the proposed treatment facility indicated that the value is the same with and without the approval of the proposed facility.

These conclusions are based on the following assumptions:

- The facilities will be well maintained and managed; and
- Any significant numbers of police/fire/ambulance calls would result in arrangements for "silent" responses.

**Definition of Market Value**

When discussing market value, the following definition is used:

The most probable price a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:

Maxxam Partners, LLC
Proposed Alcoholism and Substance Abuse Treatment Facility
August 20, 2015

- Buyer and seller are typically motivated;
- Both parties are well informed or well advised, and acting in what they consider their own best interests;
- A reasonable time is allowed for exposure in the open market;
- Payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and
- The price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.[1]

## Scope of Work and Reporting Process

Information was gathered concerning the real estate market generally and the market of the area surrounding the proposed special use specifically. The uses in the surrounding area, as well as the development of the proposed treatment facility, were considered. The following summarizes the actions taken:

- Review of the Kane County Zoning Ordinance and map;
- Review of the Kane County 2040 Land Use Plan;
- Review of the application for a special use from Maxxam Partners, LLC, (Maxxam) including supporting documents;
- Review of information on the existing facilities themselves provided by representatives of Maxxam and Glenwood School;
- Information provided by Abram Andrzejewski, an article entitled "House Prices during Siting Decision Stages: The case of an Incinerator from Rumor through Operation," by Kiel and McClain, memorandum from Day & Robert, P.C., dated November 5, 2012, respectively, and two letters to MaRous & Company concerning zoning and emergency response matters;
- Data on the subject community and on Park Ridge from the Site to do Business, STDB.com;
- Data on the market for single-family houses in the immediate area of the proposed special use from the Northern Illinois Multiple Listing Service (MLSNI) and A.L. Wagner Appraisal Group;
- The Lannert Group, Inc. report dated August 12, 2015;
- An inspection of the subject property and the surrounding area by Michael S. MaRous and Anita Rifkind on December 18, 2012, and on April 21, 2015.

---

1 *(12 C.F.R. Part 34.42(g); 55 Federal Register 34696, August 24, 1990, as amended at 57 Federal Register 12202, April 9, 1992; 59 Federal Register 29499, June 7, 1994)*



Maxxam Partners, LLC
Proposed Alcoholism and Substance Abuse Treatment Facility
August 20, 2015

This document is considered to conform to the requirements of the *Uniform Standards of Professional Appraisal Practice and Advisory Opinions* (USPAP). This letter is a brief recapitulation of the appraisal data, analyses, and conclusions; additional supporting documentation is retained in the MaRous and Company office file. There are no extraordinary assumptions or hypothetical conditions included in the market study.

In order to form a judgment concerning the potential impact, if any, on the "essential character" and value of the surrounding residential properties of the approval of the special use for the proposed treatment facility, I have considered the following:

- The nature of, and the possible uses to which, the existing facilities might be put under the Kane County Zoning ordinance;
- The impact on the character and the value of the surrounding residential properties of the existing facilities;
- The impact on the character and the value of the surrounding residential properties by the approval of the special use as proposed; and
- The impact on the character and the value of the larger community by the approval of the special use as proposed.

**Description of Property, Nearby Uses, and Proposed Development**

**Area Analysis**

The proposed treatment facility is located in the northeast corner of Campton Township, in unincorporated Kane County. Illinois Route 64 is located south of the subject property, and Illinois Route 47 is located to the west. Silver Glen Road is a major east-west arterial in the area. Corron Road to the east and Dittman Road to the west are secondary north/south arterials.

There are 31,687 people in 9,813 households within a 5-mile radius of the subject property. The following map illustrates the area included in the ESRI demographic profile reported in this statistic and in those that follow.

Maxxam Partners, LLC
Proposed Alcoholism and Substance Abuse Treatment Facility
August 20, 2015



The demographics in this portion of Kane County are strong. The following chart illustrates the spread of household income within a 5-mile radius of the proposed treatment facility and the projections for 2019. The median household income in 2014 was $113,655.



Maxxam Partners, LLC
Proposed Alcoholism and Substance Abuse Treatment Facility
August 20, 2015

The area previously had experienced a rapidly growing population; however, the area has not completely recovered from the economic recession of 2007-2009. The number of residents and the number of households are expected to grow at 0.82 and 0.85 percent, respectively, between 2014 and 2019.



The population is diversified in age with approximately 35 percent under the age of 25, approximately 39 percent between the ages of 25 and 54, and the remainder over the age of 55.



The vast majority of housing units in the area are owner occupied. Housing values in a 5-mile radius of the subject vary widely as the following pie chart indicates. The median home value is $341,026.

MaRous & Company                                                                              6

Maxxam Partners, LLC
Proposed Alcoholism and Substance Abuse Treatment Facility
August 20, 2015



Like other good-quality suburban areas, this area of Kane County experienced a softening in housing values during the 2008 economic downturn. However, recently the residential real estate market has begun to show signs of stabilization. According to the A.L. Wagner Appraisal Group "Chicagoland Quarterly Housing Reports," the South Elgin/St. Charles area has experienced an increase in average sale price of just under 5 percent in the year ending January 1, 2015.

| Town | MLS Area | Actives | Average List Price | Under Contract Contract (Ctg.) | Under Contract (Pend) | # of Sales Last 12 mos. | Average Sale Price | MONTHS SUPPLY | MONTHS SUPPLY | Percent Change | Average Sale Price | 12 mo SP Percent Change |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | January 1, 2015 Statistics | | January 1, 2014 Statistics | |
| South Elgin | 177 | 69 | $ 313,051 | 32 | 4 | 231 | $ 248,847 | 3.10 | 3.04 | 1.91% | $ 239,016 | 4.11% |
| St. Charles | 174 | 353 | $ 604,490 | 64 | 12 | 704 | $ 370,643 | 6.43 | 3.95 | 37.47% | $ 354,835 | 4.46% |

This followed a similar increase between January 1, 2013, and January 1, 2014.

| Town | MLS Area | Actives | Average List Price | Under Contract Contract (Ctg.) | Under Contract (Pend) | # of Sales Last 12 mos. | Average Sale Price | MONTHS SUPPLY | MONTHS SUPPLY | Percent Change | Average Sale Price | 12 mo SP Percent Change |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | January 1, 2014 Statistics | | January 1, 2013 Statistics | |
| South Elgin | 177 | 71 | $ 281,692 | 21 | 6 | 253 | $ 239,016 | 3.04 | 3.26 | -6.62% | $ 229,026 | 4.36% |
| St. Charles | 174 | 293 | $ 633,321 | 69 | 18 | 803 | $ 354,835 | 3.95 | 6.01 | -34.25% | $ 338,932 | 4.69% |

Within a two-mile radius of the subject property, residential development consists almost entirely of single-family houses on large lots located in various communities. According to the Midwest Real Estate Data (MRED), since January 1, 2015, there have been 21 sales of single-family residences in this area with an average sale price of $301,340 and an average marketing time of 115 days. Four of these sales resulted from financial distress. An additional five properties are pending. As of the date of this report,

Maxxam Partners, LLC
Proposed Alcoholism and Substance Abuse Treatment Facility
August 20, 2015

there are 38 active listings with an average list price of $432,575, and the average marketing time for these listings is 236 days. Only one of these listings appears to be related to financial distress. There are an additional 12 listings that are under contract. Of these listings, three are of residential properties in the subdivision south of the subject; no additional listings border the subject site.

There have been two sales of single-family houses in the last year in the subdivision immediately south of the proposed project. The house at 7N089 Fox Bend Drive sold in August 2014 for $430,000 after a marketing time of 80 days. This house previously had sold after foreclosure in December 2012, for $225,725. The house was completely remodeled subsequent to the 2012 purchase.

The house at 7N311 Red Barn Lane also is located in the subdivision south of the subject property. The access drive to the subject property is located to the west of this subdivision, and forest preserve land separates it from the subject property. The house sold in August 2014 for $329,000 after a marketing time of 39 days. The house previously had been listed for 194 days between May and December 2013.

## Immediate Area

The site is surrounded on three sides by forest preserve land located in the Kane County, and in the city of Elgin. The northern property line borders land within the village of Campton Hills that is zoned for farming uses.

The property that is proposed for a special use for an alcoholism and substance abuse treatment facility is located on the north side of Silver Glen Road, west of Corron Road. The campus is accessed by a private drive approximately ½ mile long. As the following aerial photograph illustrates, as does the existing land-use graphic included in the addenda to this report, the area is influenced predominantly by farm and/or forest preserve land, with residential subdivisions on the west side of the access drive and on the north side of Silver Glen Road. Additional subdivisions are located on the south side of Silver Glen Road, and there are additional residences on large lots situated along both sides of Dittman, McDonald, and Corron roads.

Maxxam Partners, LLC
Proposed Alcoholism and Substance Abuse Treatment Facility
August 20, 2015



## Subject Property

The subject property is an irregularly shaped, 120-acre site that has little frontage on Silver Glen Road; it is accessed via an approximately ½-mile-long drive along an easement across forest preserve district land.

The subject property currently is zoned F, Farming District, by Kane County, with a Special Use allowing the former boarding school for at-risk children. Hospitals, nursing homes, convalescent homes,

Maxxam Partners, LLC
Proposed Alcoholism and Substance Abuse Treatment Facility
August 20, 2015

and "similar facilities" are allowed as special uses; the proposed use is similar to a hospital. The following is a copy of the Kane County zoning map encompassing the subject property.



Although there is no specific reference to "an alcoholism and substance abuse treatment facility" in the zoning ordinance, it appears that the proposed use as a treatment facility could be approved as a special use under the F, Farming District, requirements.

Excerpts from the Kane County Comprehensive Plan follow. It is important, however, to note that under Illinois law, comprehensive plans are advisory in nature.

Maxxam Partners, LLC
Proposed Alcoholism and Substance Abuse Treatment Facility
August 20, 2015

The first illustrates that the subject property is located in the area designated as "Critical Growth." Some of the existing open space surrounding the subject property appears not to have been included on the map.



The second excerpt is from the Future Land Use map. The subject is designated an "Institutional/Private Open Space" area, characterized as "providing visual open space and community separation, preserving important woodlands and wetlands, protecting critical wildlife habitats, and offering important scientific, cultural, and educational opportunities to the residents of Kane County." The proposed facility is consistent with the future land use map.

Maxxam Partners, LLC
Proposed Alcoholism and Substance Abuse Treatment Facility
August 20, 2015



In Section 2.4 Planning Issues - Community Health, the Comprehensive Plan includes a statement of priorities for health care in the county. The following is an excerpt from that section.

**2011 Community Health Improvement Plan priorities:**

- Support health behaviors that promote well-being and prevent disease
- Increase access to high quality, holistic preventive and treatment services across the health care system
- Support and create health promoting neighborhoods, towns, and cities
- Promote social, economic and educational environments that optimize health

Maxxam Partners, LLC
Proposed Alcoholism and Substance Abuse Treatment Facility
August 20, 2015

## Site Improvements

The site is improved with buildings previously used as a boarding school for at-risk children. There are approximately 13 buildings: an executive residence; eight residential buildings; an academic center including a library; a recreational building with a full size gymnasium and a weight training room; and an administrative building including a dining hall and a commercial kitchen. There are additional ancillary buildings. The estimated gross building area of these buildings is just under 125,000 square feet; the resulting land to building ratio is approximately 41.82 to 1.0.

## Proposed Use

The existing buildings will be adapted for a high-end alcoholism and substance abuse treatment facility. There currently are eight residential dormitories. A total of 120 beds are planned. The interiors of common areas and of the residence dormitories will be renovated, and new furniture will be provided.

The facility will be licensed by the State of Illinois, and will be accredited by the Joint Commission on Accreditation of Health Care Organizations. Only self-pay patients and patients with private health insurance will be accepted. The average stay will be between 30 and 90 days. Patients will be provided with individual and group therapy, and with various therapeutic services. Accommodations will be private and semi-private. Transportation for out-of-town patients will be by a private vehicle from the airport, and a private vehicle will be provided as transportation for patients discharged voluntarily or involuntarily from the facility.

The following is an illustration of the proposed use incorporating the existing buildings on the site.

Maxxam Partners, LLC
Proposed Alcoholism and Substance Abuse Treatment Facility
August 20, 2015



**LEGEND**

1  Executive Residence
2  Dining / Multipurpose Building
3  Therapy / Activity Center
4  Gymnasium
5  Patient Lodge #1
6  Patient Lodge #2
7  Patient Lodge #3
8  Patient Lodge #4
9  Patient Lodge #5
10 Patient Lodge #6
11 Patient Lodge #7
12 Patient Lodge #8
13 Lake

MAXXAM PARTNERS, LLC - SITE PLAN

## Market Impact Analysis

A market impact analysis addresses issues that typically include:
–  By-right zoning and alternative uses possible, including density;
–  Trend of development;
–  Market supply and demand for the use proposed, and the alternative possible uses;
–  Market supply and demand for the surrounding development;
–  Effects of uncertainty of use on the market;
–  Economic issues such as the impact on real estate taxes, job creation; and
–  Physical conditions of the development, such as lights, traffic, noise, aesthetics, and maintenance.

Maxxam Partners, LLC
Proposed Alcoholism and Substance Abuse Treatment Facility
August 20, 2015

Therefore, as part of the highest and best use analysis, I have considered the types of uses to which the existing property could be put and the relative benefits and detriments to the surrounding community of these uses.

Furthermore, I also have considered the potential impact of a "worst case" reuse scenario using matched pairs of sales to evaluate the impact of a residential treatment facility for troubled teenagers assigned to a facility by the State of Illinois and by the County of Cook, and located in Park Ridge, Illinois.

Finally, I have specifically developed a "before" and "after" assessment of a house in the subdivision located within the Village boundaries west of the access drive and south of the subject property under the assumption that the proposed treatment facility was approved.

**Highest and Best Use Discussion**

Based upon my inspection of the subject property and on the quality, size, and configuration of the facilities, there are few users that would have the resources to purchase and to operate the existing facility. Following the failed attempt to convert Glenwood School to an alcoholism and substance abuse treatment facility in 2012/2013, there has been little interest in the site. There have been two potential purchasers interested in the property since June 2014, and both intended to convert the property to a treatment facility.

Demand for similar properties in the metropolitan area also has been weak, there have been two sales of similar facilities in the last 2 years. The former Fox River Country Day School consisted of 10 buildings containing 87,000 square feet on 62 acres situated on the north side of Illinois Route 25 between Dundee Avenue on the east and Duncan Avenue on the west, in Elgin. The newest building was constructed in 2005. The property was marketed for several years at a reported asking price of $4,000,000. Ultimately a purchase was arranged with the Max McGraw Wildlife Foundation, an adjacent owner, which apparently took possession of the property, and sold a 62-acre portion of it to the City of Elgin in April 2013 for $2,600,000, or $41,322 per acre.[2]

The Saint Charles Borromeo Pastoral Center consisting of dormitories, classrooms, a cafeteria, and a gymnasium was comprised of 129,000 square feet and was situated on 39.63 acres. The facilities were constructed in 1960. It was sold to Lewis University, the south-adjoining owner, in August 2013, for

---

2   Ferrarin, Elena, "Former Elgin school might become nature preserve," Daily Herald, March 1, 2013, http://www.dailyherald.com/article/20130301/news/703019936, accessed April 7, 2015.

Maxxam Partners, LLC
Proposed Alcoholism and Substance Abuse Treatment Facility
August 20, 2015

$9,450,000, or $73.25 per square foot of building area. The buildings were renovated substantially subsequent to the sale.

A review of the market indicates that there are a number of similar facilities available in the market place. A large convent/school comprised of 122,631 square feet is located at 13811 South Western Avenue in Blue Island. The facilities are situated on 6.87 acres. The property has been on the market for nearly 5 years; the current asking price is $1,850,000.

A former monastery located at 20300 Governors Highway, in Olympia Fields consists of 60,000 square feet including a chapel, 18,000 square feet of residential area, and classroom/office space. These improvements are situated on 19 acres. The property has been on the market for more than a year at an asking price of $5,000,000.

Two smaller properties also are being marketed. A religious facility at 424 Indianwood Boulevard, Park Forest, has been listed for more than 2 years at an asking price of $1,495,000. The facilities include a church, a chapel, and two school buildings with a total size of 37,000 square feet. The improvements are situated on 8.07 acres. A second smaller complex consisting of a worship/educational facility including 34,340 square feet of classrooms, meeting rooms, a full gymnasium, locker rooms, a commercial kitchen, and a parsonage is situated on approximately 13 acres at 134 Monaville Road, Lake Villa. It is listed for sale for $1,950,000 and has been on the market for approximately six months.

Potential purchasers for the subject property consist primarily of residential treatment facilities, educational institutions, or churches. Other alternatives for this type of property are limited by the rural location of the area, with no public transportation. The nearest commuter railroad stations are approximately 12 miles and 20 minutes to the northeast in Elgin, or 10 miles and 20 minutes to the southeast in Geneva.

Demand from educational institutions also is limited because of the rural location of the area. The facility is somewhat large for a religious institution. Moreover, a large religious institution at this location would increase significantly traffic into the area on days of worship and holidays. Both of the likely alternatives, use as either a school or a church, would be exempt from real estate taxes.

The possibility that some or all of the improvements on the property would be demolished and the site redeveloped with a residential use is limited by the availability of significant amounts of vacant land that would not require demolition. For example, 82 acres at the southwest corner of Dittman and McDonald roads has been listed for sale at $3,280,000 or $40,000 per acre for more than 9 years.

MaRous & Company                                                                                                 16

Maxxam Partners, LLC
Proposed Alcoholism and Substance Abuse Treatment Facility
August 20, 2015

Nor could the existing residential buildings be adapted easily to single-family houses. Moreover, multifamily housing in the larger buildings is unlikely to be in demand by the market or to be approved by the County.

As was discussed previously, there has been a stabilization of the housing market, with modest increases in average sale prices. This stabilization has been enough to encourage large-scale development of new subdivisions. However, the majority of this new development is positioned well to the east of the subject property, and to the north on Corron Road.

There has been considerable residential activity to the east of the subject at Silver Glen Road and Randall Road. This is a superior location due to the proximity to St. Charles and the development along Randall Road. Hovnanian is under contract to purchase a raw land parcel situated south of the southwest quadrant of the intersection. Reportedly the developer will construct 83 houses; the reported purchase price was $40,000 per lot. Pulte Homes purchased land at the southeast quadrant of Silver Glen Road and Randall Road in October 2014. The purchase price was $57,153 per lot for 133 lots. Houses currently are being marketed at a base price of $559,990, and six houses are under contract.

To the north of the subject, an approximately 100-acre parcel at Corron and Bowes roads sold in early 2014, and then again in August 2014. The August sale was for $3,808,000 or approximately $38,000 per acre. An approximately 90-acre parcel, subdivided for 110 lots, located at Corron Road and Sturbridge Way is under contract at an undisclosed price after having been marketed by the lender for more than 3 years. The 86-acre parcel at the northeast quadrant of Empire Road and Route 47 was sold by a bank in October 2013 for $1,060,600 or approximately $12,300 per acre.

Based on the recent sales and listings of comparable properties in the immediate subject market area, the subject site develops a range in value of $30,000 to $35,000 per acre, or $3,600,000 to $4,200,000 less demolition costs.

Were a residential subdivision to be constructed on this site, the impact on the surrounding residential property is likely to be significant. Although demand exists, an influx of newly constructed houses would act to depress the values of existing single-family houses.

Were the subject site to be developed as a single-family subdivision, the density of such a development would be considerably higher than that of the proposed use. A subdivision of approximately 80 houses each averaging 3,100 square feet including garages would be approximately twice as dense as the existing facilities. A single-family subdivision also would increase traffic into the area, would increase the school population significantly, and would require increased services. Although the existing uses are

MaRous & Company

Maxxam Partners, LLC
Proposed Alcoholism and Substance Abuse Treatment Facility
August 20, 2015

one story, a single-family development generally would consist of two-story structures. A subdivision also would generate more light, and would have a greater noise impact in part due to a larger amount of development closer to the edges of the site. There also would be more garbage and delivery truck traffic. The subdivision would be more visible to the neighboring uses, and the amount of noise from private basketball courts, tennis courts, and pools could be considerable.

The following table summarizes the differences in the intensity of use of the subject facilities between the proposed treatment facility and the former boarding school for at-risk children.

|  | Glenwood School | Proposed Facility | Comments |
|---|---|---|---|
| Total Residents | 136 residents* | 120 maximum residents | |
| No. of Staff | 24 residents*/10 commuters | To be determined | Glenwood had an overnight ratio of 1 staff member to about 7 students |
| Traffic | Friday evenings/Sunday evenings 60 to 68 family picking up and returning children* Monday - Friday, 8 passenger vans transporting children to and from high schools 14 other regular visitors, 2 or 3 times per week Other deliveries | Depends on occupancy and turnover. Fully occupied & assuming 6-wk. avg. stays = 1-2 new patients per week day Staff member trips per day Visitors infrequent Other deliveries | The proposed use appears to be likely to generate less traffic than the school did. |
| Activities | Parents for frequent school and sporting events; meetings with teachers and/or counselors | Minimal | |
| Emergency Calls | Police: less than twice a month; often no calls Fire: infrequent after first 3 years; minimal false alarms | Maximum of 5 to 10 calls per year | Police report indicates 5 to 10 calls per year for stand-alone treatment facilities vs. 100 calls per year for service from hospital settings. |

* These numbers reached a high between 1997 and 2008 when there were 96 students, 24 staff members and 14 staff children living on campus and an additional 14 teaching staff members commuted daily.

Information on the operation of the proposed treatment facility was provided by Maxxam Partners, LLC. Information on the operations of the former Glenwood School was provided by John Irwin of Glenwood Academy.

There have been several police reports since the property was vacated in the summer of 2012, including most recently in late April when criminal damage was reported. These incidents include theft, trespass, loitering, yard waste dumping, and destruction of property.

MaRous & Company                                                                                                                18

Maxxam Partners, LLC
Proposed Alcoholism and Substance Abuse Treatment Facility
August 20, 2015

The proposed use as a high-end, for-profit, treatment facility does provide an increase in the real estate tax base. The 2014 tax rate estimated for Kane County totals 0.46836 percent ($15,250); Campton Township totals 0.555845 percent ($18,000); School District 301 totals 7.882872 percent ($255,000); the Elgin College District 509 totals 0.607621 percent ($19,750); and the Fox River & Countryside Fire District rate is 0.266320 percent ($8,900). The total 2014 total tax rate appears is 10.365477 percent. Based on the purchase price of $9,750,000, and an assessment of 33.33 percent, the 2014 taxes would be $336,844.

## Highest & Best Use Conclusions

The alcoholism and substance abuse use of the existing facilities provides certainty: on-going maintenance as opposed to a vacant and potentially neglected property, financial benefits to the taxing bodies, and a single access point into the facility. In addition, the client population will be tightly controlled. Therefore, the highest and best use of the existing facility is the proposed use as a high-end alcoholism and substance abuse treatment facility.

## Matched Pair Analysis

In order to evaluate the impact of a residential treatment facility will have on the surrounding residential property owners, I have conducted a matched pair analysis. This methodology analyzes the importance of a selected characteristic, in this instance proximity to a residential treatment facility, to the value of a property. This technique compares the sale of a property with proximity to the selected characteristic to the sale of a similar property in the same market area and under similar market conditions but without the proximity to the selected characteristic.

It is difficult to find an identical situation of a residential treatment facility on large acreage with proximate single-family residences. However, I am familiar with a similar situation in Park Ridge, Illinois, which can be considered in developing a matched pair analysis that will be informative in this instance. Park Ridge Youth Campus is an 11.35-acre site with 13 buildings that provided residential care for a variety of children. The facility is located in the "Country Club" area of Park Ridge, which is generally defined as the area between Oakton Street on the north, Touhy Avenue and Northwest Highway on the south, Oriole Avenue on the east, and Greenwood Avenue on the west.

According to the Site to Do Business, the demographics in this neighborhood are strong: as of 2012, nearly 24 percent of residents have annual incomes greater than $150,000. The population in the area is stable, with approximately 1,900 households in the neighborhood. Just under 50 percent of all employees

MaRous & Company                                                                                    19

Maxxam Partners, LLC
Proposed Alcoholism and Substance Abuse Treatment Facility
August 20, 2015

are professionals or managers. As of 2012, the average household income is $121,059. Housing values also are strong, with nearly 45 percent of all houses in the area having a value greater than $500,000. Houses bordering the Park Ridge Country Club sell in excess of $1,000,000; a house directly across Prospect Avenue from the Park Ridge Youth Campus sold for $1,100,000 in October 2009.

Between 2001 and 2007, the program began to address needs identified by the Illinois Department of Children and Family Services. Beginning in 2008 and through 2011, the residential program was directed towards adolescent girls, ages 12 to 18, with "serious emotional and behavioral problems." The staff ratio was high, with one staff member for every four clients reported. The three residential buildings each housed 10 to 12 girls, with the average number of residents at approximately 30 at any given time. At least 75 percent of the facility's funding came from the Illinois Department of Children and Family Services.[3]

The houses considered in the matched pairs analysis directly border the Youth Campus. The entire area benefits from the proximity of open space from the Park Ridge Country Club (west across Prospect Avenue from the Youth Campus), but this open space does not separate the houses from the Youth Campus. The Youth Campus buildings are nearly all two-story buildings. The aerial photograph below illustrates the proximity of the Park Ridge Youth Campus to the surrounding residential development.

---

3    Subsequent to approval in a referendum in April 2013, the Park Ridge Park District purchased the site and is redeveloping the property as a park.

Maxxam Partners, LLC
Proposed Alcoholism and Substance Abuse Treatment Facility
August 20, 2015



The following table summarizes sales of houses immediately adjacent to the Youth Campus during the last 4 years of operations.

Maxxam Partners, LLC
Proposed Alcoholism and Substance Abuse Treatment Facility
August 20, 2015

### SINGLE-FAMILY SALES SUMMARY
#### Park Ridge Youth Campus

| No. | LOCATION | SALE PRICE | SALE DATE | MARKETING TIME (DAYS) | SITE SIZE (SQ. FT.) | BUILDING SIZE - SQ. FT. (RMS/BRS) | SALE PRICE PER SQ. FT. BLDG. AREA INCL. LAND |
|---|---|---|---|---|---|---|---|
| 1 | 339 Edgemont Ln. | $370,000 | 6/11 | 67 | 10,450 | 1,760 8/3 | $210.23 |
| 2 | 371 Edgemont Ln. (Foreclosure) | $490,000 | 4/11 | 6 | 13,750 | 3,251 12/5 | $150.72 |
| 3 | 314 W. Cuttriss St. | $855,000 | 8/08 | 71 | 11,450 | 3,298 12/4 | $259.25 |
| 4 | 427 Edgemont Ln. | $460,000 | 6/08 | 258 | 7,173 | 3,000* 9/4 | $153.33 |
| 5 | 322 W. Cuttriss St. | $851,000 | 8/07 | 7 | 11,450 | 3,000* 8/4 | $283.67 |

*estimated
Source: MiRED and Cook County Assessor

Eliminating Sale #2 because it was a foreclosure, I conducted a matched pair analysis for the four remaining sales. However, there were no sales in the broader neighborhood under similar market conditions of houses similar to Sale #4. Therefore, I have included a matched pair analysis for the remaining three sales. Details of these sales used are retained in my office files; a map in the addenda to this market impact analysis illustrates the location of the matched pairs.

### MATCHED PAIR NO. 1

| | ADJACENT TO YOUTH CAMPUS | NOT ADJACENT TO YOUTH CAMPUS |
|---|---|---|
| Address | 339 Edgemont Ln. | 125 E. Kathleen Dr. |
| Sale Date | June 2011 | November 2011 |
| Days on Market | 67 | 5 |
| Sale/List Price | $370,000/$399,000 | $420,000/$412,000 |
| Year Built | 1954 | 1961 |
| Building Size | 1,760 sq. ft. | 1,736 sq. ft. |
| Lot Size | 10,450 sq. ft. | 9,380 sq. ft. |
| Style | Brick Ranch, 8 rms., 3 bdrms. 2 ba.; 2-car attached garage | Brick ranch, 10 rooms, 3 bdrms.3 ba.; 2-car attached garage |
| Basement | Full; finished with rec. room and bath | Full; finished with 4th bdrm., bath and family room |
| Other | Master bath; deck; | Master bath; patio |

Maxxam Partners, LLC
Proposed Alcoholism and Substance Abuse Treatment Facility
August 20, 2015

These houses sold under similar market conditions and except for the proximity of the 339 Edgemont Lane house to the Youth Campus, they have a similar location. The Edgemont Lane house has a slightly larger lot; however, it is a few years older than the house on Kathleen Drive, which somewhat offsets the lot size. The room count also is similar except that the Kathleen Drive house includes the basement rooms, and the Edgemont Lane house does not. The marketing time for the Kathleen Drive house was unusually short for this area under the market conditions at the sale date. Taking into consideration the additional bedroom and bathroom in the basement, there appears to be no discount to the Edgemont Lane house due to its proximity to the Youth Campus.

### MATCHED PAIR NO. 2

| | ADJACENT TO YOUTH CAMPUS | NOT ADJACENT TO YOUTH CAMPUS |
|---|---|---|
| Address | 314 Cuttriss St. | 752 N. Elmore St. |
| Sale Date | August 2008 | October 2009 |
| Days on Market | 71 | 105 |
| Sale/List Price | $855,000/$1,049,000 | $745,000/$798,000 |
| Year Built | Older/renovated 2008 | Older/Renovated 2005 |
| Building Size | 3,298 sq. ft. | NA |
| Lot Size | 11,450 sq. ft. | 9,600 sq. ft. |
| Style | 2-Story Tudor, 12 rms., 4 bdrms. 3 ba.; 3-car attached garage | 2-Story Tudor; 10 rooms, 4 bdrms.3 ba.; 3-car attached garage |
| Basement | Full; finished with bath | Full; unfinished; outside entrance |
| Other | Master bath; deck | Master bath; adjacent to park |

These houses sold under similar market conditions. The Elmore Street house is immediately adjacent to a public park in the same neighborhood as the Cuttriss Street house. The Cuttriss Street house has a larger lot and is somewhat larger than the Elmore Street house. Marketing times were similar. After analysis, there does not appear to be any discount to the Cuttriss Street house related to its proximity to the Youth Campus.

MaRous & Company

23

Maxxam Partners, LLC
Proposed Alcoholism and Substance Abuse Treatment Facility
August 20, 2015

### MATCHED PAIR NO. 3

|  | ADJACENT TO YOUTH CAMPUS | NOT ADJACENT TO YOUTH CAMPUS |
|---|---|---|
| Address | 322 Cuttriss St. | 528 N. Merrill Ave. |
| Sale Date | August 2007 | November 2007 |
| Days on Market | 7 | 74 |
| Sale/List Price | $851,000/$889,000 | $812,500/$884,000 |
| Year Built | 1929/Typical modernization | 1930/Typical modernization |
| Building Size | 2,182 sq. ft. | 2,192 sq. ft. |
| Lot Size | 11,450 sq. ft. | 8,000 sq. ft. |
| Style | 2-Story Colonial, 8 rms., 4 bdrms. 2 ba.; 2-car attached garage | 2-Story Tudor; 8 rooms, 4 bdrms.2 ba.; 2-car attached garage |
| Basement | Full; finished with bath | Full; finished |
| Other | Master bath; patio | Master bath; patio |

These houses sold under similar market conditions, and except for the proximity of the Cuttriss Street house to the Youth Campus, they have similar locations. The Cuttriss Street house has a larger lot than the Merrill Avenue house. The marketing time for the Cuttriss Street house was unusually short for this area under the market conditions even under the very strong market conditions at the sale date. After adjusting for the larger lot size, there does not appear to be any discount to the Cuttriss Street house related to its proximity to the Youth Campus.

**Matched Pair Analysis Conclusions**

Based on this analysis, there does not appear to have been any negative impact on surrounding property values due to the proximity of a residential treatment facility.

**"Before" and "After" Value Assessment**

In order to provide some indication of the potential impact of the proposed treatment facility on the value of proximate residential development, I have considered the value of the single-family house located at 41W625 West Foxtail Circle, which is located in the Silver Glen Meadows residential subdivision directly south of the subject property. The subdivision is separated from the subject by forest preserve district. It is possible that some of the buildings on the subject property are visible from the property, especially in the winter and especially from the second story.

This house is a two-story, brick, vinyl- and cedar-sided house constructed over a partially finished basement. It was constructed in 1989, and has 11 rooms, of which four are bedrooms. The house has

Maxxam Partners, LLC
Proposed Alcoholism and Substance Abuse Treatment Facility
August 20, 2015

two full and one half bathrooms, including a master bath. The house is situated on a 1.25-acre site. The house has been remodeled including the kitchen, floors, and windows. This subdivision is in the St. Charles school district, District 303. The house currently is listed for sale for $389,000. It previously was listed for sale for $372,000 in November 2012, the listing was cancelled in March 2013, when the house was rented. The current owner purchased the house in April 2006 for $405,000.

I have considered the following recent sales of similar houses in the same general market area in developing an opinion of value for this property. Details of these sales are retained in my office files; a map depicting the location of sales is included in the addenda to this market impact study. Unless otherwise indicated, these houses all are a combination of brick and vinyl- and cedar-siding, are situated on 1.0- to 1.25-acre lots, and have well and septic systems. All are located within School District 303.

### PROXIMATE SINGLE-FAMILY SALES

| No. | Location | Sale Price | Sale Date | Days on Market | Yr. Built | Size (Rms./Brs.) | Description |
|---|---|---|---|---|---|---|---|
| 1 | 7N108 Hastings Dr. Uninc. St. Charles | $394,500 | 3/15 | 27 | 1999 | 10/4 | Crawl space; 2-car garage |
| 2 | 41W686 Privet Ct. Campton Hills | $361,500 | 10/14 | 54 | 1983 | 9/4 | Full, unfinished basement; 2-car garage; updated |
| 3 | 40W654 Willowbrook Dr. Uninc. St. Charles | $405,000 | 7/14 | 9 | 1994 | 12/4 | Full, finished basement with extra bedroom; 3-car garage |
| 4 | 7N311 Red Barn Ln. Uninc. Campton Hills | $329,000 | 8/14 | 39 | 1988 | 9/5 | Full, unfinished basement; 2-car garage |
| 5 | 6N274 Knollwood Dr. Uninc. St. Charles | $312,000 | 8/14 | 81 | 1979 | 9/4 | Full, unfinished basement; 4-car garage; 1.5-acre lot |
| 6 | 41W715 Foxtail Cr. Uninc. St. Charles | $418,500 | Contract | 211 | 1989 | 12/4 | Full, finished basement; 2.5-car garage |
| Subj. | 41W625 W. Foxtail Cir. Uninc. St. Charles | $389,000 | Listing | 15 | 1989 | 11/4 | Full, partially finished basement; 2-car garage |

Source: MRED

All of these sales occurred during the last 12 months; none were sold under financial duress.

The sales closest in proximity to the house at 41W625 West Foxtail Circle are Sales #4 and #6; these are located in the same subdivision. Sale #4 is a smaller house than the house being valued, and Sale #6 is larger. Like the house being valued, these houses are located on cul-de-sacs, with Sale #6 backing up to farm land.

MaRous & Company                                                                                      25

Maxxam Partners, LLC
Proposed Alcoholism and Substance Abuse Treatment Facility
August 20, 2015

Taking into consideration these recent sales of similar properties in the same general area and the current listing at $418,500, the value of the house at 41W625 West Foxtail Circle and the value of the houses near the Glenwood School facilities as they exist is concluded to be $365,000 to $385,000.

Were the proposed treatment facility to be approved, the house at 41W625 West Foxtail Circle would have the same view of the facilities from either the yard or the second story. The house still would be separated from the facility by forest preserve district. The benefits include the certainty of the use, the on-going maintenance, and the low density of the development. The range in value is concluded to be the same, $365,000 to $385,000.

## Conclusions

I have considered the highest and best use of the site, including the alternative uses to which the site might be put, have developed a matched pair analysis of the impact of a residential treatment facility on a more densely populated neighborhood, and finally have analyzed the potential impact on value of the approval of the proposed facility on the surrounding residential properties.

Based on this analysis, the proposed development appears to be the highest and best use of the site, in terms of the zoning, the market demand for similar properties, and the likely redevelopment of the site. The trend of development and market supply and the demand for single-family residential uses in the area does not support redevelopment of the property with a residential subdivision.

The uncertainty created by a vacant facility, and the long-term potential maintenance problems appear to be a bigger threat to property values in the area than the proposed treatment facility under the development plans reviewed. The financial impact of the proposed facility is beneficial to the real estate tax base, and to the taxing bodies. Furthermore, there are likely to be well-paying jobs created by the facility which will positively impact demand in the housing market. Renovations to the existing residential units also will create jobs in the community. Finally, the proposed operation of the facilities as they exist are not invasive into the surrounding community, with lights, traffic, and noise comparable to or below that expected by alternative users of the facility.

Therefore, it is my opinion that the approval of a special use for the alcoholism and substance abuse treatment facility will not have measurable negative impact on either the character or the property values of the adjoining uses. Specifically:
- The proposed use provides certainty, including on-going quality maintenance as opposed to vacant property, which could be described as an attractive nuisance;

Maxxam Partners, LLC
Proposed Alcoholism and Substance Abuse Treatment Facility
August 20, 2015

- There is likely to be limited demand for the existing facilities for an alternative use;
- There is no better use to which the existing facilities could be put that would enhance the value of the surrounding property;
- The existing facilities are separated by the forest preserve district from most adjoining property owners, and there are significant distances between the facilities and residential dwellings;
- There are financial benefits to the taxing bodies by use by a for-profit facility versus a not-for-profit use;
- The facility will create high-paying jobs in the area which will benefit market demand;
- Controls are in place to limit the type of patients to be accepted, and the client population will be highly controlled and carefully monitored;
- There is limited, and controlled, access into the facility;
- An analysis of the impact of the Park Ridge Youth Campus on the value of single-family residences immediately adjacent using a matched pair analysis indicated that it did not have a measurable impact on surrounding property values;
- An analysis of the value of a single-family house in a subdivision south of the proposed treatment facility indicated that the value is the same with and without the approval of the proposed facility.

These conclusions are based on the following assumptions:
- The facilities will be well maintained and managed; and
- Any significant numbers of police/fire/ambulance calls would result in arrangements for "silent" responses.

This report is based on market conditions existing as of April 21, 2015. This market impact study has been prepared specifically for the use of the client as part of the application for a Special Use for the alcoholism and substance abuse treatment facility proposed for 41W400 Silver Glen Road. Any other use or user of this report is considered to be unintended.

Respectfully submitted,

MaRous & Company

Michael S. MaRous, MAI, CRE
Illinois Certified General - #553.000141 (9/15 expiration)

# CERTIFICATE OF REPORT

I do hereby certify that:

1. The statements of fact contained in this report are true and correct;
2. The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions, and are my personal, impartial, and unbiased professional analyses, opinions, conclusions, and recommendations:
3. I have no present or prospective personal interest in the property that is the subject of this report and no personal interest with respect to the parties involved;
4. I previously have studied the market impact for the proposed treatment facility at this location, with a date of value of January 3, 2013;
5. I have no bias with respect to the property that is the subject of the work under review or to the parties involved with this assignment;
6. My engagement in this assignment was not contingent upon developing or reporting predetermined results;
7. My compensation for completing this assignment is not contingent upon the development or reporting of predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal consulting assignment;
9. My analyses, opinions, and conclusions were developed, and this report has been prepared in conformity with the *Uniform Standards of Professional Appraisal Practice;*
10. I have made a personal inspection of the subject of the work under review;
11. Anita Rifkind provided significant appraisal review assistance to the person signing this certification;
12. The reported analysis, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Code of Professional Ethics and Standards of Professional Appraisal Practice of the Appraisal Foundation;
12. The use of the report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives; and
13. As of the date of this report, Michael S. MaRous, MAI, CRE, has completed the continuing education requirements for Designated Members of the Appraisal Institute.

MaRous & Company

Michael S. MaRous, MAI, CRE
Illinois Certified General - #553.000141 (9/15 expiration)

# ADDENDA



**MATCHED PAIRS LOCATION MAP**



**SINGLE-FAMILY SALES LOCATION MAP**

# PHOTOGRAPHS OF SUBJECT PROPERTY



**PHYSICAL EDUCATION BUILDING**



**LEARNING CENTER**



**ADMINISTRATION BUILDING (CAFETERIA)**



**RESIDENTIAL BUILDINGS AROUND LAKE**



**COMMON AREA IN TYPICAL RESIDENTIAL BUILDING**



**KITCHEN FINISH IN TYPICAL RESIDENTIAL BUILDING**



**GYMNASIUM**



**BATHROOM FINISH IN GYMNASIUM BUILDING**



**LARGE EATING AREA IN ADMINISTRATIVE BUILDING**



**CONFERENCE ROOM IN LEARNING CENTER**



**PLAT OF SURVEY (Excerpt)**



Source: Lannert Group

**EXISTING LAND USE**

# MICHAEL S. MAROUS
# STATEMENT OF QUALIFICATIONS

Michael S. MaRous, MAI, CRE, is president and owner of MaRous and Company. He has appraised more than $15 billion worth of primarily investment-grade real estate in more than 25 states. In addition to providing documented appraisals, he has served as an expert witness in litigation proceedings for many law firms; financial institutions; corporations; builders and developers; architects; local, state, county, and federal governments and agencies; and school districts in the Chicago metropolitan area. His experience in partial interest, condemnation, damage impact, easement (including aerial and subsurface), marital dissolutions, bankruptcy proceedings, and other valuation issues is extensive. He has provided highest and best use, marketability, and feasibility studies for a variety of properties. Many of the largest redevelopment areas and public projects, including Interstate 355, the O'Hare International Airport expansion, the Midway Airport expansion, and the McCormick Place expansion, are part of Mr. MaRous' experience. Also, he purchases and develops real estate for his own account.

## APPRAISAL AND CONSULTATION EXPERIENCE

### Industrial Properties

| | | |
|---|---|---|
| Business Parks | Manufacturing Facilities | Self-storage Facilities |
| Distribution Centers | Research Facilities | Warehouses |

### Commercial Properties

| | | |
|---|---|---|
| Auto Sales/Service Facilities | Gasoline Stations | Restaurants |
| Banquet Halls | Hotels and Motels | Shopping Centers |
| Big Box Stores | Office Buildings | Theaters |

### Special-Purpose Properties

| | | |
|---|---|---|
| Bowling Alleys | Lumber Yards | Tank Farms |
| Cemeteries | Nurseries | Underground Gas Aquifers |
| Farms | Riverboat Gambling Facilities | Utility Corridors |
| Golf Courses | Schools | Waste Transfer Facilities |
| | Stadium Expansion Issues | |

### Residential Properties

| | | |
|---|---|---|
| Apartment Complexes | Condominium Developments | Subdivision Developments |
| Condominium Conversions | Single-family Residences | Townhouse Developments |

### Vacant Land

| | | |
|---|---|---|
| Agricultural | Easements | Right of Ways |
| Alleys | Industrial | Streets |
| Commercial | Residential | Vacations |

### Clients

| | | |
|---|---|---|
| Corporations | Law Firms | Private Parties |
| Financial Institutions | Not-for-profit Associations | Public Entities |

## EDUCATION

B.S., Urban Land Economics, University of Illinois, Urbana-Champaign
Continuing education seminars and programs through the Appraisal Institute
and the American Society of Real Estate Counselors and real estate brokerage classes

## PUBLIC SERVICE

Mayor, City of Park Ridge, Illinois (2003-2005)
Alderman, City of Park Ridge, including Liaison to the Zoning Board of Appeals and Planning and Zoning and
Chairman of the Finance and Public Safety Committees (1997-2005)

## PROFESSIONAL AFFILIATIONS AND LICENSES

Appraisal Institute, MAI designation, Number 6159
American Society of Real Estate Counselors, CRE designation
Illinois Certified General Real Estate Appraiser, License Number 553.000141 (9/15)
Licensed Real Estate Broker (Illinois)

## PROFESSIONAL ACTIVITIES

Mr. MaRous is past president of the Chicago Chapter of the Appraisal Institute. He is former chair and vice chair of the National Publications Committee and has sat on the board of *The Appraisal Journal*. In addition, he has served on and/or chaired more than fifteen other committees of the Appraisal Institute, the Society of Real Estate Appraisers, and the American Institute of Real Estate Appraisers.

Mr. MaRous served as chair of the Midwest Chapter of the American Society of Real Estate Counselors in 2006 and 2007. He has sat on the Chicago Chapter Board of Directors, the Editorial Board of *Real Estate Issues,* and on various other committees.

Mr. MaRous also is past president of the Illinois Coalition of Appraisal Professionals. He has sat on the board of directors, has held office, and has served on numerous committees of many other professional associations, including the National Association of Security Dealers, the International Research Council, the Chicago Real Estate Board, the Northwest Suburban Real Estate Board, the National Association of Real Estate Boards, and the Northern Illinois Commercial Association of Realtors.

## PUBLICATIONS AND PROFESSIONAL RECOGNITION

Mr. MaRous has spoken at more than 20 programs and seminars related to real estate appraisal and valuation.

### Author

"Low-income Housing in Our Backyards," *The Appraisal Journal*, January 1996

"The Appraisal Institute Moves Forward," *Illinois Real Estate Magazine*, December 1993

"Chicago Chapter, Appraisal Institute," *Northern Illinois Real Estate Magazine*, February 1993

"Independent Appraisals Can Help Protect Your Financial Base," *Illinois School Board Journal*, November-December 1990

"What Real Estate Appraisals Can Do For School Districts," *School Business Affairs*, October 1990

### Awards

Chicago Chapter of the Appraisal Institute - F. Gregory Opelka Award, 2002

Appraisal Institute - George L. Schmutz Memorial Award, 2001

Chicago Chapter of the Appraisal Institute - Heritage Award, 2000

Chicago Chapter of the Appraisal Institute - Herman O. Walther, 1987 (Distinguished Chapter Member)

### Reviewer or Citation in the Following Books

*Appraisal of Real Estate*, Twelfth Edition, 2001
*Appraisal of Real Estate,* Thirteenth Edition, 2008
*Subdivision Valuation,* 2008
*Real Estate Damages,* 2008
*Valuation of Apartment Properties,* 2007
*Valuation of Billboards,* 2006
*Appraising Industrial Properties,* 2005
*Valuation of Market Studies for Affordable Housing,* 2005
*Valuing Undivided Interest in Real Property: Partnerships and Cotenancies,* 2004
*Analysis and Valuation of Golf Courses and Country Clubs,* 2003
*Dictionary of Real Estate Appraisal,* Fourth Edition, 2002
*Valuing Contaminated Properties: An Appraisal Institute Anthology,* 2002
*Hotels and Motels: Valuation and Market Studies,* 2001
*Land Valuation: Adjustment Procedures and Assignments,* 2001
*Appraisal of Rural Property,* Second Edition, 2000
*Capitalization Theory and Techniques, Study Guide,* Second Edition, 2000
*Guide to Appraisal Valuation Modeling Land,* 2000
*Appraising Residential Properties,* Third Edition, 1999
*Business of Show Business: The Valuation of Movie Theaters,* 1999
*GIS in Real Estate: Integrating, Analyzing and Presenting Locational Information,* 1998
*Market Analysis for Valuation Appraisals,* 1995

## REPRESENTATIVE WORK OF MICHAEL S. MAROUS

### Headquarters/Corporate Office Facilities in Illinois
Fortune 500 corporation facility, 200,000 sq. ft., Libertyville
Corporate headquarters, 300,000 sq. ft. and 500,000 sq. ft., Chicago
Fortune 500 corporation facility, 450,000 sq. ft., Northfield
Major airline headquarters, 1,100,000 million sq. ft. on 47 acres, Elk Grove Village
Former communications facility, 1,400,000 million sq. ft. on 62 acres, Skokie and Niles
Corporate Headquarters, 1,500,000+ sq. ft., Lake County
Former Sears Headquarters Redevelopment Project, Chicago

### Office Buildings in Chicago
401 South LaSalle Street, 140,000 sq. ft.
134 North LaSalle Street, 260,000 sq. ft.
333 North Michigan Avenue, 260,000 sq. ft.
171 West Randolph Street, 360,000 sq. ft.
20 West Kinzie Street, 405,000 sq. ft.
55 East Washington Street, 500,000 sq. ft.
10 South LaSalle Street, 870,000 sq. ft.
222 West Adams, 1,000,000 sq. ft.
175 West Jackson Boulevard, 1,450,000 sq. ft.
227 West Monroe, 1,800,000 sq. ft.
10 South Dearborn Street, 1,900,000 sq. ft.

### Hotels in Chicago
10 E. Grand Avenue (Hilton Garden Inn)
106 East Superior Street (Peninsula Hotel)
140 East Walton Place (The Drake Hotel)
676 North Michigan Avenue (Omni Chicago Hotel)
One West Wacker Drive (Renaissance Chicago Hotel)
320 North Dearborn Street (Westin Chicago River North)
505 North Michigan Avenue (Hotel InterContinental)

### Large Industrial Properties in Illinois
Large industrial complexes, 400,000 sq. ft., 87th Street and Greenwood Avenue, Chicago
Distribution warehouse, 580,000 sq. ft. on 62 acres, Champaign
Publishing house, 700,000 sq. ft. on 195 acres, U.S. Route 45, Mattoon
AM Chicago International, 700,000± sq. ft. on 41 acres, 1800 West Central, Mt. Prospect
Nestlé distribution center, 860,000 sq. ft. on 153 acres, DeKalb
Fortune 500 company distribution center, 1,000,000 sq. ft., Elk Grove Village
U.S. Government Services Administration distribution facility, 860,000 sq. ft., 76th Street and Kostner Avenue, Chicago
Self-storage facilities, various Chicago metropolitan locations

### Vacant Land in Illinois
| | |
|---|---|
| 15 acres, office, Northbrook | 450 acres, residential, Wauconda |
| 20 acres, residential, Glenview | 475± acres, various uses, Lake County |
| 25 acres, Hinsdale | 650 acres, Hawthorne Woods |
| 55 acres, mixed-use, Darien | 650 acres, Waukegan/Libertyville |
| 75 acres, I-88 at I-355, Downers Grove | 800 acres, Woodridge |
| 100± acres, various uses, Lake County | 900 acres, Matteson |
| 140 acres, Flossmoor | 1,000± acres, Batavia area |
| 142 acres, residential, Lake County | 2,000± acres, Northern Lake County |
| 160 acres, residential, Cary | 5,000 acres, southwest suburban Chicago area |
| 200 acres, mixed-use, Bartlett | Landfill expansion, Lake County |
| 250 acres, Island Lake | |

### Business and Industrial Parks
Chevy Chase Business Park, 30 acres, Buffalo Grove
Carol Point Business Center, 300-acre industrial park, Carol Stream, $125,000,000+ project
Internationale Centre, approximately 1,000 acre-multiuse business park, Woodridge

### Retail Facilities
10 Community shopping centers, various Chicago, Metropolitan locations
Big-box uses, various Chicago metropolitan locations
Gasoline Stations, various Chicago metropolitan locations
More than 30 single-tenant retail facilities larger than 80,000 sq. ft., various Chicago metropolitan locations

### Residential Projects
Federal Square townhouse development project, 118 units, $15,000,000+ sq. ft. project, Dearborn Place, Chicago
Marketability and feasibility study, 219 East Lake Shore Drive, Chicago
Riverview II, Chicago, Old Town East and West, Chicago, Museum Park Lofts II, Museum Park Tower 4,
University Commons, Two River Place, River Place on the Park, Chicago

### Market Studies
Impact of land fill on adjacent property values
Impact of low-income housing on adjacent residential property values
Impact of proposed quarry expansion on neighboring properties
Impact of commercial and parking uses on adjacent residential property values
Impact of significant zoning changes on residential property values
Sanitary sewer value impact study
Waste transfer facility impact study

### Properties in Other States
330,000 sq. ft., Newport Beach, California
Former government depot/warehouse and distribution center, 2,500,000 sq. ft. on 100+ acres, Ohio
Shopping Center, St. Louis, Missouri
Office Building, Clayton, Missouri
Condominium Development, New York, New York

### Airport Related Properties
Mr. MaRous has done valuations on more than 100 parcels in and around O'Hare International Airport,
Chicago Midway Airport, Palwaukee Municipal Airport, Chicago Aurora Airport, DuPage Airport,
and Lambert-St. Louis International Airport

## REPRESENTATIVE CLIENT LISTING OF MICHAEL S. MAROUS

### Law Firms

Botti Law Firm, P.C.
Alschuler, Simantz & Hem, LLC
Arnstein & Lehr LLP
Steven B. Bashaw, P.C.
Berger, Newmark & Fenchel P.C.
Berger Schatz
Carmody MacDonald P.C.
Crane, Heyman, Simon, Welch & Clar
Daley & Georges, Ltd.
DLA Piper
Drinker, Biddle & Reath LLP
Figliulo & Silverman, P.C.
Foley & Lardner LLP
Foran, O'Toole & Burke LLC
Franczek Radelet P.C.
Freeborn & Peters LLP
Goldberg Kohn
Gould & Ratner LLP
Graft & Jordan
Greenberg Traurig LLP
Helm & Wagner
Robert Hill Law, Ltd.
Hinshaw & Culbertson LLP

Holland & Knight LLP
Jenner & Block
Donald L. Johnson
Kinnally, Flaherty, Krentz & Loran PC
Kirkland & Ellis LLP
Klein, Thorpe & Jenkins, Ltd.
Locke Lord LLP
McDermott, Will & Emery
Mayer Brown
McGuireWoods LLP
Michael Best & Friedrich LLP
Miller & Sweeney CO
Morrison & Morrison, Ltd.
Bryan E. Mraz & Associates
Neal, Gerber & Eisenberg, LLP
Neal & Leroy LLC
O'Donnell Law Firm Ltd.
O'Halloran Kosoff Geitner & Cook, LLC
Owens, Owens & Rinn, Ltd.
Prendergast & DelPrincipe
Rathje & Woodward, LLC
Raysa & Zimmermann, LLC
Righeimer, Martin & Cinquino, P.C.

Mary Riordan, Attorney
Robbins, Salomon & Patt, Ltd.
Rosenfeld Hafron Shapiro & Farmer
Rosenthal, Murphey, Coblentz & Donahue
Rubin & Norris, LLC
Ryan and Ryan Attorneys at Law, P.C.
Reed Smith LLP
Sarnoff & Baccash
Scariano, Himes & Petrarca, Chtd.
Schiff Hardin LLP
Schiller, DuCanto & Fleck LLP
Schirott, Luetkehans & Garner,LLC
Schuyler, Roche & Crisham, P.C.
Sidley Austin LLP
Sonnenschien, Nath & Rosenthal LLP
Storino, Ramello & Durkin
Thomas M. Tully & Associates
Thompson Coburn, LLP
Tuttle, Vedral & Collins, P.C.
Vedder Price
Wildman, Harrold, Allen & Dixon
Winston & Strawn LLP
Worsek & Vihon LLP

### Financial Institutions

AmericaUnited Bank and Trust
Charter One
Citibank
Cole Taylor Bank
Covest Banc
First Bank of Highland Park
First Midwest Bank

First Northwest Bank
Glenview State Bank
Harris Bank
Itasca Bank and Trust
Lake Forest Bank & Trust
MB Financial Bank
Midwest Bank & Trust Company

Northern Trust Bank
Northview Bank & Trust
Private Bank & Trust Co.
State Financial Bank
Winfield Community Bank
Wintrust Bank Group

### Corporations

Advocate Health Care System
American Stores Company
Archdiocese of Chicago
Arthur J. Rogers and Company
BP Amoco Oil Company
Christopher B. Burke Engineering, Ltd.
Cambridge Homes
Canadian National Railroad
Capital Realty Services, Inc.
Chicago Cubs
Children's Memorial Hospital
Chrysler Realty Corporation
Citgo Petroleum Corporation

CorLands
Edward R. James Partners, LLC
Enterprise Development Corporation
Enterprise Leasing Company
Exxon Mobil Corporation
Hamilton Partners
Hewitt Associates LLC
Hollister Corporation
Imperial Realty Company
Kenard Corporation
Kimco Realty Corporation
Kinder Morgan, Inc.
Kmart Corporation
Lakewood Homes

Loyola University Health System
Marathon Oil Corporation
Meijer, Inc.
Mesirow Stein Real Estate, Inc.
Prime Group Realty Trust
Public Storage Corporation
RREEF Corporation
Shell Oil Company
Stewart Warner Corporation
Union Pacific Railroad Company
United Airlines, Inc.
United of America Insurance Company

**Public Entities**

**Illinois Local Governments and Agencies**

Village of Arlington Heights
Village of Barrington
Village of Bartlett
Village of Bellwood
Village of Brookfield
Village of Burr Ridge
Village of Cary
City of Chicago
Village of Deer Park
City of Des Plaines
Des Plaines Park District
Downers Grove Park District
City of Elgin
Elk Grove Village
City of Elmhurst
Village of Elmwood Park
City of Evanston
Village of Forest Park
Village of Franklin Park

Village of Glenview
Glenview Park District
Village of Harwood Heights
City of Highland Park
Village of Hinsdale
Village of Inverness
Village of Kildeer
Village of Lake Zurich
Leyden Township
Village of Lincolnshire
Village of Lincolnwood
Village of Morton Grove
Village of Mount Prospect
Village of North Aurora
Village of Northbrook
City of North Chicago
Village of Northfield
Northfield Township
Village of Oak Brook

Village of Orland Park
City of Palos Hills
City of Prospect Heights
City of Rolling Meadows
Village of Rosemont
City of St. Charles
Village of Schaumburg
Village of Schiller Park
Village of Skokie
Village of South Barrington
Village of Streamwood
Metropolitan Water Reclamation
District of Greater Chicago
City of Waukegan
Village of Wheeling
Village of Wilmette
Village of Willowbrook
Village of Winnetka
Village of Woodridge

**County Governments and Agencies**

Boone County State's Attorney's Office
Forest Preserve of Cook County
Cook County State's Attorney's Office
DuPage County Board of Review

Forest Preserve District of DuPage
County
Kane County
Kendall County Board of Review

Lake County
Lake County Forest Preserve District
Lake County State's Attorney's Office

**State and Federal Government Agencies**

Federal Deposit Insurance Corporation
U.S. General Services Administration

Illinois Housing Development Authority
Illinois State Toll Highway Authority

Internal Revenue Service
The U.S. Postal Service

**Schools**

Argo Community High School
District No. 217
Arlington Heights District No. 25
Township High School District No.
214, Arlington Heights
Barrington Community Unit District
No. 220
Chicago Board of Education
Chicago Ridge District No. 127½
College of Lake County
Community Consolidated School
District No. 146

Consolidated High School
District No. 230
Darien District No. 61
DePaul University
Elmhurst Community Unit School
District No. 205
Indian Springs School District No. 109
LaGrange School District No. 105
Loyola University
Lyons Township High School District
No. 204
Maine Township High School District
No. 207

Morton College
Niles Elementary School District No. 71
North Shore District No. 112,
Highland Park
Northwestern University
Rosalind Franklin University
Roselle School District No. 12
Schaumburg Community Consolidated
District No. 54
University of Illinois
Wheeling Community Consolidated
District No. 21
Wilmette District No. 39

A REAL ESTATE STUDY
FOR THE PROPOSED ALCOHOLISM AND SUBSTANCE ABUSE TREATMENT FACILITY
UNINCORPORATED KANE COUNTY, ILLINOIS

Prepared for
MAXXAM PARTNERS, LLC

Prepared by

POLETTI AND ASSOCIATES, INC.
302 West Clay Street
Suite 100
Collinsville, Illinois
618/344-3270

June 2015

TABLE OF CONTENTS

Executive Summary.................................................... 1
Introduction........................................................ 2
Location............................................................ 2
Scope of the Consulting Report...................................... 4
Review of Literature................................................ 6
Description of Facility............................................. 8
Physical Characteristics of the Subject Property.................... 9
  Access and Frontage............................................. 9
  Topography...................................................... 9
  Utilities....................................................... 9
  Zoning.......................................................... 9
Character of the Surrounding Property............................... 10
Features to Minimize the Effect on Property Value................... 11
Effect on the Value of Surrounding Properties....................... 13
  Timberline Knolls, Lemont Illinois.............................. 13
    Comparison of Overall Averages.............................. 16
    Multiple Regression Analysis................................ 17
    Conclusion of the Sales Analysis, Timberline Knolls......... 19
  Rosecrance Center, Rockford, Illinois........................... 20
    Comparison of Overall Averages.............................. 22
    Multiple Regression Analysis................................ 24
    Conclusion of the Sales Analysis, Rosecrance Center......... 26
Conclusion.......................................................... 27
Certificate of Appraisal............................................ 29
Bibliography........................................................ 31
Resume of Peter J. Poletti.......................................... 32

Appendices
  Photographs of Facility......................................... I
  Target and Control Area Sales, Lemont, Ill...................... II
  Target and Control Area Sales, Rosecrance Center............... III
  Assumptions and Limiting Conditions............................ IV

<u>EXECUTIVE SUMMARY</u>

At the request of Maxxam Partners, LLC. Poletti and Associates, Inc. has undertaken a study of the proposed alcoholism and substance abuse treatment facility ("Facility") for the purpose of determining its compliance with the applicable standards of Kane County. The date of initial inspection of the subject property is May 1, 2015. The date of the report is June 21, 2015 with the effective date of the opinion being June 21, 2015.

The purpose of this report is to determine whether the Facility is so located as to not substantially diminish and impair property values within the neighborhood.

When a land use is proposed that is dependent upon approval for a special use, such as in the case of the subject property, it is important to consider its effect on the value of other property in the vicinity.

The procedure followed in the analysis was generally as follows:

1. A preliminary on-site inspection of the subject property and the surrounding area was performed.

2. The accumulation and review of various documents including land use and ownership plats, aerial photographic maps, local and regional roadway maps, data on real estate transfers in areas proximate to an operating alcoholism and substance abuse treatment facility, the various studies performed by other experts retained in this matter, and other materials related to the topic of alcoholism and substance abuse treatment were completed.

3. Meetings and telephone conferences with representatives of the Maxxam Partners, LLC and other experts were conducted.

Based upon our analysis and evaluation of the subject property, the surrounding area, and the data contained within this report, it is concluded that the Facility will be so located as to minimize the effect on the value of the surrounding property.

The details of the analysis and the factors considered in reaching this conclusion are found on the following pages.

1

## INTRODUCTION

This report provides an evaluation of the Facility for the purpose of determining whether it is located so as to minimize the effect on the value of surrounding property.

## LOCATION

The Facility is located within the unincorporated portion of Kane County, Illinois. The property is approximately 120.057 acres situated off of Silver Glen Road. The site may be identified by its Kane County Supervisor of Assessments permanent parcel number, which is 08-03-100-009. The subject property is currently occupied by a closed boarding school with residential units for at-risk children. Fig. 1 shows the general location and setting of the property.



Fig. 1 General Location of Facility.

## SCOPE OF THE CONSULTING REPORT

The purpose of this report is to determine if the Facility is so located as to not substantially diminish and impair property values within the neighborhood.

1. An examination was made of the topographical quadrangle, the zoning map for Kane County, the zoning map for the Village of Campton Hills, and the zoning map for Elgin.

2. Representatives of Maxxam Partners, LLC, were interviewed concerning general design and operating specifics.

3. Peter J. Poletti inspected the subject property as well as land uses within the area. The records of the sale transactions for Rockford Township in Winnebago County, Lemont Township in Cook County, and the Cook County Assessor's Office, were reviewed for sales transactions surrounding operating alcoholism and substance abuse treatment facilities. This record included the size of tract and the style, age, and size of the improvements.

4. A personal inspection was also made of the neighborhoods surrounding operating facilities analyzed in this study.

The methodology employed in this report is based upon accepted practices of the real estate valuation profession. This specific technique employed consisted of a comparison of the average selling price of a property type in a target area compared to the average selling price of similar properties in a control area. This technique is employed by valuation professionals for estimating the percent or dollar adjustments that are necessary for valuing properties.

In using the above technique, the target area is defined as a zone in proximity to an operating alcoholism and substance abuse treatment facility and is defined by a combination of distance, intervening land uses, and visibility of the facility. In contrast, the control area is defined as a region outside of the target area that is considered to be similar to the Target Area but outside the immediate influence of the operating alcoholism and substance abuse treatment facility.

The technique uses the average selling price of various property types as a comparison. Since it employs statistical analysis, this technique is considered a more exact approach. In this technique, if the facility were affecting values, there would be a statistically measurable difference between mean (average) values in the target area and those in the control area. For the analysis, the research hypothesis assumes that there is a statistically measurable difference between values in the target area and those in the control area. The test of this hypothesis is the $t$ statistic at the 95 percent confidence level. If the calculated $t$ exceeds the standard $t$ from the

*t* statistic table, then the hypothesis that there is a statistically significant difference between the two areas is accepted. If the calculated *t* does not exceed the standard *t* from the *t* statistic table, then there is not a statistically significant difference between the two areas. The research hypothesis is then rejected and it is concluded that there is no measurable difference in values between the target area and control area and therefore no measurable negative effect on property values as a result of existing alcoholism and substance abuse treatment facilities.

In addition to the above quantitative analysis, a qualitative analysis was made. This analysis was based on observations of land uses and development patterns around the existing alcoholism and substance abuse treatment facilities.

REVIEW OF LITERATURE

A review of published literature revealed no articles pertaining directly to alcoholism and substance abuse treatment facilities similar to that proposed for the subject property. However, there have been several articles and studies produced concerning other land uses effect on surrounding property values. These articles provide a useful methodology for analyzing an alcoholism and substance abuse treatment facility.

The common approach in these articles is that they typically establish target and control areas as the basis for analysis. The target area is a zone in proximity to an operating facility and is defined by a combination of distance, visibility, and intervening land uses. The control area is the region outside of the target area and is considered to be a zone where property values would not be affected. Comparisons can then be made concerning pricing between the target and control areas to assess the effect of an operating facility on property values.

The analysis of effects can be done several ways. These include Hedonic modeling, multiple regression modeling, comparison of average prices, and paired sales comparison techniques. Not all of these techniques can be used for any particular property. The techniques used are dependent upon the amount of data available and information that is publically available.

A popular methodology today is Hedonic price modeling. This method uses multiple regression analysis to measure the effect on value of a single characteristic. In the Hedonic modeling technique, the researcher uses properties with many disparate characteristics to measure the effect on pricing of a single character or variable and determine whether it is statistically significant. To be used, this technique requires a large number of property sales. A characteristic of an alcoholism and substance abuse treatment facility is any potential effect on surrounding property values will be within an area that is close to the facility.

A second technique is the use of multiple regression modeling. In this technique, the researcher seeks to limit differences among the various properties. This may include using a single style of home, a limited range of home ages, or other characteristics. Like Hedonic modeling, this technique requires the use of a large number of sales.

The third technique is a comparison of averages. This technique statistically compares the prices paid for properties in the target and control areas. The advantage of this method is that it requires fewer sales than the two previous techniques.

The fourth technique is a paired sales analysis. This technique is similar to that used by appraisers in valuing properties for mortgage purposes. In this technique similar properties are compared

6

with adjustments for the various differences. Any difference in value is attributable to the characteristic for which the properties are being analyzed. The advantage of this technique is that it requires few sales. The disadvantage is that it requires the appraiser to estimate the contributory values of differences (i.e. size, number of bedrooms, fireplaces, garages, basement, etc.) between the houses. Additionally, because individual properties are being used, there is little statistical reliability to this technique.

Finally, one may also use a qualitative approach. If improvements are being made to existing properties or new structures are being built in a similar manner to what is occurring in the control area, then it is logical to conclude that alcoholism and substance abuse treatment facility has a minimal effect on property values. The basis for this conclusion is that owners will not make an investment in properties that they believe will be devalued relative to properties making the same improvements in the control areas.

The methodology used in this report to assess potential effect on the value of surrounding property incorporates elements of each of the techniques described above. For this report, a target area is established around a currently operating alcoholism and substance abuse treatment facility. The facilities used are the Rosecrance Center in Rockford, Illinois and the Timberline Knolls Center in Lemont, Illinois. Poletti and Associates, Inc. chose these sites because of the nearness to residential properties.

## DESCRIPTION OF THE FACILITY

The subject property will occupy 120.057 acres. It is located at 41W400 Silver Glen Road in Kane County. The Facility design, orientation, existing landscape, off-site land uses, topography, and distance will shield the operations from the view of the traffic and nearby homes along Silver Glen Road as well as from the nearest adjoining roads of Dittmer Road to the west, McDonald Road to the north and Corron Road to the east.

The existing buildings at the subject property have been used as a school since the early 1990s. Improvements include a therapy/activity center, dining/multi-purpose building, gymnasium, and residences. In addition, there is an executive residence at the entrance as well as some ancillary maintenance buildings. The plans are to use this Facility as an in-patient residential alcoholism and substance abuse treatment center

<u>PHYSICAL CHARACTERISTICS OF THE SUBJECT PROPERTY</u>

### ACCESS AND FRONTAGE

The Facility is located about one-half mile north of Silver Glen Road and about one-quarter of a mile south of McDonald Road. Vehicular access to the facility is only from Silver Glen Road via an easement across the Kane County Forest Preserve Property.

### TOPOGRAPHY

The site topography is considered to be essentially level.

### UTILITIES

Water and sewer for the property is provided by private well and waste treatment facilities. Electricity is provided by Commonwealth Edison with telephone service furnished by Ameritech.

### ZONING

The site is situated in the unincorporated area of Kane County. According to the Kane County Zoning Map, the property is zoned as F: Farm with a Special Use Permit.

CHARACTER OF THE SURROUNDING PROPERTY

The Facility is situated in an open space and residential area. The general area may be described as north of Burlington Road; west of Corron Drive, south of Lenz Road, and east of the Illinois Route 47. Streets in this area include Burlington Road, Corron, Silver Glen, Lenz, and Dittmer. Burlington Road serves as the primary east-west arterial road through the neighborhood with Silver Glen serving as a secondary east-west arterial road.

The predominant land use in the area is agricultural and open space. The Facility is primarily bordered by land owned by Kane County Forest Preserve that is maintained as prairie land. The closest residential properties to the Facility on the south are the Silver Glen Meadows Subdivision located on the north side of Silver Glen Road. Homes in this subdivision are buffered from views of the Facility by a combination of distance, and the existing tree lines. Additional subdivisions are located south of Silver Glen and north of Burlington Road. With the exception of Silver Glen Meadows subdivision, properties north of Silver Glen and Burlington Roads are zoned as agricultural and consist primarily of farmsteads and associated outbuildings or homes built on individual tracts.

FEATURES TO MINIMIZE THE EFFECT ON PROPERTY VALUE

An important consideration in the evaluation is the use of the Facility's proposed features as well as the incorporation of existing surrounding features to minimize the Facility's effect on surrounding property values. These features are described in greater detail in the following paragraphs.

There are several factors that help to minimize the effect on surrounding property values. Primary among these is the fact that the Facility is located in an area with a high proportion of open space and agricultural land that serves as visual buffers. This is further enhance by the Facility being situated a minimum of about 1,100 feet from any public road. The closest public road is McDonald Road on the north side of the property. Silver Glen Road, Dittmer Road, and Corron Road are all located significantly greater distances from the Facility.

While the setback distance from public roads is one factor, a second important factor is that the land immediately adjoining the property on the east, south, and west, and partially on the north is owned by the Kane County Forest Preserve. These lands are being used to restore and preserve native prairie habitat. In addition, the remaining land that adjoins the north side of the property is zoned as farm by the Village of Campton Hills. Since these are publically owned preservation lands, they will not be developed into more intensive uses such as subdivisions.

Along the edges of the open fields are trees or hedgerows. These trees form vertical walls creating an open room within which the Facility is located. Like walls in a home, these lines of trees in combination with the distance effectively block clear views of the facility from surrounding roads as well as from nearby houses. While this is true from all directions from the property, it is especially true towards the north. The Facility is bordered on the north by mature oak climax woods with secondary growth located along the edge. This secondary growth is a combination of sumac, some multi-flora, golden rod, and other pioneering species. This combination of secondary and climax growth effectively serves as both a visual barrier as well as an ingress and egress barrier.

Road access to the Facility also will help to minimize the effect on surrounding property values. The only access point from a public road is Sliver Glen Road. Access from this point requires the use of a one-half mile easement through forest preserve land before reaching the Facility. The use of only one access point means that traffic to and from the Facility will be essentially limited to Silver Glen Road. The traffic generated by the Facility will be minimal according to the traffic study by, KLOA, Inc., which indicated that . . .

The site-generated traffic, based on the proposed operations of the facility and trip generation surveys of Timberline Knolls,

11

will not be significant and can be accommodated efficiently without significant impact on Silver Glen Road.

Operations at the facility will also serve to minimize the Facility's effect on surrounding property values. The Facility's mission is to provide a private setting for their clients. As the Facility's representatives indicated their target clientele is a more affluent sector of the population and have a desire for both privacy and lack of publicity during their stay at the Facility. The setting in an area away from nearby houses certainly enhances those two desires. Corresponding for this desire for privacy, it is proposed to only have a minimal amount of signage at the entrance from Silver Glen Road, which ensures that drivers unfamiliar with the area will not know the purpose of the Facility. Further enhancing privacy as well as security is a gate at the actual entrance to the Facility with nearby executive residence. There is staff present at all hours. Thermal cameras will be installed in order to effectively and efficiently monitor the perimeter. These cameras are monitored both by staff on-site as well as by an independent off-site security service. Transportation to and from the Facility for the clientele will be via private car or limousine.

In summary, the aforementioned combination of distance, off-site vegetation, and intermediate land uses will limit visibility of the Facility from the surrounding roads as well as from residential properties. The Facility will have minimal effect on the surrounding road network. The general plan of operations has also been designed to help promote privacy for the clientele as well as for the neighboring properties. All of these factors will help to limit visibility of the Facility, which will help to minimize the potential effect on surrounding property values.

<u>EFFECT ON THE VALUE OF SURROUNDING PROPERTIES</u>

As discussed previously, the effect of the Facility on the value of the surrounding property may also be evaluated by comparing sale prices within a target area to those within a control area. There is no alcoholism and substance abuse treatment facility currently on the subject property. To use the techniques described in the Review of Literature section, it is necessary to use an operating alcoholism and substance abuse treatment facility to provide information concerning any potential effect on property values. The two facilities used for this analysis was the Timberline Knolls Facility in Lemont, Illinois and the Rosecrance Center in Rockford, Illinois.

### TIMBERLINE KNOLLS, LEMONT, ILLINOIS

The Timberline Knolls Facility is located along Timberline Drive where it meets west Logan Street in Lemont, Illinois. The facility treats women of various ages for alcoholism and substance abuse, eating disorders, and trauma. The facility, converted in 2005, is located on a 43 acre site.

Land uses around the facility consist of a variety of single-family residential units to the south and east with the industrial corridor along the Des Plaines River to the north.

A target and control area was developed around this facility. These areas are illustrated on Figure. 2. Sale transactions were obtained from Lemont Township Assessors Office, the Cook County Assessor's Office, and Cook County Recorder of Deeds for the years January 2012 through December of 2014. There were a total of 340 residential sales that occurred with 90 sales in the target area and the remaining 250 sales in the control area (see Appendix IIa). The overall average price per square foot was $138.56 on the target area and $139.55 in the control area.

The above 340 property transactions included all single-family residential sales including those that were considered to be non-arm's length. An arm's length sale is defined as: "A transaction freely arrived at in the open market, unaffected by abnormal pressure or by the absence of normal competitive negotiation as might be true in the case of a transaction between related parties". [Boyce]  In contrast, a non-arm's length sale is a transaction where a participant is under pressure to conclude the transaction and the price is not necessarily that which would be attained in a market driven sale. A non-arm's length sale is considered by appraisers as well as the courts to not be indicative of the market value of a property. Examples of non-arms length sales are: (1) between family members; (2) forced sales such as foreclosure, divorce, bankruptcy, or condemnation proceedings; (3) to governmental entities which have the power of eminent domain; or (4) involve buyers or sellers particularly motivated to purchase or sell a

13

specific property. An example of this type of sale is a transaction involving a job transfer. There were a total of 261 arm's length sales that occurred over this time frame with 73 sales in the Target Area and 188 sales within the control area. The average price per square foot in the target area was $140.39 and $149.06 in the control area. These arm's length sales are summarized in Appendix IIb).



Fig. 2: Target and Control Areas. Timberline Knolls, Lemont Illinois.

At first glance this difference in averages appears to be statistically significant and, in fact, it is. However, further analyses reveal a significant difference in the average date of construction between the two groups. The average date of construction of properties in the target area was 1975 while the average date of construction of the in the control area as 1989 or the average age of house within the control area was fourteen years newer.

14

Consequently, to make the properties more comparable between the target and control areas, only houses from both groups that were constructed in 1970 or after were used in this analysis. Bi-level and tri-level homes were also not included in the study because they tend to sell for less per square foot than do one-story and two-story homes and because it is often difficult to accurately estimate the actual amount of living space. Consequently, these types of homes would tend to skew results in the sample and make the sample less reliable as an indicator. The remaining sales are summarized in Appendix IIc.

This data was reviewed using a paired sales analysis and a multiple regression analysis to determine if there is a statistically measurable effect on property values. The results of these analysis are discussed in greater in the following two sections.

15

## Comparison Of Overall Averages

A comparison was made of the overall averages within the target area and control area. There were a total of twenty-one sales in the target area and ninety-seven sales in the control area. The overall average in the target area was $142.40 per square foot while within the control area it was $144.78 per square foot or a difference of $2.38 per square foot (see Table 1). A statistical comparison was made of the means for the groups to ascertain if this was a significant difference between the indicated prices. The calculated $t$ statistic for the sample was 0.524. The standard $t$ statistic for 178 degrees of freedom applicable is 1.654. Since the calculated $t$ statistic of 0.524 is less than the standard $t$ of 1.654, the research hypothesis that there is a difference in value between the target and control areas is rejected, it is concluded that there is no statistically significant difference between these two means at a 95 percent confidence interval.

Table 1: Comparison of Averages in Target and Control Areas.

| Sample | Sample Size | Degrees Of Freedom | Sample Mean | Sum Of Squares | Standard Deviation |
|---|---|---|---|---|---|
| Target: | 43 | 42 | $142.40 | 12,973 | 17.575 |
| Control: | 136 | 135 | $144.78 | 105,726 | 27.985 |
| Combined: | 179 | 177 | | 118,699 | |

| | |
|---|---|
| Variance: | 670.615 |
| Variance of Difference of Means: | 20.527 |
| Standard Deviation: | 4.531 |
| Calculated $t$ = | -0.524 |
| Standard $t$ at 95% 178 Degrees of Freedom: | 1.654 |

16

Multiple Regression Analysis

A multiple regression analysis was also made to compare the prices paid for houses in the Target and Control Areas. Regression analysis is a technique to model and analyze numerical data by relating one or more independent variables (characteristics) to a dependent variable (measurement). This method can determine the strength and relationship between the variables [Yeates].

The multiple regression analysis used the sale price as the dependent variable with the independent variables being proximity (target/control), house size, house size squared, sale date, age, bath, fireplace, garage size, basement, and recreation room.

Table 2 is a summary of each variable, and its associated $t$ statistic. The $t$ test is a method to determine if a variable is statistically significant in affecting the value of a property. The important variable in this analysis for determining the effect of an alcoholism and substance abuse treatment facility on surrounding property is the proximity variable. Like the test comparing two means, if the calculated $t$ statistic is less than the Standard $t$, then the hypothesis that an alcoholism and substance abuse treatment facility affects surrounding property values is rejected and the null hypothesis is accepted. In Table 4, the associated $t$ statistic for the proximity variable is 1.006. The standard $t$ statistic for 167 degrees of freedom applicable in this case is 1.655. Since the associated $t$ statistic is less than the standard $t$ statistic, the hypothesis is rejected and it is concluded that the presence of an alcoholism and substance abuse treatment facility has no statistically measurable effect on property values. This analysis indicated that there was no statistically significantly difference between the value of properties within the target area and those within the control area.

17

Table 2: Multiple Regression Analysis of Single Family Residences,
Timberline Knolls.

| Regression Statistics | Measure |
|---|---|
| Multiple R | 0.873 |
| R Square | 0.761 |
| Adjusted R Square | 0.741 |
| Standard Error | 54,601.545 |
| Observations | 179 |

| ANOVA | Deg. Of Freedom |
|---|---|
| Regression: | 11 |
| Stadard Error: | 1 |
| Residual | 167 |

| | Coefficients | Standard Error | t Stat |
|---|---|---|---|
| Intercept | 0 | #N/A | #N/A |
| Proximate: | 10,117.071 | 10,061.167 | 1.006 |
| Size: | 79.450 | 9.534 | 8.333 |
| Sale Date: | 0.477 | 1.126 | 0.423 |
| Age: | -2,050.102 | 569.761 | -3.598 |
| Bath: | -5,720.233 | 9,210.034 | -0.621 |
| Fireplace: | 5,712.356 | 10,702.055 | 0.534 |
| Garage: | 46,468.806 | 9,333.813 | 4.979 |
| Basement: | 86,402.811 | 32,726.125 | 2.640 |
| Partial Base.: | 60,776.965 | 33,046.560 | 1.839 |
| Style: | -1,984.837 | 13,810.599 | -0.144 |
| Brick: | 15,219.923 | 12,501.295 | 1.217 |

18

CONCLUSION OF THE SALES ANALYSIS, TIMBERLINE KNOLLS

The two techniques used provided similar results indicating that there was no significant difference in the selling prices of homes located near an alcoholism and substance abuse treatment facility than similar houses located some distance from those facilities. The comparison of price per square foot indicated no statistically significant difference between prices within the Target and Control areas. This conclusion was also supported by the results of the regression analysis. Regression analysis of the data can take into account differences between the homes such as the size, the age, the number of bathrooms, presence of a basement, and other factors. When these characteristics are considered, this analysis also indicated that there is no measurable difference between the selling price for houses near an alcoholism and substance abuse treatment facility and houses some distance away.

ROSECRANCE CENTER, ROCKFORD, ILLINOIS

The Rosecrance Center is Rockford is located at the southeast corner of Rotte Road and North University Drive. The facility comprises a 67,000 square foot, 80-bed treatment center for adolescents ages 12-18. The facilities include an on-site school, a chapel, a gymnasium, fitness center, and outdoor dining patio. The facility is located on a 50 acre site. The facility was built in 2005.

Land uses around the facility consists of a mixture of farmland, residential subdivision, and some estate properties. In addition, there are some commercial developments as well as a branch campus for Northern Illinois University located along US Highway 20 and University Drive.

Like the analysis done for the Timberline Knolls Facility, a target and control are were established around the Rosecrance Center. The target and control areas are illustrated in Fig. 3. Sale transactions were obtained from Rockford Township Assessors Office for the years 2012 through 2014. There were a total of 101 residential sales that occurred with 37 sales in the target are and the remaining 64 sales in the control area (see Appendix IIIa). Like the analysis conducted on the Timberline Knolls Facility, all non-arm's length transactions were removed from the analysis. There were a total of 50 sales that occurred over this time frame with 17 sales in the Target Area and 33 sales within the Control Area. The average price per square foot in the Target Area was $100.35 and $83.60 in the Control Area. These arm's length sales are summarized in Appendix IIIb).

The arm's length sales vary widely in size, age, style of house, and amenities. A review of sales within the target area indicated that properties were primarily constructed after 1970. Again, like the Lemont analysis, to make the properties more comparable between the Target and Control groups, only houses from both groups that were constructed in 1970 or after were used in this analysis. Bi-level and tri-level homes were also not included in the study because they tend to sell for less per square foot than do one-story and two-story homes and because it is often difficult to accurately estimate the actual amount of living space. Consequently, these types of homes would tend to skew results in the sample and make the sample less reliable as an indicator. The remaining sales are summarized in Appendix IIIc.

This data was reviewed using a comparison of the overall average prices within the target and control areas, a multiple regression analysis, and a paired sales analysis to determine if there was a statistically measurable effect on property values.

20

Fig. 3: Target and Control Areas, Rosecrance Center.



## Comparison Of Overall Averages

A comparison was made of the overall averages within the Target Area and Control Area. There were a total of fifteen sales in the Target Area and twenty-two sales in the Control Area. The overall average in the target area was $99.13 per square foot while within the Control Area it was $85.22 per square foot or a difference of $13.91 per square foot (see Appendix IIIc and Table 3). A statistical comparison was made of the means for the groups to ascertain if this was a significant difference between the indicated prices. The calculated $t$ statistic for the sample was 2.443. The standard $t$ statistic for 35 degrees of freedom applicable is 1.690. Since the calculated $t$ statistic of 2.433 is greater than the standard $t$ of 1.690, the research hypothesis that there is a difference in value between the target and control areas is accepted, it is concluded that there is a statistically significant difference between these two means at a 95 percent confidence interval based on the selling price per square foot and that prices in the Target Area are measurably higher than those in the Control Area.

Table 3: Comparison of Averages in Target and Control Areas,
Rosecrance Center.

| Sample | Sample Size | Degrees Of Freedom | Sample Mean | Sum Of Squares | Standard Deviation |
|---|---|---|---|---|---|
| Target: | 15 | 14 | $99.13 | 4,671 | 18.266 |
| Control: | 22 | 21 | $85.22 | 5,444 | 16.101 |
| Combined: | 37 | 35 | | 10,115 | |

| | |
|---|---|
| Variance: | 289.000 |
| Variance of Difference of Means: | 32.403 |
| Standard Deviation: | 5.692 |
| Calculated $t$ = | 2.443 |
| Standard $t$ at 95% 35 Degrees of Freedom: | 1.690 |

Multiple Regression Analysis

A multiple regression analysis was also made to compare the prices paid for houses in the target and control Areas. The multiple regression analysis used the sale price as the dependent variable with the independent variables being proximity (target/control), house size, sale date, age, basement finish, bedrooms, baths, fireplaces, style, and garage.

Table 4 is a summary of each variable, and its associated $t$ statistic. The $t$ test is a method to determine if a variable is statistically significant in affecting the value of a property. The important variable in this analysis for determining the effect of a alcoholism and substance abuse treatment facility on surrounding property is the proximity variable. Like the test comparing two means, if the calculated $t$ statistic is less than the Standard $t$, then the hypothesis that an alcoholism and substance abuse treatment facility affects surrounding property values is rejected and the null hypothesis is accepted. In Table 4, the associated $t$ statistic for the proximity variable is 1.288. The standard $t$ statistic for 26 degrees of freedom applicable in this case is 1.706. Since the associated $t$ statistic is lower than the standard $t$ statistic, the hypothesis is rejected and it is concluded that the proximity variable for an alcoholism and substance abuse treatment facility has no measurable effect on surrounding property values.

24

Table 4: Multiple Regression Analysis of Single Family Residences, Rosecrance Facility.

| Item | |
|---|---|
| Multiple R | 0.869 |
| R Square: | 0.755 |
| Adjusted R Square: | 0.636 |
| Standard Error: | 28,730.584 |
| Observations: | 37 |

| Source: | |
|---|---|
| Regression | 10 |
| Standard Error of Estimate: | 1 |
| Residual | 26 |

| Ind. Variables | Coefficients | Standard Error | t Stat |
|---|---|---|---|
| Intercept: | 0 | #N/A | #N/A |
| Proximate: | 16,453.545 | 12,771.460 | 1.288 |
| Above Grade Ft$^2$: | 64.679 | 30.145 | 2.146 |
| Sale Date: | -0.642 | 1.487 | -0.432 |
| Age: | -1,853.219 | 924.345 | -2.005 |
| Base. Finish: | 47.552 | 20.659 | 2.302 |
| Bedrooms: | 13,426.724 | 25,199.297 | 0.533 |
| Baths: | -19,253.135 | 16,945.881 | -1.136 |
| Fireplace: | 31,346.099 | 18,470.133 | 1.697 |
| Style: | -95,133.021 | 34,706.178 | -2.741 |
| Garage: | 69,073.002 | 42,298.306 | 1.633 |

CONCLUSION OF THE SALES ANALYSIS, ROSECRANCE CENTER

Both a sales comparison of the price per square foot analysis and a regression analysis was undertaken for the Target and Control areas around the Rosecrance Center. The comparison of the average selling price per square foot indicated that prices were higher near an alcoholism and substance abuse treatment facility than for houses some distance away. The regression analysis, which has the advantage of being able to account for differences between the homes such as the size, the age, the number of bathrooms, presence of a basement, and other factors, indicated that there was a no significant difference between prices in the Target and Control areas. Within the regression analysis, the proximity variable does have a positive co-efficient which supports the finding from the average price per square foot analysis is higher in the Target Area than it is in the Control Area. This finding reflects not particularly the presence of the Rosecrance Center as it does the nature of the area within which the Rosecrance Center is located. Property values have generally been high and the general development nearby, including along University and Castlehill drives immediately nearby the Rosecrance Center feature larger homes while properties to the east have large lots or are in estate settings. New homes have been built including near the Rosecrance Center after it opened, this indicates that there has been no measurable effect on the desirability of the area or a significant effect on property values in the area.

## CONCLUSION

The Facility is located in a rural setting on the north side of Silver Glen Road in Campton Hills Township. The topography of the area is considered to be level with a minimum of topographical differences. The current land use of the surrounding properties is generally agricultural and open space with some subdivisions to the south and several estate tracts to the north.

Visibility of the Facility will be limited by a combination of distance, intermediate natural vegetation, and other intervening land uses. The Facility is adjoined on the east, south, and west by land owned by the Kane County Forest Preserve and that is used as a prairie restoration and preservation area. This acreage provides a visual buffer from both roadways and nearby homes. This is enhanced by hedgerows of trees that effectively form vertical walls creating an outdoor room into which the facility is located. The Facility is also taking certain steps on-site to minimize the effect on the surrounding area. These include a minimal amount of signage at the entrance road, monitoring of patients twenty-four hours, monitored doors, monitored thermal cameras, and transportation of patients to and from the facility via a private car or limousine. Furthermore, the traffic report produced by KLOA, Inc. indicated that the proposed operations will have no measurable impact on the surrounding roads. All of the above items contribute to the visual buffering of the Facility and help to minimize the impact on property values.

While the above comments represent a qualitative analysis of an alcoholism and substance abuse treatment facility's effect on surrounding property values, Poletti and Associates also completed a quantitative analysis. This quantitative analysis consisted of two parts: (1) a study of sales surrounding the currently operating Timberline Knolls Facility in Lemont, Illinois; (2) a study of the currently operating Rosecrance Center in Rockford, Illinois.

A study of the Timberline Knolls reviewed all sales that occurred between January 1, 2012 and December of 2014 in the target and control areas that were developed around that facility. The analysis consisted of both a comparison of averages between the target and control areas as well as a regression analysis of those sales. These analyses demonstrated that there was no statistically measurable difference between the selling prices for homes located near the Timberline Knolls Facility compared to similar homes located some distance away from the Facility.

A study of the Rosecrance Center reviewed all sales that occurred between January 1, 2012 and December of 2014 in the target and control areas that were developed around that facility. In the case of the Rosecrance Center, there was a statistically significant difference in the average price per square foot between the homes located near an alcoholism and substance abuse treatment facility and homes located farther away, with homes located nearer the facility selling for a

27

higher price. The regression analysis, which accounts for the various characteristics of the houses, indicated a positive coefficient for the proximity variable, but that it was statistically insignificant. Since the regression analysis can best account for differences in the characteristics of the individual sales, it was concluded that at the 95 percent confidence level that here was no statistically measurable difference between prices in the Target and Control areas.

Therefore, after reviewing the available data, it is my opinion that as of June 21, 2015 the Facility is located so as to not substantially diminish and impair property values within the neighborhood.

<u>CERTIFICATE OF APPRAISAL</u>

I certify to the best of my knowledge and belief, that:

1.  the facts and conclusions reached in this report are true and correct.

2.  the report analyses, opinions, and conclusions are limited only by the assumptions and limiting conditions, and are my personal, impartial, unbiased professional analyses, opinions, and conclusions.

3.  I have no present or prospective interest in the property that is the subject of this report, and I have no personal interest or bias with respect to the parties involved.

4.  my compensation is not contingent on an action or event resulting from the analyses, opinions, or conclusions in, or the use of, this report.

5.  my analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice.

6.  my engagement in the assignment was not contingent upon developing or reporting predetermined results.

7.  my compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of value, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this consulting assignment.

8.  I have made a personal inspection of the property that is the subject of this report.

9.  the consulting assignment was not based on a requested minimum valuation, a specific valuation or the approval of a loan.

10. the reported analyses, opinions, and conclusions were developed, and this report prepared, in conformity with the requirements of the Code of Professional Ethics and the Standards of Professional Practice of the Appraisal Institute and the International Association of Assessing Officers.

11. I have the necessary experience and education and am competent to undertake this consulting assignment.

12. as of the date of this report, I have completed the requirements of the continuing education program of the Appraisal Institute and the International Association of Assessing Officers.

13. the departure rule of the Uniform Standards of the Appraisal Foundation and Appraisal Institute was not used.

14. I have provided a previous consulting report on the subject property in the past three years but have not provided any other appraisal or other service on the subject property in the previous three years.


Dated: June 21, 2015


*Peter J. Poletti*

Peter J. Poletti, Jr., Ph.D.; MAI
President
Illinois Certified General Real Estate Appraiser
553.000415 Exp. 9/15

## BIBLIOGRAPHY

Cook County Assessor's Office. Transfers and Property Record Card Information.

Cook County Recorder of Deeds Office. Deed Records

Lemont Township Assessor's Office. Property Record Cards.

Rockford Township Assessor's Office. Property Record Cards.

Yeates, Maurice. <u>An Introduction to Quantitative Analysis in Human Geography</u>. New York, New York. McGraw-Hill. 1974.

RESUME
OF PETER J. POLETTI, JR.

I. EDUCATION:
    1963-1966: Collinsville High School, Collinsville, Illinois.
    1966-1971: University of Illinois, Urbana, Illinois. Bachelor of
        Science Degree, Forest Management.
    1976-1982: Southern Illinois University at Edwardsville,
        Edwardsville, Illinois. Master of Arts Degree in Cultural
        Geography.
    1982-1989: St. Louis University, St. Louis, Missouri. Doctor of
        Philosophy Degree in American Studies.

II. WORK EXPERIENCE:
    1987-Present: President of Poletti and Associates, Inc.,
        Collinsville, IL.
    1989 - 1999: Assistant Professor of Geography, Department of
        Economics and Geography, University of Missouri-St. Louis.
    1981 - 1989: Instructor of Geography, Department of Economics and
        Geography, University of Missouri - St. Louis, Missouri.
    1981 - 1982: Adjunct Instructor of Geography, Harris-Stowe State
        College, St. Louis, Missouri.
    1977 - Present: Elected Township Assessor, Collinsville Township,
        Madison County, Illinois.
    1973-1977: Draftsman, Madison County Courthouse, Edwardsville,
        Illinois.

III. MEMBERSHIPS AND OFFICES:
    Member-Appraisal Institute.
    Member International Association of Assessing Officers.
    President-Society of Real Estate Appraisers; Chapter 152; 1987-
        89.
    President-Madison County Township Assessor's Association- 1979 to
        1986.
    Member-Illinois Township Assessors Association.
    Member-Certified Illinois Assessing Officials Association.
    Member-Edwardsville-Collinsville Board of Realtors.
    Member-Regional Panel, Standards of Professional Practice,
        Appraisal Institute, 1987 to present.
    Member-Chapter 12, Education Committee, Appraisal Institute, 1987
        to 1990.
    Member-Association of American Geographers.
    Member-National Council for Geographic Education.
    Member-Gamma Theta Upsilon Honorary Fraternity.

IV. CERTIFICATIONS AND DESIGNATIONS:
     Certified General Appraiser, State of Illinois,
          Certificate/License No. 153-000415.
     Certified General Appraiser, State of Missouri,
          Certificate/License No. RA 001663.
     Certified General Appraiser, State of Iowa, Certificate/License
          No. 328402075.
     Certified General Appraiser, State of Tennessee,
          Certificate/License No. CG-1250.
     Certified General Appraiser, Commonwealth of Kentucky,
          Certificate/License No. 001271.
     Certified General Appraiser, State of Indiana,
          Certificate/License No. CG49400309.
     Certified General Appraiser, State of Arkansas,
          Certificate/License No. CG1481N.
     Certified General Appraiser, State of Wisconsin
          Certificate/License No. 1026-010

     MAI designation of the Appraisal Institute. Certified Assessment
          Evaluator Designation of the International Association of
          Assessing Officers.
     Certified Illinois Assessing Officer.
     Certified Instructor for the Illinois Property Institute. Basic,
          Income, Shopping Center, Grain Elevator Courses.
     Certified Instructor for the Appraisal Institute. Case Studies in
          Real Estate and Report Writing and Valuation Analysis.

V. APPRAISAL COURSES:
     Appraisal Institute; Online Appraising Blue Prints and
          Specifications, 2006.
     Appraisal Institute; Introduction to GIS Application for Real
          Estate Appraisal, 2005.
     Appraisal Institute; Online Valuation of Detrimental Condition in
          Real Estate, 2005
     Appraisal Institute; Appraising the Tough ones: Case Studies in
          Complex Residential Valuation, 2004
     Appraisal Institute; The Road Less Traveled: Special Purpose
          Properties, 2004.
     Appraisal Institute; Business Practice and Ethics, 2003.
     Appraisal Institute; 15 Hours National USPAP Course, 2003.
     Appraisal Institute; Course 510: Advanced Income Capitalization,
          2002.
     Appraisal Institute; Standards of Professional Practice A and B,
          1991.
     Appraisal Institute; Course 320: General Applications, 1994.
     American Institute of Real Estate Appraisers; Course 1A-1: Real
          Estate Appraisal Principles, 1985.
     American Institute of Real Estate Appraisers; Course 1A-2:Basic
          Valuation Procedures, 1985.
     American Institute of Real Estate Appraisers; Course 1B-
          A:Capitalization Theory and Techniques, Part A, 1985.

33

American Institute of Real Estate Appraisers; Course 1B-B:
Capitalization Theory and Techniques, Part B, 1985.
American Institute of Real Estate Appraisers; Course 2-1:Case
Studies in Real Estate Valuation, 1985.
American Institute of Real Estate Appraisers; Course 2-2:
Valuation Analysis and Report Writing, 1985.
American Institute of Real Estate Appraisers; Course 8-2:
Residential Valuation, 1985.
American Institute of Real Estate Appraisers; Course 8-
3:Standards of Professional Practice, 1985, 1989, 1994.
American Institute of Real Estate Appraisers; Course 7:
Industrial Valuation, 1986.
McKissock; Appraisal Trends, 2006.
McKissock; National USPAP Update, 2005.
Society of Real Estate Appraisers; Course 101: An Introduction to
Appraising Real Property, 1985.
Society of Real Estate Appraisers; Course 102: Applied
Residential Property Valuation, 1985.
Society of Real Estate Appraisers; Course 201: Principles of
Income Property Appraising, 1984.
Society of Real Estate Appraisers; Course 202: Applied Income
Property Valuation, 1985.
Society of Real Estate Appraisers; Course 301: Special
Applications of Real Estate Analysis, 1987.

VI. LIST OF PRIOR CLIENTS:
Abnet, LLC, Olney, Maryland.
Allied Signal Corporation, Metropolis, Illinois.
Appraisal Management Company, Canton, Massachusetts.
Bank of Edwardsville Branch, Collinsville, Illinois.
Bernard and Davison, Attorneys, Granite City, Illinois.
Bi-State Development Authority, St. Louis, Missouri.
Bo Bueckman Ford, Ellisville, Missouri.
Boatmen's Bank, St. Louis, Missouri.
Boatmen's Bank, Hillsboro, Illinois.
Burlington Bank and Trust, Burlington, Iowa
Capri Sun, Inc., Granite City, Illinois.
Central Bank, Fairview Heights, Illinois
Citicorp Mortgage Co., St. Louis, Missouri.
City Attorney's Office, Lincoln, Nebraska.
City of Edwardsville, Edwardsville, Illinois.
City of Granite City, Granite City, Illinois.
City of Highland, Highland, Illinois.
City of St. Peters, St. Peters, Missouri.
Collinsville Building and Loan, Collinsville, Illinois.
Columbia Quarry Company, Columbia, Illinois.
Community First Bank, Fairview Heights, Illinois.
Crowder and Scoggins, Attorneys, Columbia, Illinois
Crowder and Taliana, Attorneys, Edwardsville, Illinois.
Delivery Network Warehouse Company, Madison, Illinois.
Derango & Vetter, Attorneys, Belleville, Illinois.
Dunham, Bowman and Leskera, Collinsville, Illinois.

Du Quoin State Bank, Du Quoin, Illinois.
Exxon Coal and Mineral, Carlinville, Illinois.
Family Credit Connection, Schaumburg, Illinois.
Farmers Home Administration, Champaign, Illinois.
First Bank, Minneapolis, Minnesota.
First Bank Mortgage, Clayton, Missouri.
First Bank of Illinois, O'Fallon, Illinois.
First Bank of Illinois, Salem, Illinois.
First Federal Savings, Bloomington, Illinois.
First National Bank, Sikeston, Missouri.
First of America Bank, Springfield, Illinois.
Hawkeye Bank of Clinton County, Clinton, Iowa.
H & R Block Mortgage, Pleasanton, California.
Hinshaw & Culbertson, Attorneys, Belleville, Illinois.
Home Federal Savings and Loan, Collinsville, Illinois.
Home Telephone Company, St. Jacob, Illinois.
Illinois American Water Company, Belleville, Illinois.
Illinois Power Company, Decatur, Illinois.
Illinois State Bank, Lake in the Hills, Illinois.
Invenergy, LLC, Chicago, Illinois.
ITT Small Business Finance Corporation, St. Louis, MO..
JBL Limited, Alton, Illinois.
J.R. Kelley Company, Collinsville, Illinois.
Jefferson Bank and Trust, St. Louis, Missouri.
Ralph Korte Construction Co., Highland, Illinois.
Laidlaw Waste Systems (Madison), Roxana, Illinois.
Levy and Levy, Attorneys, Collinsville, Illinois.
Long Beach Mortgage Company, Rolling Meadows, Illinois.
Lueders, Robertson and Konzen, Attorneys, Granite City, IL
Madison County Transit Authority, Granite City, Illinois.
Maedge Trucking Co., Marine, Illinois.
Magna Bank, NA, Belleville, Illinois.
Mark Twain Bank, St. Louis, Missouri.
MCCormack Baron & Associates, Inc., St. Louis, Missouri.
Mercantile Bank, St. Louis, Missouri.
Midwest Waste, Cahokia, Illinois.
Moore Research, Inc., St. Louis, Missouri.
NationsBank, St. Louis, Missouri.
Navy Federal Credit Union, Cleveland, Ohio.
Norfolk-Southern Corporation, Atlanta, Georgia.
Ogle County Supervisor, Oregon, Illinois.
Peoria Disposal Company, Peoria, Illinois.
Onyx Waste Services Midwest, Inc., Batavia, Illinois.
RECOLL Management Corporation, Boston, Massachusetts.
Erin E. Reilly, Attorney, Edwardsville, Illinois.
Republic Services, Inc., Ft. Lauderdale, Florida
Richard McGovern, Attorney, Belleville, Illinois.
Ross Construction Co., Granite City, Illinois.
Sears Mortgage Corporation, St. Louis, Missouri.
Sears, Roebuck and Company, Chicago, Illinois.
Shell Oil Company, Wood River, Illinois.
Service Corporate Mortgage, Naperville, Illinois.

Southern Illinois Regional Landfill, Desoto, Illinois.
Speed Lube, Inc., Highland, Illinois.
Stifel, Nicolaus & Company, Belleville, Illinois.
Stobbs and Sinclair, Attorneys, Alton, Illinois.
Town and Country Mortgage, Chesterfield, Missouri.
Tri-City Port District, Granite City, Illinois.
Tri-Township Library District, Troy, Illinois.
Harry J. Sterling, Attorney, Fairview Heights, Illinois.
Dean Sweet, Attorney, Wood River, Illinois.
United Illinois Bank, Collinsville, Illinois.
United Missouri Bank, St. Louis, Missouri.
US Can Company, Danville, Illinois.
US Postal Service, Overland Park, Kansas.
Waste Management of Illinois, Inc., Downers Grove, Illinois.
Weaver, Boos & Gordon, Inc., Chicago, Illinois.
Wolf Construction Company, Granite City, Illinois.

APPENDICES

Appendix 1: Photographs Of Facility.



Appendix Ia: Entrance to Facility from Silver Glen Road.



Appendix Ib: View Looking Northwest from Intersection of Silver Glen
Road and Croonen Road.



Appendix Ic: View Looking Northeast from Dittmer Road just north of
Silver Glen Road.



Appendix Id: View Looking Southwest toward Facility from McDonald
Road.



Appendix Ie: An Example of Secondary Growth along North Property Line.



Appendix If: Example of Secondary and Mature Growth Trees along North Property Line.



Appendix Ig: Overview of Facility.



Appendix Ih: Typical Residential Unit.

Appendix II: Target and Control Area Sales, Lemont, Ill.

Appendix IIa: Target and Control Area Sales, Lemont, Ill.

| Sale | Parcel No. | Address | Grantor | Grantee | Doc. No. | | | Sale Price | Size | Age | Style | $/Ft2 | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Target: | | | | | | | | | | | | | |
| 1 | 22 20 317 002 | 407 Warner | Sepskis | Boyle | 1222133108 | Jun-12 | WD | $200,000 | 1,537 | 1911 | 2SF | $130.12 | |
| 2 | 22 20 314 008 | 113 Cass | Schroeder Tr | Kasbohm | 1219435C33 | Jul-12 | TRD | $125,000 | 1,358 | 1948 | 1SF | $92.05 | |
| 3 | 22 29 100 023 | 730 Kettering | Lambert | Hunnewell | 1420241IC11 | Jun-14 | WD | $262,500 | 1,680 | 1970 | 1SB | $156.25 | |
| 4 | 22 29 100 024 | 730 Kettering | Sheady Tr | Johnson | 1316501C24 | May-13 | TRD | $235,000 | 1,373 | 1974 | SPLFB | $171.16 | |
| 5 | 22 29 101 004 | 14 E. Divi. | S Hlnd Bnk Tr | Bates | 1424735C13 | Jul-14 | TRD | $142,000 | 1,328 | 1925 | 1SF | $106.93 | |
| 6 | 22 29 101 007 | 5 E. Custer | Zyzniewsky | Campo | 1303646C58 | Feb-13 | WD | $265,000 | 2,098 | 1926 | 2SF | $126.31 | |
| 7 | 22 29 102 010 | 30 E. Divi. | Wiegand-Cresap | Cammiso | 1418104C44 | EXD | WD | $245,000 | 1,816 | 1948 | 2SF | $134.91 | |
| 8 | 22 29 103 005 | 519 Warner | Baer | Marinello | 1301057C47 | Dec-12 | WD | $240,000 | 1,560 | 1888 | 2SF | $153.85 | |
| 9 | 22 29 103 014 | 104 E. Divi. | Pavlik | Somer, Tr | 1208711C52 | Mar-12 | WD | $95,000 | 864 | 1957 | 1SF | $109.95 | |
| 10 | 22 29 106 017 | 34 E. Custer | Burkhart | McEvoy | 1416333129 | Jun-14 | WD | $240,000 | 1,566 | 1916 | 1.5SF | $153.26 | |
| 11 | 22 29 109 007 | 11 E. Eureka | Sokolis | Jaenicka | 1311912105 | Apr-13 | WD | $230,000 | 1,533 | 1930 | 1.5SF | $150.03 | Shrt Sle |
| 12 | 22 29 109 015 | 9 E. Eureka | Eller Tr | Sperka | 1323942C89 | Aug-13 | TRD | $195,000 | 1,008 | 1958 | 1SB | $193.45 | |
| 13 | 22 29 110 005 | 717 Warner | Forzley | Bushman | 1312855107 | May-13 | WD | $125,000 | 1,116 | 1879 | 1SF | $112.01 | |
| 14 | 22 29 110 018 | 720 Singer | Molis | Welch | 1336401C65 | Dec-13 | WD | $250,000 | 1,920 | 1908 | 1.5SF | $130.21 | |
| 15 | 22 29 110 025 | 730 Singer | Hejka | Siriana | 1307857C66 | Mar-13 | WD | $148,000 | 2,023 | 1918 | 2SB | $73.16 | |
| 16 | 22 29 111 002 | 705 Singer | Carpediem Grp. | Araulio | 1317742C29 | May-13 | WD | $350,000 | 2,656 | 2008 | 2SF | $131.78 | Shrt Sle |
| 17 | 22 29 111 025 | 724 Ridge | Frysztak Tr | Bertolino | 1212912I43 | May-12 | TRD | $267,000 | 1,613 | 1973 | 1SB | $165.53 | |
| 18 | 22 29 113 008 | 22 E. Eureka | Newquist | Hale | 1426804C43 | Aug-14 | WD | $342,500 | 2,035 | 1922 | 2SF | $168.30 | |
| 19 | 22 29 113 022 | 19 Ridge Rd | Fries | Petrauskas | 1219305??? | Jun-12 | | $121,000 | 832 | 1950 | 1SB | $145.43 | ? Sale |
| 20 | 22 29 114 019 | 17 Norton | Bolino | Lawler | 1432110C04 | Nov-14 | WD | $148,000 | 1,187 | 1961 | SPLFB | $124.68 | |
| 21 | 22 29 114 025 | 20 Norton | Ilrak LLC | Kolatik | 1208747C38 | Jan-12 | WD | $365,000 | 2,390 | 2008 | 2SFB | $152.72 | |
| 22 | 22 29 114 027 | 4 Norton | Parkway Bank | IH2 Prop. | 1324201I40 | Jul-13 | TRD | $156,000 | 1,118 | 1961 | SPLFB | $139.53 | Ex. Opt. |
| 23 | 22 29 115 002 | 828 Singer | Reineke | Kodieli | 1320304102 | Jun-13 | WD | $182,000 | 1,000 | 1960 | 2SF | $182.00 | |
| 24 | 22 29 116 005 | 819 Singer | Naples | Inn. Cty Liv. | 1306647C03 | Feb-13 | WD | $135,000 | 1,327 | 1888 | 2SF | $101.73 | |
| 25 | 22 29 116 006 | 823 Singer | FNMA | Mack Ind. | 1424156C03 | Aug-14 | SPD | $74,200 | 946 | 1921 | 1SF | $78.44 | Bank |
| 26 | 22 29 116 018 | 824 State | Nyman-Finke Tr | Bercher | 1333149C58 | Nov-13 | WD | $142,500 | 1,737 | 1940 | 1.5SF | $82.04 | |
| 27 | 22 29 120 001 | 18 W. Divi. | Bromberek | Zumhegen | 1323447C17 | Aug-13 | WD | $225,000 | 1,314 | 1966 | SP1B | $171.23 | Shrt Sle |
| 28 | 22 29 120 005 | 10 W. Divi. | Knosik | MacDonough | 1412741C70 | Apr-14 | WD | $240,000 | 1,369 | 1958 | SPLFB | $175.31 | |
| 29 | 22 29 120 009 | 19 W. Custer | Brandt | Englund | 1302212I07 | Jan-13 | WD | $175,000 | 1,414 | 1960 | 1SB | $123.76 | |
| 30 | 22 29 127 002 | 31 Peiffer | Flaherty Tr. | Skierkiewicz | 1309435C31 | Mar-13 | TRD | $333,000 | 2,405 | 1990 | 1.5SFB | $138.46 | |
| 31 | 22 29 301 029 | 1010 Salim | Francisco | Hatton | 1430810C97 | Oct-14 | WD | $521,000 | 3,883 | 2002 | 2SFB | $134.17 | |
| 32 | 22 29 303 003 | 1003 Walter | Bresingham | Benoit | 1322126625 | Jul-13 | WD | $500,000 | 4,054 | 2002 | 2SF | $123.33 | |
| 33 | 22 29 303 004 | 1007 Walter | Tasharski | Lutz | 1220742289 | Jul-12 | WD | $110,000 | 630 | 1948 | 1SF | $174.60 | |

Appendix IIa: Continued on Next Page.

Appendix IIa: Continued.

| Sale | Parcel No. | Address | Grantor | Grantee | Date | Doc. No. | Doc. | Sale Price | Size | Age | Style | $/Ft2 | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 34 | 22 29 304 014 | 1002 Warner | FNMA | Kollezeb | Jan-14 | SPD | 1-403135136 | $220,000 | 1,560 | 1948 | 2SF | $141.03 | Bank |
| 35 | 22 29 304 021 | 1020 Warner | TCF Bank | IH2 Prop. | May-13 | SPD | 1315633141 | $160,000 | 1,080 | 1970 | 1SF | $148.15 | Bank |
| 36 | 22 29 311 004 | 1043 Walter | U.S. Bank | PNCST1 | Mar-14 | SPD | 1410415035 | $166,000 | 1,104 | 1965 | SPLFB | $150.36 | Bank |
| 37 | 22 29 311 005 | 1030 Florence | Zolecki Tr. | Stop Prop. | Jan-13 | TRD | 1304242088 | $150,000 | 1,040 | 1963 | 1SB | $144.23 | |
| 38 | 22 29 312 005 | 1030 Warner | Hoster Est. | Ellett | Jun-14 | EXD | 1418926057 | $115,000 | 1,104 | 1963 | SPLFB | $104.17 | Crt Ord. |
| 39 | 22 29 315 002 | 1005 Edgewood | Jerling | DeSantis | May-12 | WD | 1216741045 | $375,000 | 2,196 | 1990 | 1SB | $170.77 | |
| 40 | 22 29 315 010 | 1008 Edgewood | Citimortgage | Schutz | Mar-13 | SPD | 1308541003 | $315,000 | 3,154 | 1991 | 2SB | $99.87 | Bank |
| 41 | 22 29 316 011 | 23 W. Roberta | Rogel | Buffalo | Aug-13 | WD | 1322635089 | $316,000 | 2,288 | 1990 | 2SFB | $138.11 | |
| 42 | 22 29 316 018 | 102 Rose | Chicago Title | Dargis | Jul-14 | TRD | 1423741245 | $520,000 | 4,032 | 2006 | 2SFB | $128.97 | |
| 43 | 22 29 317 013 | 6 W. Roberts | Guthrie Tr | Alvarado | Oct-14 | TRD | 1431433056 | $272,500 | 1,348 | 1990 | SPLFB | $202.15 | |
| 44 | 22 29 318 012 | 6 W. Megan | Warhol Tr. | Zielinski | Nov-13 | WD | 1407941070 | $255,000 | 1,760 | 1990 | SPLFB | $144.89 | |
| 45 | 22 29 319 012 | 10 W. Wend | Lambert | Acevedo | Jan-14 | WD | 1402226070 | $305,500 | 2,057 | 1990 | 2SFB | $148.52 | |
| 46 | 22 29 319 015 | 4 W. Wend | Kaatz | Nappier | Jun-14 | WD | 1423035030 | $360,000 | 2,434 | 1991 | 1.5SFB | $147.90 | |
| 47 | 22 29 321 009 | 1133 Florence | Konieczka | Allen | Apr-12 | WD | 1215755132 | $317,500 | 1,712 | 1990 | SPLFB | $185.46 | |
| 48 | 22 29 324 006 | 167 Erin | Chicago Ttl | Albrecht | Aug-12 | TRD | 1226446028 | $369,000 | 2,800 | 1996 | 2SFB | $131.79 | |
| 49 | 22 29 325 003 | 1063 Hermes | Rehfus | Gabseviclute | Jul-12 | WD | 1221541071 | $142,500 | 3,047 | 1999 | 2SFB | $137.84 | |
| 50 | 22 30 101 036 | 16548 New | Jud. Sales | Starko LLC | Jun-12 | SPD | 1217831029 | $240,500 | 1,526 | 1872 | 2SFB | $157.60 | Bank, Ll. |
| 51 | 22 30 101 047 | 16490 New | Forkel etal | Hedger | Mar-12 | WD | 1207204081 | $100,000 | 1,332 | 1933 | 1.5SF | $75.08 | |
| 52 | 22 30 101 015 | 16374 New | Chicago Ttl | Hussey | May-12 | TRD | 1222749008 | $97,500 | 874 | 1919 | 1SF | $111.56 | |
| 53 | 22 30 201 016/014 | 16368 New | Senese | Christie | Oct-12 | WD | 1308417031 | $126,900 | 1,675 | 1939 | 1SF | $75.76 | |
| 54 | 22 30 205 010 | 14 Timberline | Landmark Bldg. | Leise | Feb-12 | WD | 1204747000 | $281,000 | 1,803 | 1986 | SPLFB | $155.85 | |
| 55 | 22 30 205 033 | 20 Evergreen | Wirth | Janowski | Apr-12 | WD | 1210822018 | $285,000 | 2,465 | 1987 | 2SFB | $115.62 | |
| 56 | 22 30 205 002 | 47 Timberline | Brombarek | Dunn | Apr-13 | WD | 1310551002 | $380,000 | 2,568 | 1994 | 2SF | $147.98 | |
| 57 | 22 30 206 002 | 52 Timberline | Rychtarczyk | Sobol | Jan-14 | WD | 1402801111 | $280,000 | 1,330 | 1986 | SPLFB | $210.53 | |
| 58 | 22 30 206 035 | 79 W. Logan | Bertulis | Fostier | Jun-12 | WD | 1221655042 | $256,500 | 1,949 | 1987 | 2SF | $131.35 | |
| 59 | 22 30 206 037 | 75 W. Logan | Levy Tr. | Faddis | Aug-14 | WD | 1426104074 | $320,000 | 1,843 | 1971 | 2SB | $173.63 | |
| 60 | 22 30 207 013 | 11 Cedar Ct. | FNMA | Agnieszka | Feb-12 | SPD | 1205304064 | $247,000 | 2,722 | 1991 | 2SFB | $90.74 | Bank |
| 61 | 22 30 207 013 | 11 Cedar Ct. | Medoniene | Jud. Sales | Sep-12 | TRD | 1075722107 | $247,000 | 2,722 | 1991 | 2SFB | $90.74 | Bank |
| 62 | 22 30 207 023 | 1 Cedar | Berming | Heiserman | Mar-13 | WD | 1308141036 | $327,500 | 2,572 | 1986 | 2SF | $127.33 | |
| 63 | 22 30 207 047 | 14 Aspen | Chicago Ttl | Blaskevicius | Aug-13 | WD | 1325433064 | $277,500 | 1,845 | 1988 | 1SFB | $150.41 | |
| 64 | 22 30 207 060 | 1 Aspen Ct. | Henderson | Polo | Jun-12 | WD | 1216746003 | $305,000 | 2,365 | 1987 | 2SFB | $128.96 | |
| 65 | 22 30 208 002 | 1403 Briarcliffe | Derrigi Cont. | Sharp | Jan-14 | WD | 1405042020 | $499,000 | 3,376 | 2014 | 2SFB | $147.81 | New House |
| 66 | 22 30 305 002 | 12670 Briarcliffe | Carpenter Tr | Highland | Sep-13 | TRD | 1328026026 | $575,736 | 3,452 | 2011 | 2SFB | $166.78 | |
| 67 | 22 30 306 014 | 16701 Wilshire | 159 Harlem | Demir | Oct-13 | WD | 1331750013 | $475,000 | 3,395 | 2006 | 1.5SB | $139.91 | |
| 68 | 22 30 308 007 | 12473 Briarcliffe | Edwards Bld. | Greco | Apr-12 | WD | 1213013027 | $575,000 | 4,641 | 2006 | 2SFB | $123.90 | |

Appendix IIa: Continued on Next Page.

Appendix IIa: Continued.

| Sale | Parcel No. | Address | Grantor | Grantee | Doc. No. | | Sale Price | Size | Age | Style | $/Ft2 | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 69 | 22 30 308 008 | 12468 Province | Kittridge | Riesenberg | 1330841141 | WD | $572,900 | 3,803 | 2005 | 2SFB | $150.64 | |
| 70 | 22 30 308 008 | 12448 Province | Maurukas | Dismore | 1203141134 | WD | $575,000 | 3,514 | 2006 | 2SB | $163.63 | |
| 71 | 22 30 308 011 | 12408 Province | Duetsche Bnk | Columbia | 1327704117 | SPD | $500,100 | 3,964 | 2005 | 2SFB | $126.16 | Bank |
| 72 | 22 30 308 009 | 12448 Province | Dismore | Badescu | 1420310031 | WD | $615,000 | 3,514 | 2006 | 2SFB | $175.01 | |
| 73 | 22 30 309 009 | 12388 Thornberry | Biskup | Caruso | 1420233203 | WD | $479,900 | 3,139 | 2014 | 2SFB | $152.88 | New House |
| 74 | 22 30 310 001 | 12437 Province | Lekousia | Stringer | 1316441120 | WD | $562,500 | 3,209 | 2013 | 2SFB | $175.21 | New House |
| 75 | 22 30 310 011 | 12544 Thornberry | Standek Bld. | Rams | 1401312444 | WD | $494,000 | 3,162 | 2013 | 2SFB | $156.23 | New House |
| 76 | 22 30 311 001 | 12595 Thornberry | LeBlanc | Dolph | 1322141197 | WD | $549,000 | 3,736 | 2006 | 2SFB | $146.95 | |
| 77 | 22 30 311 005 | 12635 Thornberry | Chunduri | Kruse | 1319601229 | WD | $550,000 | 3,381 | 2006 | 2SFB | $162.67 | |
| 78 | 22 30 312 002 | 12345 Thornberry | Guzowski | Topor | 1314235635 | WD | $445,000 | 3,669 | 2005 | 2SFB | $121.29 | |
| 79 | 22 30 312 012 | 12445 Thornberry | Mack Inv 1 | Bozin | 1219241119 | WD | $555,000 | 4,273 | 2009 | 2SFB | $129.89 | |
| 80 | 22 30 312 020 | 12535 Thornberry | DeRiggi Cont. | Grabowski | 1317841170 | WD | $485,000 | 3,489 | 2011 | 2SFB | $139.01 | |
| 81 | 22 30 313 010 | 16649 Sterling | Zyirbulis | Gubula | 1425449999 | WD | $532,000 | 3,692 | 2008 | 2SFB | $144.10 | |
| 82 | 22 30 404 009 | 109 Timberline | Rakauskas Est. | Yates | 14093309 | EXD | $287,500 | 2,558 | 1994 | 1SFB | $112.39 | |
| 83 | 22 30 405 014 | 66 W. Peiffer | Howe | Bryk | 1319110120 | WD | $200,000 | 1,738 | 1982 | 2SFLFB | $115.07 | Shrt Sle |
| 84 | 22 30 405 015 | 68 W. Peiffer | FNMA | Kazla | 1322335569 | SPD | $222,250 | 1,222 | 1982 | 2SFLFB | $181.87 | Bank |
| 85 | 22 30 406 004 | 112 Timberline | Lietz | Amberg | 1413519959 | WD | $430,000 | 3,399 | 1994 | 2SFB | $126.51 | |
| 86 | 22 30 406 013 | 93 Doolin | Regan Tr | Kelly | 1420342779 | TRD | $435,000 | 3,139 | 1994 | 2SFB | $138.58 | |
| 87 | 22 30 406 025 | 116 Doolin | Wilson | Strauss | 1404513112 | TRD | $400,000 | 2,923 | 1997 | 2SFB | $136.85 | |
| 88 | 22 30 407 009 | 117 Doolin | Baetz | Brumfield | 1222357101 | WD | $282,000 | 2,739 | 1994 | 2SFB | $102.96 | |
| 89 | 22 30 408 005 | 52 W. Roberta | Surin | Muller | 1326826249 | WD | $399,000 | 3,270 | 1997 | 2SFB | $122.02 | |
| 90 | 22 30 413 010 | 139 Doolin | Androvich | Adamjee Tr | 1326735578 | WD | $357,500 | 2,583 | 1996 | 1SFB | $138.40 | |
| | | | | | | | | | 1973 | | $138.56 | |

Control

| Sale | Parcel No. | Address | Grantor | Grantee | Doc. No. | | Sale Price | Size | Age | Style | $/Ft2 | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 91 | 22 20 315 019 | 230 E. Ill. | US Bank | Arbiser | 1217335611 | SPD | $26,000 | 903 | 1887 | 1SFB | $28.79 | Bank |
| 92 | 22 20 319 016 | 408 Lemont | Fairclough | Pima Prop. | 1236246611 | QCD | $120,000 | 864 | 1950 | 1SF | $138.89 | Related |
| 93 | 22 20 427 012 | 307 Cass | Pettik | Stanek | 1326247614 | WD | $320,000 | 1,964 | 1992 | 2SF | $162.93 | |
| 94 | 22 20 430 007 | 603 Porter | Boe | Boe | 1214642218 | WD | $50,000 | 794 | 1905 | 1SF | $62.97 | Related |
| 95 | 22 20 435 012 | 415 McCarthy | Old 2nd Bank | Old 2nd Bank | 1314104126 | WD | $0 | 704 | 1909 | 1SF | $0.00 | Related |
| 96 | 22 20 435 012 | 415 McCarthy | Old 2nd Bank | Ptaszynski | 1402201226 | SPD | $125,000 | 704 | 1909 | 1SF | $177.56 | Bank |
| 97 | 22 20 437 034 | 709 McCarthy | Cullinovic Tr | Pignone | 1332326270 | TRD | $185,000 | 1,240 | 1931 | 1SF | $149.19 | |
| 98 | 22 20 438 015 | 427 Grant | Schitz | Hannebry Est. | 1329526150 | EXD | $158,000 | 1,473 | 1930 | 1SF | $107.26 | |
| 99 | 22 20 440 004 | 409 Lemont | Michaelsen | Kissick Etal | 1432555574 | WD | $140,000 | 818 | 1927 | 1SF | $171.15 | |
| 100 | 22 20 441 005 | 500 Lochswski | Wells Fargo | Hennebry | 1209646145 | SPD | $120,000 | 1,052 | 1958 | 1SF | $114.07 | Bank |

Appendix IIa: Continued on Next Page.

Appendix IIa: Continued.

| Sale | Parcel No. | Address | Grantor | Grantee | Doc. No. | | | Sale Price | Size | Age | Style | $/Ft2 | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 101 | 22 20 441 016 | 522 Ldchswski | Plymtric Prop. | SMRT | 1321026047 | SPD | Jul-13 | $173,000 | 1,570 | 1950 | 1SB | $110.19 | Non Arms |
| 102 | 22 21 200 010 | 14679 Main | HUD | N13 Invest. | 1312246060 | WD | Apr-13 | $109,049 | 1,008 | 1956 | 1SB | $108.18 | Bank |
| 103 | 22 21 200 010 | 14679 Main | N13 Inv. | Balster | 1329646028 | WD | Oct-13 | $179,000 | 1,008 | 1956 | 1SB | $177.58 | Flip |
| 104 | 22 21 303 008 | 10 Mayfair | FNMA | Davalia | 1302401017 | WD | Jan-13 | $300,000 | 2,680 | 1994 | 1SB | $111.94 | Bank |
| 105 | 22 21 303 022 | 440 Wexford | VA | Baer | 1311212029 | QCD | Mar-13 | $297,239 | 2,833 | 1993 | 2SF | $104.92 | Bank |
| 106 | 22 21 303 024 | 460 Wexford | Butler | Klukas | 1207512027 | WD | Feb-12 | $312,000 | 2,111 | 1991 | 2SFB | $147.80 | |
| 107 | 22 21 303 026 | 480 Wexford | Christopher | Cerneckis | 1416435071 | WD | May-14 | $320,000 | 2,118 | 1993 | 2SFB | $151.09 | |
| 108 | 22 21 303 042 | 4 Lindsay | Cammiso | Blatzer | 1408542029 | WD | Feb-14 | $369,000 | 2,172 | 1993 | 1SF | $169.89 | |
| 109 | 22 21 303 022 | 5 Lenox | Kleeman | Hawrysz | 1429301100 | WD | Oct-14 | $343,000 | 2,111 | 1991 | 2SFB | $162.48 | |
| 110 | 22 21 305 034 | 490 Wheeler | O'Connell Tr. | Otterbacher | 1423035026 | WD | Jul-14 | $325,000 | 2,538 | 1991 | 2SFB | $128.05 | |
| 111 | 22 21 306 004 | 361 Wheeler | 1st Mdwst Bnk | Skendzel | 1217442010 | SPD | Jun-12 | $300,000 | 2,605 | 1993 | 2SFB | $115.16 | Bank |
| 112 | 22 21 307 020 | 5 Carley | Sytsma | Vasiliauskas | 1431142003 | LWD | Aug-14 | $785,000 | 4,229 | 2002 | 2SFB | $185.62 | |
| 113 | 22 21 308 017 | 321 Komray | Perma & Costa | Wojczak | 1334026078 | WD | Sep-13 | $450,000 | 3,175 | 1999 | 2SFB | $141.73 | |
| 114 | 22 21 311 001 | 1014 Stirrup | FNMA | Brazdeikis | 1329033190 | SPD | Sep-13 | $384,000 | 2,416 | 1997 | 2SFB | $158.94 | Bank |
| 115 | 22 21 311 002 | 433 4th | Marrero | Katalynas | 1410456030 | WD | Apr-14 | $470,000 | 3,261 | 2002 | 2SFB | $144.13 | |
| 116 | 22 21 401 010 | 11600 Center | Walker | Kellerman | 1305719068 | WD | Sep-12 | $365,000 | 2,140 | 1961 | 1SF | $170.56 | Log., LL |
| 117 | 22 21 408 005 | 1249 118 th | Rybach | Girdler | 1432349047 | WD | Nov-14 | $265,000 | 1,872 | 1971 | 1SPLFB | $141.56 | |
| 118 | 22 21 409 020 | 2 Misko | Schochat Tr | Miller | 1234926190 | TRD | Nov-12 | $390,000 | 2,804 | 1997 | 2SFB | $139.09 | |
| 119 | 22 21 412 010 | 1029 119th | Brown | Broockf. Relo | 1329637088 | WD | Aug-13 | $395,000 | 3,126 | 1993 | 2SFB | $126.36 | Relo |
| 120 | 22 21 414 002 | 486 Senon | Kopf Tr. | Purkey | 1407135022 | WD | Feb-14 | $360,000 | 2,261 | 1999 | 1SFB | $159.22 | |
| 121 | 22 27 100 025 | 14315 McCarthy | Manuel | Petch | 1334347017 | WD | Dec-13 | $265,000 | | 1958 | | | No Info |
| 122 | 22 27 207 012 | 12150 Oxford | Sexton | Radtke | 1426855007 | WD | Sep-14 | $595,000 | 2,720 | 2002 | 2SFB | $218.75 | |
| 123 | 22 27 302 039 | 12500 Derby | Pskocimas TR | Sienys | 1430710029 | WD | Aug-14 | $180,000 | 1,360 | 1956 | 1SF | $132.35 | |
| 124 | 22 27 401 021 | 13730 McCarthy | Antle | Szafarlski | 1402201011 | WD | Dec-13 | $375,000 | 2,629 | 1997 | 1SFB | $142.64 | |
| 125 | 22 27 401 031 | 13756 McCarthy | Reed | Giles | 1428735086 | WD | Oct-14 | $355,000 | 2,775 | 1991 | 1SB | $127.93 | LL |
| 126 | 22 27 406 002 | 39 Rffld Fthrs | Schaefer | Mircheva | 1432301027 | WD | Oct-14 | $549,137 | 2,935 | 1996 | 2SFB | $187.10 | |
| 127 | 22 27 407 003 | 77 Rffld Fthrs | Holloway | Ingolia | 1227246175 | WD | Sep-12 | $450,000 | 4,105 | 1999 | 2SB | $109.62 | |
| 128 | 22 28 100 013 | 1027 McCarthy | Nelson Tr. | Metzger | 1425810082 | TRD | Aug-14 | $130,000 | 1,326 | 1952 | 1.5SF | $98.04 | |
| 129 | 22 28 102 012 | 491 5th | O'Keefe | Knieza | 1323246074 | WD | Jul-13 | $290,000 | 1,514 | 1993 | 1.5FB | $191.55 | |
| 130 | 22 28 102 023 | 485 5th | Johnson Tr | Burn | 1320512089 | TRD | Jun-13 | $163,000 | 1,367 | 1954 | 1SF | $119.24 | Family |
| 131 | 22 28 104 002 | 520 McCarthy | HUD | Mrowca | 1225655017 | SPD | Aug-12 | $37,200 | 998 | 1950 | 1SF | $37.27 | Bank |
| 132 | 22 28 104 013 | 519 2nd | Diorio | Andrist | 1210155019 | WD | Mar-12 | $193,000 | 1,148 | 1988 | 1SPLF | $168.12 | |
| 133 | 22 28 104 051 | 560 4th | US Bank | Malcius | 1222019120 | SPD | Jul-12 | $43,500 | 1,308 | 1924 | 1SF | $33.26 | Bank |
| 134 | 22 28 104 107 | 600 4th | Meyer | Orozzo | 1317042027 | WD | May-13 | $174,000 | 996 | 1956 | 1SF | $174.70 | Shrt Sle |
| 135 | 22 28 104 119 | 1140 McCarthy | HUD | GS Prop. | 1326310078 | SPD | Aug-13 | $233,129 | 1,256 | 1981 | 1SPLFB | $185.61 | Bank |

Appendix IIa: Continued on Next Page.

Appendix IIa: Continued.

| Sale | Parcel No. | Address | Grantor | Grantee | | Doc. No. | Sale Date | Sale Price | Size | Age | Style | $/Ft2 | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 136 | 22 28 104 129 | 511 2nd | Johnson | Dedalow | WD | 1335701118 | Nov-13 | $125,000 | 976 | 1881 | 1SF | $128.07 | |
| 137 | 22 28 105 012 | 555 4th | Dauenheir Tr. | Ivanisevic | WD | 1414915416 | May-14 | $172,000 | 968 | 1978 | 1SF | $177.69 | |
| 138 | 22 28 105 042 | 509 4th | Bnk of Amer. | Boyle Enter. Inv | SPD | 1206626151 | Feb-12 | $81,000 | 1,337 | 1957 | 1SF | $60.58 | |
| 139 | 22 28 105 061 | 3 Country | Cealante Tr | Quimque | WD | 1220946180 | Jun-12 | $242,000 | 1,148 | 1990 | 2SFLFB | $210.80 | |
| 140 | 22 28 105 075 | 641 4th | PNC Bank | IH3 Prop. | SPD | 1403426456 | Jan-14 | $274,500 | 2,613 | 1999 | 2SB | $105.05 | Bank |
| 141 | 22 28 107 005 | 680 Tmszwski | Deardurff | Stojcevski | WD | 1306547125 | Mar-13 | $267,000 | 1,448 | 1988 | 2SFLFB | $184.39 | |
| 142 | 22 28 107 008 | 710 Tmszwski | FNMA | Blazavich | SPD | 1330204129 | Sep-13 | $250,000 | 2,134 | 1988 | 1SB | $117.15 | Bank |
| 143 | 22 28 107 013 | 760 Tmszwski | Reves | Kopec | WD | 1417855133 | Jun-14 | $368,000 | 1,607 | 1992 | 2SFLFB | $229.00 | |
| 144 | 22 28 107 020 | 731 Kruk | 1st. Mdwst Bnk | Taylor | TRD | 1216334133 | May-12 | $262,000 | 2,021 | 1981 | 1SFB | $129.64 | |
| 145 | 22 28 109 006 | 570 1st | Taylor Tr | Malak | TRD | 1321935123 | Jul-11 | $340,000 | 1,956 | 1991 | 1SB | $173.82 | |
| 146 | 22 28 111 005 | 1166 Country | Agape Invest. | Cody | WD | 1414704147 | May-14 | $330,000 | 1,336 | 1990 | 2SFLFB | $247.01 | |
| 147 | 22 28 203 015 | 12140 Hillcrest | Lux | McDonnell | WD | 1219142106 | Jun-12 | $240,000 | 1,800 | 1990 | 1SFB | $133.33 | 2 Parcels |
| 148 | 22 28 204 006 | 11995 Hillcrest | Saindon | Kiem | TRD | 1320304127 | Jun-13 | $300,000 | 2,130 | 1991 | 2SF | $140.85 | |
| 149 | 22 28 204 007 | 12045 Hillcrest | Olkiewicz | Zyzniewski | WD | 1211012168 | Apr-12 | $208,000 | 2,475 | 1976 | 1SB | $84.04 | |
| 150 | 22 28 204 020 | 12030 Center | Bell | Kallai | WD | 1208135152 | Feb-12 | $192,000 | 1,679 | 1959 | 1SB | $114.35 | |
| 151 | 22 28 205 013 | 12065 Center | Bevona Tr | Linder Ave. | ED | 1401035127 | Dec-13 | $120,000 | 1,408 | 1957 | 1SF | $85.23 | |
| 152 | 22 28 205 014 | 12095 Center | Southard | Dawson | WD | 1217035112 | Jun-12 | $258,000 | 1,598 | 1956 | 1SF | $161.45 | |
| 153 | 22 28 207 012 | 860 Kromray | Danya Est. | Jaskiewicz | CD | 1326355157 | Sep-13 | $276,500 | 1,700 | 1990 | 1SFB | $162.65 | |
| 154 | 22 28 209 010 | 841 Kromray | Randazzo | Szaflarski | WD | 1313046158 | May-13 | $340,000 | 1,555 | 1990 | SPLFB | $218.65 | |
| 155 | 22 28 209 019 | 1224 Pendleton | Phelan | Sanders | WD | 1226112113 | Aug-12 | $430,000 | 2,114 | 1993 | 2SFB | $203.41 | |
| 156 | 22 28 211 020 | 910 Woodcrest | Duraska Tr. | Pranskunas | TRD | 1412041106 | Apr-14 | $328,000 | 2,244 | 1992 | 2SFB | $141.71 | |
| 157 | 22 28 211 001 | 124 Janas | Colaizzi | Kapusta | WD | 1305349133 | Feb-13 | $324,000 | 2,303 | 1993 | 2SFB | $140.69 | |
| 158 | 22 28 211 004 | 891 Woodcrest | Van Koningaveld | Szynal | WD | 1333917101 | Nov-13 | $385,000 | 2,048 | 1990 | 1SFB | $187.99 | |
| 159 | 22 28 211 005 | 891 Woodcrest | Mitic | Eliadia | WD | 1410619134 | Mar-14 | $340,000 | 3,438 | 1990 | 2SB | $98.89 | |
| 160 | 22 28 214 018 | 4 Wild Oak | Old 2nd. Bank | Dzieman | SPD | 1415626103 | May-14 | $310,000 | 3,167 | 1996 | 2SB | $97.81 | Bank |
| 161 | 22 28 217 003 | 601 Crrige Rdg | Eggebert | Kogut | WD | 1335455108 | Dec-13 | $355,000 | 2,404 | 1995 | 2SFB | $147.67 | |
| 162 | 22 28 217 013 | 610 Crrige Rdg | Borzecki | Manolache | WD | 1327725146 | Sep-13 | $375,000 | 2,369 | 1996 | 1SB | $158.29 | |
| 163 | 22 28 302 003 | 105 Norwalk | Kozak Tr | Suwanda | TRD | 1430710142 | Oct-14 | $360,000 | 3,361 | 2000 | 1SB | $107.11 | |
| 164 | 22 28 302 006 | 1047 Norwalk | Phillips | Tumasonis | WD | 1432904104 | Nov-14 | $305,000 | 2,091 | 2002 | 2SFB | $145.86 | |
| 165 | 22 28 303 015 | 1056 Norwalk | Huckdeldt | Warchol | WD | 1422602121 | Jul-14 | $377,000 | 2,490 | 2000 | 2SF3 | $151.41 | |
| 166 | 22 28 305 012 | 6 Overton | Stndrd Bnk Tr | Hamernik | WD | 1223504158 | Aug-12 | $395,900 | 2,534 | 1997 | 2SFB | $156.24 | |
| 167 | 22 28 305 013 | 8 Overton | Stndrd Bnk Tr | Tommasi | TRD | 1325504126 | Aug-13 | $408,761 | 2,490 | 1997 | 2SFB | $164.16 | |
| 168 | 22 28 306 038 | 1156 Covington | Jud. Sales | Right Resid. | JD | 1306555103 | Aug-13 | $424,228 | 2,127 | 2002 | 2SFB | $105.42 | Bank |
| 169 | 22 28 306 038 | 1158 Covington | Right Resid. | Klislewski | WD | 1318601162 | May-13 | $331,400 | 2,127 | 2002 | 2SFB | $155.62 | Flip |
| 170 | 22 28 306 045 | 1176 Camelot | Lane | Budraitiene | WD | 1224141164 | Aug-12 | $335,000 | 2,200 | 1993 | 2SFB | $152.27 | |

Appendix IIa: Continued on Next Page.

Appendix IIa: Continued.

Case: 1:17-cv-05707 Document #: 106 Filed: 11/30/18 Page 252 of 346 PageID #:2575

| Sale | Parcel No. | Address | Grantor | Grantee | Date | | Doc. No. | Sale Price | Size | Age | Style | $/Ft2 | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 171 | 22 28 307 005 | 790 Kromray | Willner | Kowalczyk | Jun-12 | WD | 1216633042 | $220,000 | 1,450 | 1996 | SPLFB | $151.72 | Shrt Sle |
| 172 | 22 28 308 009 | 1226 Woburn | FNMA | Liako | Apr-14 | SPD | 1412833000 | $355,000 | 3,035 | 2006 | 2SFB | $116.97 | Bank |
| 173 | 22 28 308 017 | 1275 Pendleton | Kordowski | Husarik | Mar-13 | WD | 1309426286 | $370,000 | 3,035 | 2013 | 2SFB | $121.91 | |
| 174 | 22 28 310 023 | 1127 Berkley | Beranek | Sagotz | Jan-14 | WD | 1403404002 | $430,000 | 3,035 | 2005 | 2SFB | $141.68 | |
| 175 | 22 28 310 038 | 1278 Keough | Bernardy | Maitlink | Sep-12 | WD | 1226912030 | $394,000 | 3,321 | 2006 | 2SFB | $118.64 | |
| 176 | 22 28 312 001 | 1075 Norwalk | Pavlica | Swiercz | Feb-12 | WD | 1203904198 | $383,000 | 2,581 | 2000 | 1SFB | $148.39 | |
| 177 | 22 28 314 002 | 1266 Chatham | Horbach | Chau | May-12 | WD | 1216545012 | $397,500 | 3,381 | 2002 | 2SFB | $117.57 | |
| 178 | 22 28 407 007 | 1288 Drawbridge | Costello | Mietus | Feb-13 | WD | 1304556061 | $455,000 | 2,955 | 1994 | 2SFB | $153.98 | |
| 179 | 22 28 408 003 | 1236 Camelot | Valaitis Tr | Deuschle | Jun-13 | TRD | 1317116013 | $392,000 | 3,048 | 1996 | 1SB | $128.61 | |
| 180 | 22 28 408 007 | 1252 Camelot | Krzeczkowski | Kamradt | Jun-12 | WD | 1218119089 | $370,000 | 3,409 | 1996 | 2SFB | $108.54 | |
| 181 | 22 28 408 013 | 1231 Abbey Oaks | Casey | Dixon | May-13 | WD | 1315501082 | $440,000 | 3,048 | 1997 | 2SB | $144.36 | |
| 182 | 22 28 409 010 | 1233 Camelot | Fitzgerald | Anderson | Aug-13 | WD | 1325541110 | $340,000 | 2,120 | 1996 | 1SB | $160.38 | |
| 183 | 22 28 410 014 | 1180 Covington | Pierce | Lempa | Jul-14 | WD | 1421612011 | $355,000 | 1,896 | 2002 | 1SB | $187.24 | |
| 184 | 22 28 410 025 | 1340 St. Vin. | Ramos | Fabiano | May-13 | WD | 1316501062 | $410,000 | 3,381 | 2002 | 2SFB | $121.27 | Shrt Sle |
| 185 | 22 28 411 003 | 1388 St. Vin. | Muersch | O'Brien Tr. | Apr-14 | WD | 1410446052 | $427,500 | 3,367 | 1994 | 2SB | $126.97 | |
| 186 | 22 28 411 019 | 1125 St. Brend. | FNMA | Smith | Jan-13 | SPD | 1304235091 | $373,000 | 3,230 | 1996 | 1SB | $115.48 | Bank |
| 187 | 22 28 411 039 | 1216 Pleasant | McKevitt Ex. | Rhone | Feb-12 | EXD | 1205504112 | $419,000 | 2,938 | 1997 | 2SB | $142.61 | |
| 188 | 22 28 412 017 | 1380 Notre Dame | Baldwin | Antczak | Feb-14 | WD | 1406435045 | $485,000 | 3,297 | 2002 | 2SFB | $147.10 | |
| 189 | 22 28 413 004 | 1385 St. Vin. | McAndrews | Millerck | Oct-14 | WD | 1432104042 | $490,000 | 3,268 | 1997 | 2SB | $149.94 | |
| 190 | 22 28 415 012 | 1236 Auburn | Jaskiewicz | Blinstrubaite | Sep-13 | WD | 1327741072 | $402,500 | 1,922 | 2009 | 1SB | $209.42 | |
| 191 | 22 28 415 024 | 4 Auburn | Stndrd Bnk Tr | Wrublik | Mar-12 | TRD | 1208133024 | $395,000 | 2,637 | 2011 | 2SFB | $149.79 | |
| 192 | 22 28 415 027 | 1221 Monmouth | Bartkowicz | Valentino | Jun-14 | WD | 1419204056 | $372,000 | 2,535 | 2002 | 2SFB | $146.75 | |
| 193 | 22 28 416 002 | 1293 Drover | Koziel | Trench | Aug-12 | WD | 1226541105 | $393,000 | 3,381 | 2002 | 2SFB | $116.83 | |
| 194 | 22 28 416 017 | 1273 Drover | Ulanski | Klisiewicz | Nov-14 | WD | 1432110002 | $385,000 | 2,535 | 2006 | 2SFB | $151.87 | |
| 195 | 22 28 417 002 | 1297 Woburn | Krakar | Scaletta | Aug-13 | WD | 1323941114 | $395,000 | 3,381 | 2006 | 2SFB | $116.83 | |
| 196 | 22 28 417 015 | 1257 Woburn | Benoit | Leonard | Jul-13 | WD | 1322135247 | $423,500 | 3,034 | 2006 | 2SFB | $139.58 | |
| 197 | 22 29 200 008 | 207 E. Custer | Franks etal | Zeman | Aug-12 | WD | 1222742060 | $107,900 | 1,200 | 1887 | 1SF | $89.92 | |
| 198 | 22 29 202 038 | 613 Walnut | JP Morgan | AWP Invest. | Dec-12 | SPD | 1300846093 | $79,000 | 1,871 | 1880 | 2SF | $42.22 | Bank |
| 199 | 22 29 204 001 | 543 Czacki | TCF Bank | Sokolis | Jan-14 | SPD | 1403812041 | $135,000 | 960 | 1951 | 1SF | $140.63 | Bank |
| 200 | 22 29 204 009 | 610 Czacki | Paskauskas | Paskauskas | Oct-13 | WD | 1331826040 | $170,000 | 864 | 1974 | 1SF | $196.76 | Family |
| 201 | 22 29 209 010 | 540 McCarthy | Winke | Camedo LLC | Mar-12 | WD | 1208619148 | $100,000 | 1,200 | 1888 | 2SF | $83.33 | |
| 202 | 22 29 210 007 | 801 Sobieski | Koski Est. | Smallwood | Jul-13 | EXD | 1322641182 | $188,600 | 1,603 | 1966 | 1SFB | $117.65 | |
| 203 | 22 29 213 031 | 619 McCarthy | Valdes Tr | Makuch | Oct-14 | GD | 1431842030 | $185,000 | 1,072 | 1987 | 1SF | $172.57 | |
| 204 | 22 29 213 032 | 606 Houston | Heartland Bnk | Tonia | Oct-12 | GD | 1228326074 | $192,000 | 1,279 | 1967 | 1SB | $150.12 | |
| 205 | 22 29 213 033 | 608 Houston | Mierzwa | McCusker | Aug-14 | WD | 1427301017 | $239,000 | 1,234 | 1979 | SPLFB | $193.68 | Divorce |

Appendix IIa: Continued on Next Page.

Appendix IIa: Continued.

| Sale | Parcel No. | Address | Grantor | Grantee | | Doc. No. | Sale Price | Size | Age | Style | $/Ft2 | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 206 | 22 29 214 017 | 607 Houston | Dikselis | Lellos | WD | 1210855C50 | $259,000 | 1,395 | 2002 | SPLFB | $185.66 | |
| 207 | 22 29 215 019 | 705 State | FHLM | Olkiewicz | SPD | 1208635C13 | $47,000 | 1,330 | 1950 | 1SF | $35.34 | Bank |
| 208 | 22 29 216 002 | 304 Logan | Baltzer Tr | McLaughlan | WD | 1406655C43 | $267,000 | 1,768 | 1992 | 2SF | $151.02 | |
| 209 | 22 29 217 010 | 722 Hickory | FNMA | Romo | SPD | 1324233124 | $119,500 | 1,263 | 1894 | 1.5SF | $94.62 | Bank |
| 210 | 22 29 218 001 | 320 E. Logan | Hoover | Swatec | WD | 1331001185 | $130,000 | 918 | 1959 | SPLFB | $141.61 | Short |
| 211 | 22 29 218 019 | 714 East | Jud. Sales | Krajewska | JD | 1330116101 | $34,000 | 768 | 1894 | 1SF | $44.27 | Bank |
| 212 | 22 29 218 022 | 720 East | Horbach | Korozaewnski | SPD | 1429316C23 | $266,000 | 1,187 | 1988 | 1SF | $225.78 | |
| 213 | 22 29 218 002 | 720 East | Stephens | Horbach | WD | 1216046170 | $220,000 | 1,187 | 1988 | 1SF | $185.34 | |
| 214 | 22 29 219 003 | 402 E. Logan | Madsen | Wong | WD | 1218119C18 | $32,000 | 1,176 | 1892 | 1SF | $27.21 | Shrt Sle |
| 215 | 22 29 219 011 | 723 East | Hanley | Zlatic | WD | 1205446C94 | $288,000 | 1,647 | 1993 | 2SF | $174.86 | |
| 216 | 22 29 220 011 | 733 Czacki | Condron | Heeg | WD | 1423810C22 | $230,000 | 2,357 | 1997 | 2SF | $97.58 | |
| 217 | 22 29 220 015 | 710 Lowchwski | Sandoval | Daley | WD | 1208312C63 | $211,000 | 1,431 | 1884 | 1SF | $147.45 | |
| 218 | 22 29 225 006 | 212 Short | Alley | Stop Prop. | WD | 1303957C33 | $182,000 | 1,139 | 1988 | 1SF | $159.79 | |
| 219 | 22 29 225 006 | 212 Short | HSBC Bank USA | Alley | SPD | 1217418C13 | $133,000 | 1,139 | 1988 | 1SF | $116.77 | Bank |
| 220 | 22 29 225 008 | 216 Short | Greene | Jimenez Inv. | SPD | 1214541C45 | $47,000 | 1,372 | 1886 | 2SF | $34.21 | Bank |
| 221 | 22 29 225 008 | 216 Short | HUD | Greene | WD | 1214541C44 | $28,000 | 1,372 | 1886 | 2SF | $20.41 | Fore. |
| 222 | 22 29 227 037 | 301 Freehauf | Cstietwn Hms. | Huerta | SPD | 1430135C35 | $350,000 | 1,967 | 2014 | 2SF | $177.94 | New House |
| 223 | 22 29 228 009 | 315 Lintz | Mellon Bank | Bacius | SPD | 1328156C23 | $282,000 | 2,783 | 1992 | 2SFB | $101.13 | Bank |
| 224 | 22 29 229 004 | 306 Lintz | Prairie Real | Clancy | WD | 1335126C87 | $72,000 | 2,078 | 2014 | 2SFB | $34.65 | |
| 225 | 22 29 232 004 | 902 Hillview | Elgin & Hism | Koller | WD | 1322446C23 | $250,000 | 2,103 | 1978 | 2SFB | $118.88 | |
| 226 | 22 29 232 021 | 324 Lintz | Williams | Carey | WS | 1416149C45 | $345,000 | 2,470 | 1996 | 2SF | $139.68 | |
| 227 | 22 29 233 019 | 919 Hilltop | Ahlberg | Stoops | SP | 1229201181 | $260,000 | 1,617 | 1978 | SPLF | $160.79 | |
| 228 | 22 29 233 025 | 419 Freehauf | Stukel | Nicholas | WD | 1420310C58 | $272,500 | 1,305 | 1978 | SPLFB | $208.81 | |
| 229 | 22 29 233 033 | 424 Schultz | Himes | Jennings | WD | 1401626C97 | $350,000 | 2,980 | 1986 | 2SF | $117.45 | |
| 230 | 22 29 234 012 | 529 Keepataw | Biomgren | Styrczula | WD | 1416104C53 | $250,000 | 1,385 | 1984 | 1SB | $180.51 | |
| 231 | 22 29 235 008 | 811 Houston | Milekowski | Viscum | WD | 1219246C01 | $130,000 | 992 | 1957 | 1SF | $131.05 | |
| 232 | 22 29 236 008 | 800 Houston | Miller Tr | Pragvdik | TRD | 1305833C73 | $215,000 | 1,320 | 1978 | SPLFB | $162.88 | |
| 233 | 22 29 404 002 | 1028 Cherokee | Stasiulis Tr. | Taylor | TRD | 1320501C57 | $130,000 | 992 | 1957 | 1SF | $131.05 | |
| 234 | 22 29 404 002 | 1028 Cherokee | Taylor | Taylor | WD | 1426835C25 | $130,000 | 992 | 1957 | 1SF | $131.05 | Related |
| 235 | 22 29 405 007 | 1026 Kim | Moodies | Bosley | WD | 1305715C25 | $172,000 | 920 | 1958 | 1SF | $186.96 | |
| 236 | 22 29 405 017 | 308 Rosehill | Uher | Kolowski | WD | 1322141C95 | $255,000 | 1,693 | 1973 | SPLFB | $150.62 | |
| 237 | 22 29 406 002 | 1105 Cherokee | Smith | Krol | WD | 1304517C47 | $186,000 | 925 | 1959 | 1SF | $201.08 | |
| 238 | 22 29 406 007 | 298 Keepataw | Horner Tr | Cammiso | WD | 1321826C29 | $151,500 | 920 | 1958 | 1SF | $164.67 | |
| 239 | 22 29 406 011 | 1110 Kim | Pajewski | Murphy | WD | 1320735C13 | $158,000 | 925 | 1959 | 1SF | $170.81 | |
| 240 | 22 29 407 015 | 1021 Kim | Broniec | Ulanski Tr | WD | 1433033C32 | $242,000 | 1,067 | 1973 | SPLFB | $226.80 | |

Appendix IIa: Continued on Next Page.

Appendix IIa: Continued.

| Sale | Parcel No. | Address | Grantor | Grantee | Doc. No. | | Sale Price | Size | Age | Style | $/Ft2 | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 241 | 22 29 407 016 | 1019 Kim | Glembin Tr | Donegan | 1402326017 | WD | Dec-13 | $200,000 | 1,067 | 1973 | SPLFB | $187.44 | |
| 242 | 22 29 409 010 | 1015 Kip | Jud. Sales | 2005 Scav. | 1220040047 | SPD | Apr-12 | $90,000 | 1,040 | 1973 | SPLF | $86.54 | Bank |
| 243 | 22 29 409 011 | 1013 Kip | Durham TR | Leitrich | 1215933093 | TRD | May-12 | $162,000 | 1,049 | 1972 | SPLF | $154.43 | |
| 244 | 22 29 409 013 | 329 Rosehill | Gonsicrowski | Pitts | 1330504047 | WD | Oct-13 | $260,000 | 1,434 | 1974 | 1SF | $181.31 | |
| 245 | 22 29 410 006 | 1113 Kip | Galligani | Lalas | 1314246018 | WD | May-13 | $200,000 | 1,008 | 1959 | 1SF | $198.41 | |
| 246 | 22 29 411 007 | 1028 Hillview | Cavanaugh Tr. | Cavanaugh | 1411242004 | WD | Apr-14 | $200,000 | 1,307 | 1967 | SPLF | $153.02 | Related |
| 247 | 22 29 412 010 | 1112 Hillview | Peebles Est. | Purdue | 1327535072 | EXD | Aug-13 | $220,000 | 1,180 | 1966 | 1SFB | $186.44 | |
| 248 | 22 29 412 007 | 1106 Hillview | Chicago Tr | Uza | 1404112049 | TRD | Jan-14 | $156,000 | 1,169 | 1966 | SPLF | $133.45 | |
| 249 | 22 29 412 017 | 1138 Hillview | Anderson | Kwiatkowski | 1325501066 | WD | Aug-13 | $249,000 | 1,240 | 1969 | SPLFB | $200.81 | |
| 250 | 22 29 413 010 | 1035 Hillview | McClafferty | Polino | 1207534060 | WD | Feb-12 | $125,000 | 1,080 | 1964 | 1SFB | $115.74 | |
| 251 | 22 29 414 002 | 1029 Crestview | Ruzga | Ksiazek | 1222141003 | WD | Jul-12 | $174,000 | 1,154 | 1966 | SPLFB | $150.78 | |
| 252 | 22 29 414 017 | 506 Keeptaw | Soprych | Kurab | 1310233004 | WD | Mar-13 | $240,000 | 2,183 | 1978 | 2SFB | $109.94 | |
| 253 | 22 29 414 041 | 1017 Crestview | Morrison | Koopman | 1428133022 | WD | Sep-14 | $327,000 | 2,918 | 1986 | SPLFB | $112.06 | |
| 254 | 22 29 414 048 | 1027 Forest | Jacobsen Tr | Kazlauciunas | 1222749001 | TRD | Mar-12 | $265,000 | 2,652 | 1981 | 2SF | $99.92 | |
| 255 | 22 29 416 063 | 1147 Glens | Tully | White | 1415046012 | WD | May-14 | $335,000 | 2,307 | 1986 | 2SFB | $145.21 | |
| 256 | 22 29 417 001 | 404 Glenys | Baltudis | IH2 Prop. | 1319746012 | WD | Jul-13 | $220,000 | 1,461 | 1970 | SPLFB | $150.58 | |
| 257 | 22 29 419 024 | 1137 Gillian | Terwee | Duncan Tr | 1320546112 | WD | Jul-13 | $219,000 | 1,486 | 1987 | SPLFB | $147.38 | |
| 258 | 22 29 422 012 | 1143 Alpine | Dombrowski | Mikalauskas | 1314435045 | WD | May-13 | $240,000 | 1,382 | 1981 | SPLF | $173.66 | Shrt Sle |
| 259 | 22 29 423 010 | 408 Sara | Machowski | Jurinek | 1331133040 | WD | Nov-13 | $228,500 | 1,121 | 1986 | SPLFB | $203.84 | |
| 260 | 22 29 423 015 | 414 Sara | Klotz Tr. | Buti | 1224412110 | TRD | Aug-12 | $290,000 | 1,940 | 1982 | 1SFB | $149.48 | Related |
| 261 | 22 29 423 017 | 1152 Glenys | Pawlowski | Janosik | 1205504159 | WD | Feb-12 | $235,000 | 2,080 | 1990 | 1SFB | $112.98 | |
| 262 | 22 31 103 004 | 16499 Harvest | Tyrrell | White | 1324701029 | WD | Jul-13 | $435,500 | 3,056 | 2002 | 2SFB | $142.51 | |
| 263 | 22 31 103 006 | 16471 Harvest | Cantarino | Molis | 1322704000 | WD | Jun-13 | $441,500 | 2,773 | 1999 | 2SFB | $159.21 | |
| 264 | 22 31 103 007 | 16457 Harvest | Stutz | Callahan | 1308417023 | WD | Sep-12 | $395,000 | 2,715 | 1999 | 2SFB | $145.49 | |
| 265 | 22 31 103 002 | 16443 Harvest | Raila | Freeman | 1224311065 | WD | Aug-12 | $420,000 | 2,773 | 1999 | 2SFB | $151.46 | |
| 266 | 22 31 103 015 | 16480 Christopher | Chicago Ttl | Stark | 1335733080 | TRD | Dec-13 | $489,000 | 2,507 | 2013 | 1SB | $195.05 | New House |
| 267 | 22 31 106 002 | 13066 Sunrise | Ruffolo | Satiropoulos | 1322741065 | WD | Jul-13 | $407,500 | 2,775 | 2002 | 2SFB | $146.85 | |
| 268 | 22 31 106 018 | 12995 Fairway | Berger Tr | Patrick | 1317901031 | WD | Jun-13 | $330,000 | 2,554 | 1999 | 2SFB | $129.21 | |
| 269 | 22 31 106 020 | 13023 Fairway | Ratajczak | Farrell | 1328447041 | WD | Oct-13 | $400,000 | 2,641 | 1999 | 2SFB | $151.46 | |
| 270 | 22 31 107 015 | 12955 Sunrise | Stott | Maders | 1226335058 | WD | Sep-12 | $435,000 | 3,969 | 1999 | 2SFB | $109.60 | |
| 271 | 22 31 108 002 | 12985 Blue Grass | Hardy | Rosenberger | 1220155056 | WD | Jun-12 | $390,000 | 3,377 | 2002 | 2SFB | $115.49 | |
| 272 | 22 31 108 002 | 12985 Blue Grass | Rosenberger | Keleritas | 1319655010 | WD | Jun-13 | $405,000 | 3,377 | 2002 | 2SFB | $119.93 | Exc. Opt. |
| 273 | 22 31 109 006 | 16570 Willow | Chicago Tr | McGrady | 1329442093 | TRD | Sep-13 | $484,874 | 3,955 | 2013 | 2SFB | $122.60 | New House |
| 274 | 22 31 109 007 | 16550 Willow | Quesnel | Chicago Tr. | 1414733044 | TRD | May-14 | $490,700 | 3,976 | 2014 | 2SFB | $123.42 | New House |
| 275 | 22 31 109 008 | 16530 Willow | Chicago Ttl | Cohn | 1427610067 | TRD | Sep-14 | $489,000 | 3,287 | 2014 | 2SFB | $148.77 | New House |

Appendix IIa: Continued on Next Page.

Appendix IIa: Continued.

| Sale | Parcel No. | Address | Grantor | Grantee | Doc. No. | | Date | Sale Price | Size | Age | Style | $/Ft2 | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 276 | 22 31 110 012 | 16414 Willow | Chicago Ttl | Wolf | 1334641056 | TRD | Nov-13 | $450,000 | 3,603 | 2013 | 2SFB | $124.90 | New House |
| 277 | 22 31 112 001 | 16727 W. Pasture | Bee. Dill Hms | Mrqte. Bnk | 1420935001 | DT | Jul-14 | $588,838 | 3,296 | 2014 | 2SFB | $178.65 | New House |
| 278 | 22 31 112 004 | 16685 Pasture | Bee. Dill Hms | Stock | 1405647027 | WD | Feb-14 | $449,910 | 3,308 | 2014 | 2SFB | $136.01 | New House |
| 279 | 22 31 113 005 | 16670 Pasture | Cstletwn Hms | Lorenz | 1224411072 | WD | Aug-12 | $640,000 | | 2015 | | | No Info. |
| 280 | 22 31 203 001 | 13099 Klappa | Cstletwn Hms | Leyden | 1430704034 | WD | Sep-14 | $445,000 | 3,640 | 2014 | 2SFB | $122.25 | New House |
| 281 | 22 31 205 002 | 13073 Klappa | Natlstar. Mott. | Dublino | 1428735184 | SPD | Aug-14 | $532,350 | 3,428 | 2002 | 2SFB | $155.29 | Bank |
| 282 | 22 31 205 008 | 16932 Stny Brook | Coffman Tr | Schaldecker | 1329141.58 | TRD | Sep-13 | $620,000 | 3,594 | 2005 | 2SFB | $172.51 | |
| 283 | 22 31 206 002 | 12977 Klappa | Cstletwn Hms | Moran | 1430233050 | WD | Apr-14 | $509,000 | 4,148 | 2014 | 2SFB | $122.71 | New House |
| 284 | 22 31 206 003 | 12961 Klappa | FNMA | Wajda | 1218011125 | SPD | Jun-12 | $448,000 | 4,043 | 2002 | 2SB | $110.81 | Bank |
| 285 | 22 31 206 008 | 12881 Kapp | Grob | Briski | 1311912.01 | WD | Apr-13 | $442,000 | 3,532 | 2002 | 2SFB | $125.14 | |
| 286 | 22 31 206 020 | 12992 S. Mayfair | Cntryside Bnk | Jovanivich | 1330241053 | TRD | Oct-13 | $433,880 | 3,393 | 2011 | 2SFB | $127.88 | |
| 287 | 22 31 207 001 | 12991 Mayfair | Meyer | Pazdan | 1212218n22 | WD | Mar-12 | $360,000 | 2,382 | 2005 | 1SB | $151.13 | |
| 288 | 22 31 207 006 | 12891 Mayfair | Morgan Chase | Woolfe | 1208041.41 | SPD | Mar-12 | $300,000 | 3,052 | 2005 | 1SB | $98.30 | Bank |
| 289 | 22 31 207 012 | 12751 Mayfair | Cntryside Bnk | Charca | 1319601n60 | TRD | Jan-13 | $439,000 | 3,166 | 2011 | 2SFB | $138.66 | |
| 290 | 22 31 304 005 | 4 Vlly View | Hartle | Leatherman | 1211012.58 | WD | Apr-12 | $298,500 | 2,837 | 1988 | 2SFB | $105.22 | |
| 291 | 22 31 307 003 | 23 Longwood | Chicago Ttl | Herout | 1424157.79 | TRD | Aug-14 | $557,500 | 4,813 | 1996 | 2SFB | $115.83 | |
| 292 | 22 31 402 020 | 16119 135th | Wendasek | Carlson | 1224442.37 | WD | Aug-12 | $164,000 | 1,385 | 1965 | 1SB | $118.41 | |
| 293 | 22 31 402 022 | 16103 135th | Pytlewski Tr. | Guzy | 1428101053 | TRD | Sep-14 | $150,000 | 1,427 | 1956 | 1SF | $105.12 | |
| 294 | 22 32 103 010 | 1314 Leinster | Doeberl Tr. | Darovic | 1411242007 | TRD | Apr-14 | $345,500 | 2,894 | 1986 | 2SF | $119.38 | |
| 295 | 22 32 103 023 | 1279 Acron | Hadlock | Lyons | 1315533n75 | WD | Apr-13 | $497,000 | 3,244 | 1991 | 2SFB | $153.21 | |
| 296 | 22 32 108 005 | 182 Munster | Carvell | Bruzzino | 1307956n05 | WD | Feb-13 | $275,000 | 3,497 | 1982 | 2SFB | $78.64 | |
| 297 | 22 32 109 004 | 1216 Leinster | US Bank | Mautukas | 1207912.04 | SPD | Feb-12 | $374,000 | 3,818 | 1993 | 2SFB | $97.96 | Bank |
| 298 | 22 32 114 006 | 1269 Eagle Crest | Moravek | Petri | 1220033183 | WD | Jul-12 | $390,000 | 2,748 | 1991 | 2SB | $141.92 | |
| 299 | 22 32 115 003 | 32 Deer | Chicago Ttl | Klass | 1403801119 | TRD | Jan-14 | $417,000 | 3,570 | 1991 | 2SFB | $116.81 | |
| 300 | 22 32 117 020 | 1230 Arbor | Mrqtt Bnk TR | Morawa | 1413446176 | TRD | May-14 | $385,000 | 3,072 | 1997 | 2SFB | $125.33 | |
| 301 | 22 32 203 019 | 15529 129th | Laughlin | Koziol | 1415626197 | TRD | May-14 | $250,000 | 1,315 | 1979 | SPLF | $190.11 | |
| 302 | 22 32 203 018 | 15530 129th | Townsend | Licata | 1218546n64 | WD | Jun-12 | $190,000 | 1,766 | 1958 | 2SF | $107.59 | |
| 303 | 22 32 203 018 | 15344 129th | REO OWB | Zahradnicek | 1208847011 | SPD | Mar-12 | $113,000 | 1,384 | 1958 | 1SF | $81.65 | Bank |
| 304 | 22 32 208 005 | 15357 130th | Jud. Sales | ROG Fund 1 | 1206039.52 | SPD | Sep-12 | $121,400 | 2,809 | 1993 | 2SFB | $121.40 | Bank |
| 305 | 22 32 303 003 | 20 Emily | FNMA | Cesevicione | 1411235.07 | SPD | Apr-14 | $340,000 | 2,218 | 1990 | 1SFB | $153.23 | Bank |
| 306 | 22 32 303 019 | 15344 W. 129th | QWB REO | Zahradnicek | 1208847011 | SPD | Mar-12 | $113,000 | 1,384 | 1958 | 1SF | $81.65 | Bank |
| 307 | 22 32 306 001 | 1327 Acorn | Mrqtt Bnk TR | Zernika | 1427634l31 | WD | Sep-14 | $625,000 | 4,884 | 2003 | 2SB | $127.97 | |
| 308 | 22 32 306 005 | 1343 Acorn | Jud. Sales | Cirrus Inv. | 1421116l60 | SPD | Jul-14 | $416,300 | 4,929 | 2005 | 2SB | $84.44 | Bank |
| 309 | 22 32 307 001 | 1336 Cypress | Cullen Tr | Perri | 1225516l42 | WD | Aug-12 | $595,000 | 3,818 | 2005 | 2SB | $155.84 | |
| 310 | 22 32 307 003 | 1336 Cypress | Leyden | Lepont Tr | 1405350l7 | WD | Jan-4 | $512,500 | 3,290 | 2002 | 2SB | $155.78 | |

Appendix IIa: Continued on Next Page.

Appendix IIa: Continued.

| Sale | Parcel No. | Address | Grantor | Grantee | Doc. No. | | Sale Price | Size | Age | Style | $/Ft2 | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 311 | 22 32 400 008 | 13302 Archer | Edmiston | Rohrer | 1212842000 | WD | Apr-12 | $265,000 | 2,015 | 1986 | 1SF | $131.51 | LL |
| 312 | 22 32 400 021 | 7 Katie | Stako LLC | Budz | 1223450032 | WD | Aug-12 | $262,500 | 2,473 | 1988 | 2SFB | $106.15 | |
| 313 | 22 33 103 013 | 12926 Archer | Hundal | Suchmiel | 1403841015 | WD | Jan-14 | $410,000 | 2,207 | 1974 | 1SB | $185.77 | LL |
| 314 | 22 33 109 001 | 1401 Chestnut | Claes | Kappas | 1415626015 | WD | May-14 | $441,500 | 3,368 | 1999 | 2SFB | $131.09 | |
| 315 | 22 33 112 008 | 15139 Newberry | Messer | Jurgilene | 1417526013 | WD | Jun-14 | $520,000 | 3,275 | 1996 | 2SB | $158.78 | |
| 316 | 22 33 112 015 | 15104 Orchard | Smith | Cagney | 1315548014 | WD | Apr-13 | $446,750 | 3,338 | 1999 | 2SB | $133.84 | |
| 317 | 22 33 113 001 | 14896 Ashford | Scanlan | Kijaic | 13178460967 | WD | May-13 | $320,000 | 2,245 | 1997 | 1SFB | $142.54 | |
| 318 | 22 33 113 024 | 14758 Ashford | Griffin | Putt | 1307333055 | WD | Mar-13 | $335,000 | 2,687 | 1997 | 2SFB | $124.67 | |
| 319 | 22 33 114 013 | 14795 Ashford | PNC Bank | Miravinskaite | 1316455068 | SPD | May-13 | $361,000 | 2,992 | 1999 | 2SFB | $120.66 | Bank |
| 320 | 22 33 116 001 | 1349 Krystyna | Cstletwn Hms. | Plahm | 1401433022 | WD | Dec-13 | $533,000 | 3,434 | 2013 | 2SFB | $155.21 | New House |
| 321 | 22 33 116 002 | 1338 Krystyna | Cstletwn Hms. | Vysniauskas | 1418835006 | WD | Apr-14 | $535,000 | 2,972 | 2014 | 2SFB | $180.01 | New House |
| 322 | 22 33 116 004 | 1322 Krystyna | Cstletwn Hms. | Bacigalupo | 1300326082 | WD | Nov-12 | $479,000 | 3,264 | 2011 | 2SFB | $146.75 | |
| 323 | 22 33 116 005 | 1314 Krystyna | Cstletwn Hms. | Molnar | 1403501070 | WD | Jan-14 | $461,000 | 3,095 | 2014 | 2SFB | $148.95 | New House |
| 324 | 22 33 116 006 | 1306 Krystyna | Cstletwn Hms. | Zogby | 1417126032 | WD | May-14 | $468,226 | 3,163 | 2014 | 2SFB | $148.03 | New House |
| 325 | 22 33 116 007 | 1300 Krystyna | Cstletwn Hms. | Stiles | 1317104000 | WD | May-13 | $450,000 | 3,074 | 2011 | 2SFB | $146.39 | |
| 326 | 22 33 116 008 | 1307 Krystyna | Cstletwn Hms. | Michals | 1319301076 | WD | Apr-13 | $498,000 | 3,264 | 2011 | 2SFB | $152.57 | |
| 327 | 22 33 116 009 | 1315 Krystyna | Cstletwn Hms. | Wagner | 1320501088 | WD | May-13 | $485,000 | 2,450 | 2011 | 2SFB | $197.96 | Mdl Hse |
| 328 | 22 33 116 012 | 1312 Krystyna | Cstletwn Hms. | Pensinger | 1227933015 | WD | Sep-12 | $452,750 | 3,121 | 2011 | 2SFB | $145.07 | |
| 329 | 22 33 116 013 | 1304 Krystyna | Cstletwn Hms. | Nelson | 1305026007 | WD | Feb-13 | $515,000 | 3,343 | 2011 | 2SFB | $154.05 | New Home |
| 330 | 22 33 117 001 | 1303 Krystyna | Cstletwn Hms. | Swendsen | 1319142000 | WD | Jun-13 | $459,000 | 3,096 | 2011 | 2SFB | $148.26 | |
| 331 | 22 33 117 002 | 1311 Krystyna | Cstletwn Hms. | Holub | 1301401040 | WD | Nov-12 | $615,000 | 3,769 | 2011 | 2SFB | $163.17 | New Home |
| 332 | 22 33 117 003 | 1319 Krystyna | Cstletwn Hms. | Gronchocinski | 1332325061 | WD | Nov-13 | $531,000 | 3,025 | 2013 | 2SFB | $175.54 | New Home |
| 333 | 22 33 117 004 | 1327 Krystyna | Cstletwn Hms. | Drillinga | 1431433003 | WD | Oct-14 | $515,000 | 2,963 | 2014 | 2SFB | $173.81 | New Home |
| 334 | 22 33 117 005 | 1149 128th | Cstletwn Hms. | Burns | 1318012055 | WD | Apr-13 | $450,000 | 3,227 | 2011 | 2SFB | $139.45 | |
| 335 | 22 33 118 002 | 1158 128th | Cstletwn Hms. | Walczak | 1320635052 | WD | Jun-13 | $529,400 | 3,769 | 2011 | 2SFB | $140.46 | |
| 336 | 22 33 118 003 | 1166 128th | Cstletwn Hms. | Hensley | 1321312027 | WD | May-13 | $585,600 | 3,695 | 2011 | 2SFB | $158.48 | |
| 337 | 22 33 118 006 | 1339 Krystyna | Cstletwn Hms. | Beranek | 1402801002 | WD | Oct-13 | $588,200 | 4,201 | 2013 | 2SFB | $140.01 | New House |
| 338 | 22 33 118 010 | 1190 128th | Cstletwn Hms. | DeMent | 1418112005 | WD | Apr-14 | $499,000 | 3,296 | 2014 | 2SFB | $151.40 | New House |
| 339 | 22 33 203 011 | 14571 131 St | Lawson Tr. | Granner | 1305135032 | WD | Feb-13 | $475,000 | 1,590 | 1948 | 1SB | $298.74 | LL |
| 340 | 22 33 404 014 | 14790 Hickory | Melrose Hldng | Antolak | 1220504045 | SPD | Jul-12 | $180,000 | 2,202 | 1954 | 1SF | $81.74 | Bank, LL |
| | | | | | | | | | 1983 | | | $139.55 | |

Appendix IIb: Arm's Length Sales, Lemont, Illinois.

| Sale | Parcel No. | Sale Date | Sale Price | Size | Age | Style | Bath | FP | Gar. | Bsmt/Fin | $/Ft$^2$ |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Target: | | | | | | | | | | | |
| 1 | 22 20 317 002 | 6/28/12 | $200,000 | 1,537 | 1911 | 2SF | 1 | 0 | 2 | Full/Unf. | $130.12 |
| 2 | 22 29 314 008 | 7/12/12 | $125,000 | 1,358 | 1948 | 1SF | 1 | 1 | 1 | Full/Rec | $92.05 |
| 3 | 22 29 100 023 | 6/10/14 | $262,500 | 1,680 | 1970 | 1SB | 2.5 | 1 | 2 | Full/Rec. | $156.25 |
| 4 | 22 29 100 024 | 5/30/13 | $235,000 | 1,373 | 1974 | SPLFB | 1.5 | 0 | 2 | Part/Rec. | $171.16 |
| 5 | 22 29 101 004 | 7/21/14 | $142,000 | 1,328 | 1925 | 1SF | 1 | 0 | 1 | Slab | $106.93 |
| 6 | 22 29 101 007 | 2/4/13 | $265,000 | 2,098 | 1926 | 2SF | 2 | 0 | 2 | Full/Unf. | $126.31 |
| 7 | 22 29 102 010 | 6/18/14 | $245,000 | 1,816 | 1948 | 2SF | 1 | 0 | 0 | Full/Unf. | $134.91 |
| 8 | 22 29 103 005 | 12/17/12 | $240,000 | 1,560 | 1889 | 2SF | 1.5 | 1 | 2 | Full/Unf. | $153.85 |
| 9 | 22 29 103 014 | 3/13/12 | $95,000 | 864 | 1957 | 1SF | 1 | 0 | 0 | Crawl | $109.95 |
| 10 | 22 29 106 017 | 6/6/14 | $240,000 | 1,566 | 1916 | 1.5SF | 2 | 0 | 3 | Full/Unf. | $153.26 |
| 12 | 22 29 109 015 | 8/8/13 | $195,000 | 1,008 | 1958 | 1SB | 1 | 0 | 1 | Full/Unf. | $193.45 |
| 13 | 22 29 110 005 | 5/6/13 | $125,000 | 1,116 | 1879 | 1SF | 1 | 0 | 3 | Part/Unf. | $112.01 |
| 14 | 22 29 110 018 | 12/4/13 | $250,000 | 1,920 | 1908 | 1.5SF | 2 | 0 | 3 | Full/Unf. | $130.21 |
| 15 | 22 29 110 025 | 3/15/13 | $148,000 | 2,023 | 1918 | 2SB | 1.5 | 1 | 0 | Full/Unf. | $73.16 |
| 17 | 22 29 112 025 | 5/1/12 | $267,000 | 1,613 | 1973 | 1SB | 2 | 1 | 2 | Full/Rec. | $165.53 |
| 18 | 22 29 113 008 | 8/26/14 | $342,500 | 2,035 | 1922 | 2SF | 2.5 | 0 | 2 | Full/Unf. | $168.30 |
| 20 | 22 29 114 019 | 11/3/14 | $148,000 | 1,187 | 1961 | SPLFB | 1 | 0 | CP | Slab | $124.68 |
| 21 | 22 29 114 025 | 1/25/12 | $365,000 | 2,390 | 2005 | 2SFB | 2.5 | 0 | 2 | Full/Unf. | $152.72 |
| 23 | 22 29 115 020 | 6/27/13 | $182,000 | 1,000 | 1960 | 2SF | 1 | 0 | 3 | Full/Unf. | $182.00 |
| 24 | 22 29 116 005 | 2/15/13 | $135,000 | 1,327 | 1888 | 2SF | 1.5 | 1 | 2 | Part/Rec. | $101.73 |
| 26 | 22 29 116 018 | 11/12/13 | $142,500 | 1,737 | 1940 | 1.5SF | 1 | 1 | 2 | Full/Unf. | $82.04 |
| 28 | 22 29 120 005 | 4/28/14 | $240,000 | 1,369 | 1958 | SPLFB | 1 | 0 | 2 | Part/Rec. | $175.31 |
| 29 | 22 29 120 009 | 1/10/13 | $175,000 | 1,414 | 1960 | 1SB | 1 | 0 | None | Full/Unf. | $123.76 |
| 30 | 22 29 127 002 | 3/22/13 | $333,000 | 2,405 | 1990 | 1.5SFB | 2.5 | 1 | 2 | Part/Unf. | $138.46 |
| 31 | 22 29 301 029 | 10/28/14 | $521,000 | 3,883 | 2002 | 2SFB | 3.5 | 3 | 2 | Full/Rec. | $134.17 |
| 32 | 22 29 303 002 | 7/24/13 | $500,000 | 4,054 | 2002 | 2SF | 3.5 | 1 | 2 | Full/Unf. | $123.33 |
| 33 | 22 29 303 004 | 7/11/12 | $110,000 | 630 | 1948 | 1SF | 1 | 1 | 2 | Crawl | $174.60 |
| 37 | 22 29 311 005 | 1/31/13 | $150,000 | 1,040 | 1963 | 1SB | 1 | 0 | 1 | Full/Unf. | $144.23 |
| 39 | 22 29 315 002 | 5/31/12 | $375,000 | 2,196 | 1990 | 1SB | 2 | 1 | 2 | Full/Unf. | $170.77 |
| 41 | 22 29 316 011 | 8/1/13 | $316,000 | 2,288 | 1990 | 2SFB | 2.5 | 1 | 2 | Full/Unf. | $138.11 |
| 42 | 22 29 316 018 | 7/25/14 | $520,000 | 4,032 | 2006 | 2SFB | 3.5 | 3 | 3 | Full/Rec. | $128.97 |
| 43 | 22 29 317 013 | 10/24/14 | $272,500 | 1,348 | 1990 | SPLFB | 2.5 | 1 | 2 | Part/Rec. | $202.15 |
| 44 | 22 29 318 012 | 11/26/13 | $255,000 | 1,760 | 1990 | SPLFB | 2.5 | 1 | 2 | Part/Rec. | $144.89 |
| 45 | 22 29 319 012 | 1/22/14 | $305,500 | 2,057 | 1990 | 2SFB | 2.5 | 1 | 2 | Full/Unf. | $148.52 |
| 46 | 22 29 319 015 | 6/25/14 | $360,000 | 2,434 | 1991 | 1.5SFB | 2.5 | 1 | 2 | Full/Unf. | $147.90 |
| 47 | 22 29 321 009 | 4/25/12 | $317,500 | 1,712 | 1990 | SPLFB | 2.5 | 1 | 2 | Part/Rec | $185.46 |
| 48 | 22 29 324 005 | 8/8/12 | $369,000 | 2,800 | 1996 | 2SFB | 2.5 | 1 | 2 | Full/Unf. | $131.79 |
| 49 | 22 29 325 003 | 7/13/12 | $420,000 | 3,047 | 1999 | 2SFB | 2.5 | 1 | 3 | Full/Rec | $137.84 |
| 51 | 22 30 101 047 | 3/1/12 | $100,000 | 1,332 | 1933 | 1.5SF | 1.5 | 0 | 2 | Part/Unf. | $75.08 |
| 52 | 22 30 201 015 | 5/11/12 | $97,500 | 874 | 1919 | 1SF | 1 | 0 | 2 | Slab | $111.56 |
| 53 | 22 30 201 016/ | 10/2/12 | $126,900 | 1,675 | 1939 | 1SF | 1.5 | 0 | 3 | Part/Unf. | $75.76 |
| 54 | 22 30 205 010 | 2/13/12 | $281,000 | 1,803 | 1986 | SPLFB | 3.5 | 1 | 2 | Part/Rec. | $155.85 |
| 55 | 22 30 205 033 | 4/3/12 | $285,000 | 2,465 | 1987 | 2SFB | 2.5 | 1 | 2 | Part/Unf. | $115.62 |
| 56 | 22 30 205 039 | 4/2/13 | $380,000 | 2,568 | 1994 | 2SF | 2.5 | 1 | 2 | Full/Unf. | $147.98 |
| 57 | 22 30 206 010 | 1/8/14 | $280,000 | 1,330 | 1986 | SPLFB | 1.5 | 1 | 2 | Part/Rec. | $210.53 |
| 58 | 22 30 206 035 | 6/27/12 | $256,000 | 1,949 | 1987 | 2SF | 1.5 | 1 | 2 | Part/Unf. | $131.35 |

Appendix IIb: Continued on Next Page.

Appendix IIb: Continued.

| Sale | Parcel No. | Sale Date | Sale Price | Size | Age | Style | Bath | FP | Gar. | Bsmt/Fin | $/Ft$^2$ |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 59 | 22 30 206 037 | 8/21/14 | $320,000 | 1,843 | 1971 | 2SF | 2.5 | 0 | 2 | Part/Unf. | $173.63 |
| 62 | 22 30 207 023 | 3/14/13 | $327,500 | 2,572 | 1986 | 2SF | 2.5 | 1 | 3 | Crawl | $127.33 |
| 63 | 22 30 207 047 | 8/9/13 | $277,500 | 1,845 | 1988 | 1SFB | 1.5 | 1 | 2 | Part/Unf. | $150.41 |
| 64 | 22 30 207 060 | 6/11/12 | $305,000 | 2,365 | 1987 | 2SFB | 2.5 | 0 | 2 | Full/Unf. | $128.96 |
| 65 | 22 30 208 002 | 1/31/14 | $499,000 | 3,376 | 2014 | 2SFB | 2.5 | 1 | 3 | Full/Unf. | $147.81 |
| 66 | 22 30 305 002 | 9/5/13 | $575,736 | 3,452 | 2011 | 2SFB | 2 | 2 | 3 | Full/Rec. | $166.78 |
| 67 | 22 30 306 014 | 10/25/13 | $475,000 | 3,395 | 2006 | 1.5SB | 3.5 | 3 | 3 | Full/Unf. | $139.91 |
| 68 | 22 30 308 007 | 4/15/12 | $575,000 | 4,641 | 2006 | 2SFB | 3.5 | 2 | 3 | Fuu/Unf. | $123.90 |
| 69 | 22 30 308 008 | 10/15/13 | $572,900 | 3,803 | 2005 | 2SFB | 4 | 2 | 3 | Full/Unf. | $150.64 |
| 70 | 22 30 308 009 | 1/19/12 | $575,000 | 3,514 | 2006 | 2SB | 2.5 | 2 | 3 | Full/Unf. | $163.63 |
| 72 | 22 30 308 009 | 6/27/14 | $615,000 | 3,514 | 2006 | 2SFB | 2.5 | 2 | 3 | Full/Unf. | $175.01 |
| 73 | 22 30 309 009 | 7/3/14 | $479,900 | 3,139 | 2014 | 2SFB | 3.5 | 1 | 3 | Full/Unf. | $152.88 |
| 74 | 22 30 310 001 | 5/31/13 | $562,500 | 3,209 | 2013 | 2SFB | 3.5 | 1 | 3 | Full/Unf. | $175.29 |
| 75 | 22 30 310 011 | 12/20/13 | $494,000 | 3,162 | 2013 | 2SFB | 2.5 | 1 | 3 | Full/Unf. | $156.23 |
| 76 | 22 30 311 001 | 5/29/13 | $549,000 | 3,736 | 2006 | 2SFB | 3.5 | 2 | 3 | Full/Unf. | $146.95 |
| 77 | 22 30 311 005 | 6/18/13 | $550,000 | 3,381 | 2006 | 2SFB | 3.5 | 1 | 3 | Full/Unf. | $162.67 |
| 78 | 22 30 312 002 | 4/26/13 | $445,000 | 3,669 | 2005 | 2SFB | 2.5 | 2 | 3 | Full/Unf. | $121.29 |
| 79 | 22 30 312 012 | 6/12/12 | $555,000 | 4,273 | 2009 | 2SFB | 3.5 | 2 | 3 | Full/Unf. | $129.89 |
| 80 | 22 30 312 020 | 6/7/13 | $485,000 | 3,489 | 2011 | 2SFB | 3 | 1 | 3 | Full/Unf. | $139.01 |
| 81 | 22 30 313 010 | 9/2/14 | $532,000 | 3,692 | 2008 | 2SFB | 2.5 | 0 | 3 | Full/Unf. | $144.10 |
| 82 | 22 30 404 009 | 3/13/14 | $287,500 | 2,558 | 1994 | 1SFB | 2.5 | 1 | 2 | Part/Unf. | $112.39 |
| 85 | 22 30 406 004 | 4/24/14 | $430,000 | 3,399 | 1994 | 2SFB | 2.5 | 1 | 3 | Full/Rec. | $126.51 |
| 86 | 22 30 406 013 | 6/30/14 | $435,000 | 3,139 | 1994 | 2SFB | 2.5 | 1 | 2 | Full/Unf. | $138.58 |
| 87 | 22 30 406 025 | 1/4/14 | $400,000 | 2,923 | 1997 | 2SFB | 2.5 | 1 | 3 | Full/Unf. | $136.85 |
| 88 | 22 30 407 009 | 7/23/12 | $282,000 | 2,739 | 1994 | 2SFB | 2.5 | 1 | 2 | Full/Unf. | $102.96 |
| 89 | 22 30 408 005 | 8/23/13 | $399,000 | 3,270 | 1997 | 2SFB | 2.5 | 1 | 3 | Full/Unf. | $122.02 |
| 90 | 22 30 413 010 | 8/26/13 | $357,500 | 2,583 | 1996 | 1SFB | 3 | 1 | 2 | Part/Unf. | $138.40 |
| Average: | | | | | 1975 | | | | | | $140.39 |
| Control | | | | | | | | | | | |
| 93 | 22 20 427 012 | 9/11/13 | $320,000 | 1,964 | 1996 | 2SF | 1.5 | 0 | 2 | Full/Unf. | $162.93 |
| 97 | 22 20 437 034 | 10/30/11 | $185,000 | 1,240 | 1931 | 1SF | 1.5 | 0 | 2 | Full/Unf. | $149.19 |
| 98 | 22 20 438 015 | 10/1/13 | $158,000 | 1,473 | 1930 | 1SF | 1 | 0 | 0 | Full/Unf. | $107.26 |
| 99 | 22 20 440 004 | 11/4/14 | $140,000 | 818 | 1927 | 1SF | 1 | 0 | 0 | Full/Rec. | $171.15 |
| 106 | 22 21 303 024 | 2/24/12 | $312,000 | 2,111 | 1991 | 2SFB | 2.5 | 1 | 2 | Part/Unf. | $147.80 |
| 107 | 22 21 303 026 | 5/21/14 | $320,000 | 2,118 | 1993 | 2SFB | 1.5 | 1 | 2 | Part/Unf. | $151.09 |
| 108 | 22 21 303 042 | 2/28/14 | $369,000 | 2,172 | 1993 | 1SF | 1.5 | 1 | 3 | Full/Unf. | $169.89 |
| 109 | 22 21 305 022 | 10/17/14 | $343,000 | 2,111 | 1991 | 2SFB | 2.5 | 1 | 2 | Part/Unf. | $162.48 |
| 110 | 22 21 305 034 | 7/19/14 | $325,000 | 2,538 | 1991 | 2SFB | 2.5 | 1 | 2 | Full/Unf. | $128.05 |
| 112 | 22 21 307 020 | 8/22/14 | $785,000 | 4,229 | 2002 | 2SFB | 4 | 1 | 4 | Full/Unf. | $185.62 |
| 113 | 22 21 308 017 | 9/23/13 | $450,000 | 3,175 | 1999 | 2SFB | 2.5 | 1 | 2 | Full/Unf. | $141.73 |
| 115 | 22 21 311 020 | 4/6/14 | $470,000 | 3,261 | 2002 | 2SFB | 2.5 | 1 | 3 | Full/Unf. | $144.13 |
| 116 | 22 21 401 010 | 9/28/12 | $365,000 | 2,140 | 1961 | 1SF | 2 | 0 | 0 | Full/Unf. | $170.56 |
| 117 | 22 21 408 005 | 11/14/14 | $265,000 | 1,872 | 1971 | SPLFB | 2.5 | 1 | 2 | Part/Rec. | $141.56 |
| 118 | 22 21 409 020 | 11/14/12 | $390,000 | 2,804 | 1997 | 2SFB | 2.5 | 1 | 2 | Full/Unf. | $139.09 |
| 120 | 22 21 414 002 | 2/20/14 | $360,000 | 2,261 | 1999 | 1SFB | 2 | 1 | 2 | Full/Unf. | $159.22 |
| 122 | 22 27 207 012 | 9/19/14 | $595,000 | 2,720 | 2002 | 2SFB | 2.5 | 1 | 3 | Full/Unf. | $218.75 |

Appendix IIb: Continued on Next Page.

Appendix IIb: Continued.

| Sale | Parcel No. | Sale Date | Sale Price | Size | Age | Style | Bath | FP | Gar. | Bsmt/Fin | $/Ft$^2$ |
|------|------------|-----------|------------|------|-----|-------|------|----|----|----------|-------|
| 123 | 22 27 302 039 | 8/17/14 | $180,000 | 1,360 | 1956 | 1SF | 1 | 1 | 0 | Full/Unf. | $132.35 |
| 124 | 22 27 401 021 | 12/30/13 | $375,000 | 2,629 | 1997 | 1SFB | 2.5 | 1 | 3 | Full/Unf. | $142.64 |
| 125 | 22 27 401 031 | 10/2/14 | $355,000 | 2,775 | 1991 | 1SB | 2.5 | 1 | 2 | Full/Unf. | $127.93 |
| 126 | 22 27 406 002 | 10/16/14 | $549,137 | 2,935 | 1996 | 2SFB | 3 | 1 | 4 | Full/Unf. | $187.10 |
| 127 | 22 27 407 003 | 9/21/12 | $450,000 | 4,105 | 1999 | 2SB | 2 | 1 | 3 | Full/Unf. | $109.62 |
| 128 | 22 28 100 013 | 8/14/14 | $130,000 | 1,326 | 1952 | 1.5SF | 1 | 0 | 2 | Full/Unf. | $98.04 |
| 129 | 22 28 102 012 | 7/10/13 | $290,000 | 1,514 | 1993 | 1SFB | 2.5 | 0 | 2 | Part/Rec. | $191.55 |
| 132 | 22 28 104 013 | 3/28/12 | $193,000 | 1,148 | 1988 | SPLF | 1.5 | 0 | 2 | Part/Rec | $168.12 |
| 136 | 22 28 104 129 | 11/27/13 | $125,000 | 976 | 1881 | 1SF | 1 | 0 | 0 | Full/Rec. | $128.07 |
| 137 | 22 28 105 012 | 5/22/14 | $172,000 | 968 | 1978 | 1SF | 1 | 0 | 2 | Full/Unf. | $177.69 |
| 139 | 22 28 105 061 | 6/14/12 | $242,000 | 1,148 | 1990 | SPLFB | 1.5 | 1 | 2 | Part/Rec. | $210.80 |
| 141 | 22 28 107 005 | 3/1/13 | $267,000 | 1,448 | 1988 | SPLFB | 2.5 | 1 | 3 | Part/Rec. | $184.39 |
| 143 | 22 28 107 013 | 6/25/14 | $368,000 | 1,607 | 1992 | SPLFB | 2.5 | 1 | 2 | Part/Rec. | $229.00 |
| 144 | 22 28 107 020 | 5/25/12 | $262,000 | 2,021 | 1988 | 1SFB | 2.5 | 1 | 3 | Full/Unf. | $129.64 |
| 145 | 22 28 109 006 | 7/11/13 | $340,000 | 1,956 | 1991 | 1SB | 2.5 | 1 | 3 | Full/Unf. | $173.82 |
| 146 | 22 28 111 005 | 5/12/14 | $330,000 | 1,336 | 1990 | SPLFB | 2 | 1 | 2 | Part/Rec. | $247.01 |
| 147 | 22 28 203 015 | 6/19/12 | $240,000 | 1,800 | 1990 | 1SFB | 2 | 1 | 2 | Part/Rec | $133.33 |
| 148 | 22 28 204 006 | 6/27/13 | $300,000 | 2,130 | 1991 | 2SF | 2.5 | 1 | 3 | Part/Unf. | $140.85 |
| 149 | 22 28 204 007 | 4/13/12 | $208,000 | 2,475 | 1976 | 1SB | 2 | 0 | 2 | Crawl | $84.04 |
| 150 | 22 28 204 020 | 2/27/12 | $192,000 | 1,679 | 1959 | 1SB | 2 | 0 | 2 | Full/Unf. | $114.35 |
| 151 | 22 28 205 013 | 12/18/13 | $120,000 | 1,408 | 1957 | 1SF | 2 | 0 | 3 | Slab | $85.23 |
| 152 | 22 28 205 014 | 6/8/12 | $258,000 | 1,598 | 1956 | 1SF | 2.5 | 1 | 2 | Crawl | $161.45 |
| 154 | 22 28 209 010 | 5/8/13 | $340,000 | 1,555 | 1990 | SPLFB | 2.5 | 1 | 2 | Part/Rec | $218.65 |
| 155 | 22 28 209 019 | 8/17/12 | $430,000 | 2,114 | 1993 | 2SFB | 2 | 1 | 2 | Full/Unf. | $203.41 |
| 156 | 22 28 210 020 | 4/23/14 | $318,000 | 2,244 | 1990 | 2SFB | 2.5 | 1 | 2 | Part/Unf. | $141.71 |
| 157 | 22 28 211 001 | 2/15/13 | $324,000 | 2,303 | 1993 | 2SFB | 2.5 | 1 | 3 | Part/Unf. | $140.69 |
| 158 | 22 28 211 004 | 11/20/13 | $385,000 | 2,048 | 1990 | 1SFB | 2 | 1 | 2 | Part/Rec. | $187.99 |
| 159 | 22 28 211 005 | 3/31/14 | $340,000 | 3,438 | 1990 | 2SB | 2.5 | 1 | 2 | Part/Unf. | $98.89 |
| 161 | 22 28 217 003 | 12/17/13 | $355,000 | 2,404 | 1995 | 2SFB | 2.5 | 1 | 3 | Full/Unf. | $147.67 |
| 162 | 22 28 217 013 | 9/5/13 | $375,000 | 2,369 | 1996 | 1SB | 2.5 | 1 | 2 | Part/Rec. | $158.29 |
| 163 | 22 28 302 003 | 10/27/14 | $360,000 | 3,361 | 2000 | 1SB | 2 | 1 | 3 | Full/Unf. | $107.11 |
| 164 | 22 28 302 006 | 11/4/14 | $305,000 | 2,091 | 2002 | 2SFB | 3.5 | 1 | 3 | Full/Rec. | $145.86 |
| 165 | 22 28 303 015 | 7/25/14 | $377,000 | 2,490 | 2000 | 2SFB | 2.5 | 1 | 2 | Full/Unf. | $151.41 |
| 166 | 22 28 305 012 | 8/15/12 | $395,900 | 2,534 | 1997 | 2SFB | 2.5 | 1 | 3 | Full/Unf. | $156.24 |
| 167 | 22 28 305 013 | 8/16/13 | $408,761 | 2,490 | 1997 | 2SFB | 2.5 | 1 | 2 | Full/Unf. | $164.16 |
| 170 | 22 28 306 045 | 8/16/12 | $335,000 | 2,200 | 1999 | 2SFB | 2.5 | 1 | 2 | Full/Unf. | $152.27 |
| 173 | 22 28 308 017 | 3/22/13 | $370,000 | 3,035 | 2006 | 2SFB | 2.5 | 1 | 3 | Part/Unf. | $121.91 |
| 174 | 22 28 310 023 | 1/3/14 | $430,000 | 3,035 | 2005 | 2SFB | 2.5 | 1 | 3 | Full/Unf. | $141.68 |
| 175 | 22 28 310 038 | 9/18/12 | $394,000 | 3,321 | 2006 | 2SFB | 2.5 | 1 | 3 | Full/Unf. | $118.64 |
| 176 | 22 28 312 001 | 2/3/12 | $383,000 | 2,581 | 2000 | 1SFB | 2.5 | 1 | 2 | Full/Unf. | $148.39 |
| 177 | 22 28 314 002 | 5/15/12 | $397,500 | 3,381 | 2002 | 2SFB | 2.5 | 1 | 2 | Full/Unf. | $117.57 |
| 178 | 22 28 407 007 | 2/4/13 | $455,000 | 2,955 | 1994 | 2SFB | 2.5 | 1 | 3 | Full/Unf. | $153.98 |
| 179 | 22 28 408 003 | 6/13/13 | $392,000 | 3,048 | 1996 | 1SB | 2.5 | 1 | 2 | Full/Unf. | $128.61 |
| 180 | 22 28 408 007 | 6/15/12 | $370,000 | 3,409 | 1996 | 2SFB | 2.5 | 1 | 2 | Part/Unf. | $108.54 |
| 181 | 22 28 408 013 | 5/20/13 | $440,000 | 3,048 | 1997 | 2SB | 2.5 | 1 | 3 | Full/Unf. | $144.36 |
| 182 | 22 28 409 010 | 8/15/13 | $340,000 | 2,120 | 1996 | 1SB | 2.5 | 1 | 2 | Full/Unf. | $160.38 |
| 183 | 22 28 410 014 | 7/15/14 | $355,000 | 1,896 | 2002 | 1SB | 2 | 1 | 2 | Full/Unf. | $187.24 |

Appendix IIb: Continued on Next Page.

Appendix IIb: Continued.

| Sale | Parcel No. | Sale Date | Sale Price | Size | Age | Style | Bath | FP | Gar. | Bsmt/Fin | $/Ft$^2$ |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 185 | 22 28 411 003 | 4/9/14 | $427,500 | 3,367 | 1994 | 2SB | 2.5 | 1 | 3 | Full/Unf. | $126.97 |
| 187 | 22 28 411 039 | 2/21/12 | $419,000 | 2,938 | 1997 | 2SB | 2.5 | 1 | 2 | Full/Unf. | $142.61 |
| 188 | 22 28 412 017 | 2/14/14 | $485,000 | 3,297 | 1996 | 2SFB | 4 | 1 | 3 | Part/Rec. | $147.10 |
| 189 | 22 28 413 004 | 10/15/14 | $490,000 | 3,268 | 1997 | 2SB | 2.5 | 1 | 2 | Full/Unf. | $149.94 |
| 190 | 22 28 415 012 | 9/9/13 | $402,500 | 1,922 | 2009 | 1SB | 2 | 1 | 3 | Full/Rec. | $209.42 |
| 191 | 22 28 415 024 | 3/7/12 | $395,000 | 2,637 | 2011 | 2SFB | 2.5 | 1 | 3 | Full/Unf. | $149.79 |
| 192 | 22 28 415 027 | 6/23/14 | $372,000 | 2,535 | 2006 | 2SFB | 2.5 | 1 | 3 | Full/Unf. | $146.75 |
| 193 | 22 28 416 002 | 8/17/12 | $395,000 | 3,381 | 2002 | 2SFB | 2.5 | 1 | 2 | Part/Unf. | $116.83 |
| 194 | 22 28 416 017 | 11/3/14 | $385,000 | 2,535 | 2006 | 2SFB | 2.5 | 1 | 2 | Full/Unf. | $151.87 |
| 195 | 22 28 417 002 | 8/12/13 | $395,000 | 3,381 | 2002 | 2SFB | 2.5 | 1 | 2 | Part/Unf. | $116.83 |
| 196 | 22 28 417 015 | 7/24/13 | $423,500 | 3,034 | 2006 | 2SFB | 2.5 | 1 | 3 | Full/Unf. | $139.58 |
| 197 | 22 29 200 008 | 8/2/12 | $107,900 | 1,200 | 1887 | 1SF | 1 | 0 | 1 | Part/Unf. | $89.92 |
| 201 | 22 29 209 010 | 3/7/12 | $100,000 | 1,200 | 1888 | 2SF | 1 | 0 | 3 | Crawl | $83.33 |
| 202 | 22 29 210 007 | 7/31/13 | $188,600 | 1,603 | 1966 | 1SFB | 2.5 | 0 | 2 | Full/Unf. | $117.65 |
| 203 | 22 29 213 031 | 10/17/14 | $185,000 | 1,072 | 1987 | 1SF | 1.5 | 0 | 2 | Full/Unf. | $172.57 |
| 204 | 22 29 213 032 | 10/9/12 | $192,000 | 1,279 | 1967 | 1SB | 1 | 0 | 2 | Full/Unf. | $150.12 |
| 206 | 22 29 214 017 | 4/10/12 | $259,000 | 1,395 | 2002 | SPLFB | 2 | 0 | 2 | Part/Rec | $185.66 |
| 208 | 22 29 216 002 | 2/28/14 | $267,000 | 1,768 | 1992 | 2SF | 2 | 1 | 1 | Full/Unf. | $151.02 |
| 212 | 22 29 218 022 | 9/15/14 | $268,000 | 1,187 | 1988 | 1SF | 1.5 | 0 | 3 | Full/Unf. | $225.78 |
| 213 | 22 29 218 022 | 6/4/12 | $220,000 | 1,187 | 1988 | 1SF | 1.5 | 0 | 3 | Full/Unf. | $185.34 |
| 215 | 22 29 219 011 | 2/19/12 | $288,000 | 1,647 | 1993 | 2SF | 1.5 | 0 | 2 | Part/Unf. | $174.86 |
| 216 | 22 29 220 011 | 7/30/14 | $230,000 | 2,357 | 1997 | 2SF | 2 | 1 | 2 | Slab | $97.58 |
| 217 | 22 29 220 015 | 3/12/12 | $211,000 | 1,431 | 1884 | 1SF | 2 | 0 | 1 | Full/Rec | $147.45 |
| 218 | 22 29 225 006 | 2/4/13 | $182,000 | 1,139 | 1988 | 1SF | 1.5 | 0 | 3 | Full/Unf. | $159.79 |
| 222 | 22 29 227 037 | 10/31/14 | $350,000 | 1,967 | 2014 | 2SF | 2.5 | 1 | 2 | Full/Unf. | $177.94 |
| 224 | 22 29 229 004 | 11/14/13 | $72,000 | 2,078 | 2014 | 2SFB | 2.5 | 1 | 2 | Full/Rec. | $34.65 |
| 225 | 22 29 232 004 | 8/9/13 | $250,000 | 2,103 | 1978 | 2SFB | 2.5 | 1 | 2 | Part/Unf. | $118.88 |
| 226 | 22 29 232 021 | 5/30/14 | $345,000 | 2,470 | 1996 | 2SF | 3 | 1 | 2 | Full/Unf. | $139.68 |
| 227 | 22 29 233 019 | 9/26/12 | $260,000 | 1,617 | 1978 | SPLF | 1.5 | 1 | 2 | Part/Rec. | $160.79 |
| 228 | 22 29 233 025 | 6/17/14 | $272,500 | 1,305 | 1978 | SPLFB | 1.5 | 1 | 2 | Part/Rec. | $208.81 |
| 229 | 22 29 233 033 | 1/16/14 | $350,000 | 2,980 | 1986 | 2SF | 1.5 | 1 | 2 | Full/Unf. | $117.45 |
| 230 | 22 29 234 012 | 5/27/14 | $250,000 | 1,385 | 1984 | 1SB | 1.5 | 0 | 2 | Part/Rec. | $180.51 |
| 231 | 22 29 235 008 | 7/6/12 | $271,500 | 2,449 | 1978 | 2SFB | 2.5 | 1 | 2 | Part/Unf. | $110.86 |
| 232 | 22 29 236 008 | 2/20/13 | $215,000 | 1,320 | 1978 | SPLFB | 2.5 | 1 | 2 | Part/Rec. | $162.88 |
| 233 | 22 29 404 002 | 6/25/13 | $130,000 | 992 | 1957 | 1SF | 1 | 1 | 1 | Full/Unf. | $131.05 |
| 235 | 22 29 405 007 | 10/24/12 | $172,000 | 920 | 1958 | 1SF | 1 | 0 | 2 | Crawl | $186.96 |
| 236 | 22 29 405 017 | 6/27/13 | $255,000 | 1,693 | 1973 | SPLFB | 2 | 2 | 3 | Part/Rec. | $150.62 |
| 237 | 22 29 406 002 | 9/28/12 | $186,000 | 925 | 1959 | 1SF | 1 | 0 | 3 | Crawl | $201.08 |
| 238 | 22 29 406 007 | 7/15/13 | $151,500 | 920 | 1958 | 1SF | 1 | 0 | 2 | Crawl | $164.67 |
| 239 | 22 29 406 011 | 7/1/13 | $158,000 | 925 | 1959 | 1SF | 1 | 0 | 2 | Crawl | $170.81 |
| 240 | 22 29 407 015 | 11/3/14 | $242,000 | 1,067 | 1973 | SPLFB | 1 | 0 | 2 | Part/Rec. | $226.80 |
| 241 | 22 29 407 016 | 12/30/13 | $200,000 | 1,067 | 1973 | SPLFB | 1 | 0 | 2 | Part/Rec. | $187.44 |
| 243 | 22 29 409 011 | 5/29/12 | $162,000 | 1,049 | 1972 | SPLF | 1.5 | 0 | 2 | Part/Rec | $154.43 |
| 244 | 22 29 409 013 | 10/15/13 | $260,000 | 1,434 | 1974 | 1SF | 1 | 1 | 0 | Full/Unf. | $181.31 |
| 245 | 22 29 410 006 | 5/17/13 | $200,000 | 1,008 | 1959 | 1SF | 1.5 | 0 | 2 | Part/Rec. | $198.41 |
| 247 | 22 29 412 004 | 8/30/13 | $220,000 | 1,180 | 1966 | 1SFB | 1 | 0 | 2 | Part/Rec. | $186.44 |
| 248 | 22 29 412 007 | 1/17/14 | $156,000 | 1,169 | 1966 | SPLF | 1 | 0 | 2 | Part/Rec. | $133.45 |

Appendix IIb: Continued on Next Page.

Appendix IIb: Continued.

| Sale | Parcel No. | Sale Date | Sale Price | Size | Age | Style | Bath | FP | Gar. | Bsmt/Fin | $/Ft$^2$ |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 249 | 22 29 412 017 | 8/15/13 | $249,000 | 1,240 | 1969 | SPLFB | 1.5 | 0 | 2 | Part/Rec. | $200.81 |
| 250 | 22 29 413 010 | 2/22/12 | $125,000 | 1,080 | 1964 | 1SFB | 1 | 0 | 2 | Crawl | $115.74 |
| 251 | 22 29 414 010 | 7/23/12 | $174,000 | 1,154 | 1966 | SPLFB | 1.5 | 0 | 2 | Part/Rec | $150.78 |
| 252 | 22 29 414 017 | 3/19/13 | $240,000 | 2,183 | 1978 | 2SFB | 2.5 | 1 | 2 | Full/Unf. | $109.94 |
| 253 | 22 29 414 041 | 9/10/14 | $327,000 | 2,918 | 1986 | SPLFB | 3 | 1 | 2 | Part/Rec. | $112.06 |
| 254 | 22 29 414 048 | 3/26/12 | $265,000 | 2,652 | 1981 | 2SF | 2.5 | 2 | 2 | Part/Unf. | $99.92 |
| 255 | 22 29 416 063 | 5/28/14 | $335,000 | 2,307 | 1986 | 2SFB | 2.5 | 1 | 2 | Full/Unf. | $145.21 |
| 256 | 22 29 417 001 | 7/11/13 | $220,000 | 1,461 | 1970 | SPLFB | 2.5 | 0 | 2 | Full/Rec. | $150.58 |
| 257 | 22 29 419 024 | 7/23/13 | $219,000 | 1,486 | 1987 | SPLFB | 1.5 | 0 | 2 | Part/Rec. | $147.38 |
| 259 | 22 29 423 010 | 11/7/13 | $228,500 | 1,121 | 1986 | SPLFB | 1.5 | 0 | 2 | Part/Unf. | $203.84 |
| 261 | 22 29 423 017 | 2/13/12 | $235,000 | 2,080 | 1990 | 1SFB | 2.5 | 1 | 2 | Part/Rec. | $112.98 |
| 262 | 22 31 103 004 | 7/31/13 | $435,500 | 3,056 | 2002 | 2SFB | 3 | 1 | 2 | Full/Unf. | $142.51 |
| 263 | 22 31 103 006 | 6/14/13 | $441,500 | 2,773 | 1999 | 2SFB | 3 | 1 | 3 | Full/Unf. | $159.21 |
| 264 | 22 31 103 007 | 9/20/12 | $395,000 | 2,715 | 1999 | 2SFB | 2.5 | 1 | 2 | Full/Unf. | $145.49 |
| 265 | 22 31 103 008 | 8/21/12 | $420,000 | 2,773 | 1999 | 2SFB | 3.5 | 1 | 3 | Full/Unf. | $151.46 |
| 266 | 22 31 103 015 | 12/6/13 | $489,000 | 2,507 | 2013 | 1SB | 3.5 | 2 | 3 | Full/Rec. | $195.05 |
| 267 | 22 31 106 002 | 7/30/13 | $407,500 | 2,775 | 2002 | 2SFB | 2.5 | 1 | 2 | Full/Unf. | $146.85 |
| 268 | 22 31 106 018 | 6/6/13 | $330,000 | 2,554 | 1999 | 2SFB | 2.5 | 1 | 2 | Full/Unf. | $129.21 |
| 269 | 22 31 106 020 | 10/4/13 | $400,000 | 2,641 | 1999 | 2SFB | 2.5 | 1 | 2 | Full/Unf. | $151.46 |
| 270 | 22 31 107 015 | 9/7/12 | $435,000 | 3,969 | 1999 | 2SFB | 2.5 | 1 | 2 | Full/Rec. | $109.60 |
| 271 | 22 31 108 012 | 6/19/12 | $390,000 | 3,377 | 2002 | 2SFB | 2.5 | 1 | 2 | Full/Unf. | $115.49 |
| 273 | 22 31 109 006 | 9/6/13 | $484,874 | 3,955 | 2013 | 2SFB | 4.5 | 2 | 3 | Full/Rec. | $122.60 |
| 274 | 22 31 109 007 | 5/16/14 | $490,700 | 3,976 | 2014 | 2SFB | 4.5 | 1 | 3 | Full/Rec. | $123.42 |
| 275 | 22 31 109 008 | 9/5/14 | $489,000 | 3,287 | 2014 | 2SFB | 2.5 | 1 | 2 | Full/Unf. | $148.77 |
| 276 | 22 31 110 012 | 11/22/13 | $450,000 | 3,603 | 2013 | 2SFB | 3.5 | 1 | 3 | Full/Unf. | $124.90 |
| 277 | 22 31 112 001 | 7/10/14 | $588,838 | 3,296 | 2014 | 2SFB | 2.5 | 1 | 3 | Full/Unf. | $178.65 |
| 278 | 22 31 112 004 | 2/20/14 | $449,910 | 3,308 | 2014 | 2SFB | 2.5 | 1 | 2 | Full/Unf. | $136.01 |
| 280 | 22 31 203 001 | 9/30/14 | $445,000 | 3,640 | 2014 | 2SFB | 2.5 | 1 | 2 | Full/Unf. | $122.25 |
| 282 | 22 31 205 008 | 9/20/13 | $620,000 | 3,594 | 2005 | 2SFB | 2.5 | 1 | 4 | Full/Unf. | $172.51 |
| 283 | 22 31 206 002 | 4/30/14 | $509,000 | 4,148 | 2014 | 2SFB | 3.5 | 1 | 3 | Full/Unf. | $122.71 |
| 285 | 22 31 206 008 | 4/15/13 | $442,000 | 3,532 | 2002 | 2SFB | 2.5 | 1 | 3 | Full/Unf. | $125.14 |
| 286 | 22 31 206 020 | 10/8/13 | $433,880 | 3,393 | 2011 | 2SFB | 3.5 | 1 | 3 | Full/Unf. | $127.88 |
| 287 | 22 31 207 001 | 3/15/12 | $360,000 | 2,382 | 2005 | 1SB | 2.5 | 1 | 4 | Full/Unf. | $151.13 |
| 289 | 22 31 207 012 | 6/3/13 | $439,000 | 3,166 | 2011 | 2SFB | 3.5 | 1 | 3 | Full/Unf. | $138.66 |
| 290 | 22 31 304 005 | 4/2/12 | $298,500 | 2,837 | 1988 | 2SFB | 2.5 | 1 | 2 | Part/Unf. | $105.22 |
| 291 | 22 31 307 003 | 8/27/14 | $557,500 | 4,813 | 1996 | 2SFB | 4.5 | 1 | 3 | Full/Unf. | $115.83 |
| 292 | 22 31 402 020 | 8/15/12 | $164,000 | 1,385 | 1965 | 1SB | 1 | 1 | 1 | Full/Unf. | $118.41 |
| 293 | 22 31 402 022 | 9/5/14 | $150,000 | 1,427 | 1956 | 1SF | 1 | 0 | 2 | Full/Unf. | $105.12 |
| 294 | 22 32 103 010 | 4/14/14 | $345,500 | 2,894 | 1986 | 2SF | 2 | 1 | 3 | Part/Unf. | $119.38 |
| 295 | 22 32 103 023 | 4/3/13 | $497,000 | 3,244 | 1991 | 2SFB | 2.5 | 2 | 3 | Full/Unf. | $153.21 |
| 296 | 22 32 108 005 | 2/13/13 | $275,000 | 3,497 | 1982 | 2SFB | 3 | 1 | 2 | Full/Unf. | $78.64 |
| 298 | 22 32 114 006 | 7/9/12 | $390,000 | 2,748 | 1991 | 2SB | 2.5 | 1 | 2 | Part/Unf. | $141.92 |
| 299 | 22 32 115 003 | 1/24/14 | $417,000 | 3,570 | 1991 | 2SFB | 3.5 | 1 | 3 | Full/Unf. | $116.81 |
| 300 | 22 32 117 020 | 5/12/14 | $385,000 | 3,072 | 1997 | 2SFB | 3.5 | 1 | 2 | Full/Unf. | $125.33 |
| 301 | 22 32 200 010 | 5/23/14 | $250,000 | 1,315 | 1979 | SPLF | 2 | 1 | 2 | Part/Rec. | $190.11 |
| 302 | 22 32 203 018 | 6/28/12 | $190,000 | 1,766 | 1958 | 2SF | 2 | 0 | 0 | Crawl | $107.59 |
| 307 | 22 32 306 001 | 9/15/14 | $625,000 | 4,884 | 2003 | 2SB | 4.5 | 2 | 3 | Full/Rec. | $127.97 |

Appendix IIb: Continued on Next Page.

Appendix IIb: Continued.

| Sale | Parcel No. | Sale Date | Sale Price | Size | Age | Style | Bath | FP | Gar. | Bsmt/Fin | $/Ft² |
|------|------------|-----------|------------|------|-----|-------|------|-----|------|----------|-------|
| 309 | 22 32 307 001 | 8/31/12 | $595,000 | 3,818 | 2005 | 2SB | 3.5 | 1 | 3 | Full/Unf. | $155.84 |
| 310 | 22 32 307 003 | 1/31/14 | $512,500 | 3,290 | 2002 | 2SB | 3.5 | 2 | 3 | Full/Unf. | $155.78 |
| 311 | 22 32 400 008 | 4/24/12 | $265,000 | 2,015 | 1986 | 1SF | 2 | 1 | 3 | Part/Rec | $131.51 |
| 312 | 22 32 400 021 | 8/1/12 | $262,500 | 2,473 | 1988 | 2SFB | 3 | 1 | 3 | Full/Unf. | $106.15 |
| 313 | 22 33 103 013 | 1/17/14 | $410,000 | 2,207 | 1974 | 1SB | 2 | 1 | 2 | Part/Unf. | $185.77 |
| 314 | 22 33 109 001 | 5/29/14 | $441,500 | 3,368 | 1999 | 2SFB | 2.5 | 1 | 3 | Full/Unf. | $131.09 |
| 315 | 22 33 112 008 | 6/13/14 | $520,000 | 3,275 | 1996 | 2SB | 2.5 | 1 | 2 | Full/Unf. | $158.78 |
| 316 | 22 33 112 015 | 4/5/13 | $446,750 | 3,338 | 1999 | 2SB | 1.5 | 1 | 2 | Part/Unf. | $133.84 |
| 317 | 22 33 113 001 | 5/17/13 | $320,000 | 2,245 | 1997 | 1SFB | 2.5 | 1 | 2 | Part/Rec. | $142.54 |
| 318 | 22 33 113 024 | 3/8/13 | $335,000 | 2,687 | 1997 | 2SFB | 2.5 | 1 | 2 | Full/Unf. | $124.67 |
| 320 | 22 33 116 001 | 12/2/13 | $533,000 | 3,434 | 2013 | 2SFB | 3.5 | 1 | 3 | Full/Unf. | $155.21 |
| 321 | 22 33 116 002 | 4/17/14 | $535,000 | 2,972 | 2014 | 2SFB | 2.5 | 1 | 3 | Full/Unf. | $180.01 |
| 322 | 22 33 116 004 | 11/30/12 | $479,000 | 3,264 | 2011 | 2SFB | 2.5 | 1 | 3 | Full/Unf. | $146.75 |
| 323 | 22 33 116 005 | 1/17/14 | $461,000 | 3,095 | 2014 | 2SFB | 2.5 | 1 | 3 | Full/Unf. | $148.95 |
| 324 | 22 33 116 006 | 5/30/14 | $468,226 | 3,163 | 2014 | 2SFB | 2.5 | 1 | 2 | Full/Unf. | $148.03 |
| 325 | 22 33 116 007 | 5/23/13 | $450,000 | 3,074 | 2011 | 2SFB | 2.5 | 1 | 2 | Full/Unf. | $146.39 |
| 326 | 22 33 116 008 | 4/25/13 | $498,000 | 3,264 | 2011 | 2SFB | 2.5 | 1 | 3 | Full/Unf. | $152.57 |
| 327 | 22 33 116 009 | 5/30/13 | $485,000 | 2,450 | 2011 | 2SFB | 2.5 | 1 | 3 | Full/Unf. | $197.96 |
| 328 | 22 33 116 012 | 9/28/12 | $452,750 | 3,121 | 2011 | 2SFB | 2.5 | 1 | 3 | Full/Unf. | $145.07 |
| 329 | 22 33 116 013 | 2/8/13 | $515,000 | 3,343 | 2011 | 2SFB | 2.5 | 1 | 3 | Full/Unf. | $154.05 |
| 330 | 22 33 117 001 | 6/11/13 | $459,000 | 3,096 | 2011 | 2SFB | 2.5 | 1 | 3 | Full/Unf. | $148.26 |
| 331 | 22 33 117 002 | 11/30/12 | $615,000 | 3,769 | 2011 | 2SFB | 2.5 | 1 | 3 | Full/Unf. | $163.17 |
| 332 | 22 33 117 003 | 11/1/13 | $531,000 | 3,025 | 2013 | 2SFB | 2.5 | 1 | 3 | Full/Unf. | $175.54 |
| 333 | 22 33 117 004 | 10/17/14 | $515,000 | 2,963 | 2014 | 2SFB | 2.5 | 1 | 3 | Full/Unf. | $173.81 |
| 334 | 22 33 117 005 | 4/23/13 | $450,000 | 3,227 | 2011 | 2SFB | 2.5 | 1 | 3 | Full/Unf. | $139.45 |
| 335 | 22 33 118 002 | 6/30/13 | $529,400 | 3,769 | 2011 | 2SFB | 2.5 | 1 | 3 | Full/Unf. | $140.46 |
| 336 | 22 33 118 003 | 5/30/13 | $565,600 | 3,695 | 2011 | 2SFB | 2.5 | 1 | 3 | Full/Unf. | $158.48 |
| 337 | 22 33 118 006 | 10/30/13 | $588,200 | 4,201 | 2013 | 2SFB | 3.5 | 1 | 3 | Full/Unf. | $140.01 |
| 338 | 22 33 118 010 | 4/17/14 | $499,000 | 3,296 | 2011 | 2SFB | 2.5 | 1 | 3 | Full/Unf. | $151.40 |
| 339 | 22 33 203 011 | 2/1/13 | $475,000 | 1,590 | 1948 | 1SB | 1.5 | 1 | 1 | Full/Rec. | $298.74 |
| Average: | | | | | 1989 | | | | | | $149.06 |

Appendix IIc: Houses Built Post 1970, Lemont, Illinois.

| Sale | Parcel No. | Sale Date | Sale Price | Size | Age | Style | Bath | FF | Gar. | Bsmt/Fin | $/Ft² |
|------|-----------|-----------|-----------|------|-----|-------|------|-----|------|----------|-------|
| Target: | | | | | | | | | | | |
| 3 | 22 29 100 023 | Jun-14 | $262,500 | 1,680 | 1970 | 1SB | 2.5 | 1 | 2 | Full/Rec | $156.25 |
| 17 | 22 29 112 025 | May-12 | $267,000 | 1,613 | 1973 | 1SB | 2 | 1 | 2 | Full/Rec | $165.53 |
| 21 | 22 29 114 025 | Jan-12 | $365,000 | 2390 | 2005 | 2SFB | 2.5 | 0 | 2 | Full/Unf | $152.72 |
| 30 | 22 29 127 002 | Mar-13 | $333,000 | 2,405 | 1990 | 1.5SFB | 2.5 | 1 | 2 | Full/Unf | $138.46 |
| 31 | 22 29 301 029 | Oct-14 | $521,000 | 3,883 | 2002 | 3SFB | 3.5 | 3 | 2 | Full/Rec | $134.17 |
| 32 | 22 29 303 002 | Jul-13 | $500,000 | 4,054 | 2002 | 2SF | 3.5 | 1 | 2 | Full/Rec | $123.33 |
| 39 | 22 29 315 002 | May-12 | $375,000 | 2196 | 1990 | 1SB | 2 | 1 | 2 | Full/Unf | $170.77 |
| 41 | 22 29 316 011 | Aug-13 | $316,000 | 2,288 | 1990 | 2SFB | 2.5 | 1 | 2 | Full/Unf | $138.11 |
| 42 | 22 29 316 018 | Jul-14 | $520,000 | 4,032 | 2006 | 2SFB | 3.5 | 3 | 3 | Full/Rec | $128.97 |
| 45 | 22 29 319 012 | Jan-14 | $305,500 | 2,057 | 1990 | 2SFB | 2.5 | 1 | 2 | Full/Unf | $148.52 |
| 46 | 22 29 319 015 | Jun-14 | $360,000 | 2,434 | 1991 | 1.5SFB | 2.5 | 1 | 2 | Full/Unf | $147.90 |
| 48 | 22 29 324 005 | Aug-12 | $369,000 | 2,800 | 1996 | 2SFB | 2.5 | 1 | 2 | Full/Unf | $131.79 |
| 49 | 22 29 325 003 | Jul-12 | $420,000 | 3047 | 1999 | 2SFB | 2.5 | 1 | 3 | Full/Rec | $137.84 |
| 55 | 22 30 205 033 | Apr-12 | $285,000 | 2465 | 1987 | 2SFB | 2.5 | 1 | 2 | Full/Unf | $115.62 |
| 56 | 22 30 205 039 | Apr-13 | $380,000 | 2,568 | 1994 | 2SF | 2.5 | 1 | 2 | Full/Unf | $147.98 |
| 58 | 22 30 206 035 | Jun-12 | $256,000 | 1949 | 1987 | 2SF | 1.5 | 1 | 2 | Full/Unf | $131.35 |
| 59 | 22 30 206 037 | Aug-14 | $320,000 | 1,843 | 1971 | 2SF | 2.5 | 0 | 2 | Part/Unf | $173.63 |
| 62 | 22 30 207 023 | Mar-13 | $327,500 | 2,572 | 1986 | 2SF | 2.5 | 1 | 3 | Crawl | $127.33 |
| 63 | 22 30 207 047 | Aug-13 | $277,500 | 1,845 | 1988 | 1SFB | 1.5 | 1 | 2 | Part/Unf | $150.41 |
| 64 | 22 30 207 060 | Jun-12 | $305,000 | 2365 | 1987 | 2SFB | 2.5 | 0 | 2 | Full/Unf | $128.96 |
| 65 | 22 30 208 002 | Jan-14 | $499,000 | 3,376 | 2014 | 2SFB | 2.5 | 1 | 3 | Full/Unf | $147.81 |
| 66 | 22 30 305 002 | Sep-13 | $575,736 | 3,452 | 2011 | 2SFB | 2 | 2 | 3 | Full/Rec | $166.78 |
| 67 | 22 30 306 014 | Oct-13 | $475,000 | 3,395 | 2006 | 1.5SB | 3.5 | 3 | 3 | Full/Unf | $139.91 |
| 68 | 22 30 308 007 | Apr-12 | $575,000 | 4,641 | 2006 | 2SFB | 3.5 | 2 | 3 | Full/Unf | $123.90 |
| 69 | 22 30 308 008 | Oct-13 | $572,900 | 3,803 | 2005 | 2SFB | 4 | 2 | 3 | Full/Unf | $150.64 |
| 70 | 22 30 308 009 | Jan-12 | $575,000 | 3514 | 2006 | 2SB | 2.5 | 2 | 3 | Full/Unf | $163.63 |
| 72 | 22 30 308 009 | Jun-14 | $615,000 | 3,514 | 2006 | 2SFB | 2.5 | 2 | 3 | Full/Unf | $175.01 |
| 73 | 22 30 309 009 | Jul-14 | $479,900 | 3,139 | 2014 | 2SFB | 3.5 | 1 | 3 | Full/Unf | $152.88 |
| 74 | 22 30 310 001 | May-13 | $562,500 | 3,209 | 2013 | 2SFB | 3.5 | 1 | 3 | Full/Unf | $175.29 |
| 75 | 22 30 310 011 | Dec-13 | $494,000 | 3,162 | 2013 | 2SFB | 2.5 | 1 | 3 | Full/Unf | $156.23 |
| 76 | 22 30 311 001 | May-13 | $549,000 | 3,736 | 2006 | 2SFB | 3.5 | 2 | 3 | Full/Unf | $146.95 |
| 77 | 22 30 311 005 | Jun-13 | $550,000 | 3,381 | 2006 | 2SFB | 3.5 | 1 | 3 | Full/Unf | $162.67 |
| 78 | 22 30 312 002 | Apr-13 | $445,000 | 3,669 | 2005 | 2SFB | 2.5 | 2 | 3 | Full/Unf | $121.29 |
| 79 | 22 30 312 012 | Jun-12 | $555,000 | 4273 | 2009 | 2SFB | 3.5 | 2 | 3 | Full/Unf | $129.89 |
| 80 | 22 30 312 020 | Jun-13 | $485,000 | 3,489 | 2011 | 2SFB | 3 | 1 | 3 | Full/Unf | $139.01 |
| 81 | 22 30 313 010 | Sep-14 | $532,000 | 3,692 | 2008 | 2SFB | 2.5 | 0 | 3 | Full/Unf | $144.10 |
| 82 | 22 30 404 009 | Mar-14 | $287,500 | 2,558 | 1994 | 1SFB | 2.5 | 1 | 2 | Part/Unf | $112.39 |
| 85 | 22 30 406 004 | Apr-14 | $430,000 | 3,399 | 1994 | 2SFB | 2.5 | 1 | 3 | Full/Rec | $126.51 |
| 86 | 22 30 406 013 | Jun-14 | $435,000 | 3,139 | 1994 | 2SFB | 2.5 | 1 | 2 | Full/Unf | $138.58 |
| 87 | 22 30 406 025 | Jan-14 | $400,000 | 2,923 | 1997 | 2SFB | 2.5 | 1 | 3 | Full/Unf | $136.85 |
| 88 | 22 30 407 009 | Jul-12 | $282,000 | 2,739 | 1994 | 2SFB | 2.5 | 1 | 2 | Full/Unf | $102.96 |
| 89 | 22 30 408 005 | Aug-13 | $399,000 | 3,270 | 1997 | 2SFB | 2.5 | 1 | 2 | Full/Unf | $122.02 |
| 90 | 22 30 413 010 | Aug-13 | $357,500 | 2,583 | 1996 | 1SFB | 3 | 1 | 2 | Part/Unf | $138.40 |
| Average: | | | | | 1998 | | | | | | $142.40 |

Appendix IIc: Continued on Next Page.

Appendix IIc: Continued.

| Sale | Parcel No. | Sale Date | Sale Price | Size | Age | Style | Bath | FP | Gar. | Bsmt/Fin | $/Ft$^2$ |
|------|------------|-----------|-----------|------|-----|-------|------|----|----|---------|------------|
| Control |
| 93 | 22 20 427 012 | Sep-13 | $320,000 | 1,964 | 1996 | 2SF | 1.5 | 0 | 2 | Full/Unf | $162.93 |
| 106 | 22 21 303 024 | Feb-12 | $312,000 | 2,111 | 1991 | 2SFB | 2.5 | 1 | 2 | Part/Unf | $147.80 |
| 107 | 22 21 303 026 | May-14 | $320,000 | 2,118 | 1993 | 2SFB | 1.5 | 1 | 2 | Part/Unf | $151.09 |
| 108 | 22 21 303 042 | Feb-14 | $369,000 | 2,172 | 1993 | 1SF | 1.5 | 1 | 3 | Full/Unf | $169.89 |
| 109 | 22 21 305 022 | Oct-14 | $343,000 | 2,111 | 1991 | 2SFB | 2.5 | 1 | 2 | Part/Unf | $162.48 |
| 110 | 22 21 305 034 | Jul-14 | $325,000 | 2,538 | 1991 | 2SFB | 2.5 | 1 | 2 | Full/Unf | $128.05 |
| 112 | 22 21 307 020 | Aug-14 | $785,000 | 4,229 | 2002 | 2SFB | 4 | 1 | 4 | Full/Unf | $185.62 |
| 113 | 22 21 308 017 | Sep-13 | $450,000 | 3,175 | 1999 | 2SFB | 2.5 | 1 | 2 | Full/Unf | $141.73 |
| 115 | 22 21 311 020 | Apr-14 | $470,000 | 3,261 | 2002 | 2SFB | 2.5 | 1 | 2 | Full/Unf | $144.13 |
| 118 | 22 21 409 020 | Nov-12 | $390,000 | 2,804 | 1997 | 2SFB | 2.5 | 1 | 2 | Full/Unf | $139.09 |
| 120 | 22 21 414 002 | Feb-14 | $360,000 | 2,261 | 1999 | 1SFB | 2 | 1 | 2 | Full/Unf | $159.22 |
| 122 | 22 27 207 012 | Sep-14 | $595,000 | 2,720 | 2002 | 2SFB | 2.5 | 1 | 3 | Full/Unf | $218.75 |
| 124 | 22 27 401 021 | Dec-13 | $375,000 | 2,629 | 1997 | 1SFB | 2.5 | 1 | 3 | Full/Unf | $142.64 |
| 125 | 22 27 401 031 | Oct-14 | $355,000 | 2,775 | 1991 | 1SB | 2.5 | 1 | 2 | Full/Unf | $127.93 |
| 126 | 22 27 406 002 | Oct-14 | $549,137 | 2,935 | 1996 | 2SFB | 3 | 1 | 4 | Full/Unf | $187.10 |
| 127 | 22 27 407 003 | Sep-12 | $450,000 | 4,105 | 1999 | 2SB | 2 | 1 | 3 | Full/Unf | $109.62 |
| 129 | 22 28 102 012 | Jul-13 | $290,000 | 1,514 | 1993 | 1SFB | 2.5 | 0 | 2 | Part/Rec | $191.55 |
| 137 | 22 28 105 012 | May-14 | $172,000 | 968 | 1978 | 1SF | 1 | 0 | 2 | Full/Unf | $177.69 |
| 144 | 22 28 107 020 | May-12 | $262,000 | 2021 | 1988 | 1SFB | 2.5 | 1 | 3 | Full/Unf | $129.64 |
| 145 | 22 28 109 006 | Jul-13 | $340,000 | 1,956 | 1991 | 1SB | 2.5 | 1 | 3 | Full/Unf | $173.82 |
| 147 | 22 28 203 015 | Jun-12 | $240,000 | 1800 | 1990 | 1SFB | 2 | 1 | 2 | Part/Rec | $133.33 |
| 148 | 22 28 204 006 | Jun-13 | $300,000 | 2,130 | 1991 | 2SF | 2.5 | 1 | 3 | Part/Unf | $140.85 |
| 149 | 22 28 204 007 | Apr-12 | $208,000 | 2475 | 1976 | 1SB | 2 | 0 | 2 | Crawl | $84.04 |
| 155 | 22 28 209 019 | Aug-12 | $430,000 | 2,114 | 1993 | 2SFB | 2 | 1 | 2 | Full/Unf | $203.41 |
| 156 | 22 28 210 020 | Apr-14 | $318,000 | 2,244 | 1990 | 2SFB | 2.5 | 1 | 2 | Part/Unf | $141.71 |
| 157 | 22 28 211 001 | Feb-13 | $324,000 | 2,303 | 1993 | 2SFB | 2.5 | 1 | 3 | Part/Unf | $140.69 |
| 158 | 22 28 211 004 | Nov-13 | $385,000 | 2,048 | 1990 | 1SFB | 2 | 1 | 2 | Part/Rec | $187.99 |
| 159 | 22 28 211 005 | Mar-14 | $340,000 | 3,438 | 1990 | 2SB | 2.5 | 1 | 2 | Part/Unf | $98.89 |
| 161 | 22 28 217 003 | Dec-13 | $355,000 | 2,404 | 1995 | 2SFB | 2.5 | 1 | 3 | Full/Unf | $147.67 |
| 162 | 22 28 217 013 | Sep-13 | $375,000 | 2,369 | 1996 | 1SB | 2.5 | 1 | 2 | Part/Rec | $158.29 |
| 163 | 22 28 302 003 | Oct-14 | $360,000 | 3,361 | 2000 | 1SB | 2 | 1 | 2 | Full/Unf | $107.11 |
| 164 | 22 28 302 006 | Nov-14 | $305,000 | 2,091 | 2002 | 2SFB | 3.5 | 1 | 3 | Full/Rec | $145.86 |
| 165 | 22 28 303 015 | Jul-14 | $377,000 | 2,490 | 2000 | 2SFB | 2.5 | 1 | 2 | Full/Unf | $151.41 |
| 166 | 22 28 305 012 | Aug-12 | $395,900 | 2,534 | 1997 | 2SFB | 2.5 | 1 | 3 | Full/Unf | $156.24 |
| 167 | 22 28 305 013 | Aug-13 | $408,761 | 2,490 | 1997 | 2SFB | 2.5 | 1 | 3 | Full/Unf | $164.16 |
| 170 | 22 28 306 045 | Aug-12 | $335,000 | 2,200 | 1999 | 2SFB | 2.5 | 1 | 2 | Full/Unf | $152.27 |
| 173 | 22 28 308 017 | Mar-13 | $370,000 | 3,035 | 2006 | 2SFB | 2.5 | 1 | 3 | Part/Unf | $121.91 |
| 174 | 22 28 310 023 | Jan-14 | $430,000 | 3,035 | 2005 | 2SFB | 2.5 | 1 | 3 | Full/Unf | $141.68 |
| 175 | 22 28 310 038 | Sep-12 | $394,000 | 3,321 | 2006 | 2SFB | 2.5 | 1 | 3 | Part/Unf | $118.64 |
| 176 | 22 28 312 001 | Feb-12 | $383,000 | 2581 | 2000 | 1SFB | 2.5 | 1 | 2 | Full/Unf | $148.39 |
| 177 | 22 28 314 002 | May-12 | $397,500 | 3381 | 2002 | 2SFB | 2.5 | 1 | 2 | Part/Unf | $117.57 |
| 178 | 22 28 407 007 | Feb-13 | $455,000 | 2,955 | 1994 | 2SFB | 2.5 | 1 | 3 | Full/Unf | $153.98 |
| 179 | 22 28 408 003 | Jun-13 | $392,000 | 3,048 | 1996 | 1SB | 2.5 | 1 | 2 | Full/Unf | $128.61 |
| 180 | 22 28 408 007 | Jun-12 | $370,000 | 3,409 | 1996 | 2SFB | 2.5 | 1 | 2 | Part/Unf | $108.54 |
| 181 | 22 28 408 013 | May-13 | $440,000 | 3,048 | 1996 | 2SB | 2.5 | 1 | 3 | Full/Unf | $144.36 |
| 182 | 22 28 409 010 | Aug-13 | $340,000 | 2,120 | 1996 | 1SB | 2.5 | 1 | 2 | Full/Unf | $160.38 |

Appendix IIc: Continued on Next Page.

Appendix IIc: Continued.

| Sale | Parcel No. | Sale Date | Sale Price | Size | Age | Style | Bath | FP | Gar. | Bsmt/Fin | $/Ft$^2$ |
|------|------------|-----------|------------|------|-----|-------|------|----|----|----------|-------|
| 183 | 22 28 410 014 | Jul-14 | $355,000 | 1,896 | 2002 | 1SB | 2 | 1 | 2 | Full/Unf | $187.24 |
| 185 | 22 28 411 003 | Apr-14 | $427,500 | 3,367 | 1994 | 2SB | 2.5 | 1 | 3 | Full/Unf | $126.97 |
| 187 | 22 28 411 039 | Feb-12 | $419,000 | 2938 | 1997 | 2SB | 2.5 | 1 | 2 | Full/Unf | $142.61 |
| 188 | 22 28 412 017 | Feb-14 | $485,000 | 3,297 | 1996 | 2SFB | 4 | 1 | 3 | Part/Rec | $147.10 |
| 189 | 22 28 413 004 | Oct-14 | $490,000 | 3,268 | 1997 | 2SB | 2.5 | 1 | 2 | Full/Unf | $149.94 |
| 190 | 22 28 415 012 | Sep-13 | $402,500 | 1,922 | 2009 | 1SB | 2 | 1 | 3 | Full/Rec | $209.42 |
| 191 | 22 28 415 024 | Mar-12 | $395,000 | 2637 | 2011 | 2SFB | 2.5 | 1 | 3 | Full/Unf | $149.79 |
| 192 | 22 28 415 027 | Jun-14 | $372,000 | 2,535 | 2006 | 2SFB | 2.5 | 1 | 3 | Full/Unf | $146.75 |
| 193 | 22 28 416 002 | Aug-12 | $395,000 | 3,381 | 2002 | 2SFB | 2.5 | 1 | 2 | Part/Unf | $116.83 |
| 194 | 22 28 416 017 | Nov-14 | $385,000 | 2,535 | 2006 | 2SFB | 2.5 | 1 | 2 | Full/Unf | $151.87 |
| 195 | 22 28 417 002 | Aug-13 | $395,000 | 3,381 | 2002 | 2SFB | 2.5 | 1 | 2 | Part/Unf | $116.83 |
| 196 | 22 28 417 015 | Jul-13 | $423,500 | 3,034 | 2006 | 2SFB | 2.5 | 1 | 3 | Full/Unf | $139.58 |
| 203 | 22 29 213 031 | Oct-14 | $185,000 | 1,072 | 1987 | 1SF | 1.5 | 0 | 2 | Full/Unf | $172.57 |
| 208 | 22 29 216 002 | Feb-14 | $267,000 | 1,768 | 1992 | 2SF | 2 | 1 | 1 | Full/Unf | $151.02 |
| 212 | 22 29 218 022 | Sep-14 | $268,000 | 1,187 | 1988 | 1SF | 1.5 | 0 | 3 | Full/Unf | $225.78 |
| 213 | 22 29 218 022 | Jun-12 | $220,000 | 1187 | 1988 | 1SF | 1.5 | 0 | 3 | Full/Unf | $185.34 |
| 215 | 22 29 219 011 | Feb-12 | $288,000 | 1647 | 1993 | 2SF | 1.5 | 0 | 2 | Part/Unf | $174.86 |
| 216 | 22 29 220 011 | Jul-14 | $230,000 | 2,357 | 1997 | 2SF | 2 | 1 | 2 | Slab | $97.58 |
| 218 | 22 29 225 006 | Feb-13 | $182,000 | 1,139 | 1988 | 1SF | 1.5 | 0 | 3 | Part/Unf | $159.79 |
| 222 | 22 29 227 037 | Oct-14 | $350,000 | 1,967 | 2014 | 2SF | 2.5 | 1 | 2 | Full/Unf | $177.94 |
| 224 | 22 29 229 004 | Nov-13 | $72,000 | 2,078 | 2014 | 2SFB | 2.5 | 1 | 2 | Full/Rec | $34.65 |
| 225 | 22 29 232 004 | Aug-13 | $250,000 | 2,103 | 1978 | 2SFB | 2.5 | 1 | 2 | Part/Unf | $118.88 |
| 226 | 22 29 232 021 | May-14 | $345,000 | 2,470 | 1996 | 2SF | 3 | 1 | 2 | Full/Unf | $139.68 |
| 229 | 22 29 233 033 | Jan-14 | $350,000 | 2,980 | 1986 | 2SF | 1.5 | 1 | 2 | Full/Unf | $117.45 |
| 230 | 22 29 234 012 | May-14 | $250,000 | 1,385 | 1984 | 1SB | 1.5 | 0 | 2 | Part/Rec | $180.51 |
| 231 | 22 29 235 008 | Jul-12 | $271,500 | 2449 | 1978 | 2SFB | 2.5 | 1 | 2 | Part/Unf | $110.86 |
| 244 | 22 29 409 013 | Oct-13 | $260,000 | 1,434 | 1974 | 1SF | 1 | 1 | 0 | Full/Unf | $181.31 |
| 252 | 22 29 414 017 | Mar-13 | $240,000 | 2,183 | 1978 | 2SFB | 2.5 | 1 | 2 | Full/Unf | $109.94 |
| 254 | 22 29 414 048 | Mar-12 | $265,000 | 2652 | 1981 | 2SF | 2.5 | 2 | 2 | Part/Unf | $99.92 |
| 255 | 22 29 416 063 | May-14 | $335,000 | 2,307 | 1986 | 2SFB | 2.5 | 1 | 2 | Full/Unf | $145.21 |
| 261 | 22 29 423 017 | Feb-12 | $235,000 | 2080 | 1990 | 1SFB | 2.5 | 1 | 2 | Part/Unf | $112.98 |
| 262 | 22 31 103 004 | Jul-13 | $435,500 | 3,056 | 2002 | 2SFB | 3 | 1 | 2 | Full/Unf | $142.51 |
| 263 | 22 31 103 006 | Jun-13 | $441,500 | 2,773 | 1999 | 2SFB | 3 | 1 | 3 | Full/Unf | $159.21 |
| 264 | 22 31 103 007 | Sep-12 | $395,000 | 2,715 | 1999 | 2SFB | 2.5 | 1 | 3 | Full/Unf | $145.49 |
| 265 | 22 31 103 008 | Aug-12 | $420,000 | 2,773 | 1999 | 2SFB | 3.5 | 1 | 2 | Full/Unf | $151.46 |
| 266 | 22 31 103 015 | Dec-13 | $489,000 | 2,507 | 2013 | 1SB | 3.5 | 2 | 3 | Full/Rec | $195.05 |
| 267 | 22 31 106 002 | Jul-13 | $407,500 | 2,775 | 2002 | 2SFB | 2.5 | 1 | 2 | Full/Unf | $146.85 |
| 268 | 22 31 106 018 | Jun-13 | $330,000 | 2,554 | 1999 | 2SFB | 2.5 | 1 | 2 | Full/Unf | $129.21 |
| 269 | 22 31 106 020 | Oct-13 | $400,000 | 2,641 | 1999 | 2SFB | 2.5 | 1 | 2 | Full/Unf | $151.46 |
| 270 | 22 31 107 015 | Sep-12 | $435,000 | 3,969 | 1999 | 2SFB | 2.5 | 1 | 2 | Full/Rec | $109.60 |
| 271 | 22 31 108 002 | Jun-12 | $390,000 | 3,377 | 2002 | 2SFB | 2.5 | 1 | 2 | Full/Unf | $115.49 |
| 273 | 22 31 109 006 | Sep-13 | $484,874 | 3,955 | 2013 | 2SFB | 4.5 | 2 | 3 | Full/Rec | $122.60 |
| 274 | 22 31 109 007 | May-14 | $490,700 | 3,976 | 2014 | 2SFB | 4.5 | 1 | 3 | Full/Rec | $123.42 |
| 275 | 22 31 109 008 | Sep-14 | $489,000 | 3,287 | 2014 | 2SFB | 2.5 | 1 | 2 | Full/Unf | $148.77 |
| 276 | 22 31 110 012 | Nov-13 | $450,000 | 3,603 | 2013 | 2SFB | 3.5 | 1 | 3 | Full/Unf | $124.90 |
| 277 | 22 31 112 001 | Jul-14 | $588,838 | 3,296 | 2014 | 2SFB | 2.5 | 1 | 3 | Full/Unf | $178.65 |
| 278 | 22 31 112 004 | Feb-14 | $449,910 | 3,308 | 2014 | 2SFB | 2.5 | 1 | 2 | Full/Unf | $136.01 |

Appendix IIc: Continued on Next Page.

Appendix IIc: Continued.

| Sale | Parcel No. | Sale Date | Sale Price | Size | Age | Style | Bath | FP | Gar. | Bsmt/Fin | $/Ft² |
|------|-----------|-----------|-----------|------|-----|-------|------|-----|------|----------|-------|
| 280 | 22 31 203 001 | Sep-14 | $445,000 | 3,640 | 2014 | 2SFB | 2.5 | 1 | 2 | Full/Unf | $122.25 |
| 282 | 22 31 205 008 | Sep-13 | $620,000 | 3,594 | 2005 | 2SFB | 2.5 | 1 | 4 | Full/Unf | $172.51 |
| 283 | 22 31 206 002 | Apr-14 | $509,000 | 4,148 | 2014 | 2SFB | 3.5 | 1 | 3 | Full/Unf | $122.71 |
| 285 | 22 31 206 008 | Apr-13 | $442,000 | 3,532 | 2002 | 2SFB | 2.5 | 1 | 3 | Full/Unf | $125.14 |
| 286 | 22 31 206 020 | Oct-13 | $433,880 | 3,393 | 2011 | 2SFB | 3.5 | 1 | 3 | Full/Unf | $127.88 |
| 287 | 22 31 207 001 | Mar-12 | $360,000 | 2382 | 2005 | 1SB | 2.5 | 1 | 4 | Full/Unf | $151.13 |
| 289 | 22 31 207 012 | Jun-13 | $439,000 | 3,166 | 2011 | 2SFB | 3.5 | 1 | 3 | Full/Unf | $138.66 |
| 290 | 22 31 304 005 | Apr-12 | $298,500 | 2837 | 1988 | 2SFB | 2.5 | 1 | 2 | Part/Unf | $105.22 |
| 291 | 22 31 307 003 | Aug-14 | $557,500 | 4,813 | 1996 | 2SFB | 4.5 | 1 | 3 | Full/Unf | $115.83 |
| 294 | 22 32 103 010 | Apr-14 | $345,500 | 2,894 | 1986 | 2SF | 2 | 1 | 3 | Part/Unf | $119.38 |
| 295 | 22 32 103 023 | Apr-13 | $497,000 | 3,244 | 1991 | 2SFB | 2.5 | 2 | 3 | Full/Unf | $153.21 |
| 296 | 22 32 108 005 | Feb-13 | $275,000 | 3,497 | 1982 | 2SFB | 3 | 1 | 2 | Full/Unf | $78.64 |
| 298 | 22 32 114 006 | Jul-12 | $390,000 | 2748 | 1991 | 2SB | 2.5 | 1 | 2 | Part/Unf | $141.92 |
| 299 | 22 32 115 003 | Jan-14 | $417,000 | 3,570 | 1991 | 2SB | 3.5 | 1 | 2 | Full/Unf | $116.81 |
| 300 | 22 32 117 020 | May-14 | $385,000 | 3,072 | 1997 | 2SFB | 3.5 | 1 | 3 | Full/Unf | $125.33 |
| 307 | 22 32 306 001 | Sep-14 | $625,000 | 4,884 | 2003 | 2SB | 4.5 | 2 | 3 | Full/Rec | $127.97 |
| 309 | 22 32 307 001 | Aug-12 | $595,000 | 3,818 | 2005 | 2SB | 3.5 | 1 | 3 | Full/Unf | $155.84 |
| 310 | 22 32 307 003 | Jan-14 | $512,500 | 3,290 | 2002 | 2SB | 3.5 | 2 | 3 | Full/Unf | $155.78 |
| 312 | 22 32 400 021 | Aug-12 | $262,500 | 2,473 | 1988 | 2SFB | 3 | 1 | 3 | Full/Unf | $106.15 |
| 314 | 22 33 109 001 | May-14 | $441,500 | 3,368 | 1999 | 2SFB | 2.5 | 1 | 3 | Full/Unf | $131.09 |
| 315 | 22 33 112 008 | Jun-14 | $520,000 | 3,275 | 1996 | 2SB | 2.5 | 1 | 2 | Full/Unf | $158.78 |
| 316 | 22 33 112 015 | Apr-13 | $446,750 | 3,338 | 1999 | 2SB | 1.5 | 1 | 2 | Part/Unf | $133.84 |
| 317 | 22 33 113 001 | May-13 | $320,000 | 2,245 | 1997 | 1SFB | 2.5 | 1 | 2 | Part/Rec | $142.54 |
| 318 | 22 33 113 024 | Mar-13 | $335,000 | 2,687 | 1997 | 2SFB | 2.5 | 1 | 2 | Full/Unf | $124.67 |
| 320 | 22 33 116 001 | Dec-13 | $533,000 | 3,434 | 2013 | 2SFB | 3.5 | 1 | 3 | Full/Unf | $155.21 |
| 321 | 22 33 116 002 | Apr-14 | $535,000 | 2,972 | 2014 | 2SFB | 2.5 | 1 | 3 | Full/Unf | $180.01 |
| 322 | 22 33 116 004 | Nov-12 | $479,000 | 3,264 | 2011 | 2SFB | 2.5 | 1 | 3 | Full/Unf | $146.75 |
| 323 | 22 33 116 005 | Jan-14 | $461,000 | 3,095 | 2014 | 2SFB | 2.5 | 1 | 3 | Full/Unf | $148.95 |
| 324 | 22 33 116 006 | May-14 | $468,226 | 3,163 | 2014 | 2SFB | 2.5 | 1 | 2 | Full/Unf | $148.03 |
| 325 | 22 33 116 007 | May-13 | $450,000 | 3,074 | 2011 | 2SFB | 2.5 | 1 | 2 | Full/Unf | $146.39 |
| 326 | 22 33 116 008 | Apr-13 | $498,000 | 3,264 | 2011 | 2SFB | 2.5 | 1 | 3 | Full/Unf | $152.57 |
| 327 | 22 33 116 009 | May-13 | $485,000 | 2,450 | 2011 | 2SFB | 2.5 | 1 | 3 | Full/Unf | $197.96 |
| 328 | 22 33 116 012 | Sep-12 | $452,750 | 3,121 | 2011 | 2SFB | 2.5 | 1 | 3 | Full/Unf | $145.07 |
| 329 | 22 33 116 013 | Feb-13 | $515,000 | 3,343 | 2011 | 2SFB | 2.5 | 1 | 3 | Full/Unf | $154.05 |
| 330 | 22 33 117 001 | Jun-13 | $459,000 | 3,096 | 2011 | 2SFB | 2.5 | 1 | 3 | Full/Unf | $148.26 |
| 331 | 22 33 117 002 | Nov-12 | $615,000 | 3,769 | 2011 | 2SFB | 2.5 | 1 | 3 | Full/Unf | $163.17 |
| 332 | 22 33 117 003 | Nov-13 | $531,000 | 3,025 | 2013 | 2SFB | 2.5 | 1 | 3 | Full/Unf | $175.54 |
| 333 | 22 33 117 004 | Oct-14 | $515,000 | 2,963 | 2014 | 2SFB | 2.5 | 1 | 3 | Full/Unf | $173.81 |
| 334 | 22 33 117 005 | Apr-13 | $450,000 | 3,227 | 2011 | 2SFB | 2.5 | 1 | 3 | Full/Unf | $139.45 |
| 335 | 22 33 118 002 | Jun-13 | $529,400 | 3,769 | 2011 | 2SFB | 2.5 | 1 | 3 | Full/Unf | $140.46 |
| 336 | 22 33 118 003 | May-13 | $585,600 | 3,695 | 2011 | 2SFB | 2.5 | 1 | 3 | Full/Unf | $158.48 |
| 337 | 22 33 118 006 | Oct-13 | $588,200 | 4,201 | 2013 | 2SFB | 3.5 | 1 | 3 | Full/Unf | $140.01 |
| 338 | 22 33 118 010 | Apr-14 | $499,000 | 3,296 | 2014 | 2SFB | 2.5 | 1 | 3 | Full/Unf | $151.40 |
| Average: | | | | | 1999 | | | | | | $144.78 |

Appendix III: Target and Control Area Sales, Rosecrance Center.

Appendix IIIa: Target and Control Area Sales, Rosecrance Center.

| Sale | Parcel No. | Address | Grantor | Grantee | Doc. No. | Sale Date | Sale Price | Age | Above Grade | Notes | $/Ft2 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Target: | | | | | | | | | | | |
| 1 | 12 13 151 003 | 1975 N. LYFORD | Ruiz | Reid | 20131034223 | Jul-2013 | $ 650,000 | 1900 | 2,748 | Take Back | $ 236.54 |
| 2 | 12 13 376 008 | 1332 UNIVERSITY | Kilduff | Rouse | 20141027250 | Aug-2014 | $ 245,000 | 2006 | 1,945 | | $ 125.96 |
| 3 | 12 13 401 018 | 8525 ROTE | Jud. Sales | FNMA | 20121015333 | Mar-2012 | $ 432,787 | 2006 | 2,610 Bank | | $ 165.82 |
| 4 | 12 13 401 018 | 8525 ROTE | FNMA | Kittleson | 20121031979 | Jul-2012 | $ 295,000 | 2006 | 2,610 Bank | | $ 113.03 |
| 5 | 12 13 401 018 | 8525 ROTE | Kittleson | Speicher | 20141017474 | Apr-2014 | $ 328,000 | 2006 | 2,610 | | $ 125.67 |
| 6 | 12 13 428 006 | 1703 SECLUDED WOODS | Bruchhauser | Wenger | 20131018389 | May-2013 | $ 239,000 | 1984 | 1,715 | | $ 139.36 |
| 7 | 12 13 451 008 | 8603 GROVE HILL | VA | Vistine | 20141033617 | Sep-2014 | $ 196,000 | 1996 | 2,388 Bank | | $ 82.08 |
| 8 | 12 13 476 003 | 1508 SWEETCLOVER | FNMA | Sheila | 20141008105 | Jan-2013 | $ 252,000 | 2002 | 3,288 Bank | | $ 76.69 |
| 9 | 12 13 476 006 | 1428 SWEETCLOVER | DiGiovanni | DiGiovanni | 20121043084 | Oct-2012 | $ 160,000 | 1995 | 1,920 Related | | $ 83.33 |
| 10 | 12 13 476 013 | 1301 SUNMEADOW | Jud. Sales | Deppe | 20121029320 | Jul-2012 | $ 164,439 | 1991 | 2,570 Bank | | $ 63.98 |
| 11 | 12 13 476 013 | 1301 SUNMEADOW | Invest. House | Steigerwald | 20121041324 | Oct-2012 | $ 270,000 | 1991 | 2,570 Flip | | $ 105.06 |
| 12 | 12 13 477 010 | 1396 SUNMEADOW | Licusa | Ady | 20131017766 | Apr-2013 | $ 265,000 | 1993 | 2,710 | | $ 97.79 |
| 13 | 12 13 478 008 | 1389 SUNMEADOW | FNMA | Finner | 20141041358 | Dec-2014 | $ 225,000 | 1989 | 2,967 Bank | | $ 75.83 |
| 14 | 12 24 102 001 | 8021 ROYAL OAKS | Velazquez | Seegert | 20131044597 | Nov-2013 | $ 182,500 | 2004 | 1,788 | | $ 102.07 |
| 15 | 12 24 102 005 | 8081 ROYAL OAKS | Berkowski | Miles | 20121025905 | Apr-2013 | $ 122,000 | 1972 | 1,738 | | $ 70.20 |
| 16 | 12 24 176 003 | 8298 MACINTOSH | Krejci | AH4R-IL | 20131014998 | Mar-2013 | $ 88,000 | 2001 | 1,104 | | $ 79.71 |
| 17 | 12 24 176 006 | 8326 MACINTOSH | Egen | Myers | 20141013880 | May-2014 | $ 124,900 | 2001 | 1,330 | | $ 93.91 |
| 18 | 12 24 178 004 | 8348 RUBICON | Houghton | Thornton | 20121032591 | Aug-2012 | $ 101,500 | 1998 | 1,112 | | $ 91.28 |
| 19 | 12 24 178 007 | 454 UNIVERSITY | Blackhawk Bnk. | Martin | 20131012710 | Mar-2013 | $ 76,000 | 1999 | 1,280 Bank | | $ 59.38 |
| 20 | 12 24 178 008 | 482 UNIVERSITY | Knusli | AH4R-IL | 20121049815 | Aug-2012 | $ 114,000 | 2000 | 1,256 | | $ 90.76 |
| 21 | 12 24 179 015 | 8291 MACINTOSH | Palmer | Gruenberg | 20121035039 | Aug-2012 | $ 114,900 | 2001 | 1,036 | | $ 110.91 |
| 22 | 12 24 180 002 | 8393 UNIVERSITY | ARC Winne. | Barton | 20121004723 | Jan-2012 | $ 147,000 | 2011 | 1,741 Exe. Prop. | | $ 84.43 |
| 23 | 12 24 180 002 | 8320 BLUE RIVER | ARC Winne. | Martin | 20131048237 | Dec-2013 | $ 154,000 | 2013 | 1,893 | | $ 81.35 |
| 24 | 12 24 180 002 | 8460 BLUE RIVER | Alpine Bnk | Farmer | 20141017860 | Feb-2014 | $ 170,000 | 2006 | 2,340 | | $ 72.65 |
| 25 | 12 24 202 001 | 573 CROSS PLAINS | FNMA | Shanks | 20141001193 | Dec-2013 | $ 138,000 | 2006 | 1,802 Bank | | $ 76.58 |
| 26 | 12 24 202 002 | 545 VERONA | HUD | Booth | 20131011322 | Mar-2013 | $ 90,000 | 2006 | 1,680 Bank | | $ 53.57 |
| 27 | 12 24 251 001 | 8480 BLUE RIVER | ARC Winne. | Akre | 20131017675 | Feb-2013 | $ 150,000 | 2012 | 1,864 Exe. Prop. | | $ 81.34 |
| 28 | 12 24 252 008 | 8609 BLUE RIVER | Boens | Potocki | 20141007562 | Feb-2014 | $ 129,000 | 2004 | 1,391 | | $ 92.74 |
| 29 | 12 24 253 003 | 478 CROSS PLAINS | Nelson | Brown | 20131045393 | Nov-2013 | $ 139,000 | 2004 | 1,308 | | $ 106.27 |
| 30 | 12 24 254 001 | 515 CROSS PLAINS | Becker | Dozall | 20141036818 | Aug-2014 | $ 166,000 | 2004 | 1,451 | | $ 114.40 |

Appendix IIIa: Continued on Next Page

Appendix IIIa: Continued

| Sale | Parcel No. | Address | Grantor | Grantee | Doc. No. | Sale Date | Sale Price | Age | Above Grade | Notes | $/Ft2 |
|------|-----------|---------|---------|---------|----------|-----------|-----------|-----|-------------|-------|-------|
| 31 | 12 24 254 005 | 423 CROSS PLAINS | FNMA | Betz | 20121014752 | Mar-2012 | $ 148,000 | 2005 | 1,656 | Bank | $ 89.37 |
| 32 | 12 24 254 005 | 423 CROSS PLAINS | Betz | Nat. Resid. | 20131030102 | Jun-2013 | $ 164,500 | 2005 | 1,656 | Bank | $ 99.34 |
| 33 | 12 24 254 005 | 423 CROSS PLAINS | Nat. Resid. | Floyd | 20131030103 | Jun-2013 | $ 164,500 | 2005 | 1,656 | Flip | $ 99.34 |
| 34 | 12 24 254 013 | 532 VERONA | Sammon | Simpson | 20131023783 | Jun-2013 | $ 270,000 | 2006 | 2,335 | | $ 115.63 |
| 35 | 12 24 254 015 | 512 VERONA | FNMA | Kunz | 20141019516 | May-2014 | $ 184,900 | 2006 | 2,804 | Bank | $ 65.94 |
| 36 | 12 24 254 017 | 450 VERONA | Alpine Bnk | Cismesia | 20131050171 | Dec-2013 | $ 180,000 | 2008 | 2,962 | | $ 60.77 |
| 37 | 12 24 255 003 | 419 VERONA | Sporrer | Shanks | 20121038993 | Jul-2012 | $ 149,000 | 2005 | 1,730 | | $ 86.13 |
| Average: | | | | | | | | | | | $ 96.47 |
| Control: | | | | | | | | | | | |
| 38 | 12 11 477 001 | 2751 TIMBER | Lindgren | Dvorak | 20131015730 | Apr-2013 | $ 125,000 | 1965 | 2,056 | | $ 60.80 |
| 39 | 12 11 477 008 | 2591 TIMBER | FNMA | Mutimer | 20131041132 | Sep-2013 | $ 80,000 | 1950 | 1,520 | Bank | $ 52.63 |
| 40 | 12 11 478 015 | 7984 KAHALA | Hathaway | Hathaway | 20141040159 | Dec-2014 | $ 57,500 | 1976 | 1,426 | | $ 40.32 |
| 41 | 12 11 478 015 | 7984 KAHALA | Harris Bnk | Hathaway | 20131035526 | Aug-2013 | $ 55,000 | 1976 | 1,426 | Bank | $ 38.57 |
| 42 | 12 11 478 018 | 7981 KAHALA | Cieland | Jackson | 20121030113 | Jul-2012 | $ 96,000 | 1979 | 1,251 | | $ 76.74 |
| 43 | 12 11 478 019 | 7982 ILL KAI | Vacha | Gregory | 20131043192 | Oct-2013 | $ 102,000 | 1977 | 1,400 | | $ 72.86 |
| 44 | 12 24 376 024 | 311 ASHWELL | 3 Hammer | Bonang | 20141011175 | Apr-2014 | $ 101,000 | 2007 | 1,048 | | $ 96.37 |
| 45 | 12 25 226 006 | 8878 NICOLE | Jud. Sales | HUD | 20121036752 | Jul-2013 | $ 188,378 | 2005 | 1,656 | Bank | $ 132.10 |
| 46 | 12 25 226 006 | 8878 NICOLE | HUD | Hamann | 20141002060 | Jan-2014 | $ 75,000 | 2005 | 1,426 | Bank | $ 52.59 |
| 47 | 12 25 226 006 | 8878 NICOLE | Hamann | Kieth | 20141039941 | Nov-2014 | $ 139,000 | 2005 | 1,426 | | $ 97.48 |
| 48 | 12 25 227 002 | 8903 NICOLE | Wells Fargo | Menart | 20131039790 | Apr-2013 | $ 147,900 | 2004 | 2,444 | Bank | $ 60.52 |
| 49 | 12 25 227 011 | 8924 PUTTER | Liu | Thompson | 20131022130 | Jun-2013 | $ 160,000 | 2004 | 2,482 | | $ 64.46 |
| 50 | 12 25 227 024 | 8928 BIRDIE | Wesley | Reed | 20131038.87 | Sep-2013 | $ 172,000 | 2006 | 1,915 | | $ 89.82 |
| 51 | 12 25 227 025 | 8946 BIRDIE | Russell | Worple | 20141018123 | Jun-2014 | $ 185,900 | 2006 | 1,846 | | $ 100.70 |
| 52 | 12 25 227 028 | 8875 BIRDIE | Oakley Tr | Oakley | 20131035765 | Aug-2013 | $ 208,000 | 2005 | 1,875 | | $ 110.93 |
| 53 | 12 25 227 031 | 8921 BIRDIE | Wallace | Emerson | 20141024160 | Jul-2014 | $ 210,000 | 2005 | 1,854 | | $ 113.27 |
| 54 | 12 25 228 002 | 539 PAR | Jud. Sales | FHLM | 20121028026 | Nov-2012 | $ 114,000 | 2005 | 1,772 | Bank | $ 64.33 |
| 55 | 12 25 228 003 | 553 PAR | Brooks | Deutsch | 20141027173 | Aug-2014 | $ 215,000 | 2005 | 2,552 | | $ 84.25 |
| 56 | 12 25 228 006 | 603 PAR | Hade | Legge | 20141016751 | May-2014 | $ 186,000 | 2004 | 1,920 | | $ 96.88 |
| 57 | 12 25 229 004 | 612 PAR | FNMA | Ketter | 20121010181 | Mar-2014 | $ 175,000 | 2005 | 1,855 | Bank | $ 94.34 |
| 58 | 12 25 229 006 | 640 PAR | Kachekmuss | Soelke | 20121029780 | Jul-2012 | $ 214,000 | 2005 | 1,882 | | $ 113.11 |
| 59 | 12 25 229 006 | 640 PAR | Soelke | NuCom. Mob. | | May-2014 | $ 186,000 | 2005 | 1,892 | No Record | $ 98.31 |
| 60 | 12 25 229 014 | 665 GOLF HILL | Engleby | Heideman | 20131024104 | Jun-2013 | $ 142,500 | 2004 | 1,772 | | $ 80.42 |

Appendix IIIa: Continued on Next Page

Appendix IIIa: Continued

| Sale | Parcel No. | Address | Grantor | Grantee | Doc. No. | Sale Date | Sale Price | Age | Above Grade | Notes | $/Ft2 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 61 | 12 25 302 007 | 1131 GRIGGS | Hunt | Dowell | 20141037578 | Nov-2014 | $ 130,000 | 1992 | 1,798 | | $ 72.30 |
| 62 | 12 25 302 011 | 1193 GRIGGS | Hamilton | LeMaster | 20141008186 | Mar-2014 | $ 173,400 | 1993 | 2,254 | | $ 76.93 |
| 63 | 12 25 302 015 | 1265 GRIGGS | Hendricks | Hendricks | 20131038822 | May-2013 | $ 188,000 | 1992 | 1,905 | Related | $ 98.69 |
| 64 | 12 25 302 019 | 1327 GRIGGS | McGarth | Flosi | 20141033508 | Oct-2014 | $ 182,000 | 1992 | 2,418 | | $ 75.27 |
| 65 | 12 25 303 001 | 1096 GRIGGS | Rose | Floberg Cent. | 20131015893 | Mar-2013 | $ 133,000 | 1995 | 1,798 | Exempt | $ 73.97 |
| 66 | 12 25 303 006 | 1170 GRIGGS | Leak | Brown | 20121020475 | May-2012 | $ 163,500 | 1993 | 1,684 | | $ 97.09 |
| 67 | 12 25 326 015 | 1006 ARCTIC | Warner Tr. | Minick | 20131038983 | Sep-2013 | $ 62,000 | 1964 | 1,438 | Flip | $ 43.12 |
| 68 | 12 25 326 015 | 1006 ARCTIC | Minick | Boughton | 20131038983? | Dec-2013 | $ 74,000 | 1964 | 1,438 | Flip | $ 51.46 |
| 69 | 12 25 326 028 | 8448 VICKI | Colonial Sav. | George | 20121014303 | Mar-2012 | $ 35,000 | 1964 | 960 | Bank | $ 36.46 |
| 70 | 12 25 327 008 | 1156 MILL | 1St. Nat. | Watermolon | 20141021753 | Jun-2014 | $ 87,500 | 1964 | 1,248 | Bank | $ 70.11 |
| 71 | 12 25 352 002 | 8036 SLATER | Galindo | Frenzer | 20141038170 | Nov-2014 | $ 147,900 | 1993 | 1,358 | | $ 108.91 |
| 72 | 12 25 352 029 | 1114 INGRAM | Jackson | Phomsopha | 20141014079 | May-2014 | $ 125,000 | 1995 | 1,818 | | $ 68.76 |
| 73 | 12 25 353 002 | 1218 GRIGGS | B&H Hold. | Hamplios | 20131015059 | Jan-2013 | $ 88,000 | 1992 | 2,454 | Bank | $ 35.86 |
| 74 | 12 25 354 001 | 8009 SLATER | U.S. Bnk. | Ferriter | 20131014857 | Mar-2013 | $ 100,350 | 1992 | 2,418 | Bank | $ 41.50 |
| 75 | 12 25 354 001 | 8009 SLATER | Ferriter | Swanson | 20131032727 | Aug-2013 | $ 198,000 | 1992 | 2,418 | | $ 81.89 |
| 76 | 12 25 354 002 | 8023 SLATER | Ducato | Hoelscher | 20141009848 | Mar-2014 | $ 175,000 | 1992 | 2,182 | Short | $ 80.20 |
| 77 | 12 25 376 019 | 1318 MILL | Fehler Est. | Morrison | 20121016518 | Apr-2012 | $ 86,000 | 1965 | 1,092 | Court Ord. | $ 78.75 |
| 78 | 12 25 377 003 | 1227 RANDALL | Castile | Engleking | 20131039484 | Sep-2013 | $ 75,000 | 1959 | 960 | | $ 78.13 |
| 79 | 12 25 377 009 | 1259 RANDALL | Jackson Tr. | Markley | 20141034279 | Oct-2014 | $ 86,000 | 1960 | 1,536 | | $ 55.99 |
| 80 | 12 25 377 011 | 1289 RANDALL | Jud. Sales | Bk of NY | 20121045550 | Sep-2012 | $ 36,250 | 1960 | 960 | Bank | $ 37.76 |
| 81 | 12 25 378 001 | 1268 RANDALL | Steinborn | Abernathy | 20121019806 | May-2012 | $ 70,000 | 1960 | 1,498 | | $ 46.73 |
| 82 | 12 25 378 004 | 1354 RANDALL | Janicke Est. | Gustman | 20131024829 | Jun-2013 | $ 70,000 | 1959 | 912 | | $ 76.75 |
| 83 | 12 25 379 004 | 8357 TRUDY | FNMA | Michael | 20141040124 | Dec-2014 | $ 85,000 | 1968 | 1,590 | Bank | $ 53.46 |
| 84 | 12 25 401 001 | 1002 RANDALL | Farley | Elliot | 20131022357 | Apr-2013 | $ 155,000 | 1965 | 2,176 | | $ 71.23 |
| 85 | 12 25 401 002 | 1020 RANDALL | Deutsch Bnk | Ullrich | 20141012229 | Apr-2014 | $ 74,900 | 1973 | 1,078 | Bank | $ 69.48 |
| 86 | 12 25 401 018 | 1114 BUDDY | Wells Fargo | Wright | 20121035048 | Aug-2012 | $ 39,200 | 1959 | 1,140 | Bank | $ 34.39 |
| 87 | 12 25 401 018 | 1114 BUDDY | Wright | Wells Fargo | 20131007245 | Feb-2013 | $ 83,500 | 1959 | 1,140 | Bank | $ 73.25 |
| 88 | 12 25 401 024 | 1139 MELWOOD | Erickson | Smith | 29131916690 | Apr-2013 | $ 100,000 | 1961 | 1,080 | | $ 92.59 |
| 89 | 12 25 401 025 | 8648 VICKI | Lee | Tangora | 20121018451 | May-2012 | $ 125,000 | 1959 | 912 | | $ 137.06 |
| 90 | 12 25 402 005 | 1138 MELWOOD | FHLM | Horner | 20131030181 | Jun-2013 | $ 96,000 | 1971 | 1,144 | Bank | $ 83.92 |

Appendix IIIa: Continued on Next Page

Appendix IIIa: Continued

| Sale | Parcel No. | Address | Grantor | Grantee | Doc. No. | Sale Date | Sale Price | Age | Above Grade | Notes | $/Ft2 |
|------|-----------|---------|---------|---------|----------|-----------|-----------|-----|-------------|-------|-------|
| 91 | 12 25 452 003 | 1350 DIXIE | FHLM | Shaver | 20131009298 | Feb-2013 | $ 41,500 | 1960 | 1,313 | Bank | $ 31.61 |
| 92 | 12 25 452 006 | 1470 DIXIE | Posada | Grove | 20131033341 | Aug-2013 | $ 79,700 | 1963 | 1,088 | | $ 73.25 |
| 93 | 12 25 452 013 | 8649 TRUDY | Mellon Bnk | Arcturus Ent. | 20131014191 | Mar-2013 | $ 63,000 | 1960 | 2,108 | QCD | $ 29.89 |
| 94 | 12 25 452 013 | 8649 TRUDY | Arcturus Ent. | Wolf | 20141019138 | Jun-2014 | $ 132,300 | 1960 | 2,108 | | $ 62.76 |
| 95 | 12 25 453 008 | 1446 MELWOOD | Scott Tr | Novak | 20131047329 | Dec-2013 | $ 70,500 | 1959 | 1,508 | | $ 46.75 |
| 96 | 12 26 427 004 | 1111 INGRAM | Panton | Salem | 20121004381 | Feb-2012 | $ 150,000 | 1995 | 2,468 | | $ 60.78 |
| 97 | 12 26 427 005 | 1119 INGRAM | Bratland | Brook. Relo | 20141036308 | Oct-2014 | $ 187,000 | 1994 | 2,130 | Relo. | $ 87.79 |
| 98 | 12 26 427 005 | 1119 INGRAM | Brook. Relo | Wilke | 20141036309 | Nov-2014 | $ 187,000 | 1994 | 2,130 | Relo. | $ 87.79 |
| 99 | 12 26 427 008 | 1143 INGRAM | Anderson | McConnaghy | 20121022209 | Jul-2014 | $ 167,500 | 1995 | 2,158 | | $ 77.62 |
| 100 | 12 26 427 009 | 1161 INGRAM | Luna | Yafai | 20141015794 | May-2014 | $ 150,000 | 1995 | 2,306 | | $ 65.05 |
| 101 | 12 26 427 011 | 1227 INGRAM | U.S. Bnk. | Duckworth | 20141026172 | Jul-2014 | $ 132,000 | 1995 | 2,301 | Bank | $ 57.37 |
| Average: | | | | | | | $ 132,000 | | | | $ 73.04 |

Appendix IIIb: Arm's Length Sales Near Rosecrance Center.

| Sale | Parcel No. | Sale Price | Sale Date | Age | Above Grade | $/Ft² | Base. Fin. | Total Liv. | Rec. Room | Bed | Bath | FP | Style | Garage |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Target: | | | | | | | | | | | | | | |
| 2 | 12 13 376 008 | $245,000 | Aug-2014 | 2006 | 1,945 | $125.96 | 0 | 1,945 | 0 | 3 | 2.0 | 1 | 1SF | 1.0 |
| 5 | 12 13 401 018 | $328,000 | Apr-2014 | 2006 | 2,610 | $125.67 | 0 | 2,610 | 0 | 4 | 2.0 | 1 | 1SF | 2.0 |
| 6 | 12 13 428 006 | $239,000 | May-2013 | 1984 | 1,715 | $139.36 | 932 | 2,647 | 0 | 3 | 3.0 | 1 | BI | 1.0 |
| 12 | 12 13 477 010 | $265,000 | Apr-2013 | 1993 | 2,710 | $97.79 | 0 | 2,710 | 0 | 4 | 2.5 | 1 | 2SF | 2.0 |
| 14 | 12 24 102 001 | $182,500 | Nov-2013 | 2004 | 1,788 | $102.07 | 0 | 1,788 | 0 | 4 | 2.0 | 1 | 1SF | 1.0 |
| 16 | 12 24 176 003 | $ 86,000 | Mar-2013 | 2001 | 1,104 | $79.71 | 0 | 1,104 | 0 | 3 | 1.0 | 0 | SPLF | 1.0 |
| 17 | 12 24 176 006 | $124,900 | May-2014 | 2001 | 1,330 | $93.91 | 0 | 1,330 | 0 | 3 | 2.0 | 0 | 1SF | 1.0 |
| 18 | 12 24 178 004 | $101,500 | Aug-2012 | 1998 | 1,112 | $91.28 | 0 | 1,112 | 834 | 3 | 1.0 | 0 | 1SF | 1.0 |
| 20 | 12 24 178 008 | $114,000 | Aug-2012 | 2000 | 1,256 | $90.76 | 0 | 1,256 | 0 | 3 | 2.0 | 0 | 1SF | 1.0 |
| 21 | 12 24 179 015 | $114,900 | Aug-2012 | 2001 | 1,036 | $110.91 | 0 | 1,036 | 518 | 3 | 2.0 | 0 | 1SF | 1.0 |
| 24 | 12 24 180 004 | $170,000 | Feb-2014 | 2006 | 2,340 | $72.65 | 0 | 2,340 | 0 | 3 | 2.5 | 1 | 2SF | 2.0 |
| 28 | 12 24 252 008 | $129,000 | Feb-2014 | 2004 | 1,391 | $92.74 | 0 | 1,391 | 970 | 3 | 2.0 | 0 | 1SF | 1.0 |
| 29 | 12 24 253 003 | $139,000 | Nov-2013 | 2004 | 1,308 | $106.27 | 0 | 1,308 | 512 | 3 | 2.0 | 0 | 1SF | 1.0 |
| 30 | 12 24 254 001 | $166,000 | Aug-2014 | 2004 | 1,451 | $114.40 | 941 | 2,392 | 0 | 3 | 2.0 | 0 | 1SF | 1.0 |
| 34 | 12 24 254 013 | $270,000 | Jun-2013 | 2006 | 2,335 | $115.63 | 807 | 3,142 | 0 | 4 | 3.5 | 1 | 2SF | 2.0 |
| 36 | 12 24 254 017 | $180,000 | Dec-2013 | 2008 | 2,962 | $60.77 | 0 | 2,962 | 0 | 4 | 2.5 | 1 | 2SF | 2.0 |
| 37 | 12 24 255 003 | $149,000 | Jul-2012 | 2005 | 1,730 | $86.13 | 0 | 1,730 | 0 | 3 | 2.0 | 0 | 1SF | 1.0 |
| Average: | | | | 2002 | | $100.35 | | | | | | | | |
| Control: | | | | | | | | | | | | | | |
| 42 | 12 11 478 018 | $ 96,000 | Jul-2012 | 1979 | 1,251 | $76.74 | 0 | 1,251 | 0 | 3 | 2.0 | 1 | 1SF | 1.0 |
| 43 | 12 11 478 019 | $102,500 | Oct-2013 | 1977 | 1,400 | $72.86 | 0 | 1,400 | 0 | 3 | 2.0 | 1 | 1SF | 1.0 |
| 44 | 12 24 376 024 | $101,000 | Apr-2014 | 2007 | 1,048 | $96.37 | 664 | 1,712 | 0 | 3 | 2.0 | 1 | BI | 1.0 |
| 47 | 12 25 227 006 | $139,000 | Nov-2014 | 2005 | 1,426 | $97.48 | 0 | 1,426 | 0 | 3 | 2.5 | 1 | 1SF | 1.0 |
| 49 | 12 25 227 011 | $160,000 | Jun-2013 | 2004 | 2,482 | $64.46 | 0 | 2,482 | 0 | 4 | 2.5 | 0 | 2SF | 2.0 |
| 50 | 12 25 227 024 | $172,000 | Sep-2013 | 2006 | 1,915 | $89.82 | 0 | 1,915 | 0 | 3 | 2.0 | 1 | 1SF | 1.0 |
| 51 | 12 25 227 025 | $185,900 | Jun-2014 | 2006 | 1,846 | $100.70 | 0 | 1,846 | 0 | 3 | 2.5 | 1 | 1SF | 1.0 |
| 52 | 12 25 227 028 | $208,000 | Aug-2013 | 2005 | 1,875 | $110.93 | 0 | 1,875 | 0 | 3 | 2.0 | 1 | 1SF | 1.0 |
| 53 | 12 25 227 031 | $210,000 | Jul-2014 | 2005 | 1,854 | $113.27 | 0 | 1,854 | 0 | 3 | 2.0 | 1 | 1SF | 1.0 |

Appendix IIIb: Continued on Next Page.

Appendix IIIb: Continued.

| Sale | Parcel No. | Sale Price | Sale Date | Age | Above Grade | $/Ft² | Base. Fin. | Total Liv. | Rec. Room | Bed | Bath | FP | Style | Garage |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 55 | 12 25 228 003 | $215,000 | Aug-2014 | 2005 | 2,552 | $84.25 | 0 | 2,552 | 0 | 4 | 2.5 | 1 | 2SF | 2.0 |
| 56 | 12 25 228 006 | $186,000 | May-2014 | 2004 | 1,920 | $96.88 | 0 | 1,920 | 0 | 3 | 2.0 | 1 | 1SF | 1.0 |
| 58 | 12 25 229 006 | $214,000 | Jul-2012 | 2005 | 1,892 | $113.11 | 0 | 1,892 | 0 | 3 | 2.0 | 1 | 1SF | 1.0 |
| 59 | 12 25 229 006 | $186,000 | May-2014 | 2005 | 1,892 | $98.31 | 0 | 1,892 | 0 | 3 | 2.0 | 1 | 1SF | 1.0 |
| 60 | 12 25 229 014 | $142,500 | Jun-2013 | 2004 | 1,772 | $80.42 | 0 | 1,772 | 0 | 3 | 2.0 | 1 | 1SF | 1.0 |
| 61 | 12 25 302 007 | $130,000 | Nov-2014 | 1992 | 1,798 | $72.30 | 0 | 1,798 | 660 | 3 | 2.0 | 1 | 1SF | 1.0 |
| 62 | 12 25 302 011 | $173,400 | Mar-2014 | 1993 | 2,254 | $76.93 | 0 | 2,254 | 0 | 4 | 2.5 | 1 | 2SF | 2.0 |
| 64 | 12 25 302 019 | $182,000 | Oct-2014 | 1992 | 2,418 | $75.27 | -,080 | 3,498 | 0 | 4 | 3.5 | 2 | 2SF | 2.0 |
| 66 | 12 25 303 006 | $163,500 | May-2012 | 1993 | 1,684 | $97.09 | 0 | 1,684 | 725 | 3 | 2.0 | 1 | 1SF | 1.0 |
| 71 | 12 25 352 002 | $147,900 | Nov-2014 | 1993 | 1,358 | $108.91 | 0 | 2,030 | 0 | 4 | 3.0 | 1 | SPLF | 2.0 |
| 72 | 12 25 352 029 | $125,000 | May-2014 | 1995 | 1,818 | $68.76 | 0 | 1,818 | 1,700 | 3 | 3.0 | 1 | 1SF | 1.0 |
| 75 | 12 25 354 001 | $198,000 | Aug-2013 | 1992 | 2,418 | $81.89 | 600 | 3,018 | 0 | 3 | 2.5 | 0 | 2SF | 2.0 |
| 78 | 12 25 377 003 | $ 75,000 | Sep-2013 | 1959 | 960 | $78.13 | 0 | 960 | 0 | 3 | 1.0 | 0 | 1SF | 1.0 |
| 79 | 12 25 377 009 | $ 86,000 | Oct-2014 | 1960 | 1,536 | $55.99 | 0 | 1,536 | 0 | 3 | 1.5 | 0 | 1SF | 1.0 |
| 81 | 12 25 378 001 | $ 70,000 | May-2012 | 1960 | 1,498 | $46.73 | 0 | 1,498 | 0 | 3 | 1.0 | 0 | 1SF | 1.0 |
| 82 | 12 25 378 004 | $ 70,000 | Jun-2013 | 1959 | 912 | $76.75 | 0 | 912 | 242 | 3 | 1.0 | 0 | 1SF | 1.0 |
| 84 | 12 25 401 001 | $155,000 | Apr-2013 | 1965 | 2,176 | $71.23 | 0 | 2,176 | 168 | 3 | 3.5 | 0 | 1SF | 1.0 |
| 88 | 12 25 401 024 | $100,000 | Apr-2013 | 1961 | 1,080 | $92.59 | 0 | 1,080 | 400 | 3 | 1.0 | 0 | 1SF | 1.0 |
| 89 | 12 25 401 025 | $125,000 | May-2012 | 1959 | 912 | $137.06 | 0 | 912 | 0 | 3 | 1.0 | 0 | 1SF | 1.0 |
| 92 | 12 25 452 006 | $ 79,700 | Aug-2013 | 1963 | 1,088 | $73.25 | 0 | 1,088 | 0 | 3 | 1.0 | 0 | 1SF | 1.0 |
| 95 | 12 25 453 008 | $ 70,500 | Dec-2013 | 1959 | 1,508 | $46.75 | 0 | 1,508 | 0 | 4 | 1.5 | 0 | 1SF | 1.0 |
| 96 | 12 26 427 004 | $150,000 | Feb-2012 | 1995 | 2,468 | $60.78 | 0 | 2,468 | 0 | 4 | 3.5 | 1 | 2SF | 2.0 |
| 99 | 12 26 427 008 | $167,500 | Jul-2014 | 1995 | 2,158 | $77.62 | 0 | 2,158 | 0 | 3 | 2.5 | 1 | 2SF | 2.0 |
| 100 | 12 26 427 009 | $150,000 | May-2014 | 1995 | 2,306 | $65.05 | 0 | 2,306 | 0 | 4 | 2.5 | 1 | 2SF | 2.0 |
| Average: | | | | 1988 | | $83.60 | | | | | | | | |

Appendix IIIc: Houses Built Post 1970 Near Rosecrance Center.

| Sale | Parcel No. | Sale Price | Sale Date | Age | Above Grade | $/Ft² | Base. Fin. | Total Liv. | Rec. Room | Bed | Bath | FP | Style | Garage |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Target: | | | | | | | | | | | | | | |
| 2 | 12 13 376 008 | $ 245,000 | Aug-2014 | 2006 | 1,945 | $125.96 | 0 | 1,945 | 0 | 3 | 2.0 | 1 | 1SF | 1.0 |
| 5 | 12 13 401 018 | $ 328,000 | Apr-2014 | 2006 | 2,610 | $125.67 | 0 | 2,610 | 0 | 4 | 2.0 | 1 | 1SF | 2.0 |
| 12 | 12 13 477 010 | $ 265,000 | Apr-2013 | 1993 | 2,710 | $97.79 | 0 | 2,710 | 0 | 4 | 2.5 | 1 | 2SF | 2.0 |
| 14 | 12 24 102 001 | $ 182,500 | Nov-2013 | 2004 | 1,788 | $102.07 | 0 | 1,788 | 0 | 3 | 2.0 | 1 | 1SF | 1.0 |
| 17 | 12 24 176 006 | $ 124,900 | May-2014 | 2001 | 1,330 | $93.91 | 0 | 1,330 | 0 | 3 | 2.0 | 0 | 1SF | 1.0 |
| 18 | 12 24 178 004 | $ 101,500 | Aug-2012 | 1998 | 1,112 | $91.28 | 0 | 1,112 | 834 | 3 | 1.0 | 0 | 1SF | 1.0 |
| 20 | 12 24 178 008 | $ 114,000 | Aug-2012 | 2000 | 1,256 | $90.76 | 0 | 1,256 | 0 | 3 | 2.0 | 0 | 1SF | 1.0 |
| 21 | 12 24 179 015 | $ 114,900 | Aug-2012 | 2001 | 1,036 | $110.91 | 0 | 1,036 | 518 | 3 | 2.0 | 0 | 1SF | 1.0 |
| 24 | 12 24 180 004 | $ 170,000 | Feb-2014 | 2006 | 2,340 | $72.65 | 0 | 2,340 | 0 | 3 | 2.5 | 1 | 2SF | 2.0 |
| 28 | 12 24 252 008 | $ 129,000 | Feb-2014 | 2004 | 1,391 | $92.74 | 0 | 1,391 | 970 | 3 | 2.0 | 0 | 1SF | 1.0 |
| 29 | 12 24 253 003 | $ 139,000 | Nov-2013 | 2004 | 1,308 | $106.27 | 0 | 1,308 | 512 | 3 | 2.0 | 0 | 1SF | 1.0 |
| 30 | 12 24 254 001 | $ 166,000 | Aug-2014 | 2004 | 1,451 | $114.40 | 941 | 2,392 | 0 | 3 | 2.0 | 0 | 1SF | 1.0 |
| 34 | 12 24 254 013 | $ 270,000 | Jun-2013 | 2006 | 2,335 | $115.63 | 807 | 3,142 | 0 | 4 | 3.5 | 1 | 2SF | 2.0 |
| 36 | 12 24 254 017 | $ 180,000 | Dec-2013 | 2008 | 2,962 | $60.77 | 0 | 2,962 | 0 | 4 | 2.5 | 1 | 2SF | 2.0 |
| 37 | 12 24 255 003 | $ 149,000 | Jul-2012 | | 1,730 | $86.13 | 0 | 1,730 | 0 | 3 | 2.0 | 0 | 1SF | 1.0 |
| Average: | | | | 2003 | | $99.13 | | | | | | | | |
| Control: | | | | | | | | | | | | | | |
| 42 | 12 11 478 018 | $ 96,000 | Jul-2012 | 1979 | 1,251 | $76.74 | 0 | 1,251 | 0 | 3 | 2.0 | 1 | 1SF | 1.0 |
| 43 | 12 11 478 019 | $ 102,000 | Oct-2013 | 1977 | 1,400 | $72.86 | 0 | 1,400 | 0 | 3 | 2.0 | 1 | 1SF | 1.0 |
| 47 | 12 25 226 006 | $ 139,000 | Nov-2014 | 2005 | 1,426 | $97.48 | 0 | 1,426 | 0 | 3 | 2.5 | 1 | 1SF | 1.0 |
| 49 | 12 25 227 011 | $ 160,000 | Jun-2013 | 2004 | 2,482 | $64.46 | 0 | 2,482 | 0 | 4 | 2.5 | 0 | 2SF | 2.0 |
| 50 | 12 25 227 024 | $ 172,000 | Sep-2013 | 2006 | 1,915 | $89.82 | 0 | 1,915 | 0 | 3 | 2.0 | 1 | 1SF | 1.0 |
| 51 | 12 25 227 025 | $ 185,900 | Jun-2014 | 2006 | 1,846 | $100.70 | 0 | 1,846 | 0 | 3 | 2.5 | 1 | 1SF | 1.0 |
| 52 | 12 25 227 028 | $ 208,000 | Aug-2013 | 2005 | 1,875 | $110.93 | 0 | 1,875 | 0 | 3 | 2.0 | 1 | 1SF | 1.0 |
| 53 | 12 25 227 031 | $ 210,000 | Jul-2014 | 2005 | 1,854 | $113.27 | 0 | 1,854 | 0 | 3 | 2.0 | 1 | 2SF | 2.0 |
| 55 | 12 25 228 003 | $ 215,000 | Aug-2014 | 2005 | 2,552 | $84.25 | 0 | 2,552 | 0 | 4 | 2.5 | 1 | 2SF | 2.0 |
| 56 | 12 25 228 006 | $ 186,000 | May-2014 | 2004 | 1,920 | $96.88 | 0 | 1,920 | 0 | 3 | 2.0 | 1 | 1SF | 1.0 |
| 58 | 12 25 229 006 | $ 214,000 | Jul-2012 | 2005 | 1,892 | $113.11 | 0 | 1,892 | 0 | 3 | 2.0 | 1 | 1SF | 1.0 |

Appendix IIIc: Continued on Next Page.

Appendix IIIc: Continued.

| Sale | Parcel No. | Sale Price | Sale Date | Age | Above Grade | $/Ft² | Base. Fin. | Total Liv. | Rec. Room | Bed | Bath | FP | Style | Garage |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 59 | 12 25 229 006 | $ 186,000 | May-2014 | 2005 | 1,892 | $98.31 | 0 | 1,892 | 0 | 3 | 2.0 | 1 | 1SF | 1.0 |
| 60 | 12 25 229 014 | $ 142,500 | Jun-2013 | 2004 | 1,772 | $80.42 | 0 | 1,772 | 0 | 3 | 2.0 | 1 | 1SF | 1.0 |
| 61 | 12 25 302 007 | $ 130,000 | Nov-2014 | 1992 | 1,798 | $72.30 | 0 | 1,798 | 660 | 3 | 2.0 | 1 | 1SF | 1.0 |
| 62 | 12 25 302 011 | $ 173,400 | Mar-2014 | 1993 | 2,254 | $76.93 | 0 | 2,254 | 0 | 4 | 2.5 | 1 | 2SF | 2.0 |
| 64 | 12 25 302 019 | $ 182,000 | Oct-2014 | 1992 | 2,418 | $75.27 | 1,080 | 3,498 | 0 | 4 | 3.5 | 1 | 2SF | 2.0 |
| 66 | 12 25 303 006 | $ 163,500 | May-2012 | 1993 | 1,684 | $97.09 | 0 | 1,684 | 725 | 3 | 2.0 | 1 | 1SF | 1.0 |
| 72 | 12 25 352 029 | $ 125,000 | May-2014 | 1995 | 1,818 | $68.76 | 0 | 1,818 | 1,700 | 3 | 3.0 | 2 | 1SF | 1.0 |
| 75 | 12 25 354 001 | $ 198,000 | Aug-2013 | 1992 | 2,418 | $81.89 | 600 | 3,018 | 0 | 4 | 2.5 | 1 | 2SF | 2.0 |
| 96 | 12 26 427 004 | $ 150,000 | Feb-2012 | 1995 | 2,468 | $60.78 | 0 | 2,468 | 0 | 4 | 3.5 | 1 | 2SF | 2.0 |
| 99 | 12 26 427 008 | $ 167,500 | Jul-2014 | 1995 | 2,158 | $77.62 | 0 | 2,158 | 0 | 3 | 2.5 | 1 | 2SF | 2.0 |
| 100 | 12 26 427 009 | $ 150,000 | May-2014 | 1995 | 2,306 | $65.05 | 0 | 2,306 | 0 | 4 | 2.5 | 1 | 2SF | 2.0 |
| Average: | | | | 1998 | | $85.22 | | | | | | | | |

Appendix IV: Assumptions and Limiting Conditions.

## ASSUMPTIONS AND LIMITING CONDITIONS

1. Peter Poletti did not make a boundary survey of the property; therefore, no responsibility is assumed in connection with such matters.

2. No responsibility is assumed for matters of a legal nature affecting title to the Subject Site or is an opinion of title rendered. The title is assumed to be good and merchantable.

3. Information furnished by others is assumed to be true, correct, and reliable. A reasonable effort has been made to verify such information; however, Poletti assumes no responsibility for its accuracy.

4. This report considers the Subject Site as being under responsible ownership and competent management.

5. It is assumed that there is general compliance with all federal, state, and local environmental regulations and laws unless non-compliance is stated, defined, and considered in the consulting report.

6. It is assumed that all applicable zoning and use regulations and restrictions have been complied with, unless a nonconformity has been stated, defined, and considered in the consulting report.

7. It is assumed that all required licenses, consents, or other legislative or administrative authority from any local, state, or national governmental or private entity or organization have been or can be obtained or renewed for any use on which the value estimate contained in this report is based.

8. It is assumed that the utilization of the land and improvements is within the boundaries or property lines.

9. Any use of this consulting report by anyone, whomsoever, constitutes acceptance of the above and any other limiting conditions that might be outlined later herein.

<u>GENERAL LIMITING CONDITIONS</u>

1. Poletti and Associates, Inc. will not be required to give testimony or appear in court because of having made this consulting report, with reference to the property in question, unless arrangements have been previously made therefor.

2. Possession of this consulting report, or a copy thereof, does not carry with it the right of publication. It may not be used for any purpose by any person other than the party to whom it is addressed without the written consent of Poletti and Associates, Inc., and, in any event, only with proper written qualification and only in its entirety.

3. Neither all nor any part of the contents of this consulting report, or copy thereof, shall be conveyed to the public through advertising, public relations, news, sales, or any other media without the expressed written consent and approval of Poletti and Associates, Inc.

<u>PURPOSE AND INTENDED USER OF THE REPORT</u>

The purpose of this consulting report is for incorporation in the site location application and use at the zoning siting hearing for the Facility. The intended user of this report is Maxxam Partners, LLC, its representatives, the Zoning Board of Kane County, Illinois and its representatives. Use by anyone else is not permitted. The client for the report is Maxxam Partners, LLC. Maxxam Partners, LLC ordered the report. The date of initial inspection of the subject property is April 30, 2015. The date of the report is June 21, 2015 with the effective date of the opinion being June 21, 2015.



Midwest Office
Sheaffer & Roland Inc. | 611 Stevens St | Geneva | IL 60134

telephone: (630) 208-9898 | fax: (630) 208-9895
information@sheafferandroland.com | sheafferandroland.com

## GLENWOOD SCHOOL FOR BOYS AND GIRLS WATER AND WASTEWATER SYSTEM EVALUATION

### June 9, 2015

Sheaffer & Roland, Inc. designed the Wastewater Reclamation and Reuse System (WWRRS) at the Glenwood School for Boys and Girls in 1992. Sheaffer & Roland, Inc. is both the wastewater and water supply systems Illinois Environmental Protection Agency (IEPA) licensed operator responsible for day to day operations of the facilities. The following is a description of the current facilities on site. Glenwood School for Boys and Girls was constructed in the early 1990's and consists of school and residence facilities clustered around a lake at 41W400 Silver Glen Road in unincorporated St. Charles, Kane County, Illinois. The facility is served by on-site water and wastewater systems.

## I.  EXISTING FACILITIES DESCRIPTION

### A.  Potable Water

The potable water supply system (PWD 10#0890080) at Glenwood School consists of two, 8-inch diameter sandstone (St. Peter Formation) wells. Well #1 currently produces 120 gpm and Well #2 produces 105 gpm. Only one well operates at a time. Both wells are located in close proximity to the Well House.

Approximately half the flow of raw water is softened and is blended with raw water to achieve an acceptable level of hardness. There are two ion exchange units rated at 80 gpm capacity each. The ion exchange units are regenerated with rock salt, and the spent brine is discharge to the sewer via floor drains.

Chlorine gas is used for disinfection with two cylinders mounted on a scale with vacuum regulators mounted on top of each tank, a carrier water pump and an ejector. Although the plant has fluoride dosing equipment, the raw water has natural fluoride, and none is added. The water treatment equipment is located in the Well House.

Finished water is stored in a 150,000-gallon elevated storage tank next to the Well House. The distribution system consists of 6" water main, which runs in a loop around the lake

and has individual building service connections. System pressure generally varies between 43 to 45 psi. Pressure in the system is maintained by the water surface elevation in the elevated water tank.

**B.     Fire System**

The school has a separate water system for fire protection. There are two fire pumps, which draw water from the lake. One of the pumps is electric powered, the other pump is diesel engine powered. The pumps and the diesel fuel tank are located in the well house along with the potable water treatment system. Separate water mains, with hydrants, provide fire protection throughout the Glenwood facility. Water storage for the fire protection system is provided by the on-site lake.

**C.     Wastewater**

The school has its own wastewater collection, treatment and disposal system. Wastewater is collected, pumped, treated in an aerated lagoon, polished in a storage lagoon, disinfected, filtered, and finally applied as irrigation water to grassed areas on the campus. No water is discharged from the property.

The collection system consists of 8-inch diameter sewer mains collecting sewage from lateral sewers at each building and conveying the sewage to the underground wet well at the grinder pumping station on the east side of the campus.

The grinder pumping station collects sewage in its 4-foot diameter wet well by gravity from the collection system. Sewage is ground by the pump cutter heads of the two submersible pumps and piped via an approximately 550 foot long, 2-inch diameter PVC force main to the aerated treatment lagoon. The two pumps are Myers WGX Series submersible grinder pumps with 3 horsepower, 230v/3 phase, 3450 rpm motors and are each rated at 50 gpm at 45.8' TDH.

Emergency power for the sewage pumping station is provided by a 20 KYV, natural gas fueled, Dayton Model 4W117 generator (120/240v, 1 or 3 phase). This generator is located in the Operations Building on the east side of the campus, south of the wastewater lagoons.

Wastewater treatment is provided by an aerated (aerobic) lagoon with a surface area of 13,808 sf. and a volume of 662,715 gallons (88,586 cf.). The lagoon has a hypalon liner to prevent untreated wastewater from percolating into the soil and contaminating groundwater. The lagoon has a design flow of 16,000 gpd and hydraulic retention time of 36 days.

Air is provided to the aerated lagoon by two Roots-Connersville, Type URAl rotary lobe blowers (70 cfm, 9.0 psi discharge pressure each) with 5 horsepower,

230v/3 phase, 1725 rpm Baldor motors. These blowers are also located in the Operations Building. Air is conveyed via 2 -inch steel air headers to two Air-Aqua, 12- inch static tube vertical aerators located in the lagoon.

Treated effluent runs by gravity through a 4-inch diameter pipe to the adjacent treated wastewater storage lagoon, where it receives further aeration and is held for another 120 days detention time. The second lagoon serves a dual purpose; it provides polishing treatment and stores water during inclement weather when irrigation cannot be performed. The treated wastewater storage lagoon has a surface area of 35,948 sf and a working depth of 10 ft. with an additional 3 feet of freeboard. This lagoon has a working volume of 1,918,321 gallons (256,460 cf.) above a permanent depth of 2 feet. The permanent depth of 2 feet is needed to prevent liner displacement by groundwater. This lagoon also has a hypalon liner. Monitoring well MW #4, located nearby, is used for sampling and measuring the level of the groundwater. The groundwater level determines how low the second lagoon may be drained without causing the liner to float.

Effluent from the treated storage lagoon is pumped to irrigation fields from the irrigation pumping station using one Simflo Model SG6C, 4 stage, vertical turbine pump. This pump is rated at 100 gpm at 200' TDH and has a 7.5 horsepower, 230v/3 phase,

3450 rpm motor. The pump can operate either off a float system or a timer. Chlorine solution is introduced into the wet well to provide disinfection.

Chlorine disinfection is accomplished using sodium hypochlorite solution pumped by Milton Roy LMI Series A15 reciprocating pumps with 0.01 to 1.0 gph adjustable flow rate and dual manual control. The normal dose is 10 mg/1 chlorine. The irrigation pumping station wet well and pump discharge piping serve to provide adequate detention time prior to spray irrigation. Chlorine introduction takes place prior to tertiary filtration.

Intermittent sand filters were originally installed for tertiary treatment following the storage lagoon, but the sand filters have since been abandoned and removed. These consisted of two cells with dimensions of 34 ft x 34 ft on the bottom, 64 ft x 64 ft on the top. These filters were cleaned by manual raking with the debris utilized on site as a soil conditioner.

Turbo-disc Filters were installed in 2005 to replace the intermittent sand filters. Pumped effluent from the treated storage lagoon is filtered in these units under pressure prior to irrigation. The system consists of two skid-mounted modular filters with their own controls and piping. The turbo-disc filters are Miller-Leaman Model AA-ATD2(2)x3-1OOM-AC-MOD2 and are located inside the Operations Building along with an air compressor needed for backwashing. The filtration media consists of stacked rings of

porous plastic material that filter fine particles from the effluent. An air and water backwash cycle is initiated to clean the filter based on the operations schedule or when the head loss becomes excessive, whichever is first to occur. Waste backwash water is then drained back to the aerated lagoon.

The irrigation area consists of 4.1 acres of lawn in the campus area around the gym, academic and administration buildings. Several types of Rainbird sprinkler heads, connected by 1-inch diameter schedule 80 PVC piping, provide disposal of disinfected, tertiary effluent during the irrigation season. The spray heads have pop-up nozzles, which retract when not activated to permit lawn mowing. Several types of heads are utilized in order to avoid spraying onto walkways and road surfaces. The soils in the irrigation areas consist of Miami, Octagon, Saybrook and Harvard silt loam soils, which are generally amenable to irrigation systems, with moderate permeability and well drained.

The lawn irrigation area is divided into several watering zones, which are alternated by a control panel. The irrigation pumping rate is 100 gpm as determined by the vertical turbine pump. There are two monitoring wells located nearby the lawn irrigation areas. Samples are taken and analyzed regularly for nitrate, nitrite, ammonia nitrogen, chlorides, sulfates and total dissolved solids. Water table elevation is also monitored at the wells to identify periods of high groundwater level when irrigation cannot be performed. Precipitation and wind velocity are also monitored to identify weather conditions that preclude irrigation operations.

## II. CONDITION AND CAPACITY EVALUATION

### A. General

### B. Water System

All components of the potable water system are sized to accommodate well in excess of the target population of 160 PE.

The firm pumping capacity (capacity with the largest unit out of service) of the wells is 105 gpm, or 151,200 gpd. IEPA requires that the well supply be able to meet the maximum day demand with the firm capacity. Assuming a baseline water use of 100 gpcd and a max to average ratio of 3:1, the wells can serve a population of approximately 500 PE.

The minimum recommended potable water storage volume for a campus-type facility is also equal to the maximum day demand. The 150,000 gallon volume, therefore, can also accommodate up to 500PE. Alternately, the existing storage volume can supply the target population of 160 PE for three days at the maximum demand level.

The water treatment components (ion exchange units and chlorination system) are similarly sized and can serve well over the target population of 160 PE. The water mains are appropriately sized for potable water mains, exclusive of fire protection.

## C.  Wastewater System

The sanitary sewer collection system, consisting of the 8-inch diameter gravity sewers, has a capacity in excess of the target 160 PE. For reference, an 8-inch sewer at minimum slope can serve up to 1100 PE assuming a peak factor of 4.5.

Based on the information provided in the previous section, the firm pumping capacity of the grinder pump station (with one pump out of service) is 50 gpm. or 160 PE, assuming a peaking factor of 4.5. The wet well operating level fluctuation is set at 2 ft. In the 4 ft diameter wet well, this equates to a detention time at average flow (with 160 PE) of approximately 17 minutes, less than the maximum allowable of 30 minutes. The pump cycle time with one pump out of service is 4 starts per hour, below the recommended maximum of 8 starts per hour. The grinder pump station is, therefore, appropriately sized for the target population of 160 PE.

The wastewater treatment and disposal system (also referred to as a wastewater Reclamation and reuse system) -was originally permitted by the IEPA for a capacity of 160 PE.

## III.  CONCLUSIONS

The systems have been maintained in good operating condition during the time in which Sheaffer & Roland has been operating the facilities. Necessary repairs have been made in a timely fashion by the current owner. The equipment condition is consistent with its age and good maintenance practices.

The capacity of the existing system components is summarized as follows based on IEPA Permits and flow capacity:

Potable Water Supply System 500 PE
Sanitary Sewer Collection 1100 PE
Grinder Pump Station 160 PE
Aerated Treatment Lagoon 160 PE per IEPA Permit
Storage Lagoon 160 PE per IEPA Permit
Spray Irrigation Equipment and Field 160 PE per IEPA Permit

SHEAFFER & ROLAND, INC.


Jason C. Fowler, P.E.
Vice President

# PHOTOGRAPHS OF PROPERTY AND IMPROVEMENTS

































9575 West Higgins Road, Suite 400 | Rosemont, Illinois 60018
p: 847-518-9990 | f: 847-518-9987

MEMORANDUM TO: Maxxam Partners, LLC

FROM: Robert A. Casiello
Consultant

Luay R. Aboona, PE
Principal

DATE: June 22, 2015

SUBJECT: Summary Traffic Evaluation
Proposed Alcoholism and Substance Abuse Treatment Facility
Unincorporated Kane County, Illinois

This memorandum presents the findings of a summary traffic evaluation conducted by Kenig, Lindgren, O'Hara, Aboona, Inc. (KLOA, Inc.) for a proposed alcoholism and substance abuse treatment facility located at 41 W400 Silver Glen Road in Unincorporated Kane County, Illinois. The site is a closed boarding school for at-risk children, owned by the Glenwood Academy, and is located north of Silver Glen Road approximately one mile west of Corron Road. The site contains twelve buildings and a maintenance area. All of the existing buildings will be utilized to accommodate this new development. Access to the site will continue to be provided by the existing drive off of Silver Glen Road.

The purpose of this evaluation is to examine the existing conditions of the site and evaluate the proposed site operation, specifically with respect to traffic generation.

## Existing Conditions

As noted, the proposed development will occupy the existing Glenwood School buildings, which are located north of Silver Glen Road approximately one mile west of Corron Road, as shown in **Figure 1**. Access will continue to be provided by the existing access drive off of Silver Glen Road. The characteristics of Silver Glen Road and the existing access drive are described below.

KLOA, Inc. Transportation and Parking Planning Consultants



**Aerial View of Site Location**                                                **Figure 1**

2

*Silver Glen Road* is an east-west collector road providing one through lane in each direction with parking prohibited on both sides of the road and a posted speed limit of 45 mph. Silver Glen Road is under the jurisdiction of the Kane County Division of Transportation (KDOT). At its intersection with the site Access Drive, a shared through/left-turn lane is provided in the eastbound direction and exclusive through and right-turn lanes are provided in the westbound direction. The average daily traffic (ADT) volume on Silver Glen Road between Corron Road and Burlington Road is 2,214 vehicles. This is based on traffic counts conducted by KLOA, Inc. on April 14, 2015. A copy of the 2015 ADT volumes with hourly breakdowns is included in the Appendix. Silver Glen Road is under stop sign control at its intersection with Burlington Road and is under all-way stop sign control at its intersection with Corron Road.

*Access Drive* is a north-south 24-foot wide undivided private road providing one through lane in each direction. The Access Drive extends for approximately 0.5 mile between Silver Glen Road and the main entrance to the site. At its stop-sign-controlled intersection with Silver Glen Road, the access drive provides one inbound lane and one outbound lane divided by a landscaped median. This access drive's intersection with Silver Glen Road occurs at the apex of the curve along Silver Glen Road which provides for adequate sight lines for traffic to turn onto Silver Glen Road.

## Characteristics of the Proposed Development

Proposed on the site is an in-patient residential alcoholism and substance abuse treatment facility that will utilize the existing Glenwood School buildings. The site is currently occupied by twelve buildings and a maintenance area. All of these buildings will be utilized to accommodate this new development.

### Facility Characteristics

The proposed facility is a private, high-end alcoholism and substance abuse treatment facility. The facility will provide residential treatment and inpatient detoxification, which are permitted under the licensure provided by the Illinois Department of Human Services, Division of Alcoholism and Substance Abuse. The proposed facility will have a 120-bed capacity with typical client stays ranging from 30 to 90 days. The clients will live and stay on the campus for the entire duration of their treatment.

The on-site staffing will consist of doctors, therapists, and other professional and administrative personnel. The following lists the three shifts for employees with an approximate number of employees per shift at full capacity.

- 8:00 A.M. to 4:00 P.M. (Weekdays: 40 employees; Weekends: 20 employees)
- 2:00 P.M. to 10:00 P.M. (22 employees)
- 10:00 P.M. to 8:00 A.M. (8 employees)

3

The employee hours are staggered, which spreads out the amount of traffic coming in and out of the site at any given time. Further, professional services from outside the facility will be rarely needed, as clients will primarily work with the on-site staff. In addition to the on-site employees, programmed family visitation programs are held on weekends for clients. The number of these trips will be minimal and will be offset by the reduced staffing levels on the weekends.

The site is also expected to receive routine parcel deliveries during the day. In addition, food delivery/food supply companies will be making weekly deliveries to the facility, resulting in approximately three truck deliveries per day. No additional regular vehicle trips are expected outside of the activities described above. The facility's routine maintenance and landscaping will be completed by staff and the utilization of outside companies for related services will be infrequent.

**Estimated Site-Generated Traffic**

To estimate the number of vehicle trips that will be generated by the proposed residential addiction treatment facility, KLOA, Inc. conducted peak period traffic counts at Timberline Knolls, a similar treatment facility that is currently in operation and slightly larger in size (approximately 122 beds in 2012) in Lemont, Illinois. The counts were conducted on Friday, July 6, 2012 and Saturday, July 7, 2012 during the morning (6:00 A.M. to 9:00 A.M.) and evening (3:00 P.M. to 6:00 P.M.) peak periods. The summary of the count data in 15-minute increments is included in the Appendix. **Table 1** summarizes the total number of vehicles entering and exiting the driveway during the morning and evening peak hours for both Friday and Saturday.

Table 1
TIMBERLINE KNOLLS – PEAK HOUR TRAFFIC COUNT SUMMARY

|  | Morning Peak Hour | Evening Peak Hour |
|---|---|---|
| Friday | 21 | 29 |
| Saturday | 18 | 27 |

As can be seen from **Table 1**, the Timberline Knolls facility generates a minimal amount of two-way vehicular traffic during the peak hours. As such, based on the similar type of operation it can be assumed that the proposed alcoholism and substance abuse treatment facility will generate a similar amount of two-way vehicle traffic.

4

**Traffic Evaluation**

Based on the average daily traffic counts provided by Kane County, Silver Glen Road carries a morning peak (6:45 A.M. to 7:45 A.M.) two-way hourly volume of 175 vehicles and an evening peak (4:30 P.M. to 5:30 P.M.) two-way hourly volume of 218 vehicles. The critical peak hour for all time periods at the Timberline Knolls driveway occurs with 29 total vehicles entering and exiting the facility. Utilizing this data for the proposed alcoholism and substance abuse treatment facility, even though it will have fewer beds, and given the low volume of traffic along Silver Glen Road, the additional traffic from the proposed facility will not have a detrimental impact on Silver Glen Road traffic. As such, the existing access drive and existing westbound right turn lane on Silver Glen Road will be adequate in accommodating the estimated two-way traffic that will be generated by the site. No additional intersection or roadway improvements will be necessary to accommodate the site traffic.

## Conclusion

Based on the preceding traffic analysis, the following conclusions have been made.

- The proposed facility will provide 120 beds for in-patient residential alcoholism and substance abuse treatment and will utilize the existing Glenwood School buildings.

- There will be three daily employee shifts, with shifts beginning at 8:00 A.M., 2:00 P.M., and 10:00 P.M. The first shift will include approximately 40 staff members on the weekday and 20 staff members on the weekends. The second shift will include approximately 22 staff members while the third shift will include 8 staff.

- The employees are staggered over three shifts, spreading out the amount of traffic entering and exiting the site.

- Silver Glen Road currently carries a low volume of traffic. Moreover, the volume of traffic has actually decreased since the last traffic count was conducted in September of 2011.

- The site-generated traffic, based on the proposed operations of the facility and trip generation surveys of Timberline Knolls, will not be significant and can be accommodated efficiently without significant impact on Silver Glen Road.

- The existing access drive and westbound right-turn lane on Silver Glen Road will adequately serve the site-generated traffic.

- Based on the site-generated traffic and the existing traffic on Silver Glen Road a traffic signal is not warranted or necessary at the intersection of Silver Glen Road and the Access Drive.

# Appendix
2015 Silver Glen Road ADT Hourly Volumes
Timberline Knolls Traffic Count Data

2015 Silver Glen Road ADT Hourly Volumes

Type of report: Tube Count - Vehicle Classification Data

**LOCATION:** Silver Glen Rd btw Carron & Burlington
**SPECIFIC LOCATION:** 0 ft from
**CITY/STATE:** Campton Hills, IL

**QC JOB #:** 13357401
**DIRECTION:** EB/WB
**DATE:** Apr 14 2015

| Start Time | Motor-cycles | Cars & Trailer | 2 Axle Long | Buses | 2 Axle 6 Tire | 3 Axle Single | 4 Axle Single | <5 Axle Double | 5 Axle Double | >6 Axle Double | <6 Axle Multi | 6 Axle Multi | >6 Axle Multi | Not Classified | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 12:00 AM | 0 | 5 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 5 |
| 12:15 AM | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| 12:30 AM | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 12:45 AM | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 1:00 AM | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| 1:15 AM | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| 1:30 AM | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| 1:45 AM | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| 2:00 AM | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| 2:15 AM | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| 2:30 AM | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| 2:45 AM | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 3:00 AM | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| 3:15 AM | 0 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 |
| 3:30 AM | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| 3:45 AM | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| 4:00 AM | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| 4:15 AM | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| 4:30 AM | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| 4:45 AM | 0 | 9 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 10 |
| 5:00 AM | 0 | 7 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 7 |
| 5:15 AM | 0 | 6 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 10 |
| 5:30 AM | 0 | 19 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 20 |
| 5:45 AM | 0 | 15 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 15 |
| **Day Total** | | | | | | | | | | | | | | | |
| **Percent** | | | | | | | | | | | | | | | |
| **AM Peak** | | | | | | | | | | | | | | | |
| Volume | | | | | | | | | | | | | | | |
| **PM Peak** | | | | | | | | | | | | | | | |
| Volume | | | | | | | | | | | | | | | |

**Comments:**

Report generated on 4/16/2015 9:46 AM

SOURCE: Quality Counts, LLC (http://www.qualitycounts.net)

Type of report: Tube Count - Vehicle Classification Data

**LOCATION:** Silver Glen Rd btw Carron & Burlington
**SPECIFIC LOCATION:** 0 ft from
**CITY/STATE:** Campton Hills, IL

**QC JOB #:** 13357401
**DIRECTION:** EB/WB
**DATE:** Apr 14 2015

| Start Time | Motor-cycles | Cars & Trailer | 2 Axle Long | Buses | 2 Axle 6 Tire | 3 Axle Single | 4 Axle Single | <5 Axle Double | 5 Axle Double | >6 Axle Double | <6 Axle Multi | 6 Axle Multi | >6 Axle Multi | Not Classified | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 6:00 AM | 0 | 26 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 29 |
| 6:15 AM | 0 | 27 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 30 |
| 6:30 AM | 0 | 30 | 3 | 0 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 36 |
| 6:45 AM | 0 | 35 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 36 |
| 7:00 AM | 0 | 38 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 40 |
| 7:15 AM | 0 | 42 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 44 |
| 7:30 AM | 0 | 52 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 55 |
| 7:45 AM | 0 | 29 | 2 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 32 |
| 8:00 AM | 0 | 33 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 36 |
| 8:15 AM | 0 | 23 | 3 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 28 |
| 8:30 AM | 0 | 29 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 33 |
| 8:45 AM | 0 | 26 | 5 | 0 | 2 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 1 | 34 |
| 9:00 AM | 0 | 19 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 21 |
| 9:15 AM | 0 | 18 | 5 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 23 |
| 9:30 AM | 0 | 19 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 21 |
| 9:45 AM | 0 | 18 | 1 | 0 | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 21 |
| 10:00 AM | 0 | 30 | 2 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 33 |
| 10:15 AM | 0 | 21 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 23 |
| 10:30 AM | 0 | 26 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 26 |
| 10:45 AM | 0 | 19 | 2 | 0 | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 23 |
| 11:00 AM | 0 | 21 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 24 |
| 11:15 AM | 0 | 21 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 24 |
| 11:30 AM | 0 | 16 | 1 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 20 |
| 11:45 AM | 1 | 23 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 26 |
| Day Total | | | | | | | | | | | | | | | |
| Percent | | | | | | | | | | | | | | | |
| AM Peak Volume | | | | | | | | | | | | | | | |
| PM Peak Volume | | | | | | | | | | | | | | | |

**Comments:**

Report generated on 4/16/2015 9:46 AM

SOURCE: Quality Counts, LLC (http://www.qualitycounts.net)

Type of report: Tube Count - Vehicle Classification Data

Page 3 of 5

**LOCATION:** Silver Glen Rd btw Carron & Burlington
**SPECIFIC LOCATION:** 0 ft from
**CITY/STATE:** Campton Hills, IL

**QC JOB #:** 13357401
**DIRECTION:** EB/WB
**DATE:** Apr 14 2015

| Start Time | Motor-cycles | Cars & Trailer | 2 Axle Long | Buses | 2 Axle 6 Tire | 3 Axle Single | 4 Axle Single | <5 Axle Double | 5 Axle Double | >6 Axle Double | <6 Axle Multi | 6 Axle Multi | >6 Axle Multi | Not Classified | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 12:00 PM | 0 | 26 | 2 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 29 |
| 12:15 PM | 0 | 24 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 26 |
| 12:30 PM | 0 | 20 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 23 |
| 12:45 PM | 1 | 24 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 26 |
| 1:00 PM | 0 | 24 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 26 |
| 1:15 PM | 1 | 21 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 25 |
| 1:30 PM | 1 | 27 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 32 |
| 1:45 PM | 0 | 21 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 25 |
| 2:00 PM | 0 | 19 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 22 |
| 2:15 PM | 1 | 24 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 27 |
| 2:30 PM | 0 | 25 | 1 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 30 |
| 2:45 PM | 1 | 28 | 5 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 36 |
| 3:00 PM | 0 | 39 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 40 |
| 3:15 PM | 1 | 36 | 1 | 0 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 43 |
| 3:30 PM | 1 | 33 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 37 |
| 3:45 PM | 0 | 45 | 2 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 49 |
| 4:00 PM | 1 | 47 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 50 |
| 4:15 PM | 1 | 41 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 43 |
| 4:30 PM | 0 | 49 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4 | 54 |
| 4:45 PM | 0 | 49 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 51 |
| 5:00 PM | 0 | 49 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 50 |
| 5:15 PM | 0 | 60 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 63 |
| 5:30 PM | 0 | 42 | 1 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 | 45 |
| 5:45 PM | 0 | 51 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 52 |
| **Day Total** | | | | | | | | | | | | | | | |
| **Percent** | | | | | | | | | | | | | | | |
| **AM Peak Volume** | | | | | | | | | | | | | | | |
| **PM Peak Volume** | | | | | | | | | | | | | | | |
| **Comments:** | | | | | | | | | | | | | | | |

Report generated on 4/16/2015 9:46 AM

SOURCE: Quality Counts, LLC (http://www.qualitycounts.net)

Type of report: Tube Count - Vehicle Classification Data

**QC JOB #:** 13357401
**DIRECTION:** EB/WB
**DATE:** Apr 14 2015

**LOCATION:** Silver Glen Rd btw Carron & Burlington
**SPECIFIC LOCATION:** 0 ft from
**CITY/STATE:** Campton Hills, IL

| Start Time | Motor-cycles | Cars & Trailer | 2 Axle Long | Buses | 2 Axle 6 Tire | 3 Axle Single | 4 Axle Single | <5 Axle Double | 5 Axle Double | >6 Axle Double | <6 Axle Multi | 6 Axle Multi | >6 Axle Multi | Not Classified | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 6:00 PM | 0 | 40 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 43 |
| 6:15 PM | 0 | 45 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 46 |
| 6:30 PM | 0 | 43 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 45 |
| 6:45 PM | 0 | 35 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 39 |
| 7:00 PM | 1 | 42 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 44 |
| 7:15 PM | 0 | 24 | 6 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 30 |
| 7:30 PM | 0 | 43 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 44 |
| 7:45 PM | 0 | 27 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 27 |
| 8:00 PM | 1 | 31 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 32 |
| 8:15 PM | 0 | 16 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 17 |
| 8:30 PM | 0 | 15 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 15 |
| 8:45 PM | 0 | 20 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 20 |
| 9:00 PM | 0 | 16 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 17 |
| 9:15 PM | 0 | 9 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 9 |
| 9:30 PM | 0 | 11 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 11 |
| 9:45 PM | 0 | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 13 |
| 10:00 PM | 0 | 15 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 15 |
| 10:15 PM | 0 | 11 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 11 |
| 10:30 PM | 0 | 8 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 8 |
| 10:45 PM | 0 | 7 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 8 |
| 11:00 PM | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| 11:15 PM | 0 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 |
| 11:30 PM | 0 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| 11:45 PM | 0 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 |
| **Day Total** | 10 | 2026 | 102 | 1 | 32 | 0 | 0 | 3 | 1 | 0 | 0 | 0 | 0 | 39 | 2214 |
| **Percent** | 0.5% | 91.5% | 4.6% | 0.0% | 1.4% | 0.0% | 0.0% | 0.1% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 1.8% | |

**ADT 2214**

| | Motor-cycles | Cars & Trailer | 2 Axle Long | Buses | 2 Axle 6 Tire | | | <5 Axle Double | 5 Axle Double | | | | | Not Classified | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **AM Peak Volume** | 11:45 AM / 1 | 7:30 AM / 52 | 8:45 AM / 5 | 12:30 PM / 1 | 6:30 AM / 3 | | | 10:00 AM / 1 | 8:30 AM / 1 | | | | | 6:15 AM / 2 | 7:30 AM / 55 |
| **PM Peak Volume** | 12:45 PM / 1 | 5:15 PM / 60 | 7:15 PM / 6 | 12:30 PM / 1 | 3:15 PM / 4 | | | 5:30 PM / 1 | | | | | | 4:30 PM / 4 | 5:15 PM / 63 |

**Comments:**

Report generated on 4/16/2015 9:46 AM

SOURCE: Quality Counts, LLC (http://www.qualitycounts.net)

Type of report: Tube Count - Vehicle Classification Data

## SUMMARY - Tube Count - Vehicle Classification Data

Page 5 of 5

**LOCATION:** Silver Glen Rd btw Carron & Burlington
**SPECIFIC LOCATION:** 0 ft from
**CITY/STATE:** Campton Hills, IL

**QC JOB #:** 13357401
**DIRECTION:** EB/WB
**DATE:** Apr 14 2015 - Apr 14 2015

| Start Time | Motor-cycles | Cars & Trailer | 2 Axle Long | Buses | 2 Axle 6 Tire | 3 Axle Single | 4 Axle Single | <5 Axle Double | 5 Axle Double | >6 Axle Double | <6 Axle Multi | 6 Axle Multi | >6 Axle Multi | Not Classified | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Grand Total | 10 | 2026 | 102 | 1 | 32 | 0 | 0 | 3 | 1 | 0 | 0 | 0 | 0 | 39 | 2214 |
| Percent | 0.5% | 91.5% | 4.6% | 0.0% | 1.4% | 0.0% | 0.0% | 0.1% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 1.8% | |



ADT 2214

*Comments:*

Report generated on 4/16/2015 9:46 AM

SOURCE: Quality Counts, LLC (http://www.qualitycounts.net)

Type of report: Tube Count - Speed Data

**LOCATION:** Silver Glen Rd btw Carron & Burlington
**SPECIFIC LOCATION:** 0 ft from
**CITY/STATE:** Campton Hills, IL

**QC JOB #:** 13357401
**DIRECTION:** EB/WB
**DATE:** Apr 14 2015

Page 1 of 5

| Start Time | 1-15 | 16-20 | 21-25 | 26-30 | 31-35 | 36-40 | 41-45 | 46-50 | 51-55 | 56-60 | 61-65 | 66-70 | 71-75 | 76-999 | Total | Pace Speed | Number in Pace |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 12:00 AM | 0 | 0 | 0 | 0 | 0 | 2 | 1 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 5 | 36-45 | 3 |
| 12:15 AM | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 36-45 | 1 |
| 12:30 AM | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1-10 | 0 |
| 12:45 AM | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1-10 | 0 |
| 1:00 AM | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 36-45 | 1 |
| 1:15 AM | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 41-50 | 1 |
| 1:30 AM | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 31-40 | 1 |
| 1:45 AM | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 31-40 | 1 |
| 2:00 AM | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 31-40 | 2 |
| 2:15 AM | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 36-45 | 2 |
| 2:30 AM | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 31-40 | 1 |
| 2:45 AM | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1-10 | 0 |
| 3:00 AM | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 26-35 | 1 |
| 3:15 AM | 0 | 0 | 0 | 0 | 1 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 31-40 | 2 |
| 3:30 AM | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1-10 | 0 |
| 3:45 AM | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 31-40 | 1 |
| 4:00 AM | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 36-45 | 2 |
| 4:15 AM | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 21-30 | 2 |
| 4:30 AM | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 41-50 | 1 |
| 4:45 AM | 0 | 0 | 0 | 1 | 0 | 3 | 6 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 10 | 37-46 | 8 |
| 5:00 AM | 0 | 0 | 0 | 0 | 1 | 4 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 7 | 36-45 | 6 |
| 5:15 AM | 0 | 0 | 0 | 0 | 1 | 1 | 4 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 10 | 41-50 | 8 |
| 5:30 AM | 0 | 0 | 0 | 1 | 2 | 5 | 9 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 20 | 36-45 | 14 |
| 5:45 AM | 0 | 0 | 0 | 0 | 2 | 3 | 9 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 15 | 36-45 | 12 |
| Day Total | | | | | | | | | | | | | | | | | |
| Percent | | | | | | | | | | | | | | | | | |

| | | | |
|---|---|---|---|
| AM Peak Volume | | | |
| PM Peak Volume | | | |

Comments:

Report generated on 4/16/2015 9:46 AM

SOURCE: Quality Counts, LLC (http://www.qualitycounts.net)

Type of report: Tube Count - Speed Data

LOCATION: Silver Glen Rd btw Carron & Burlington
SPECIFIC LOCATION: 0 ft from
CITY/STATE: Campton Hills, IL

QC JOB #: 13357401
DIRECTION: EB/WB
DATE: Apr 14 2015

Page 2 of 5

| Start Time | 1 15 | 16 20 | 21 25 | 26 30 | 31 35 | 36 40 | 41 45 | 46 50 | 51 55 | 56 60 | 61 65 | 66 70 | 71 75 | 76 999 | Total | Pace Speed | Number in Pace |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 6:00 AM | 0 | 0 | 0 | 0 | 2 | 13 | 7 | 3 | 1 | 0 | 0 | 0 | 0 | 0 | 29 | 36-45 | 19 |
| 6:15 AM | 2 | 0 | 0 | 0 | 3 | 8 | 13 | 3 | 2 | 0 | 0 | 0 | 0 | 0 | 30 | 36-45 | 21 |
| 6:30 AM | 0 | 0 | 1 | 2 | 2 | 11 | 18 | 3 | 1 | 0 | 0 | 0 | 0 | 0 | 36 | 36-45 | 29 |
| 6:45 AM | 1 | 0 | 0 | 0 | 0 | 12 | 13 | 10 | 0 | 0 | 0 | 0 | 0 | 0 | 36 | 36-45 | 25 |
| 7:00 AM | 0 | 0 | 0 | 0 | 0 | 21 | 11 | 8 | 0 | 0 | 0 | 0 | 0 | 0 | 40 | 36-45 | 32 |
| 7:15 AM | 0 | 0 | 0 | 0 | 2 | 14 | 23 | 5 | 0 | 0 | 0 | 0 | 0 | 0 | 44 | 36-45 | 37 |
| 7:30 AM | 0 | 0 | 0 | 1 | 6 | 16 | 21 | 10 | 1 | 0 | 0 | 0 | 0 | 0 | 55 | 36-45 | 37 |
| 7:45 AM | 0 | 0 | 1 | 0 | 3 | 10 | 14 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 32 | 36-45 | 23 |
| 8:00 AM | 1 | 0 | 0 | 0 | 2 | 19 | 7 | 6 | 1 | 0 | 0 | 0 | 0 | 0 | 36 | 36-45 | 23 |
| 8:15 AM | 1 | 0 | 0 | 0 | 1 | 9 | 11 | 6 | 0 | 0 | 0 | 0 | 0 | 0 | 28 | 36-45 | 20 |
| 8:30 AM | 1 | 0 | 0 | 0 | 2 | 13 | 14 | 2 | 0 | 1 | 0 | 0 | 0 | 0 | 33 | 36-45 | 26 |
| 8:45 AM | 1 | 0 | 0 | 1 | 2 | 16 | 9 | 5 | 0 | 0 | 0 | 0 | 0 | 0 | 34 | 36-45 | 24 |
| 9:00 AM | 1 | 0 | 0 | 0 | 1 | 7 | 8 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 21 | 36-45 | 15 |
| 9:15 AM | 0 | 0 | 0 | 0 | 1 | 10 | 7 | 3 | 1 | 0 | 0 | 0 | 0 | 0 | 23 | 36-45 | 17 |
| 9:30 AM | 1 | 0 | 0 | 0 | 0 | 8 | 9 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 21 | 36-45 | 16 |
| 9:45 AM | 1 | 0 | 0 | 3 | 3 | 7 | 9 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 21 | 36-45 | 16 |
| 10:00 AM | 0 | 0 | 0 | 3 | 4 | 13 | 12 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 33 | 36-45 | 24 |
| 10:15 AM | 0 | 0 | 0 | 0 | 3 | 10 | 9 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 23 | 36-45 | 19 |
| 10:30 AM | 0 | 0 | 0 | 0 | 3 | 8 | 10 | 4 | 1 | 0 | 0 | 0 | 0 | 0 | 26 | 36-45 | 18 |
| 10:45 AM | 0 | 0 | 0 | 0 | 1 | 6 | 14 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 23 | 36-45 | 20 |
| 11:00 AM | 1 | 1 | 0 | 0 | 0 | 11 | 7 | 5 | 0 | 0 | 0 | 0 | 0 | 0 | 24 | 36-45 | 17 |
| 11:15 AM | 0 | 0 | 0 | 0 | 2 | 8 | 11 | 2 | 1 | 0 | 0 | 0 | 0 | 0 | 24 | 36-45 | 19 |
| 11:30 AM | 1 | 1 | 0 | 0 | 0 | 4 | 12 | 2 | 1 | 1 | 0 | 0 | 0 | 0 | 20 | 36-45 | 16 |
| 11:45 AM | 1 | 0 | 0 | 0 | 3 | 8 | 11 | 2 | 1 | 0 | 0 | 0 | 0 | 0 | 26 | 36-45 | 19 |
| Day Total | | | | | | | | | | | | | | | | | |
| Percent | | | | | | | | | | | | | | | | | |
| AM Peak Volume | | | | | | | | | | | | | | | | | |
| PM Peak Volume | | | | | | | | | | | | | | | | | |
| Comments: | | | | | | | | | | | | | | | | | |

Report generated on 4/16/2015 9:46 AM

SOURCE: Quality Counts, LLC (http://www.qualitycounts.net)

Type of report: Tube Count - Speed Data

**LOCATION:** Silver Glen Rd btw Carron & Burlington
**SPECIFIC LOCATION:** 0 ft from
**CITY/STATE:** Campton Hills, IL

Page 3 of 5

**QC JOB #:** 13357401
**DIRECTION:** EB/WB
**DATE:** Apr 14 2015

| Start Time | 1 15 | 16 20 | 21 25 | 26 30 | 31 35 | 36 40 | 41 45 | 46 50 | 51 55 | 56 60 | 61 65 | 66 70 | 71 75 | 76 999 | Total | Pace Speed | Number in Pace |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 12:00 PM | 0 | 0 | 0 | 0 | 2 | 19 | 6 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 29 | 36-45 | 25 |
| 12:15 PM | 1 | 0 | 0 | 0 | 5 | 11 | 8 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 26 | 36-45 | 19 |
| 12:30 PM | 1 | 0 | 0 | 1 | 1 | 7 | 11 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 23 | 36-45 | 18 |
| 12:45 PM | 2 | 0 | 0 | 0 | 3 | 9 | 10 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 26 | 36-45 | 19 |
| 1:00 PM | 0 | 0 | 0 | 0 | 3 | 10 | 9 | 3 | 1 | 0 | 0 | 0 | 0 | 0 | 26 | 36-45 | 19 |
| 1:15 PM | 0 | 0 | 0 | 1 | 0 | 7 | 12 | 5 | 0 | 0 | 0 | 0 | 0 | 0 | 25 | 38-47 | 18 |
| 1:30 PM | 0 | 0 | 0 | 2 | 2 | 12 | 12 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 32 | 36-45 | 23 |
| 1:45 PM | 2 | 0 | 0 | 0 | 2 | 14 | 6 | 1 | 0 | 2 | 0 | 0 | 0 | 0 | 25 | 36-45 | 20 |
| 2:00 PM | 1 | 0 | 0 | 0 | 2 | 11 | 8 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 25 | 36-45 | 19 |
| 2:15 PM | 2 | 0 | 0 | 1 | 3 | 9 | 11 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 27 | 36-45 | 20 |
| 2:30 PM | 2 | 0 | 0 | 0 | 3 | 12 | 10 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 30 | 36-45 | 22 |
| 2:45 PM | 2 | 0 | 0 | 0 | 3 | 16 | 13 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 36 | 36-45 | 29 |
| 3:00 PM | 0 | 0 | 0 | 1 | 3 | 11 | 20 | 4 | 1 | 0 | 0 | 0 | 0 | 0 | 40 | 36-45 | 31 |
| 3:15 PM | 1 | 1 | 0 | 0 | 5 | 22 | 12 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 43 | 36-45 | 34 |
| 3:30 PM | 0 | 0 | 0 | 1 | 2 | 15 | 15 | 9 | 0 | 0 | 0 | 0 | 0 | 0 | 37 | 36-45 | 30 |
| 3:45 PM | 0 | 0 | 0 | 1 | 5 | 21 | 16 | 4 | 1 | 0 | 0 | 0 | 0 | 0 | 49 | 36-45 | 36 |
| 4:00 PM | 1 | 0 | 0 | 2 | 6 | 23 | 16 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 50 | 36-45 | 39 |
| 4:15 PM | 1 | 0 | 0 | 2 | 2 | 26 | 11 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 43 | 36-45 | 37 |
| 4:30 PM | 4 | 0 | 0 | 1 | 5 | 25 | 16 | 3 | 1 | 1 | 0 | 0 | 0 | 0 | 54 | 36-45 | 41 |
| 4:45 PM | 1 | 0 | 0 | 2 | 4 | 28 | 11 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 50 | 36-45 | 39 |
| 5:00 PM | 0 | 0 | 0 | 0 | 3 | 19 | 19 | 8 | 1 | 0 | 0 | 0 | 0 | 0 | 51 | 36-45 | 49 |
| 5:15 PM | 0 | 0 | 0 | 2 | 4 | 20 | **30** | **10** | 0 | 1 | 0 | 0 | 0 | 0 | **63** | 36-45 | 35 |
| 5:30 PM | 1 | 0 | 0 | 1 | 3 | 20 | 15 | 4 | 1 | 0 | 0 | 0 | 0 | 0 | 45 | 36-45 | 41 |
| 5:45 PM | 0 | 0 | 0 | 0 | 6 | 24 | 17 | 5 | 0 | 0 | 0 | 0 | 0 | 0 | 52 | 36-45 | 41 |
| Day Total | | | | | | | | | | | | | | | | | |
| Percent | | | | | | | | | | | | | | | | | |
| AM Peak Volume | | | | | | | | | | | | | | | | | |
| PM Peak Volume | | | | | | | | | | | | | | | | | |

*Comments:*

Report generated on 4/16/2015 9:46 AM

SOURCE: Quality Counts, LLC (http://www.qualitycounts.net)

Type of report: Tube Count - Speed Data

**LOCATION:** Silver Glen Rd btw Carron & Burlington
**SPECIFIC LOCATION:** 0 ft from
**CITY/STATE:** Campton Hills, IL

Page 4 of 5
**QC JOB #:** 13357401
**DIRECTION:** EB/WB
**DATE:** Apr 14 2015

| Start Time | 1-15 | 16-20 | 21-25 | 26-30 | 31-35 | 36-40 | 41-45 | 46-50 | 51-55 | 56-60 | 61-65 | 66-70 | 71-75 | 76-999 | Total | Pace Speed | Number in Pace |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 6:00 PM | 1 | 0 | 0 | 0 | 6 | 17 | 15 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 43 | 36-45 | 32 |
| 6:15 PM | 0 | 0 | 0 | 0 | 6 | 15 | 21 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 46 | 36-45 | 36 |
| 6:30 PM | 0 | 0 | 0 | 1 | 2 | 23 | 15 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 45 | 36-45 | 38 |
| 6:45 PM | 2 | 0 | 1 | 1 | 1 | 12 | 17 | 5 | 0 | 0 | 0 | 0 | 0 | 0 | 39 | 36-45 | 28 |
| 7:00 PM | 1 | 0 | 0 | 0 | 0 | 18 | 21 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 44 | 36-45 | 39 |
| 7:15 PM | 0 | 0 | 0 | 0 | 3 | 14 | 11 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 30 | 36-45 | 25 |
| 7:30 PM | 0 | 0 | 0 | 0 | 7 | 24 | 9 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 44 | 36-45 | 32 |
| 7:45 PM | 0 | 0 | 0 | 1 | 1 | 15 | 8 | 2 | 1 | 0 | 0 | 0 | 0 | 0 | 30 | 36-45 | 23 |
| 8:00 PM | 0 | 0 | 0 | 1 | 9 | 10 | 7 | 5 | 0 | 0 | 0 | 0 | 0 | 0 | 32 | 31-40 | 19 |
| 8:15 PM | 1 | 0 | 0 | 0 | 1 | 5 | 8 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 17 | 36-45 | 13 |
| 8:30 PM | 0 | 0 | 0 | 0 | 3 | 8 | 3 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 15 | 36-45 | 11 |
| 8:45 PM | 1 | 0 | 0 | 0 | 1 | 11 | 6 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 20 | 36-45 | 17 |
| 9:00 PM | 1 | 0 | 0 | 0 | 0 | 8 | 7 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 17 | 36-45 | 14 |
| 9:15 PM | 0 | 1 | 0 | 0 | 1 | 3 | 2 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 9 | 36-45 | 5 |
| 9:30 PM | 1 | 0 | 0 | 1 | 1 | 7 | 5 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 11 | 36-45 | 10 |
| 9:45 PM | 1 | 0 | 0 | 0 | 2 | 2 | 4 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 13 | 36-45 | 9 |
| 10:00 PM | 0 | 0 | 0 | 0 | 2 | 5 | 6 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 15 | 37-46 | 10 |
| 10:15 PM | 0 | 0 | 0 | 0 | 2 | 6 | 1 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 11 | 31-40 | 8 |
| 10:30 PM | 0 | 0 | 0 | 0 | 2 | 2 | 1 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 8 | 31-40 | 4 |
| 10:45 PM | 1 | 0 | 0 | 1 | 0 | 4 | 2 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 8 | 36-45 | 6 |
| 11:00 PM | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 36-45 | 2 |
| 11:15 PM | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 36-45 | 2 |
| 11:30 PM | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 31-40 | 2 |
| 11:45 PM | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 41-50 | 3 |
| **Day Total** | 43 | 1 | 4 | 29 | 180 | 887 | 807 | 233 | 28 | 2 | 0 | 0 | 0 | 0 | 2214 | 36-45 | 1694 |
| **Percent** | 1.9% | 0.0% | 0.2% | 1.3% | 8.1% | 40.1% | 36.4% | 10.5% | 1.3% | 0.1% | 0.0% | 0.0% | 0.0% | 0.0% | | | |

**ADT 2214**

**AM Peak Volume**

| | 1-15 | 16-20 | 21-25 | 26-30 | 31-35 | 36-40 | 41-45 | 46-50 | 51-55 | 56-60 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| AM Peak | 6:15 AM | — | 4:45 AM | 10:00 AM | 7:30 AM | 7:00 AM | 7:15 AM | 6:45 AM | 5:45 AM | 8:30 AM | 7:30 AM |
| | 2 | | 1 | 3 | 6 | 28 | 23 | 10 | 2 | 1 | 55 |

**PM Peak Volume**

| | 1-15 | 16-20 | 21-25 | 26-30 | 31-35 | 36-40 | 41-45 | 46-50 | 51-55 | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| PM Peak | 4:30 PM | 9:15 PM | 3:15 PM | 1:30 PM | 8:00 PM | 4:45 PM | 5:15 PM | 5:15 PM | 1:45 PM | 5:15 PM |
| | 4 | 1 | 1 | 2 | 9 | 28 | 30 | 10 | 2 | 63 |

**Comments:**

SOURCE: Quality Counts, LLC (http://www.qualitycounts.net)

Type of report: Tube Count - Speed Data

## SUMMARY - Tube Count - Speed Data

**LOCATION:** Silver Glen Rd btw Carron & Burlington
**SPECIFIC LOCATION:** 0 ft from
**CITY/STATE:** Campton Hills, IL

**QC JOB #:** 13357401
**DIRECTION:** EB/WB
**DATE:** Apr 14 2015 - Apr 14 2015

| Start Time | 1<br>15 | 16<br>20 | 21<br>25 | 26<br>30 | 31<br>35 | 36<br>40 | 41<br>45 | 46<br>50 | 51<br>55 | 56<br>60 | 61<br>65 | 66<br>70 | 71<br>75 | 76<br>999 | Total | Pace Speed | Number in Pace |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Grand Total | 43 | 1 | 4 | 29 | 180 | 887 | 807 | 233 | 28 | 2 | 0 | 0 | 0 | 0 | 2214 | 36-45 | 1694 |
| Percent | 1.9% | 0.0% | 0.2% | 1.3% | 8.1% | 40.1% | 36.4% | 10.5% | 1.3% | 0.1% | 0.0% | 0.0% | 0.0% | 0.0% | | | |
| Cumulative Percent | 1.9% | 2.0% | 2.2% | 3.5% | 11.6% | 51.7% | 88.1% | 98.6% | 99.9% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | | | |

ADT 2214

**85th Percentile 44 MPH**

**Mean Speed(Average) 39 MPH**
Median 39 MPH
Mode: 38 MPH

Comments:

SOURCE: Quality Counts, LLC (http://www.qualitycounts.net)

Report generated on 4/16/2015 9:46 AM

# Timberline Knolls Traffic Count Data

```
Lemont, IL                Weather:    Sunny and Very Hot      07/09/12
40 Timberline Dr      Timberline Knolls                       10:49:13
Friday July 6, 2012


TURNS/TEAPAC[Ver 3.61.12] - 15-Minute Counts: All Vehicles - by Mvmt

        Intersection #  1  timberline/friday
       ================================================================
Begin      O-Approach        I-Approach        S-Approach        W-Approach      Int
Time   RT    OU    LT    RT    IN    LT    RT    TH    LT    RT    TH    LT   Total
=====  ===============  ===============  ===============  ===============  =====
 600    0     1     0     0     1     0     0     0     0     0     0     0      2
 615    0     0     0     0     3     0     0     0     0     0     0     0      3
 630    0     2     0     0     3     0     0     0     0     0     0     0      5
 645    0     1     0     0     7     0     0     0     0     0     0     0      8
 700    0     1     0     0     3     0     0     0     0     0     0     0      4
 715    0     0     0     0     4     0     0     0     0     0     0     0      4
 730    0     4     0     0     1     0     0     0     0     0     0     0      5
 745    0     0     0     0     4     0     0     0     0     0     0     0      4
 800    0     2     0     0     4     0     0     0     0     0     0     0      6
 815    0     0     0     0     6     0     0     0     0     0     0     0      6
 830    0     1     0     0     1     0     0     0     0     0     0     0      2
 845    0     0     0     0     3     0     0     0     0     0     0     0      3
-----  ---------------  ---------------  ---------------  ---------------  -----
1500    0     4     0     0     3     0     0     0     0     0     0     0      7
1515    0     4     0     0     3     0     0     0     0     0     0     0      7
1530    0     5     0     0     3     0     0     0     0     0     0     0      8
1545    0     5     0     0     2     0     0     0     0     0     0     0      7
1600    0     4     0     0     3     0     0     0     0     0     0     0      7
1615    0     3     0     0     2     0     0     0     0     0     0     0      5
1630    0     2     0     0     1     0     0     0     0     0     0     0      3
1645    0     2     0     0     1     0     0     0     0     0     0     0      3
1700    0     5     0     0     1     0     0     0     0     0     0     0      6
1715    0     4     0     0     1     0     0     0     0     0     0     0      5
1730    0     3     0     0     3     0     0     0     0     0     0     0      6
1745    0     2     0     0     4     0     0     0     0     0     0     0      6
=====  ===============  ===============  ===============  ===============  =====
Total   0    55     0     0    67     0     0     0     0     0     0     0    122
```

```
Lemont, IL                Weather:    Sunny and Very Hot        07/09/12
40 Timberline Dr     Timberline Knolls                          10:49:13
Friday July 6, 2012


TURNS/TEAPAC[Ver 3.61.12] - 60-Minute Volumes:     by Movement

          Intersection #  1  timberline/friday
          =================================================================
Begin     O-Approach       I-Approach       S-Approach       W-Approach      Int
Time     RT   OU   LT     RT   IN   LT     RT   TH   LT     RT   TH   LT    Total
=====    ===============   ===============  ===============  ===============  =====
 600      0    4    0      0   14    0      0    0    0      0    0    0      18
 615      0    4    0      0   16    0      0    0    0      0    0    0      20
 630      0    4    0      0   17    0      0    0    0      0    0    0      21
 645      0    6    0      0   15    0      0    0    0      0    0    0      21
 700      0    5    0      0   12    0      0    0    0      0    0    0      17
 715      0    6    0      0   13    0      0    0    0      0    0    0      19
 730      0    6    0      0   15    0      0    0    0      0    0    0      21
 745      0    3    0      0   15    0      0    0    0      0    0    0      18
 800      0    3    0      0   14    0      0    0    0      0    0    0      17
 815      0    1    0      0   10    0      0    0    0      0    0    0      11*
 830      0    1    0      0    4    0      0    0    0      0    0    0       5*
 845      0    0    0      0    3    0      0    0    0      0    0    0       3*
-----    ---------------   ---------------  ---------------  ---------------  -----
1500      0   18    0      0   11    0      0    0    0      0    0    0      29
1515      0   18    0      0   11    0      0    0    0      0    0    0      29
1530      0   17    0      0   10    0      0    0    0      0    0    0      27
1545      0   14    0      0    8    0      0    0    0      0    0    0      22
1600      0   11    0      0    7    0      0    0    0      0    0    0      18
1615      0   12    0      0    5    0      0    0    0      0    0    0      17
1630      0   13    0      0    4    0      0    0    0      0    0    0      17
1645      0   14    0      0    6    0      0    0    0      0    0    0      20
1700      0   14    0      0    9    0      0    0    0      0    0    0      23
1715      0    9    0      0    8    0      0    0    0      0    0    0      17*
1730      0    5    0      0    7    0      0    0    0      0    0    0      12*
1745      0    2    0      0    4    0      0    0    0      0    0    0       6*
=====    ===============   ===============  ===============  ===============  =====
```

```
Lemont, IL              Weather:   Sunny and Very Hot        07/09/12
40 Timberline Dr     Timberline Knolls                        10:51:37
Saturday July 7, 2012


TURNS/TEAPAC[Ver 3.61.12] - 15-Minute Counts: All Vehicles - by Mvmt

        Intersection #  2  timberline/saturday
       ==================================================================
Begin      O-Approach         I-Approach         S-Approach         W-Approach          Int
Time    RT   OU   LT       RT   IN   LT       RT   TH   LT       RT   TH   LT        Total
=====  ================   ================   ================   ================     =====
 600    0    0    0        0    1    0        0    0    0        0    0    0            1
 615    0    2    0        0    0    0        0    0    0        0    0    0            2
 630    0    2    0        0    4    0        0    0    0        0    0    0            6
 645    0    4    0        0    4    0        0    0    0        0    0    0            8
 700    0    1    0        0    1    0        0    0    0        0    0    0            2
 715    0    1    0        0    0    0        0    0    0        0    0    0            1
 730    0    1    0        0    1    0        0    0    0        0    0    0            2
 745    0    0    0        0    0    0        0    0    0        0    0    0            0
 800    0    1    0        0    1    0        0    0    0        0    0    0            2
 815    0    0    0        0    0    0        0    0    0        0    0    0            0
 830    0    0    0        0    0    0        0    0    0        0    0    0            0
 845    0    0    0        0    0    0        0    0    0        0    0    0            0
       ----------------   ----------------   ----------------   ----------------     -----
1500    0    4    0        0    1    0        0    0    0        0    0    0            5
1515    0    0    0        0    1    0        0    0    0        0    0    0            1
1530    0    6    0        0    1    0        0    0    0        0    0    0            7
1545    0    2    0        0    2    0        0    0    0        0    0    0            4
1600    0    6    0        0    2    0        0    0    0        0    0    0            8
1615    0    4    0        0    1    0        0    0    0        0    0    0            5
1630    0    4    0        0    0    0        0    0    0        0    0    0            4
1645    0    1    0        0    0    0        0    0    0        0    0    0            1
1700    0    9    0        0    1    0        0    0    0        0    0    0           10
1715    0    3    0        0    2    0        0    0    0        0    0    0            5
1730    0    2    0        0    4    0        0    0    0        0    0    0            6
1745    0    1    0        0    5    0        0    0    0        0    0    0            6
=====  ================   ================   ================   ================     =====
Total   0   54    0        0   32    0        0    0    0        0    0    0           86
```

```
Lemont, IL                Weather:    Sunny and Very Hot          07/09/12
40 Timberline Dr      Timberline Knolls                           10:51:37
Saturday July 7, 2012


TURNS/TEAPAC[Ver 3.61.12] - 60-Minute Volumes:     by Movement

        Intersection #  2  timberline/saturday
        =============================================================
Begin      O-Approach        I-Approach        S-Approach        W-Approach        Int
Time     RT   OU   LT      RT   IN   LT      RT   TH   LT      RT   TH   LT       Total
=====    ==============    ==============    ==============    ==============     =====
 600      0    8    0       0    9    0       0    0    0       0    0    0         17
 615      0    9    0       0    9    0       0    0    0       0    0    0         18
 630      0    8    0       0    9    0       0    0    0       0    0    0         17
 645      0    7    0       0    6    0       0    0    0       0    0    0         13
 700      0    3    0       0    2    0       0    0    0       0    0    0          5
 715      0    3    0       0    2    0       0    0    0       0    0    0          5
 730      0    2    0       0    2    0       0    0    0       0    0    0          4
 745      0    1    0       0    1    0       0    0    0       0    0    0          2
 800      0    1    0       0    1    0       0    0    0       0    0    0          2
 815      0    0    0       0    0    0       0    0    0       0    0    0         0*
 830      0    0    0       0    0    0       0    0    0       0    0    0         0*
 845      0    0    0       0    0    0       0    0    0       0    0    0         0*
-----    --------------    --------------    --------------    --------------     -----
1500      0   12    0       0    5    0       0    0    0       0    0    0         17
1515      0   14    0       0    6    0       0    0    0       0    0    0         20
1530      0   18    0       0    6    0       0    0    0       0    0    0         24
1545      0   16    0       0    5    0       0    0    0       0    0    0         21
1600      0   15    0       0    3    0       0    0    0       0    0    0         18
1615      0   18    0       0    2    0       0    0    0       0    0    0         20
1630      0   17    0       0    3    0       0    0    0       0    0    0         20
1645      0   15    0       0    7    0       0    0    0       0    0    0         22
1700      0   15    0       0   12    0       0    0    0       0    0    0         27
1715      0    6    0       0   11    0       0    0    0       0    0    0        17*
1730      0    3    0       0    9    0       0    0    0       0    0    0        12*
1745      0    1    0       0    5    0       0    0    0       0    0    0         6*
=====    ==============    ==============    ==============    ==============     =====
```

12

the retreat

6/30/15

Dear Kane County,

This letter is to serve as my expert opinion related to the possible concerns that the Kane County Board may have in regards to the Special Use application for the proposed alcoholism and substance abuse treatment facility at the former Glenwood School for Boys property, located in unincorporated Kane County. I have included my bio as a point of reference to you and the community as to my experience in the addiction treatment field.

I think it is important to state up front that I have no personal interest, financial or otherwise, in the proposed project. I do however, have 38 years of professional experience operating and helping others operate treatment facilities throughout the United States and abroad.

The following are my responses to the possible concerns that may be raised by your Board and or neighbors in the surrounding area:

I.  *Based upon your experience, to what extent is it likely that patients at this facility will leave the facility, or "escape", and go into the neighborhood in the vicinity?*

In my experience, incomplete stays and more specifically AWOL discharges are very rare in programs such as this. Treatment providers that deal primarily with self-pay or insurance pay clients, particularly in the mid-to-high end market serve a population that tends to be very motivated for help and therefore are very likely to complete the program successfully. If a patient does choose to leave the program prematurely they tend to call a family member or cab to take them home. It is my understanding that the proposed project will be providing a private car service to all patients who voluntarily or involuntarily discharged from the facility in order to further mitigate this concern.

A.  *What steps should be undertaken by the developer and/or the County, to prevent such "escapes"?*

The treatment facility should conduct a pre-admission screening on all prospective clients prior to them coming to the facility to ensure that all participants meet their admissions criteria. This bio-psycho-social screening/gate-keeping interview generally is conducted by phone with the client and/or their family member prior to them being accepted into the program. There would be another line of screening that occurs when the Individual arrives to ensure that they are in fact medically and psychologically stable and able to meet the program requirements.

The program will have conflict resolution processes in place to address issues long before they occur and will, I'm sure, have strict policies prohibiting patients from leaving the facility unaccompanied by a staff member. In addition, Maxxam Partners has informed me that they will be integrating thermal cameras around the property and create a virtual fence that will be monitored constantly by a third party off site. This far exceeds security measures I have seen in any other privately funded treatment facility in the country.

B.  *What kinds of negative behavior could the County expect to occur from patients leaving AWOL from the facility?*

Although this issue comes up frequently when communities are voicing their concerns about a treatment facility coming to their neighborhood, in all my years of experience in the treatment field I have found that this is not an issue that ever plays out in reality. Most treatment facilities have strict policies prohibiting patients from leaving the facility without staff supervision while they are enrolled in their program. If someone does chose to leave the program, staff should and would make every effort to help the individual get to the next appropriate level of care or help them get home if they chose not to go to another program. As mentioned, the proposed facility will be providing a private car service to all patients voluntarily and involuntarily discharged from the facility in order to further mitigate this concern.

# 12
the retreat

II.    *To what extent will the presence of the facility as described affect the reputation of the neighborhood and the municipality as a whole in the vicinity of the facility?*

A quality treatment facility will enhance the reputation of a community. The Retreat has an 80-bed campus located on a 22-acre Big Woods parcel of land in the midst of the Wayzata community and has been since 2004 embraced with pride by our local community members. We have become a primary resource for community members needing help with addiction related matters. It didn't hurt to be featured on the Oprah Winfrey Show years ago as a place she chose to send someone who needed help.

III.   *What concerns should the County have relative to this facility, which has not been mentioned above?*

Although I empathize with the concerns most communities raise about having treatment facilities in their neighborhoods, I can say with some authority that their fears will not play out in reality. A well-run treatment program is committed to raising the social norms on their campus to ensure that all participants are behaving in a sober, responsible and dignified manner. They are the solution to one of our countries most difficult and costly problems. At least half of all members of your community know someone intimately who suffers from addiction. This project, like The Retreat in Minnesota, and Hazelden Foundation in Chicago and Minnesota experienced, will ultimately become the first call for help by your community members when one of their family members needs help.

Sincerely,

John H. Curtiss
President/CEO
The Retreat
1221 Wayzata Blvd. East
Wayzata, MN 55391

# The Retreat

### John H. Curtiss, MA, LADC, NCRS

John is President of the Community of Recovering People board of directors and of The Retreat. He has been a member of the CORP board since it's inception in 1991, and is one of the principle designers of The Retreat model of care. Prior to beginning his employment with CORP in April 1998, John was employed by the Hazelden Foundation for over 19 years. In his years at Hazelden, John served in a variety of roles, including; Vice President of Hazelden's National Continuum, Executive Director of Hazelden's Outreach Services, Executive Director of Fellowship Club, Hazelden's intermediate care facility in St. Paul, MN, Unit Supervisor of two of Hazelden's primary treatment units and as a chemical dependency counselor. John was also an instructor in Hazelden's professional education program, teaching group therapy, advanced counseling skills and the treatment of special populations.

John has a Masters Degree in Human and Health Services Administration from the College of Saint Mary's, he's a graduate of Hazelden's Counselor Training Program. He is a licensed counselor in the State of Minnesota and is a Nationally Certified Recovery Specialist.

John has served on numerous boards, including; Community of Recovering People, Sobriety High School, he is the past President of the Association of Halfway House Alcoholism Programs of North America (AHHAP) and is the founder of the Minnesota Association of Sober Homes (MASH) Opportunity Neighborhood Development Corporation. He has served as a guest faculty for Rutgers Summer School for Advanced Addiction Studies and is the author of a Hazelden publication titled "Letting Go". He is co-author of "A Caring Community, The Story of The Retreat", to be published December 2013.

John has dedicated his life to the creation of affordable accessible recovery communities throughout the United States and many other countries. He led the efforts to set up Hazelden's treatment continuum in New York City, Chicago and their Intermediate care program in West Palm Florida.

The Retreat model of recovery is rapidly becoming a national standard for a non-clinical, spiritually-grounded, affordable approach to helping people access recovery from alcohol and drug dependency. The Retreat has captured the hearts of recovering alcoholics and professionals throughout the country. It has gained a reputation, not only as an affordable, effective approach to helping people recover, but as a great place for alcoholics in recovery to be of service to others. John has consulted with many individuals (in Hong Kong, Beijing, Russia, Ireland, England, New Zealand, Brazil and in many cities in the US) interested in replicating The Retreat and the Retreat Residence models in their community.

In his work with the Association of Halfway House Alcoholism Programs of North America John has worked tirelessly to promote the development of quality halfway house and sober-living environments in the Twin Cities, throughout the United States and in many other countries.

 **Lannert Group**

### J. Christopher Lannert  RLA
#### President

**Experience with this Firm**
- 1982 through present

**Previous Experience**
- SSPF, Inc. - St. Charles, Illinois
- Wm. S. Lawrence & Associates, Inc. - Chicago, Illinois
- Carl Gardner & Associates, Inc. - Chicago, Illinois

**Education**
- Michigan State University
  B.S. Landscape Architecture/Urban and Regional Planning, 1970

**License**
  Landscape Architect, State of Illinois #157-000886 (ASLA)
  Landscape Architect, State of Indiana #AR11100042 (IPLA)

**Professional Organizations**
- American Planning Association (APA)
- American Society of Landscape Architects (ASLA)
- Urban Land Institute (ULI)
- Congress for the New Urbanism (CNU)
- Landscape Architecture Foundation (LAF), Past President
- Illinois Department of Professional Regulation, Past Board Member &Chair
- CLARB, Master Grader
- President Elect ILASLA

**Community Consulting Commissions:**
- Village of Oswego
- City of Sycamore
- City of Yorkville
- Village of Maple Park
- Village of North Aurora
- Village of New Lenox
- City of Beloit
- Village of Vernon Hills
- Village of West Dundee
- Village of Montgomery

**Representative Project Experience**
- ***Southbury Village – Oswego, Illinois***
  350 Acre Mixed-Use Residential Community – Incorporating single family and multi-family into an open space clubhouse community (Ocean Atlantic).
- ***Harrison West – Valparaiso, Indiana***
  50-Acre Single Family Development – The overall plan uses best management practices throughout, establishes homeowner guidelines, and tree preservation and restoration (Wagner Homes).
- ***Mill Creek – Geneva, Illinois***
  1,375 Acres Mixed Use – Residential/commercial/golf course community incorporating walkable neighborhoods of various housing types, recreational amenities, Mill Creek Corridor protection and a pedestrian-oriented village center (Shodeen, Inc.).
- ***Prairie Crossing – Grayslake, Illinois***
  668 Acres Conservation Plan/Development – Integrating existing farm fields and a natural landscape of restored prairies, wetlands, meadows and lake, with 317 homes, balancing economic, social, civic and environmental objectives (Shaw Homes, Inc., George and Victoria Ranney)

- ***Danada Farms – Wheaton, Illinois***
  500 Acres Mixed Use – Residential/commercial property at the intersection of Naperville and Butterfield Roads, with neighborhood pods for builder purchases, mixed uses and significant commercial corners. (Keim Land Corporation).
- ***White Eagle Club – Aurora, Illinois***
  640 Acres Mixed Use – Residential/commercial property with an Arnold Palmer golf course as the open space amenity (Macom Corporation).
- ***The Galena Territory – Galena, Illinois***
  6,500 Acres – Recreational community including three golf courses, homeowner amenity package, 210 acres lake resort facilities and trails (The Branigar Organization).

## Awards

- AIA Illinois 150 Great Places in Illinois for New Lenox Commons Park, New Lenox, Illinois and Prairie Crossing, Grayslake, Illinois
- ASLA President's Award for Midwest Groundcovers Virgil Headquarters, Virgil, Illinois (Commercial Design)
- Silver Key Award for Southbury Village, Oswego, Illinois (Landscape Architecture)
- Silver Key Award for Riverwoods Residence, Riverwoods, Illinois (Landscape Architecture)
- Bronze Key Award for Southbury Village, Oswego, Illinois (Land Planning)
- Best in American Living Award for Mill Creek, Geneva, Illinois
- Silver Key Award for Farmington Lakes, Oswego, Illinois (Landscape Architecture)
- Bronze Key Award for Farmington Lakes, Oswego, Illinois (Land Planning)
- Indiana Dept. of Environmental Management Award for Harrison West, Valparaiso, IN (Land Use)
- Gold Key Award for Amli at St. Charles, Illinois (Multi-family, Land Planning)
- Gold Key Award for Amli at St. Charles, Illinois (Multi-family, Landscape Architecture)
- Silver Key Award for Majestic Oaks, St. Charles, Illinois (Single-family, Land Planning)
- ASLA Honor Award for Harrison West, Valparaiso, Indiana
- ASLA Honor Award for New Lenox Commons, New Lenox, Illinois (Planning and Analysis)
- ASLA Honor Award for Peck Farm Park, Geneva, Illinois (Design)
- ASLA Honor Award for Peck Farm Park, Geneva, Illinois (Planning and Analysis)
- Gold Key Award for Pheasant Run Trails, St. Charles, Illinois (Multi-family, Land Planning)
- Gold Key Award for Pheasant Run Trails, St. Charles, Illinois (Multi-family, Landscape Architecture)
- American Planning Association Award for St. Charles Park District Comprehensive Master Plan, St. Charles, Illinois (Environmental protection, greenway linkages and property acquisition.)
- American Planning Association Award for Innovation in Growth Management, Village of New Lenox Comprehensive Plan, New Lenox, Illinois
- Silver Key Award for Wesmere, Joliet, Illinois (Land Planning-Mixed-use Development)
- Gold Key Award for The Oaks, Waterford Homes, Inc., (Multi-family, Landscape Architecture)
- Gold Key Award for Prairie Crossing, Grayslake, Illinois (Single-family Land Planning)
- ASLA Honor Award for Mill Creek, Kane County, Illinois with Design Workshop (Environmentally Sustainable Community and Smart Growth Example)
- Nat'l. Association of Homebuilders Certificate of Recognition for Prairie Crossing, Grayslake, IL
- ASLA Honor Award for Prairie Crossing, Grayslake, Illinois, with Peter Walker of William Johnson & Partners (Environmentally Sustainable Community)
- Bronze Key Award for The Hamlet of Season's Ridge, Montgomery, Illinois (Landscape Architecture, Single-family Development)
- Bronze Key Award for Willowgate on the River, St. Charles, Illinois (Landscape Architecture, Multi-family Planning)
- Silver Key Award for Willowgate on the River, St. Charles, Illinois (Land Planning - Multi-family)
- Silver Key Award for Eaglebrook, Geneva, Illinois (Mixed-use Planning)
- Gold Key Award for Georgetown II, Batavia, Illinois (Multi-family Planning)
- Gold Key Award for Lakeview Estates, Oswego, Illinois (Mixed-use Development)
- ILCA Silver Award, Kahn Residence
- ASLA Merit Award for Campton Hills PUD, Kane County, Illinois

- Bronze Key Award for Seasons Ridge, Montgomery, Illinois (Land Plan, Mixed-use Development)
- Bronze Key Award forThe Timbers, St. Charles, Illinois (Mixed-use Development)
- Silver Key Award for Brunswick Manor Homes, St. Charles, Illinois (Attached 1,201-1,500 sq. ft.)
- Silver Key Award for Windcrest, Oswego, Illinois (Single-family Detached over 2,500 sq. ft.)
- Silver Key Award for Windcrest, Oswego, Illinois (Single-family 2,000-2,500 sq. ft.)
- Silver Key Award for Butterfield, Aurora, Illinois (PUD Mixed-use)
- Merit Award, Builders Choice for Settlers Cottage, Galena, Illinois
- Merit Award, Builders Choice for the Farmsteads, Galena, Illinois

## Special Plans

- Springfield Road Corridor Study, Winnebago County/Rockford, Illinois
- Route 31/34 Corridor Study, Oswego, Illinois
- Village Station – Phase I Commuter Parking Study, Valparaiso, Indiana
- New Lenox Open Space Plan, New Lenox, Illinois
- Cedar Road Corridor Study with Metro Transportation, New Lenox, Illinois
- Orchard Road Corridor Study, Montgomery, Illinois
- Beloit Industrial Plan, Beloit, Wisconsin
- Milwaukee Avenue/Route 45 Corridor Study, Vernon Hills, Illinois

## Golf Course Projects

- Eagle Brook Country Club, Geneva, Illinois
- White Eagle Club, Aurora/Naperville, Illinois
- Orchard Valley, Aurora, Illinois
- Blue Island Landfill Golf Course, Blue Island, Illinois
- Bryn Mawr Golf Club. Dowagiac. Michigan
- Sand Creek Country Club, Chesterton, Indiana
- Techny Landfill Golf Course, Lake County, Illinois
- Settlers Hill Landfill Golf Course, Geneva, Illlinois
- Galena Territory, Galena, Illinois

## Comprehensive Plans

- Village of Oswego, Illinois
- Village of New Lenox, Illinois
- St. Charles Park District, St. Charles, Illinois
- City of Beloit, Wisconsin
- City of Beloit Park Master Plan, Beloit, Wisconsin
- City of Sycamore, Illinois
- City of Yorkville, Illinois
- Village of Montgomery, Illinois
- Village of Maple Park, Illinois
- Village of North Aurora, Illinois

## Zoning Ordinances

- Village of Montgomery, Illinois
- Village of North Aurora, Illinois
- Village of Maple Park, Illinois
- Village of East Dundee, Illinois

## Traffic Experience

- Development of land use, transportation, and access improvements for the Route 21 and Route 45 corridor in Vernon Hills, Illinois
- Landscape beautification, signage, lighting and pavement for Hough Street (Route 59) through Barrington, Illinois
- Comprehensive plan and traffic thoroughfare plan for North Aurora, Illinois with special emphasis on Interstate 88 and the Orchard Road and Randall Road corridors

- Comprehensive plan and traffic thoroughfare plan for Montgomery, Illinois located in Kane and Kendall County
- Master roadway network for the 6,500 acre Galena Territory to include major arterial development access and minor subdivision roads

## Seminars "Presentations/Speaking Engagements"
- Sugar Grove Chamber of Commerce & Industry – Living Green
- W.C.R.T., Inc. (Investment Group) -- "Dirt to Reality"
- Ohio-Kentucky-Indiana Regional Planning Conference
- University of Illinois Professional Development Class - I
- University of Illinois Professional Development Class - II
- Northern Indiana Planning Commission – Environmental Design Conference
- Wisconsin Community Development Institute, "Development without Sprawl"
- Kane County Bar Association's Municipal Law Committee's Seminar, "Stand By Your Plan"
- Iowa Chapter, ASLA Spring Conference, "Midwestern Communities"
- Graduate Builders Institute, Illinois State University
- Home Builders Association of Greater Chicago, Seminar on Land Planning: "Land Development"
- Landscape Buyer - Meet the Experts
- AIA National Housing Conference, New Towns - The Debate
- Home Builders Association of Greater Chicago, Land Development I
- Home Builders Association of Greater Chicago, Land Development II
- Home Builders Association of Greater Chicago, Land Development III
- AIA National Housing Committee Fall Conference
- Kane County Bar Association, Continuing Legal Education Program – I
- Kane County Bar Association, Continuing Legal Education Program - II

## Publications
- HBAGC Building America's Dream and APA Newsblast -- "The Conservation Approach to Residential Development"
- Urban Land Institute - "Cost Effective Site Planning Commercial Investment"
- Real Estate Journal - "Practical Wetlands Planning Enhances Development"
- MSW Management - "Is Your Waste Facility a Good Neighbor"

## Expert Witness Testimony

### Condemnation – Highest and Best Use - Takings
- The Old Second National Bank of Aurora vs. The City of Aurora (Business Rezoning)
- Harrison Street & Chalmers Street/City of Geneva vs. Distinctive Properties (Multi-family Rezoning)
- Oliver Hoffmann Construction vs. Villa Park (Land Use after ROW Taking)
- DuPage County Forest Preserve vs. LaSalle National Bank (Butterfield) (Highest and Best Use Before Condemnation)
- Ivan Seppell & Marilee Seppell vs. The City of Aurora (Business Variation)
- IDOT vs. LaSalle National Bank & Trust, Wood Dale (Forest Creek) (Land Use After Taking)
- Guardian Pipeline, LLC vs. 976 Acres Land Owners, et al (Highest and Best Use)
- Harris Bank of Hinsdale vs. County of Kendall (Milbourne) (Residential Rezoning)
- Kane County Division of Transportation vs. Aurora Community Church (Damage to the Remainder After ROW Taking)
- IDOT vs. LaSalle National Bank (Heartland) (Highest and Best Use, Damage to the Remainder After ROW Taking)
- Deno Melchiorre vs. Village of South Elgin (Concord on the Fox) (Residential Rezoning)
- Guardian Pipeline, LLC vs. Vidican & McShane (Highest and Best Use for Pipeline)
- Kane County FPD vs. Harris Property, Nelson Lake (Highest and Best Use Before Condemnation)
- IDOT vs. Smith, Route 38 & County Line Road (Damage to the Remainder After ROW Taking)
- IDOT vs. Bartoszek, Lockport, Will County, Illinois (Land Use after ROW Taking)

- Kane County Forest Preserve District vs. Old Second National Bank of Aurora as Trustee (highest and best use testimony for condemnation)
- Blazek Special Use Zoning Case, Cook County, Illinois (the first approved zoning for an elderly day care in a residence in Cook County)
- Valley Run Stone, Kendall County, Illinois (Application for M-3 Earth Material Extraction, Processing & Site Reclamation and Proposed Special Use for Ready-Mix Cement Plant/Asphalt Plant)
- Michigan Avenue and Roosevelt Road, City of Chicago (height, character and use opinion regarding TIF District)
- Village of Lemont vs. Ganna Construction (Cook County ZBA petition to require review of permit)
- Dearborn-Buckingham Group (Cook County ZBA petition to rezone from single-family to townhomes)
- DeKalb County/Peace Road Condemnation (ROW taking and damage to remainder)
- Lincoln Inn, Batavia, Illinois (Highest and Best Use Zoning)
- Oliver Hoffman School District (Boundary change)
- Rosecranz Health Network (Annexation, Zoning and Special Use Permit)
- ISTHA vs. New Lenox State Bank (Highest and Best Use after ROW Taking)
- ISTHA Bridge Crossing, Lemont, Cook County/Will County, Illinois (Highest & Best Use)
- ISTHA vs. Handorf, Will County, Illinois (Highest &Best Use)
- IDOT vs. Ozinga, Will County, Illinois (Access and Highest and Best Use after ROW Taking)
- IDOT vs. Harris Bank Hinsdale Trust, Will County, Illinois (Access and Highest and Best Use after ROW Taking)
- ISTHA vs. McCarrin, Lemont, Illinois (Highest and Best Use damage to remainder)
- IDOT vs. LaSalle National Bank, Will County, Illinois (Access, Highest and Best Use, ROW Taking)
- IDOT vs. Heritage Trust Co., Will County, Illinois (Access, Highest and Best Use, ROW Taking)
- IDOT vs. Linkscorp, Inc., Tamarack Golf Course, Highway 59 Corridor, Naperville, Illinois (Highest and Best Use after ROW Taking)
- Burr Road/Silver Springs, Riemer, Kane County, Illinois (Rezoning)
- ISTHA vs. Chicago Title & Trust Co., Sprinkle Farm, Will County, Illinois (Highest and Best Use after ROW Taking)
- James Byrne (Walmart) vs. Village of Plainfield , Will County, Illinois (Highest and Best Use)
- IDOT vs. Sunnyside Partnership LP, Madison County, Illinois (Access and Highest and Best Use)

## Wind Energy
- Midwest Wind Energy, Dodge County, Wisconsin - Wind Farm Siting "Butler Ridge"
- Midwest Wind Energy, Bureau County, Illinois - Wind Farm Siting "Walnut Ridge"
- Porter County, Indiana – Text Review for County Ordinance
- Navitas, Winnebago County, Illinois – Permitted Special Use Ordinance
- Gamesa Energy USA, LLC, Livingston County, Illinois – Wind Farm Siting Special Use

## Zoning
- Testimony for all annexation or rezoning projects from 1981 through present, including large scale, mixed-use office, commercial and residential planned unit developments.

## Solid Waste Facility Testimony

### Transfer Stations
- Atlas Transfer Station, Crestwood, Illinois
- Garden City Transfer Station, Bensenville, Illinois
- Melrose Park Transfer Station, Melrose Park, Illinois
- Westmont Transfer Station, Westmont, Illinois
- Dukane/Crown Transfer Station, West Chicago, Illinois
- Bensenville Transfer Station, DuPage County, Illinois
- Freeport Transfer Station, Freeport, Illinois
- Woodland Transfer Station, Kane County, Illinois
- West DuPage Transfer Station, West Chicago, Illinois
- Planet Recovery Transfer Station, Chicago, Illinois

- Onyx Transfer Station, Evanston, Illinois –Improvement Plan
- Spaulding Road Transfer Station, Elgin Illinois
- Greenwood Transfer Station, Maywood, Illinois
- Batavia Transfer Station, Batavia, Illinois
- Crystal Lake Transfer Station, Crystal Lake, Illinois
- Bluff City Transfer Station, Elgin, Illinois
- Northlake Transfer Station, Northlake, Illinois
- Lake Transfer Station, Village of Round Lake Park, IL

## Landfills

- Settlers Hill, Geneva, Illinois – Siting, expansion (2)
- McHenry County Landfill, McHenry County, Illinois – Siting
- St. Joseph County Landfill, St. Joseph County, Indiana – Siting
- Lake County Landfill, Lake County, Illinois – Siting
- Prairie Hill, Whiteside County, Illinois – Siting
- LaSalle County Landfill, LaSalle, Illinois – Siting
- Lee County Landfill, Lee County, Illinois – Expansion
- Marseilles Landfill, Marseilles, Illinois – Siting
- Orchard Hills, Davis Junction, Illinois – Siting
- Spoon Ridge Landfill, Fairview, Illinois – Expansion
- Rochelle Landfill, Ogle County, Illinois –Expansion (2)
- Barton Landfill, Edwardsville, Illinois – Siting
- Prairie View Landfill, Joliet, Illinois – Siting
- Milam County Landfill, East St. Louis, Illinois–Expansion for Cover, Footprint & Height Expansion (2)
- CDT Landfill, Joliet, Illinois – Siting
- Envirofil of Illinois, Inc., Disposal Facility, McDonough County, Illinois – Expansion
- Streator Area Landfill, Streator, Illinois – Expansion
- C.I.D. Landfill, Chicago, Illinois – End Use Plan Alternatives
- Newton County Landfill, Newton County, Illinois –Expansion
- Woodland, South Elgin, Illinois – Expansion
- Clinton Landfill,  DeWitt County, Illinois – Expansion
- Kankakee Landfill, Kankakee County, Illinois – Expansion (2)
- Livingston Landfill, Livingston County, Illinois –Expansion
- Lee County Landfill, Lee County, Illinois – Siting
- Winnebago Landfill, Winnebago County, Illinois – Expansion
- Peoria Landfill-PDC No. 1, Peoria, Illinois – Hazardous Waste Siting
- Indian Creek Landfill, Tazewell County, Illinois – Footprint and Height Expansion
- Laraway Recycling and Disposal Facility, Will County, Illinois – Footprint and Height Expansion
- Rochelle Municipal Landfill #2, Rochelle, Illinois – Footprint and Height Expansion
- Peoria City/County - Landfill Expansion
- Fox Moraine, Yorkville, Illinois - Siting
- Willow Run Landfill, Kendall County, Illinois – Siting
- Willowhill Landfill, Kendall County, Illinois – Siting
- Willow Run Landfill #2, Kendall County, Illinois – Siting Review
- Roxana Landfill, Roxana, Illinois – Footprint and Height Expansion
- Veolia E.S. Zion Landfill, Zion, Illinois – Footprint and Height Expansion
- Winnebago Landfill- Baxter Road, Winnebago County, Illinois- Expansion

 **Lannert Group**

## MEMORANDUM

TO: Maxxam Partners, LLC

FROM: The Lannert Group, Inc.

DATE: August 12, 2015

**SUBJECT: SPECIAL USE PETITION-PROPOSED ALCOHOLISM AND SUBSTANCE ABUSE TREATMENT FACILITY**

INTRODUCTION

The Lannert Group was retained by Maxxam Partners, LLC to undertake an independent analysis to determine if the Special Use of the proposed alcoholism and substance abuse treatment facility will "impede the normal and orderly development and improvement of surrounding property for uses permitted in the district".

This memorandum addresses the specifics of Section 4.8-2 (C) of the Kane County Zoning Ordinance as stated above. The Subject Site is located at 41W400 Silver Glen Road in Unincorporated Kane County, formerly operated as the Glenwood Academy for Boys. The Lannert Group provided planning, landscape architecture, and expert witness testimony at the original entitlement hearings.

The methodology used to evaluate the effect of the proposed alcoholism and substance abuse treatment facility on the adjacent properties and surrounding area included the following.

1. Review of reports and documentation prepared by the other consultants.
2. Gathering and review of the jurisdictional authority's, plans, and ordinances.
3. Obtaining an aerial photograph of the site.
4. Preparation of an exhibit reflecting the information gathered.
5. Field reconnaissance of the area to verify existing conditions.
6. Prepare a Memorandum to summarize the findings.

The Aerial Photograph Exhibit was prepared to clearly and precisely convey the context of the property within the surrounding area. The aerial photograph was obtained from Google Earth, flown April 2, 2013.

The true scale of the Exhibit is 1"=800'; and North is to the top. The Subject Site is outlined in yellow, and shaded in green, for reference. A one and one-half mile study area was determined to include sufficient area (4,523 acres) to evaluate impact. The information gathered from the jurisdictions was graphically shown. The Village of Campton Hills is outlined and shaded in orange. The City of Elgin is outlined and shaded in blue. Unincorporated Kane County retains the base aerial background. In addition to the corporate limits, major roadways and zoning district boundary lines were depicted. The purpose of the completed exhibit is to provide context and clarity in order to evaluate opportunities or constraints that exist or could occur as a result of the granting of the Special Use.

EXECUTIVE SUMMARY

Based on our analysis and findings, it is the opinion of the Lannert Group that the proposed classification ("Hospital, Nursing and Convalescent Home" and text allowing "other uses similar to those permitted herein as special uses") satisfies the Special Use requirements and will not impede the normal and orderly development and improvement of surrounding property for uses permitted in the district.

- ❖ The existing corporate limits of the surrounding communities (the Village of Campton Hills and City of Elgin), control the future development of the area.

- ❖ Established uses in the area and permitted rights of the underlying zoning (by jurisdiction), dictate future development.

- ❖ The historical open space policies of the jurisdictions, the existing open space commitments on site, and the Forest Preserve holdings, prevent any transitional impact on adjacent properties.

- ❖ The self-contained, inward orientation of the existing facility, will not effect future development.

- ❖ "Hospital, Nursing and Convalescent Home" with the text allowing "other uses similar to those permitted herein as special uses" is an appropriate classification for the proposed Special Use in the Farming District.

DEVELOPMENT TRENDS

An analysis of the potential future development of the site and surrounding area needs to be reviewed within the context of the jurisdictional boundaries of the neighboring communities. The one and one-half mile study area (shown on Exhibit 1) provides this opportunity. The initial overview of the aerial appears to indicate that the agriculture and open space existing uses are the established trends in the area. While this fact exists presently, and could remain over time, it does not establish the character of the future trend of development in the area. The corporate limit lines shown on the plan will dictate the future uses in the area. Corporate limits shift the land use control from the County to the municipalities.

The corporate limits of the adjacent communities control future development. As shown, the Village of Campton Hills (outlined and shaded in orange) controls the majority of land in the area (48.3%). A small portion of the proposed Special Use Petition is contiguous to the corporate limits of the Village of Campton Hills. The corporate limits of the City of Elgin are outlined and shaded in blue and account for 11.9% of the area. These corporate limits generally surround the site on the north, south, and west. The boundary of the site is surrounded by the Forest Preserve District of Kane County (shaded in green, 522 acres), 246 acres of which are part of the unincorporated land within the County that comprises 37.2% of the area studied. With the exception of the County Forest Preserve adjacent to the site, most of the unincorporated County land exists at the outer edges of the study area and will not affect the future development in proximity of the subject site. In conclusion, the effect of the County's granting of this special use will not (cannot) limit possible future development in the area.

PERMITTED USES

The established uses in the area and the permitted underling zoning categories have limited, to the greatest extent, any potential effect of the proposed special use on surrounding properties. Both the Marous & Company, and Poletti Associates studies evaluate, through specific analysis, the suitability of the proposed alcoholism and substance abuse treatment facility. Land use compatibility exists through adjacent zoning and reinforces the suitability of their opinions. A focused review of the underlying existing zoning within the corporate limits of Elgin identifies definitive open space buffers surrounding the site. The PCF (Public Community Facilities) District created, as part of the entitlements for the annexation buffers, this proposed special use site (north, south, and west). The result of this land use authority protects both the existing property (now vacant) and future development in the area.

The intent of the zoned buffers in the city complements the existing natural features on the periphery of the special use property. The interface between zoning classifications and the on-site protected areas (soils, drainage, and vegetation) of the proposed special use insure on and off-site transitional compatibility. Permitted rights have established the trend and character of development in the adjacent and surrounding area.

OPEN SPACE

Kane County Land Resource Management Plans have been focused on issues that address County priorities. The previous 2020 plan highlighted the value of open space and protection of agriculture. The current 2040 plan focuses on healthy living and quality of life and wellness. The existing campus environment supports these goals and objectives.

The value and protection of open space and agricultural land uses have long been, and continue to be, a guiding principal in Kane County. The previous Kane County Land Resource Management Plan specifically identified protection of open space and prime farm land. This goal was implemented through the corridor concept. The current Kane County Land Resource Management Plan focuses on healthy living as a result of protecting prime farm land and open spaces. Additionally the plan generally seeks to direct future development inwardly towards infill, rather than encouraging leap frog development scattered through the County. In addition to the County policies, the Village of Campton Hills also encourages protection of natural features (vegetation, soils, and drainage) through their policies, ordinances and regulations. As a specific example, the zoning classifications in the Village of Campton Hills promotes large lot sizes in an attempt to create open space on each home-site (lot) and perpetuate the rural atmosphere of the Village. The Meissner Prairie-Corron Forest Preserve blends successfully with the Village's goals while implementing historic County open land commitments. Finally as a commitment and protection of open space in the area, this special use site itself protects open space. The protection is achieved in large measure as a result of the non-developable area reserved for the private utility system (land application). As described in the report by Schaeffer & Roland, Inc., this fully functioning utility system relies on open space. Approximately 70% of the special use site (plus or minus 74 acres) will remain open to accommodate the utility

system, surface drainage, soil conditions, wood lots, hedge rows, and open space as an amenity feature of the proposal.


## SITE FEATURES

The previous sections of this analysis have focused on the context of the proposed alcoholism and substance abuse treatment facility. The discussion of the Site Features is to depict that even though the external influences have been determined to support the proposed special use for the site, the site itself is appropriate for the intended use. The evaluation of the existing physical buildings for the intended use has been well documented in the petition. This detailed analysis establishes that "what you see is what you get" and eliminates any concerns of the unknown regarding the continued normal and orderly future development. The existing facility, in the past, has not impeded or impacted growth. Both the communities of Elgin and the Village of Campton Hills have encroached on the borders of the property subsequent to its construction and indicates the unrestricted and continuing growth and development of the area. Contributing to the successful blending of the facility with the surrounding area is its inward orientation. The residential structures, common elements, and administrative functions are grouped into an operational entity that can manage, maintain, and provide the professional service envisioned within a protected self-contained environment. The single access point on Silver Glen Road and the loop street internal access allows for controlled and supervised traffic flow internally and externally. These elements mitigate any effect on adjoining properties, while providing efficient external access to the facility and protection of internal security within the facility. The report by Kening, Lindgren, O'Hara, Aboona, Inc. (KLOA) addresses these features and supports the basis for compatibility. A final attribute of the site's suitability rests in the natural features that are adjacent to the Elgin zoning classification (PCF). The plus or minus 74 acres of the special use site mirrors the permitted uses in the area. The special use petition will maintain the existing open space element onsite. Without any changes, the proposal perpetuates the permitted uses in the district and the surrounding area. As a physical factor of the above commitment, the open space, on site, reflects limitations additionally due to regulations, which will control development on unsuitable soils, within major drainage ways on required land application surface areas, and protection of existing vegetation. As enumerated above, the self-contained features of the site will not affect or impede the normal and orderly development or improvement of the surrounding property for the uses permitted.


## TERMINOLOGY

Included in the Lannert Group's planning analysis of the site, is the knowledge and experience of the operational aspects of the facility. As an element of the Lannert Group's evaluation, the reports regarding terminology were reviewed. Convincing opinions have been presented by Murer Consultants, Inc., Holland & Knight and Meyers & Flowers. All consultants have properly concluded, through their detailed analysis, that the facility will function like a "Hospital, Nursing and Convalescent Home" with the text allowing "other uses similar to those permitted herein as special uses" and as such, is an appropriate use as defined by the County Ordinances. Through years of planning experience in Kane County and its communities, and the preparation of many Zoning Ordinances and Comprehensive Plans, I can, without question, support their findings. The same end point can be a comfortable reach by working backward. The proposed

facility does not have the characteristics or the functionality of a single-family home, a multiple-family dwelling, and certainly does not appear to be a commercial or industrial use with massive parking lots and loading docks.

When the original Glenwood School was entitled, it was presented as a desirable self-contained, mixed-use concept; like a school, a camp, a resort, but mostly like a park. Over the functioning years of use, it achieved those multiple uses. This proposal seeks to re-establish the mixed-use, agreeably with a twist, that was appropriate then and is appropriate now. The determination that the proposed alcoholism and substance abuse treatment facility is properly defined as a "Hospital, Nursing and Convalescent Home" or "other uses similar to those permitted herein as special uses" is consistent with this report.

CONCLUSIONS

Based on its analysis, and shown in the following findings, the Lannert Group believes that the proposed Special Use will not affect the normal or future development of the surrounding area.

- ❖ The existing corporate limits of the surrounding communities (the Village of Campton Hills and City of Elgin), control the future development of the area.
- ❖ Established uses in the area and permitted rights of the underlying zoning (by jurisdiction) dictate future development.
- ❖ The historical open space policies of the jurisdictions, the existing open space commitments on site, and the Forest Preserve holdings, prevent any transitional impact on adjacent properties.
- ❖ The self-contained, inward orientation of the existing facility, will not affect future development.
- ❖ "Hospital, Nursing and Convalescent Home" or "other uses similar to those permitted herein as special uses" is an appropriate classification of a proposed Special Use in the Farming District.

This report is based upon the normal and general planning principles that evaluate land use compatibility. The continuing development trends and local community land use decisions that have occurred over the decades serve to reinforce my professional opinion rendered years ago and restated as part of this proposal. The normal and orderly development that has occurred will continue and will not be effected as a result of this proposal.

Best Regards,

J. Christopher Lannert

# APPENDIX

## Site Data Chart

| | Acres | Percent |
|---|---|---|
| Area of Site ($\pm$ 34 Loop, $\pm$ 86 Open) | 120 | 2.6 |
| Area in the City of Elgin | 538 | 11.9 |
| Area in Unincorporated Kane County | 1,684 | 37.2 |
| Area in the Village of Campton Hills | 2,181 | 48.3 |
| | | |
| TOTALS | 4,523 | 100 |
| | | |

Case: 1:17-cv-05707 Document #: 106 Filed: 11/30/18 Page 329 of 346 PageID #:2652



Exhibit 3

STATE OF ILLINOIS

COUNTY OF KANE

### ORDINANCE APPROVING THE CONSENT DECREE AND SETTLEMENT AGREEMENT WITH MAXXAM PARTNERS, LLC AND GLENWOOD ACADEMY AND GRANTING A SPECIAL USE AS DESCRIBED IN PETITION NO.＿＿＿

WHEREAS, on August 28, 2015, Maxxam Partners, LLC (hereinafter "Maxxam"), filed an application for a special use permit to operate an alcoholism and substance abuse treatment facility on property located at 41 W 400 Silver Glen Road, St. Charles, Illinois 60175 (hereinafter the "Property"), and owned by co-applicant Glenwood Academy (hereinafter "Glenwood");

WHEREAS, the Property is identified under parcel numbers 08-03-100-109; 05-34-300-032; 05-34-400-025, and the legal description of the property is attached hereto as Exhibit 1, which is expressly incorporated herein by this reference;

WHEREAS, the County Zoning Officer designated the application submitted by Maxxam as Petition 4364 (hereinafter "Petition 4364") and properly scheduled public hearings before the Kane County Zoning Board of Appeals pursuant to the Kane County Zoning Ordinance and Illinois law, a record of which can be found on the County website or otherwise made available for public inspection;

WHEREAS, on May 9, 2017, the Kane County Board denied Petition 4364;

WHEREAS, on August 4, 2017, Maxxam and Glenwood filed a lawsuit in federal court against the County, County Board and Zoning Board, challenging the County Board's denial of the special use permit under federal and state law and seeking monetary, declaratory and injunctive relief (hereinafter the "Lawsuit");

WHEREAS, the County Defendants denied and still deny liability and damages as claimed by Maxxam and Glenwood;

WHEREAS, to avoid the uncertainty, delay and expense of complicated litigation, the parties to the Lawsuit have agreed that: (i) Maxxam should re-file, and the County should again consider, Maxxam's application for a special use permit to operate an alcoholism and substance abuse treatment facility (the "Facility") on the Property; and (ii) the dispute between them should be resolved upon the terms and conditions set forth in the proposed Settlement Agreement and Consent Decree attached hereto as Exhibits 2 and 3, respectively.

WHEREAS, in settling the Lawsuit, the parties recognize and acknowledge that the County Defendants do not admit liability and dispute that they are liable to Maxxam and Glenwood for any of the claims and allegations in the Lawsuit;

WHEREAS, Maxxam re-filed its application for a special use permit to operate the Facility on the Property, and incorporated therein its application and all supporting materials filed previously as Petition 4364;

WHEREAS, the County Zoning Officer designated the re-filed application submitted by Maxxam as Petition _____ (hereinafter "Petition _____") and properly scheduled a public hearing before the Kane County Zoning Board of Appeals;

WHEREAS, the Kane County Zoning Board of Appeals properly conducted a public hearing pursuant to the Kane County Zoning Ordinance and Illinois law during which it incorporated the complete public record from Petition 4364 and heard additional testimony and comments; a record of which public hearing can be found on the County website or otherwise made available for public inspection;

WHEREAS, the County Board has considered the public record and the findings and recommendations of the Kane County Zoning Board of Appeals concerning Petition _____;

WHEREAS, as set forth in Paragraph 2 of this Ordinance, the County Board has determined that Petition _____, as modified by the terms and conditions set forth in the proposed Settlement Agreement and Consent Decree, including but not limited to the conditions as set forth in the attached Exhibit 4 to this Ordinance: (i) satisfies all of the standards set forth in Sections 4.8-2(a) through 4.8-2(f) of the Kane County Zoning Ordinance for the approval of a special use permit to operate the Facility on the Property; and (ii) complies with all applicable provisions of the Zoning Ordinance;

WHEREAS, as part of the settlement, and pursuant to the requirements of Section 4.8 of the Kane County Zoning Ordinance, including Section 4.8-2(a) – (f), the County has agreed to grant Petition _____ subject to the terms and conditions set forth in the proposed Settlement Agreement and Consent Decree and in this Ordinance.

NOW, THEREFORE, BE IT ORDAINED by the County Board of Kane County, Illinois, as follows:

1   That the County Board of Kane County hereby ratifies and approves, and the Chairman or other authorized representative of the County of Kane has the authority to execute all necessary documents associated with, the proposed Settlement Agreement and Consent Decree in the form attached hereto as Exhibits 2 and 3, respectively, and incorporated herein by this reference.

2   That the County Board of Kane County hereby specifically finds, with respect to Petition _____, that all applicable procedures and requirements for the review and consideration of Petition _____ under the Kane County Zoning Ordinance and under Illinois law have been fully and properly satisfied.

3   That the County Board of Kane County hereby specifically finds, with respect to Petition _____, as modified by the terms and conditions set forth in the proposed Settlement Agreement and Consent Decree, including but not limited to the conditions as set forth in the attached Exhibit 4 to this Ordinance, that the establishment, maintenance and operation of the Facility on the Property (a) will not be unreasonably detrimental to or endanger the public health, safety, morals, comfort or general welfare; (b) will not be injurious to the use and enjoyment of other property in the immediate vicinity for the purposes already permitted, nor substantially diminish and impair property values within the neighborhood; and (c) will not impede the normal and

orderly development and improvement of surrounding property for uses permitted in the district; and the County Board of Kane County further specifically finds that (d) adequate utility, access roads, drainage and/or other necessary facilities have been or are being provided on the Property; (e) adequate measures have been or will be taken to provide ingress and egress so designed as to minimize traffic congestion in the public streets and roads; and (f) the Facility, in all other respects, conforms to the applicable regulations of the district in which it is located, except as such regulations are modified by the County Board pursuant to this Ordinance.

4    That a special use permit to operate the private-pay alcoholism and substance abuse treatment Facility on the Property is hereby granted to Maxxam, and is hereby approved under the provisions of Section 4.8 of the Kane County Zoning Ordinance, including Section 4.8-2(a) – (f), and subject to the terms and conditions set forth in the proposed Settlement Agreement and Consent Decree, including but not limited to the conditions as set forth in the Attached Exhibit 4 to this Ordinance.

5    That the zoning maps of Kane County, Illinois shall be, and are hereby amended to reflect the relief granted in this Ordinance.

6    This Ordinance shall be in full force and effect from and after its passage and approved as provided by law.

Passed by the Kane County Board on August 14, 2018.

_____          _____
John A. Cunningham                                Christopher J. Lauzen or Other Authorized
Clerk, County Board                               Board Representative
Kane County, Illinois                             Chairman, County Board
                                                  Kane County, Illinois

Vote:

**Exhibit 1**

**To Ordinance Approving the Consent Decree and Settlement Agreement with Maxxam Partners, LLC and Glenwood Academy and Granting a Special Use as Described in Petition No. _____**

THAT PART OF THE SOUTH HALF OF SECTION 34, TOWNSHIP 41 NORTH, RANGE 7 EAST OF THE 3rd PRINCIPAL MERIDIAN AND PART OF THE NORTH HALF OF FRACTIONAL SECTION 3, TOWNSHIP 40 NORTH, RANGE 7 EAST OF THE 3rd PRINCIPAL MERIDIAN ALL DESCRIBED AS FOLLOWS: COMMENCING AT THE NORTHWEST CORNER OF THE SOUTHWEST QUARTER OF SECTION 35, TOWNSHIP 41 NORTH, RANGE 7 EAST OF THE 3rd PRINCIPAL MERIDIAN, THENCE EASTERLY ALONG THE NORTH LINE OF SAID SOUTHWEST QUARTER 339.90 FEET; THENCE SOUTHERLY TO THE SOUTHWEST CORNER OF THE SOUTHWEST QUARTER; THENCE NORTHERLY ALONG THE LAST DESCRIBED COURSE 980.77 FEET TO THE CENTER LINE OF MCDONALD DRIVE; THENCE NORTHWESTERLY AND WESTERLY ALONG SAID CENTER LINE 2884.59 FEET TO A POINT THAT IS 62.70 FEET WESTERLY OF THE EAST LINE OF THE SOUTHWEST QUARTER OF SAID SECTION 34 (MEASURED ALONG SAID CENTER LINE) BEING THE NORTHEAST CORNER OF A TRACT OF LAND CONVEYED TO HENRY O. LARSON AND ELIZABETH V. LARSON BY DEED RECORDED AS DOCUMENT 648085; THENCE SOUTHERLY ALONG THE EASTERLY LINE OF SAID LARSON TRACT 776.0 FEET TO A POINT THAT IS 10.0 FEET NORTHERLY OF THE SOUTHEAST CORNER OF SAID LARSON TRACT; THENCE EASTERLY PARALLEL WITH THE SOUTH LINE OF SAID LARSON TRACT 24.85 FEET; THENCE SOUTHEASTERLY ALONG A LINE FORMING AN ANGLE OF 68°59'52" WITH THE PROLONGATION OF THE LAST DESCRIBED COURSE (MEASURED CLOCKWISE THEREFROM) 101.12 FEET; THENCE SOUTHERLY ALONG A CURVE TO THE RIGHT HAVING A RADIUS OF 210.0 FEET, TANGENT TO THE LAST DESCRIBED COURSE 104.64 FEET; THENCE SOUTHWESTERLY ALONG A CURVE TO THE RIGHT HAVING A RADIUS OF 390.0 FEET, TANGENT TO THE LAST DESCRIBED CURVE, 90.98 FEET; THENCE SOUTHWESTERLY TANGENT TO THE LAST DESCRIBED CURVE 104.0 FEET; THENCE SOUTHERLY ALONG A CURVE TO THE LEFT HAVING A RADIUS OF 360.0 FEET TANGENT TO THE LAST DESCRIBED COURSE 94.87 FEET TO A LINE DRAWN PARALLEL WITH AND 59.25 FEET NORTHERLY OF THE SOUTH LINE (MEASURED AT RIGHT ANGLES THERETO) OF THE SOUTHWEST QUARTER OF SAID SECTION 34 FOR A POINT OF BEGINNING; THENCE EASTERLY ALONG SAID PARALLEL LINE 336.05 FEET; THENCE SOUTHEASTERLY ALONG A LINE FORMING AN ANGLE OF 157°06'37" WITH THE LAST DESCRIBED COURSE (MEASURED COUNTERCLOCKWISE THEREFROM) 1418.0 FEET; THENCE SOUTHERLY ALONG A LINE FORMING AN ANGLE OF 122°50'43" WITH THE LAST DESCRIBED COURSE (MEASURED COUNTERCLOCKWISE THEREFROM) 892.0 FEET; THENCE SOUTHWESTERLY ALONG A LINE FORMING AN ANGLE OF 99°11'29" WITH THE LAST DESCRIBED COURSE (MEASURED COUNTERCLOCKWISE THEREFROM) 1863.0 FEET; THENCE NORTHWESTERLY ALONG A LINE FORMING AN ANGLE OF 142°54'33" WITH THE LAST DESCRIBED COURSE (MEASURED COUNTERCLOCKWISE THEREFROM) 1448.0 FEET; THENCE NORTHERLY ALONG A LINE FORMING AN ANGLE OF 117°39'28" WITH THE LAST DESCRIBED COURSE (MEASURED COUNTERCLOCKWISE THEREFROM) 867.0 FEET; THENCE NORTHERLY ALONG A LINE FORMING AN ANGLE OF 172°26'59" WITH THE LAST DESCRIBED COURSE (MEASURED COUNTERCLOCKWISE THEREFROM) 741.0 FEET TO SAID PARALLEL LINE; THENCE EASTERLY ALONG SAID

PARALLEL LINE 1514.95 FEET TO THE POINT OF BEGINNING, IN KANE COUNTY, ILLINOIS. The property is located at 41W400 Silver Glen Road.

**Exhibit 4**

**To Ordinance Approving the Consent Decree and Settlement Agreement with Maxxam Partners, LLC and Glenwood Academy and Granting a Special Use as Described in Petition No. _____**

1. Maxxam and the Facility shall obtain all necessary licenses from the State of Illinois prior to start of operation and shall maintain such licenses in good standing during any period of operation. In connection therewith, Maxxam shall comply with the legal and administrative requirements of the Department of Human Services Division of Alcoholism and Substance Abuse Treatment and Intervention Licenses ("DHS"), found at 77 Illinois Administrative Code, Subchapter d, Part 2060 ("Code"), to the satisfaction of Department of Human Services. These requirements shall include, but are not limited to, all restrictions, obligations, undertakings, and requirements of Part 2060 (77 Ill. Admin. Code 2060) that govern any of the following:

   a. Organization representative and ownership disclosure (see Section 2060.207, 209);
   b. License application, period of licensure, renewal, change of ownership/management, and dissolution (see Sections 2060.211, 213, 215, 217, 219, 221, 223, 225, 227);
   c. Facility requirements (see Section 2060.305), including those requiring proof of compliance with all local and State health, safety, sanitation, building and zoning codes (see Section 2060.305(a)(1)) and life safety codes (see Section 2060.305(a)(2)), and those pertaining to emergency and disaster planning and preparedness (see Section 2060.305(c));
   d. Records retention (see Section 2060.307);
   e. Staff qualifications, training, and personnel requirements and procedures (see Section 2060.309, 311, 313);
   f. Quality improvement (see Section 2060.315);
   g. Emergency patient care (see Section 2060.327);
   h. Incident reporting (see Section 2060.331);
   i. Inspections (see Section 2060.335);
   j. Medical services (see Section 2060.413);
   k. Infectious disease control (see Section 2060.415);
   l. Patient assessment, screening and treatment planning (see Section 2060.417, 419, 421, 423); and
   m. Continuing recovery planning and discharge (see Section 2060.427).

2. To the extent permitted by law, Maxxam shall provide Kane County or its designee with 150 doses of NARCAN (Naloxone) or similar mutually agreeable medication per year for a total of 1,500 doses for a 10-year period, starting on the date one month after the start of operation and thereafter on the annual anniversary of such date.

3. The Special Use Permit approved by this Ordinance specifically and solely applies to the use and operation of all existing buildings on the subject Property as depicted on the site plan labeled "Maxxam Partners, LLC – Site Plan" and as described in the Application and Rider (Exhibit 2 to the Consent Decree). A copy of "Maxxam Partners, LLC – Site Plan" is separately attached and incorporated into the Consent Decree as Exhibit 5.

4.  Should Maxxam or its successors or assigns desire to add new buildings the parties shall comply with all applicable review and approval procedures in the Kane County Zoning Ordinance, as well as all applicable Kane County Ordinances, Illinois law, and federal and state anti-discrimination laws.

5.  The Facility shall not provide outpatient treatment of methadone patients or any other outpatient program or service unless it is related to a patient's inpatient continuum of care.

6.  Maxxam agrees to provide a level of security that, in the opinion of Maxxam's retained security vendor, is sufficient to protect the facility's residents and the surrounding community.

7.  Maxxam shall comply with Change of Ownership/Management requirements in Section 2060.221 of the Code.   Section 2060.221 provides, among other things, that each license issued by the Department of Human Services is not transferable and becomes null and void when there is a change of ownership involving more than 25% of the aggregate ownership interest within a one-year period or a significant change in management. Maxxam agrees to contemporaneously provide the County Zoning Officer with a copy of any notifications sent to the Department of Human Services under Section 2060.221(b). Maxxam agrees to provide to any successor owner(s) a copy of this Ordinance.

8.  Maxxam shall use reasonable efforts to pursue accreditation for the Facility by the Joint Commission on Accreditation of Health Care Organizations ("JCAHO") and the Commission on Accreditation of Rehabilitation Facilities ("CARF").

9.  Maxxam and the Facility shall comply, as applicable, with all requirements of the Illinois Controlled Substances Act, 720 ILCS 520, and any other applicable federal, state or local law, regulation or code pertaining to the storage, distribution, disposal, and dispensation of any controlled substance.

10. Maxxam shall comply with the Professional Staff Qualifications requirement provided in Section 2060.309 of the Code.   Such compliance includes, in any medically managed or monitored detoxification service that at least one staff member, 24 hours a day, shall be a registered nurse, or a licensed practical nurse or certified emergency medical technician who has completed at least 40 hours of formal training in the field of alcoholism or other substance abuse.   Notwithstanding Section 2060.309's staffing requirements, Maxxam agrees to provide a Medical Director as referenced in Section 2060.413(a)(1) on premises at least 30 hours per week.

11. Within one year of the start of operation, Maxxam shall establish a foundation through the Community Foundation for the Fox River Valley for outreach to the Kane County community in connection with issues pertaining to substance abuse and addiction.   Maxxam will fund the foundation at a minimum level of $15,000 per year for a minimum of 10 years.

12. Maxxam shall comply with all applicable federal, state and local laws, regulations and codes pertaining to wastewater at its facility, including but not limited to the Wastewater Land Treatment Site Regulation Act, 415 ILCS 50/1, all related legal requirements of Kane County, and all related requirements of the Illinois and federal Environmental Protection Agency.   Maxxam shall provide to

the County any well monitoring/testing reports it receives from the Illinois or federal Environmental Protection Agency and/or any reports it receives from third-party vendors within 30 days of receipt.

13. Maxxam shall comply with Section 2060.305 (g) (1)-(24) of the Code's spacing requirements including that (a) a minimum of 80 square feet is provided in a single bedroom; (b) 60 square feet is provided per bed in a multi-bedroom with no more than four beds per room; and (c) no bunk beds will be used for any detoxification patient.

14. Maxxam shall install a fence substantially in compliance with Exhibit 6 to the Consent Decree. The fence shall be located and installed around the Property 5-yards inside the survey line except for designated floodplain areas, as indicated in Exhibit 6 to the Consent Decree, and across the private road/access drive. The fence shall be a minimum of 4 feet in height and shall be similar to the fence depicted in the photograph in Exhibit 7 to the Consent Decree.

15. Exterior lighting fixtures upon replacement of existing fixtures or upon installation of new fixtures shall be full cut-off and have a color temperature of less than 3,000 Kelvin, provided that such fixtures do not compromise security as determined by the security system provider.

16. All signage related to the Facility shall be restricted to the Property. Further, such signage or advertising shall not be placed on the water tower located on the Property.

17. Maxxam shall pay the Fox River & Countryside Fire/Rescue District or any entity providing emergency medical services (EMS) to the Subject Property, including through any mutual aid agreements (hereinafter collectively the "EMS Entity"), directly for all emergency transport fees for transports to or from the Property, according to the EMS Entity's regular cost recovery and fee schedule in effect at the time of the transport. Maxxam agrees that the EMS Entity can bill Maxxam directly for all such transport fees and that Maxxam shall pay such fees on behalf of its patients and residents directly to the EMS Entity.

# Exhibit 4

**EXHIBIT 4**

**(Report of Compliance)**

Kane County Development Department
Zoning Division, Kane County Gov't Center
219 Batavia Ave.
Geneva, Illinois 60134
Attn. Kane County Zoning Officer

**Re: 41W400 Silver Glen Rd., St. Charles, IL 60175**

To Whom It May Concern:

Pursuant to the terms of the Consent Decree, dated August _, 2018, Maxxam (or its successor) hereby confirms compliance with all the conditions contained therein. In particular, Maxxam confirms the following to the best of its knowledge and belief:

     1.     Maxxam has obtained all necessary licenses from the State of Illinois on _____. Since obtaining the necessary State licenses, Maxxam has maintain those licenses in good standing and with any revocation, suspension or other disciplinary actions.

     Maxxam confirms that it is in full compliance with all legal and administrative requirements of the Department of Human Services Division of Alcoholism and Substance Abuse Treatment and Intervention Licenses ("DHS"), found at 77 Illinois Administrative Code, Subchapter d, Part 2060 ("Code"), to the satisfaction of Department of Human Services.

     2.     Maxxam has provided Kane County or its designee with 150 doses of NARCAN (Naloxone) or similar mutually agreeable medication in the last 12 months.

     3.     Maxxam confirms that its use of the property is in compliance with the site plan labeled "Maxxam Partners, LLC – Site Plan" and as described in the Application and Rider (Exhibit 2 and 5 to the Consent Decree).

     4.     Maxxam has not added any additional buildings to the site without complying with all applicable review and approval procedures in the Kane County Zoning Ordinance.

     5.     Maxxam confirms that it is not providing outpatient treatment of methadone patients or any other outpatient program or service unless it is related to a patient's inpatient continuum of care.

     6.     Maxxam has retained a security vendor on _____. Maxxam confirms that it is providing a level of security that, in the opinion of this retained security vendor, is sufficient to protect the facility's residents and the surrounding community.

7.    Maxxam has had no change of ownership greater than 25% of the aggregate ownership interest or change in management [or Maxxam has provided the County Zoning Officer with a copy of any notifications sent to the Department of Human Services under Section 2060.221(b) and provided any successor owner(s) a copy of Ordinance ___ and the Consent Decree].

8.    Maxxam has obtained [ or used reasonable efforts to pursue] accreditation for the Facility by the Joint Commission on Accreditation of Health Care Organizations ("JCAHO") and the Commission on Accreditation of Rehabilitation Facilities ("CARF"). [Those reasonable efforts are as follows: _____.]

9.    Maxxam confirms that it has complied with all applicable requirements of the Illinois Controlled Substances Act, 720 ILCS 520, and any other applicable federal, state or local law, regulation or code pertaining to the storage, distribution, disposal, and dispensation of any controlled substance.

10.    Maxxam confirms that it has complied with the Professional Staff Qualifications requirement provided in Section 2060.309 of the Code, including that at least one staff member, 24 hours a day, is a registered nurse, or a licensed practical nurse or certified emergency medical technician who has completed at least 40 hours of formal training in the field of alcoholism or other substance abuse. Maxxam also confirms that it has exceeded Section 2060.309's staffing requirements in that it has provided a Medical Director as referenced in Section 2060.413(a)(1) on premises at least 30 hours per week.

11.    Maxxam confirms that it has established a foundation through the Community Foundation for the Fox River Valley for outreach to the Kane County community in connection with issues pertaining to substance abuse and addiction and has funded the foundation at a minimum level of $15,000 per year.

12.    Maxxam confirms that it has complied with all applicable federal, state and local laws, regulations and codes pertaining to wastewater at its facility, including but not limited to the Wastewater Land Treatment Site Regulation Act, 415 ILCS 50/1, all related legal requirements of Kane County, and all related requirements of the Illinois and federal Environmental Protection Agency. Maxxam has provided to the County any well monitoring/testing reports it receives from the Illinois or federal Environmental Protection Agency and/or any reports it receives from third-party vendors within 30 days of receipt.

13.    Maxxam has complied with Section 2060.305 (g) (1)-(24) of the Code's spacing requirements including that (a) a minimum of 80 square feet is provided in a single bedroom; (b) 60 square feet is provided per bed in a multi-bedroom with no more than four beds per room; and (c) no bunk beds will be used for any detoxification patient.

14.    Maxxam has installed and maintained a fence substantially in compliance with Exhibit 6 and 7 to the Consent Decree.

15.     Maxxam confirms that any new or replacement exterior lighting fixtures are full cut-off and have a color temperature of less than 3,000 Kelvin, provided that such fixtures do not compromise security as determined by the security system provider.

16.     Maxxam confirms that all signage related to the Facility is only on the Property and that no signage or advertising is on the water tower located on the Property.

17.     Maxxam confirms that it has paid the Fox River & Countryside Fire/Rescue District or any entity providing emergency medical services (EMS) to the Subject Property all emergency transport fees for transports to or from the Property, according to the EMS Entity's regular cost recovery and fee schedule in effect at the time of the transport on behalf of its patients and residents directly to the EMS Entity.

Maxxam understands and agrees that this report is not confidential and is subject to public disclosure.

**MAXXAM PARTNERS, LLC**


By:_____

Its:_____

Date:_____



SUBSCRIBED and SWORN to before

me this _____ day of _____, 2018.


_____
          NOTARY PUBLIC

# Exhibit 5



**LEGEND**

1  Executive Residence
2  Dining / Multipurpose Building
3  Therapy / Activity Center
4  Gymnasium
5  Patient Lodge #1
6  Patient Lodge #2
7  Patient Lodge #3
8  Patient Lodge #4
9  Patient Lodge #5
10 Patient Lodge #6
11 Patient Lodge #7
12 Patient Lodge #8
13 Lake

MAXXAM PARTNERS, LLC - SITE PLAN

Exhibit 6

